# EXHIBIT 1

EMMA SCHMIDT, ET AL. VS. CONAGRA FOODS, INC.

10/06/2017                                                   Hallie Meyer

```
 1                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT
 2

 3
       EMMA SCHMIDT AND HALLIE MEYER,   :
 4
                   PLAINTIFFS           :
 5                                      :   Civil Action NO.
       VS.                              :
 6                                      :
       CONAGRA FOODS, INC.,             :   3:14-CV-01816-SRU
 7                                      :
                   DEFENDANT            :
 8

 9

10            VIDEO DEPOSITION OF HALLIE MEYER

11

12
                      October 6, 2017
13

14

15                      HELD AT:

16       CARMODY, TORRANCE, SANDAK & HENNESSEY, LLP
                    195 Church Street
17            New Haven, Connecticut 06509

18

19
           Reporter:  Victoria L. Germani, RPR, LSR #262
20
                 Video Operator:  Ed Giovanni
21

22

23           BRANDON HUSEBY REPORTING & VIDEO
                    249 Pearl Street
24            Hartford, Connecticut 06106
                    (860)549-1850
25
```

EMMA SCHMIDT, ET AL. VS. CONAGRA FOODS, INC.

10/06/2017                                                                    Hallie Meyer

Page 82

1  had used that word; makes me wonder if you had a sense
2  of, you know, that it shouldn't be closer or something
3  like that.
4         I mean, was there something that you knew at the
5  time about where cooking spray should be located in
6  proximity to frying croquettes?
7     A.  I don't really know what you mean by that.
8     Q.  Okay.  It was not a very well-worded question.
9  Let me ask it a different way.
10        In your opinion what it -- what would
11 "unreasonably close" be?  What are you thinking of when
12 you say that?
13    A.  Within, like -- maybe this is six inches.
14 That -- that would seem (indicating).  I think I
15 wouldn't want it to be anywhere closer than that.
16    Q.  Okay.  And do you recall having used PAM cooking
17 spray at all on the day of the incident?
18    A.  I -- I believe we must have.  I'm not sure -- I
19 really don't -- I don't remember the other things that
20 we made besides the croquettes.
21        Yeah.  But we wouldn't have had it there if we
22 weren't using it for something.
23    Q.  Okay.  And would you -- but you don't
24 specifically recall using the cooking spray; is that
25 what you said?

Page 83

1     A.  I don't personally recall it.
2     Q.  Okay.  Do you have any memory of where -- so --
3  so where were you standing exactly at the time of
4  hearing the combustion sound?
5     A.  I was, like -- can I use the thing?
6     Q.  Yeah, certainly.
7     A.  I was like there.
8     Q.  Okay.  And do you want to mark an "X" with a pen
9  for the record.
10    A.  Yeah.  (So marked exhibit.)
11    Q.  Okay.  And do you have a -- do you know where
12 Emma Schmidt was at the time?
13    A.  Yeah.  She was standing behind me, like right
14 there.  (So marked exhibit.)
15    Q.  Okay.  And do you know what she was doing?  Do
16 you have any memory?
17    A.  I don't know what she was doing, no.
18    Q.  All right.  So once you heard the sound, you said
19 you left the house; is that right?
20    A.  Yes.
21    Q.  What's -- what do you remember after that?
22    A.  I remember I left, like, this way (indicating).
23    Q.  Okay.  Why don't you draw that on the -- on
24 there, too.  I think that would be helpful.
25    A.  (So marked exhibit.)

Page 84

1     Q.  And as I -- as I think about this, why don't you
2  write the -- your name and Emma's name next to the X's
3  on Defendant's Exhibit 1.
4     A.  (So marked exhibit.)
5     Q.  Okay.  Thank you.
6        MR. SMITH:  No.  I mean, write it legibly.
7        THE WITNESS:  Sorry.  This is all I got.
8  BY MS. AMBROSE:
9     Q.  Okay.  So -- okay.  So what -- sorry, I think --
10 so what do you recall -- what's the next thing you
11 remember after you -- after you left?
12    A.  I remember going outside to the, like, driveway.
13    Q.  Okay.  And do you remember -- just prior to
14 leaving do you specifically remember seeing Emma at all?
15    A.  Like, in the kitchen?
16    Q.  If she was -- assuming she was in the kitchen,
17 yeah.
18    A.  I -- I don't -- after the explosion I don't
19 remember seeing her until we got outside.
20    Q.  Okay.  Yeah, that's --
21    A.  Yeah.
22    Q.  -- that's what I'm asking is, you know --
23    A.  I don't know how she exited.
24    Q.  Okay.  Okay.  And is -- the last time you saw her
25 before you went outside was she standing by the island?

Page 85

1     A.  Yes.
2     Q.  Okay.  And I think you had said -- can you
3  describe again what you saw with the can specifically?
4     A.  I didn't really see the can.  I just -- suddenly
5  there was, like, a flame above on the hood of the stove.
6     Q.  Okay.  So you saw a flame on the hood of the
7  stove?
8     A.  Yeah.  It was caught -- caught on fire.
9     Q.  Okay.  But -- and it was the can that was on fire
10 or just the flame that you saw?
11    A.  I just saw the flame.
12    Q.  Okay.  Did you see -- did the flame continue to
13 move across the top of the stove or...
14    A.  I -- I assume.  But I left.
15    Q.  Okay.  So why -- what is it that makes you think
16 it was the can specifically?
17    A.  There was in one of the photos clear, kind of,
18 like protrusion on the bottom of it.
19        And also Emma has told me that it, like, hit the
20 back of her legs; and that's what she was burned by.
21    Q.  Okay.  Do you recall seeing the can -- like,
22 personally seeing the can at any time, kind of, before
23 you left the house after you saw the flame?
24    A.  No.
25    Q.  Okay.  Once you left the house, what -- what's

EMMA SCHMIDT, ET AL. VS. CONAGRA FOODS, INC.

10/06/2017                                                         Hallie Meyer

Page 118

1    A.  Yeah.  To be honest, I really don't -- I don't
2  want to say I remember exactly what I've used it for.
3    Q.  Okay.
4    A.  I can just sort of imagine the general
5  circumstance.
6    Q.  And I know that you probably don't have a precise
7  date for this.  But generally do you recall how -- like,
8  when you maybe first started using PAM cooking spray?
9    A.  No.
10   Q.  Okay.  Do you remember whether you would have
11 been using it, like, while you were in high school?
12   A.  Probably.
13   Q.  Okay.  Have you ever read the label on the -- on
14 a PAM cooking spray container?
15   A.  I think so.
16       I don't remember what it says, though.  Yeah.
17   Q.  Do you remember anything about -- anything about
18 what the label says?
19   A.  Not really, no.
20   Q.  Okay.  Do you recall there being any, like,
21 warnings or anything like that on the label?
22   A.  There likely are.
23   Q.  And why do you say that?
24   A.  Because it's a kitchen product.  So I assume that
25 most have warnings on them.

Page 119

1    Q.  And it's a particular kitchen product; right?
2  It's like an aerosol can?
3    A.  Right.
4    Q.  And so would you expect it to have, you know,
5  some kind of a warning about the pressure in the can,
6  something like that?
7        MR. SMITH:  Object to form.
8        THE WITNESS:  Probably.
9  BY MS. AMBROSE:
10   Q.  Okay.  Are you aware that it contains flammable
11 liquid?
12   A.  I am now.
13   Q.  Okay.  So prior to the time of the incident were
14 you aware that cooking spray is flammable?
15   A.  I actually don't know.
16   Q.  Were you aware that cooking oil is flammable?
17   A.  I don't think so.  I don't know.
18   Q.  Okay.  Let me back up and ask -- and this is a
19 bigger question here:  What is your understanding of the
20 word "flammable"?  I think that might be...
21   A.  Like, it can catch fire?
22   Q.  Okay.  Okay.  So I'll use that definition, too.
23       So did you understand that -- that cooking oil
24 could catch fire?
25   A.  I think.

Page 120

1    Q.  Okay.  Did you have an -- any understanding about
2  whether, you know, you should be using -- you should be
3  spraying cooking spray, you know, onto a -- into a flame
4  or anything like that?
5    A.  Yeah.
6        MR. SMITH:  Object to form.
7        THE WITNESS:  I would not spray it onto an
8    open flame.
9  BY MS. AMBROSE:
10   Q.  Okay.  What about storing a cooking spray can
11 near a heat source?
12   A.  I didn't have necessarily a sense that I would
13 not keep it, as I said, within five inches.
14   Q.  Okay.  And do you know what -- and why -- why --
15 like, why -- why would you not spray cooking spray into
16 an open flame?
17   A.  Because it would spread the fire.
18   Q.  Okay.  And have you used other -- like,
19 what -- have you used an -- aerosol cans before?
20   A.  Yeah.
21   Q.  Okay.  And in what capacity?
22   A.  Like, hairspray.  But not often.
23   Q.  Okay.  Do you recall reading any kind of warnings
24 on -- on those -- those type of containers?
25   A.  I don't recall reading them.

Page 121

1    Q.  Okay.  And I think you had mentioned earlier that
2  you had called somebody to ask about the fire
3  extinguisher.  Do you remember that testimony?
4    A.  Yes.
5    Q.  I never asked you where -- where -- where was the
6  fire extinguisher?
7    A.  You know, I don't actually remember what his
8  answer was.
9    Q.  Do you remember at any point in time anybody
10 using a fire extinguisher from the house?
11   A.  No.
12   Q.  Are you a party to any other lawsuits other than
13 this one?
14   A.  No.
15   Q.  And by that I mean, really, have you ever been a
16 party to any other lawsuits other than this one?
17   A.  No.
18   Q.  Okay.  And is -- are there any, you know, claims
19 relating to the TBI that you got in August of 2014?
20   A.  No.
21   Q.  And who -- I assume you had medical bills as a
22 result of that injury; right?
23   A.  Yeah.
24   Q.  Okay.  And who's paying -- who paid for those
25 medical bills?

# EXHIBIT 2

```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF CONNECTICUT
 2

 3   EMMA SCHMIDT AND HALLIE MEYER,   :
                                      :
 4              PLAINTIFFS            :     Civil Action NO.
                                      :
 5   VS.                              :
                                      :     3:14-CV-01816-SRU
 6   CONAGRA FOODS, INC.,             :
                                      :
 7              DEFENDANT             :

 8

 9

10            VIDEO DEPOSITION OF EMMA SCHMIDT

11

12

                         October 5, 2017
13

14

                         HELD AT:
15

        CARMODY, TORRANCE, SANDAK & HENNESSEY, LLP
16                  50 Leavenworth Street
                 Waterbury, Connecticut 06721
17

18

19

20     Reporter:  Victoria L. Germani, RPR, LSR #262
                  Videographer Ed Giovanni
21

22

23          BRANDON HUSEBY REPORTING & VIDEO
                      249 Pearl Street
24             Hartford, Connecticut 06106
                     (860)549-1850
25
```

EMMA SCHMIDT, ET AL. VS. CONAGRA FOODS, INC.

10/05/2017                                                          Emma Schmidt

Page 102

1    Q.  Okay.  Do you remember using PAM in the past as
2  part of -- for anything you've done with the Northern
3  Greening?
4        And by "past" I mean prior to the incident?
5    A.  I don't remember.
6    Q.  Okay.  So that's -- I mean, that's quite a bit of
7  PAM, right, the two -- the two-pack of PAM that you
8  purchased?
9        MR. SMITH:  Object to form.
10  BY MS. AMBROSE:
11    Q.  Okay.  Did you -- were you thinking that you
12  would -- you would use it for this project?
13    A.  Yes.
14    Q.  Okay.  Did you think that -- did you have a sense
15  of how much of it would need to get used as part of
16  this --
17    A.  No.
18    Q.  Okay.  Just in general, like, when you have
19  leftover items like -- from catering events, do you have
20  a place that you store additional food items like
21  leftover cooking spray or things like that?
22    A.  We would usually store them in one of our rooms.
23    Q.  And is that at Yale?
24    A.  Yes.
25    Q.  Okay.  So you -- do you remember -- so you

Page 103

1  remembered the one can -- or one or more cans you'd set
2  on the counter to the right of the stove; is that right?
3    A.  Yes.
4    Q.  Could it -- could both of the cans in the
5  two-pack been on that counter?
6    A.  I really don't know.
7    Q.  Okay.  Do you remember any other location in the
8  kitchen where -- seeing a PAM cooking spray?
9    A.  I don't remember.
10    Q.  Okay.  How about any other kinds of cooking
11  spray?  Do you remember seeing any other kinds of
12  cooking spray?
13    A.  I don't remember.
14    Q.  Do you know -- so the can that you -- or the cans
15  that you are remembering on the right hand of
16  the -- right side of the stove, what makes you think
17  those are the ones that you -- are ones that you
18  purchased?
19    A.  We were using items that I had brought to do our
20  cooking.
21    Q.  Were you using any items that they just had
22  already at the Meyer kitchen?
23    A.  I don't remember.
24    Q.  Do you -- do you remember ever personally using
25  cooking spray that day?

Page 104

1    A.  I don't remember.
2    Q.  Okay.  Do you have any other memories about any
3  other specific food items that were in the kitchen when
4  you -- at the time of the incident or when you returned
5  inside the house?
6    A.  I don't remember.
7    Q.  Okay.  Do you recall seeing the cooking spray
8  that you remember -- Okay, the cooking spray can or cans
9  that you remember seeing to the right of the stove
10  before the incident, do you recall seeing -- ever seeing
11  those after the incident?
12    A.  I don't remember.
13    Q.  Okay.  So you don't -- you don't remember -- I'll
14  just take that, you don't remember.  Okay.
15        So I think you had said that somebody had told
16  you that they found cans of PAM, is that right, after
17  the incident?
18    A.  I don't remember specifics.
19    Q.  Okay.  Do you remember anybody else telling you
20  anything after the incident about, you know, what
21  happened or what they believed may have happened?
22    A.  I don't remember specifics.
23    Q.  Okay.  But do you remember anything -- what do
24  you remember generally?
25    A.  (Pause.)  I remember Hallie and her family coming

Page 105

1  to visit in the hospital.  And I believe we discussed
2  what had happened then.
3    Q.  And who -- when you say "her family," was
4  it -- who in her family was there?
5    A.  I believe it was her parents and her sister and
6  one of her brothers.
7    Q.  And which brother?
8    A.  I believe that it was Peyton.
9    Q.  Peyton, okay.
10        Do you -- do you remember when they came to
11  first -- when they came to visit you?
12    A.  I don't remember.
13    Q.  Okay.  Was it -- it was still while you were in
14  the hospital, though; right?
15    A.  Yes.
16    Q.  And you -- and was there anybody else in the room
17  with you other than you, Hallie, her parents, and one of
18  her brothers?
19    A.  And my mom as well.
20    Q.  And your mom; okay.
21        And what is your mom's name?
22    A.  Colleen Christian.
23    Q.  And where does she live?
24    A.  In Philadelphia.
25    Q.  And was she living in Philadelphia at the time?

EMMA SCHMIDT, ET AL. VS. CONAGRA FOODS, INC.

10/05/2017                                                           Emma Schmidt

Page 106

1    A.  Yes.

2    Q.  So did she travel to the hospital then?

3    A.  Yes.

4    Q.  Okay.  And when did she arrive?

5    A.  She arrived that night right when it happened.

6    Q.  Okay.  And -- so what do you remember -- okay.  I

7  guess, who from the Meyer family was the one that you

8  remember telling you about -- telling you about the

9  incident?

10   A.  I honestly don't remember.

11   Q.  Okay.  But you remember some kind of a

12  conversation about what happened that was discussed?

13   A.  Yes.

14   Q.  Okay.  What do you remember about the

15  conversation?

16   A.  I remember Hallie's mom and my mom talking.

17   Q.  And do you remember anything that they were

18  saying?

19   A.  I don't remember any specifics.

20   Q.  Do you remember if Hallie's mom had a theory of

21  what had happened that she was communicating?

22   A.  I don't remember.

23   Q.  Okay.  Do you remember anybody else in the Meyer

24  family talking about the incident during this meeting?

25   A.  I really don't remember.

Page 107

1    Q.  Okay.  Do you remember talking to the doctors

2  about what -- what had happened in terms of just giving

3  a description of -- of what had happened?

4    A.  I believe I described what I thought my injuries

5  were.  But I don't believe I gave an explanation

6  initially for what had happened because I didn't know

7  what had happened.

8    Q.  Okay.  Okay.  And do you know -- just to -- just

9  to make sure I'm clear -- I apologize if you had said

10  this before -- but how many cans of cooking spray were

11  found in the kitchen after the fire?

12   A.  I don't know.

13   Q.  Okay.  Was there -- did anybody ever tell you or

14  did you otherwise come to believe what -- what it was

15  that caused your burns?

16       I know you said at the time you didn't -- you

17  didn't know.  I'm just wondering if now sitting here

18  today you have an opinion about what -- what burned you?

19   A.  After understanding that the cans of PAM were

20  found burnt at the site, I believe that that is what

21  burned me.

22   Q.  The actual cans themselves?

23       MR. SMITH:  Object to form.

24

25

Page 108

1  BY MS. AMBROSE:

2    Q.  Or what do you -- what do you mean by that?

3    A.  My understanding is that as a result of the

4  burning of the cans, I was burnt.

5    Q.  Okay.  But do you have an -- like, do you have an

6  opinion about whether it was, like, the cooking spray

7  itself that burned you or whether something else burned

8  you like oil or, you know, any number of other things

9  that you might see in a kitchen?

10   A.  My understanding is that the hot cooking spray

11  burned me.

12   Q.  Okay.  And -- and -- and -- why do you have that

13  understanding?  Just from --

14   A.  Just from understanding what was found at the

15  site.

16   Q.  Okay.  All right.  Are you aware that there

17  was -- of any other flammable-type items that were found

18  at the site?

19   A.  I don't know.

20   Q.  Okay.  And have you been to the -- to the home

21  since the incident?

22   A.  No.

23       (Off the record.)

24

25  ///

Page 109

1  BY MS. AMBROSE:

2    Q.  What were you -- what were you wearing at the

3  time of the incident?

4    A.  I was wearing short exercise shorts.

5    Q.  Okay.  And some kind of a top?

6    A.  I don't remember what top I was wearing.

7    Q.  Okay.  Did your clothes get burned at all or

8  damaged in any way?

9    A.  I don't believe so.

10   Q.  And were you wearing any kind of shoes?

11   A.  I was wearing TOMS.

12   Q.  And were the TOMS damaged in any way?

13   A.  The TOMS were also covered in skin.

14   Q.  Anything else?  I mean, what did they have, like,

15  oil or anything on them too?

16   A.  I don't know.

17   Q.  Do you still have the TOMS?

18   A.  No.

19   Q.  Do you know what happened to them?

20   A.  I threw them out.

21   Q.  Do you remember when you threw them out?

22   A.  No.

23   Q.  Okay.  Do you remember if you threw them out, you

24  know, shortly after the incident or whether --

25   A.  I don't know.

EMMA SCHMIDT, ET AL. VS. CONAGRA FOODS, INC.

10/05/2017                                                    Emma Schmidt

Page 122

1     Q.  Have you ever had any friends or family members
2  that had -- have had issues with cooking spray?
3     A.  No.
4     Q.  Prior to the incident had you ever been burned
5  before?
6     A.  Not beyond simple burns from touching a hot pan
7  or a hot pot.
8         I've never received medical attention for other
9  burns.
10    Q.  Do you have any scars from other burns?
11    A.  No.
12    Q.  And you currently live in Boston; right?
13    A.  Yes.
14    Q.  Can you tell us just, like, about -- do you live
15 in an apartment or --
16    A.  Yes.
17    Q.  And what's the apartment like generally in terms
18 of, you know, size?
19    A.  One-bedroom apartment.
20    Q.  Do you live by yourself?
21    A.  Yes.
22    Q.  And you don't currently have any cooking spray
23 products in your apartment; is that right?
24    A.  Correct.
25    Q.  Do you recall ever, like, reading the label of

Page 123

1  PAM cooking spray?
2     A.  No.
3     Q.  And earlier you mentioned, you know, being aware
4  of safety in the kitchen, and then that's important to
5  you.  Do you recall that?
6     A.  Yes.
7     Q.  Okay.  Are you aware that -- that you shouldn't
8  have, like, cooking spray near a heat source, that kind
9  of thing?
10        MR. SMITH:  Object to form.
11        THE WITNESS:  Could you be more specific?
12 BY MS. AMBROSE:
13    Q.  Or what do you know, I guess I should say, about,
14 you know, aerosol cans and cooking spray cans in terms
15 of keeping them near heat?
16        MR. SMITH:  Object to form.
17        Go ahead and answer it if you can.
18        THE WITNESS:  Okay.  That's a very general
19 question.  So if you could be more specific, it
20 would be helpful.
21 BY MS. AMBROSE:
22    Q.  Yes.  I guess generally what I'm trying to get at
23 is whether -- whether in your cooking practice, you
24 know, prior to the incident when you used to use cooking
25 spray, whether you were careful or knew, you know,

Page 124

1  how -- how to use it or had any sense of -- of those
2  issues or anything like that?
3         MR. SMITH:  Object to form.
4         THE WITNESS:  (Pause.)
5         MR. SMITH:  You can answer.
6  BY MS. AMBROSE:
7     Q.  You can still answer.
8     A.  Okay.
9     Q.  Yeah.  He'll -- he'll say an objection.
10    A.  Okay.
11    Q.  But unless he tells you not to answer, you can
12 still...
13    A.  (Pause.)  I had taken physics and knew that any
14 kind of container with compressed anything inside has a
15 high pressure and shouldn't be too close to heat.
16    Q.  Okay.  So you wouldn't, you know, put a cooking
17 spray can right next to a flame; right?
18    A.  Correct.
19    Q.  Okay.  All right.  I want to walk through a
20 little bit from where we left off before.
21        So you arrived at the hospital in an ambulance,
22 is that right, after the incident?
23    A.  Yes.
24    Q.  And do you recall what the name of the hospital
25 was or where it was that you were sent?

Page 125

1     A.  The first hospital I was sent to was only for a
2  few hours.  And I don't remember which hospital that
3  was.
4     Q.  Okay.  And then where did you go?
5     A.  Then an ambulance took me to the Bridgeport
6  Hospital.
7     Q.  Do you have a recollection of how long you were
8  at the Bridgeport Hospital?
9     A.  I believe it was between one and two weeks.
10    Q.  Okay.  And do you remember, did a doctor give you
11 any kind of diagnosis that you recall when you were
12 there?
13        That's kind of a strong word.  I just mean do you
14 remember, like, what they had said your injuries were --
15 I guess might be an easier way to say it?
16    A.  They said that I had burns on my legs.
17    Q.  Okay.  Did they give you a sense of, like, you
18 know, first degree, second degree, or anything like that
19 that you remember?
20    A.  I don't remember them using that language.
21    Q.  And do you remember, like -- do you remember the
22 treatment that they provided in -- in general at all?
23    A.  Yes.
24    Q.  Would you describe what that was for us?
25    A.  The first night I arrived I believe they removed

# EXHIBIT 3

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU  Document 167-2  Filed 12/17/19  Page 11 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1     UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF CONNECTICUT
2

           CIVIL ACTION NO.
3          3:14-CV-01816(SRU)
 EMMA SCHMIDT and HALLIE MEYER,
4
    Plaintiffs,
5
 vs.
6
 CONAGRA FOODS, INC.,
7
     Defendant
8
 AND
9
 GUILLERMINA COELLO, JOSE BALSECA,  CIVIL ACTION NO.
10 PPA GUILLERMINA COELLO AND JACK  3:15-CV-00083(SRU)
 BALSECA, PPA GUILLERMINA COELLO,
11
     Plaintiffs,
12
 vs.
13
 CONAGRA FOODS, INC.,
14
     Defendant.
15 _____/

16 VIDEO DEPOSITION OF:  WILLIAM KITZES

17 DATE:      APRIL 5, 2018

18 TIME:      9:08 A.M. - 4:53 P.M.

19 PLACE:     BOCA CONFERENCE AND
         EXECUTIVE OFFICES
20        301 YAMATO ROAD
         SUITE 1240
21        BOCA RATON, FLORIDA 33431

22 TAKEN BY:    THE DEFENDANT

23 REPORTED BY:   SHERYL N. BUSSINGER, CSR-1441
         CERTIFIED SHORTHAND REPORTER
24        NOTARY PUBLIC, STATE OF FLORIDA

25

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU  Document 167-2  Filed 12/17/19  Page 12 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1    A P P E A R A N C E S:

2    EMILY ROCK, ESQUIRE
     J. CRAIG SMITH, ESQUIRE
3    OF:    KOSKOFF, KOSKOFF & BIEDER, P.C.
            350 Fairfield Avenue
4            Bridgeport, Connecticut 06604
            203.583.8634
5            erock@koskoff.com
            csmith@koskoff.com
6
            Counsel for the Plaintiffs
7

8
     EMILY A. AMBROSE, ESQUIRE
9    OF:    BLACKWELL BURKE, P.A.
            431 South Seventh Street
10           Suite 2500
            Minneapolis, Minnesota 55415
11           612.343.3200
            eambrose@blackwellburke.com
12
            Counsel for the Defendant
13
     Also Present:
14           Michael Abarca - Videographer

15

16

17

18

19

20

21

22

23

24

25

```
 1                     I N D E X

 2    TESTIMONY OF WILLIAM KITZES:
         Direct Examination by Ms. Ambrose...................5
 3

 4    CERTIFICATE OF OATH................................267

 5    CERTIFICATE OF REPORTER...........................268

 6    ERRATA SHEET......................................269

 7


 8


 9                    *   *   *   *   *   *

10                     E X H I B I T S

11    Exhibit #1 - Trial list..............................7
      Exhibit #2 - Curriculum vitae.......................26
12    Exhibit #3 - Schmidt and Meyer Report..............81
      Exhibit #4 - Coello Report.........................81
13    Exhibit #5 - Hazard Analysis of Injuries Relating to
                   Aerosol and Pressurized Containers
14                 report.................................97
      Exhibit #6 - March 2005 Hazard report.............108
15    Exhibit #7 - Pam label............................126
      Exhibit #8 - Westinghouse Handbook excerpts.......130
16    Exhibit #9 - Value of Explicit Hazard and Consequence
                   Warnings for Products with Hidden Hazards
17                 article...............................130
      Exhibit #10 - Warning Sign Components and Hazard
18                  Perceptions article..................130
      Exhibit #11 - Hazard Level Perceptions of Current and
19                  Proposed Warning Sign and Label Panels
                    article..............................130
20    Exhibit #12 - What is a Warning and When Will It Work
                    article..............................130
21    Exhibit #13 - Effectiveness of Warnings article.....130
      Exhibit #14 - Explicitness of Consequence Information
22                  Warnings article.....................130
      Exhibit #15 - Research-based Guidelines for Warning
23                  Design and Evaluation article........130
      Exhibit #16 - Journal of Safety Research excerpt....130
24    Exhibit #17 - Sage Journals article................130
      Exhibit #18 - ASTM F 839-83........................142
25
```

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 14 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1                    *   *   *   *   *   *

2                  E X H I B I T S

3   Exhibit #19 - Labor & Industries bulletin...........144
    Exhibit #20 - Government of Western Australia Safety
4                 Alert 5/2010........................145
    Exhibit #21 - 16 CFR 1115.10.......................182
5   Exhibit #22 - U.S. Consumer Product Safety Commission
                  1-15-15 correspondence...............186
6   Exhibit #23 - DOT-SP 13601 Seventh Revision........203
    Exhibit #24 - 49 CFR 173.306.......................205
7   Exhibit #25 - 49 CFR 178.33d-3.....................211
    Exhibit #26 - ConAgra Consumer complaint #61690955..227
8   Exhibit #27 - ConAgra Pam SDS......................258
    Exhibit #28 - ConAgra Pam SDS......................259
9   Exhibit #29 - Coello Rule 26(a)(2)(B) Disclosure....264
    Exhibit #30 - Schmidt/Meyer 26(a)(2)(B) Disclosure..264
10  Exhibit #31 - PHMSA Hazardous Materials Special
                  Permits..............................266

11

12

13                    *   *   *   *   *   *

14

15              S T I P U L A T I O N S

16

17      It is hereby stipulated and agreed by and between

18   counsel present for the respective parties, and the

19   deponent, that the reading and signing of the deposition

20   are hereby reserved.

21

22

23

24

25

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 15 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1    P R O C E E D I N G S
2            * * *
3        THE VIDEOGRAPHER:  Okay.  We're now on the
4    record.  Today's date is April 5th, 2018.  The
5    time is 9:08 a.m.  Today's depo -- we're taking
6    the deposition of William Kitzes in the matter of
7    Schmidt and Meyer versus ConAgra Foods, Inc., and
8    Coello, et. al. Versus ConAgra Foods, Inc., Case
9    Number 3:14-CV-01816(SRU) and also
10   3:15-CV-00083(SRU).
11       This deposition is taking place at the Boca
12   Raton Conference and Executive Offices in Boca
13   Raton, Florida.
14       Will counsel and all present please state
15   their name for the record.
16       MS. AMBROSE:  Emily Ambrose representing
17   ConAgra Foods.
18       MS. ROCK:  Emily Rock representing the
19   plaintiffs.
20       MR. SMITH:  Craig Smith for the plaintiffs.
21           WILLIAM KITZES,
22   having been first duly sworn, was examined and
23   testified as follows:
24           DIRECT EXAMINATION
25   BY MS. AMBROSE:

Page 5

1        Q.   All right, Mr. Kitze.  My name is Emily
2    Ambrose and I represent the defendant in these actions,
3    which is ConAgra Foods, Inc.  You understand you're here
4    today testifying with regard to two separate incidences
5    in Connecticut, correct?
6        A.   Yes.
7        Q.   I want to go over a few ground rules, which
8    I'm sure you're familiar with, in terms of taking of
9    depositions.  You understand your testimony today is
10   under oath.
11       A.   Yes.
12       Q.   And you're obligated to tell the truth.
13       A.   Yes.
14       Q.   We'll want -- as you can see, there's a court
15   reporter taking down what we say so it'll be important
16   that we give audible answers.  You understand that?
17       A.   Sure.
18       Q.   If you don't understand any of my questions,
19   please let me know.
20       A.   I will.
21       Q.   And if you need a break, please let me know
22   and I'll do my best to accommodate you.
23       A.   I will.
24       Q.   Is there anything that would interfere with
25   your ability to provide truthful, accurate testimony

Page 6

1    today?
2        A.   No, ma'am.
3        Q.   For example, have you taken any medication
4    that might affect your memory, anything like that?
5        A.   No.
6        Q.   Okay.  So you've been disclosed as an expert
7    in two cases.  One we'll call the Coello case and the
8    other is the Schmidt Meyer case.  During this
9    deposition, most of my questions will relate to your
10   opinions across both cases and I'll try to be clear if I
11   am talking about a particular case.  If you're unsure
12   whether I'm talking about, you know, the Coello case or
13   the Schmidt Meyer case or both, just please ask.  I want
14   the record to be as clear as we can make it.
15       A.   Sure.
16       Q.   Fair enough?  Okay.
17           (Exhibit Number 1 marked for identification)
18   BY MS. AMBROSE:
19       Q.   I'm handing you a document that has been
20   marked as Exhibit 1.  Do you recognize this?
21       A.   Yes.
22       Q.   I'll give you a second to review but is this
23   a complete and accurate list of the cases in which
24   you've offered expert testimony?
25       A.   Up through February of 2014, yes.

Page 7

1        Q.   And did you mean 2018?  I think you said '14.
2        A.   Yes.
3        Q.   Okay.  So it's -- you think it's true up
4    through February of 2018?
5        A.   Correct.
6        Q.   Okay.  The names listed here in the second
7    column, are those the names of the attorneys that
8    retained you?
9        A.   Yes.
10       Q.   Do any of these cases involve aerosol cans?
11       A.   Yes.
12       Q.   Okay.  What -- can you tell me which ones?
13       A.   On the trial list, 11-13, Roanoke Companies
14   Group versus Aerofil Technologies.
15           That's the only one on this list.
16       Q.   Okay.  And I notice -- is that -- did that
17   one -- did you offer testimony in November of 2013?
18       A.   Yes.
19       Q.   Is that what 11-13 is?
20       A.   Uh-huh.
21       Q.   Is there a particular reason why it's
22   included on a list that's supposed to start in February
23   2014?  Just inadvertent or --
24       A.   Yeah, I guess.
25       Q.   And do you recall if you gave deposition

Page 8

Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 16 of 140
William Kitzes - 4/5/2018
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  testimony in that same case?

2   A.  I believe so.  Deposition and arbitration.

3   Q.  Do you remember what the issue was in that

4  case?

5   A.  The cans of grout sealer were distributed by

6  Roanoke to their proprietary formula and they very

7  quickly started knocking people down from the chemicals

8  and Aerofil, my client, took their proprietary formula

9  and filled the cans.  And they were recalled and Aerofil

10 was being sued to contribute to the recall cost.

11  Q.  And do you remember specifically what topic

12 you were offering an opinion on relating to this matter?

13  A.  The responsibilities of the filler under the

14 recall requirements.

15  Q.  So you didn't give testimony on -- regarding

16 product warnings for that case?

17  A.  No, it was not at issue.

18  Q.  And you didn't give any testimony about kind

19 of the adequacy of the design of the can or the

20 formulation.  Fair to say?

21  A.  No.

22  Q.  So your main -- the topic to which you

23 testified was about compliance with regulatory or legal

24 obligations relating to the recall?

25  A.  Well, no, about, you know, responsibilities

Page 9

1  of the parties as it related to the recall, not the

2  legal obligations.

3   Q.  Okay.  And you testified on behalf of Aerofil

4  Technologies?

5   A.  Yes.

6   Q.  All right.  Do any of these cases in

7  Exhibit 1 involve food products?

8   A.  I don't think so, no.

9   Q.  And do any of the cases involve items --

10  A.  I have had -- I'm sorry.

11  Q.  I don't mean to cut you off.

12  A.  Let me -- let me make sure.

13      No.  I have had cases involving the FDA but

14 most of them relate to medical devices and

15 over-the-counter and/or prescription drugs.

16  Q.  And do any of these cases involve items that

17 are used in a kitchen?

18  A.  Well, the answer is they could but not for

19 cooking as I recall.

20  Q.  And which items are you thinking of that

21 could be used in a kitchen in Exhibit 1?

22  A.  Well, you know -- and I take it back.  If you

23 look at 10-16, that involved a Ninja blender and --

24  Q.  Is that the Cardenas case or the Fazzio --

25 sorry, is it the Fazzio?

Page 10

1   A.  No, no, no.  It's -- it's not a -- not a

2  trial case, a deposition case.

3   Q.  Which -- can you just tell me the name of

4  the --

5   A.  Yeah, Darrell Padgette, Jamie Argueta versus

6  Euro-Pro.  It's dated 10-16 the bottom of the page.

7  Starting with the second page and it would be the third

8  page at the bottom.

9   Q.  Oh.  Got it.  Okay.  Thank you.

10  A.  And then there is another case.  On the next

11 page, the very top, Michael Carr dealt with a -- a

12 blender and Walmart.

13  Q.  Any others?

14  A.  Yeah.  At 8-15, another blender case with

15 Mr. Carr, Blankenship.  And I think that's it.

16  Q.  Okay.  And Michael Carr, is that a

17 plaintiff's lawyer?

18  A.  Yes.  Well, he was the plaintiff's lawyer in

19 that case.  I can't speak for all his cases.

20  Q.  Beginning with the case Jaime Argueta --

21  A.  Uh-huh.

22  Q.  -- which is the one with -- dated 10-16 in

23 the Superior Court of California, LA County.  You said

24 that one involved a Ninja blender?

25  A.  Yes.

Page 11

1   Q.  And can you just give me kind of a top line

2  overview of what your opinion or role was with respect

3  to that case.

4   A.  You know, I will but I want to -- in between

5  the publication of this list and now, I also was deposed

6  in a case involving a Nutribullet which is another kind

7  of blender that explodes.

8   Q.  Do you know the case name for that one?

9   A.  The case name -- yes, Littlefield versus

10 Nutribullet, LLC, I think.

11  Q.  And do you know where that case is --

12  A.  That case, in Los Angeles.

13  Q.  And is this -- which plaintiff -- or which

14 lawyer are you working with for that?

15  A.  Boris Trazon.  T-R-A-Z-O-N.

16  Q.  Okay.  Okay.  So for the -- back to the Jaime

17 Argueta case, can you just give us a top line of what

18 was your kind of role or opinion in the case involving

19 this Ninja blender.

20  A.  Well, it was a combination of an unreasonably

21 dangerous condition created by the failure to attach the

22 razor-sharp blades to the -- to the blender and when you

23 went to pour out the contents, the blades came out with

24 it.  And it had to do with on-product labeling and other

25 safety information.

Page 12

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 17 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  Q.   And did you testify that the existing label
2  on the product was not adequate?
3  A.   Yes, I did.
4  Q.   Going to the next case that you mentioned
5  involving a blender with the caption Tyra Graham versus
6  Walmart Stores and General Electric, was this a
7  different kind of blender?
8  A.   Yes.  This was more of a traditional blender.
9  It was kind of the reintroduction of General Electric
10 into small appliances.
11 Q.   And can you just give me a top level what
12 your opinion was in that case.
13 A.   Before they shipped the first one out of
14 China, they knew that the interlock to stop the blades
15 didn't work.
16 Q.   Did you give any opinions about the adequacy
17 of the warning -- the label or the warning on the
18 blender?
19 A.   That wasn't the issue.  I mean, there's
20 nothing you could do to label that blender to make it
21 reasonably safe.
22 Q.   So were you disclosed as an expert on the
23 actual design -- underlying design of the blender or was
24 it some other aspect of the case?
25 A.   Safety management.  What did they do to

Page 13

1  ensure that it was reasonably safe, what didn't they do
2  and what they should have done.
3  Q.   So you're not, you know, an engineer that
4  would --
5  A.   No.
6  Q.   -- kind of deal with -- okay.  With the
7  design of the blender.
8  A.   That also had to do with reporting to the
9  CPSC which they ultimately did.
10 Q.   Okay.  And then the Tina Blankenship case
11 versus Walmart and General Electric, this one is dated
12 8-15.  Was that the same issue as the --
13 A.   Graham case.
14 Q.   -- Tyra Graham case?
15 A.   Yes, ma'am.
16 Q.   And were your opinions largely the same?
17 A.   Yes.
18 Q.   And the more recent case that you just
19 mentioned, Littlefield versus Nutribullet, can you just
20 give us a top line statement about what, you know, your
21 opinions are in that case.
22 A.   It's a failure to warn case.  The Nutribullet
23 under intended and foreseeable conditions can heat and
24 pressurize to the point of exploding and they failed to
25 warn people about what they needed to do to avoid such

Page 14

1  an occurrence.
2  Q.   What is the Nutribullet?
3  A.   Well, it's kind of an inverted blender.
4  That's my words, not theirs.  The blades get screwed
5  directly into the bottom of the vessel which is closed
6  at the top and it gets put on a power base and then it
7  rotates.
8  Q.   So what about it causes it to explode?
9  A.   The buildup of heat and pressure inside the
10 vessel.
11 Q.   And in that case, are you providing testimony
12 that there was not an adequate label or warning on the
13 product?
14 A.   Absolutely.
15 Q.   Are you also providing testimony relating to
16 any reporting requirements by the defendant?
17 A.   To my recollection, yes.
18 Q.   Do you recall approximately when you gave
19 that deposition in -- in the last month?
20 A.   Yeah.
21 Q.   And you're not testifying -- maybe you are
22 but in that case, are you testifying about the actual
23 mechanics that can cause the -- the blender to explode
24 or are you focused more on kind of the warning and the
25 reporting requirements and those types of things?

Page 15

1  A.   Well, it's kind of tough to do one without
2  the other but there are engineers and whatnot who are
3  focused on the mechanism of explosion.
4  Q.   So you're relying to some extent on other
5  folks in the case that have more expertise on that area,
6  right?
7  A.   On the engineering, sure.
8  Q.   Have you ever testified on behalf of a
9  corporate defendant in litigation involving product
10 liability or personal injury?
11 A.   Yes.
12 Q.   Okay.  And on this list for --
13 A.   No.
14 Q.   -- for Exhibit 1 any of the cases?  No?
15 A.   No.
16 Q.   Do you -- can you give us an estimate as to
17 when the last time was you offered testimony on behalf
18 of a corporate defendant in litigation involving product
19 liability or personal injury?
20 A.   Well, I have to look back.  I did a number of
21 cases for Parker Hannifin involving a tire retreading
22 components and high pressure hoses and nozzles in an
23 industrial settings.
24       I testified for All American Homes in a case
25 involving a woman who fell through an opening to a

Page 16

Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 18 of 140
William Kitzes - 4/5/2018
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  basement in a not yet finished home.
2      About 35 years ago in Minneapolis, I
3  testified for an LP gas distributor named Gorem Colee, I
4  think, and that was adjunct to a case called Jendro
5  which I testified on behalf of the plaintiff.
6      And I've done some work for other defendants
7  that haven't wound up in testimony.
8  Q.   So for these cases involving expert testimony
9  in litigation, have any of them been in the past 15
10  years?
11  A.   I think so.
12  Q.   Okay.  And what do you think has been in the
13  past 15 years?
14  A.   The Parker Hannifin, the -- the All American
15  Homes.
16  Q.   Okay.
17  A.   I testified on behalf of the Navy in a
18  pitching machine case.  I don't remember how long ago
19  that was.
20  Q.   And you did not represent the company that
21  made the pitching machine, though.  Is that right?
22  A.   No.
23  Q.   By represent, I mean offer opinions on behalf
24  of --
25  A.   No, I -- it was on a naval base.

Page 17

1  Q.   Okay.  And for the cases -- the Parker
2  Hannifin cases, did they involve warnings to consumers?
3  A.   I think some of them did.  Some of them, I
4  filed reports and there was no testimony.  I'd have to
5  go back and look.
6  Q.   And the All American Homes, do you recall if
7  there was -- if any of those cases involved warnings to
8  consumers?
9  A.   Well, yeah, the lack thereof.  The opening
10  was unguarded.  The issue was of a responsibility to --
11  to guard the opening between All American and the
12  builder.
13  Q.   Okay.  So it didn't involve a product
14  liability issue, right?
15  A.   Well, product, premises.  I think it was a
16  little bit of both.
17  Q.   Okay.  So the opinion was not that the
18  manufacturer of the window -- or, sorry, what was it
19  that she fell through?  The basement?
20  A.   An opening to a basement.
21  Q.   Okay.  So there wasn't a claim that -- the
22  opening of the basement is not a product.  Fair enough?
23  A.   Well, it was a manufactured home so --
24  Q.   Okay.
25  A.   -- that's a product.

Page 18

1  Q.   So was the company that manufactured the home
2  a defendant in those cases?
3  A.   Yeah, my client, All American.
4  Q.   Okay.  I got it.
5      And so the question -- the issue was that the
6  design of the manufactured home was inadequate and that
7  it left this opening?
8  A.   Well, it was a little more complicated than
9  that.  It was during the building process.  And the
10  woman who fell through was kind of trespassing, you
11  know, nobody was supposed to be in there, you know, but
12  that didn't excuse the fact that the warn -- the opening
13  was unguarded.
14  Q.   So you testified that the company that
15  manufactured the home did not do anything wrong with
16  respect to guarding the opening.  Is that what you're
17  saying?
18  A.   Actually, no.  I testified mainly that it was
19  the responsibility of the builder to -- to guard or to
20  warn about it but as an adjunct, with the knowledge of
21  my client, I also said that they had a responsibility to
22  address the issue also.
23  Q.   Okay.  That makes sense.  I'm just trying to
24  figure out if there are cases in which you represented a
25  corporate defendant and defended I guess the warning or

Page 19

1  the company or anything like that in litigation.
2  A.   Yes.  As a matter -- well, about 25 years
3  ago, I testified on behalf of Eka Nobel Chemical as in
4  Nobel dynamite.  They had a 55-gallon drum of potassium
5  hyperchloride in a fireworks factory and it blew up and
6  the issue was whether or not their warning was adequate
7  and my opinion was not perfect but adequate.  In an
8  industrial setting.
9  Q.   Parker Hannifin cases, were those in an
10  industrial or like workplace setting or were those
11  consumer cases?
12  A.   They make industrial products.
13  Q.   But do you know, the lawsuits, were they
14  brought on behalf of consumer plaintiffs or were they
15  brought on behalf of -- who were they brought on behalf
16  of?
17  A.   On behalf of the injured party.
18  Q.   Injured party.
19      Have you ever testified in litigation that a
20  warning on a consumer product was adequate?
21  A.   I'd have to go back and look but on a
22  consumer product, not that I recall.  You know, I
23  generally haven't been retained by defendants to render
24  that opinion.  Although, I'm always all open to
25  providing them with my analysis.

Page 20

Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 19 of 140
William Kitzes -  4/5/2018
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

Q.   Okay.  You agree that there's been occasions when either some or all of your expert opinions have been deemed inadmissible by the court, right?

A.   Limited, sure.

Q.   What do you mean limited?

A.   Well, I think I'm saying the same thing that you just said, you know.  I mean, a lot of times, I get noticed to say certain things and the evidence doesn't bear it out or, you know, things like that.

Q.   What do you mean noticed to say certain things?  Sorry.

A.   Well, my client might say I'm going to testify about X and if the evidence isn't there or the judge thinks it's within his province or the jury's province, then I won't testify about it.

Q.   Okay.  And you agree that there's been at least some occasions when all of your opinions have been deemed inadmissible for whatever reason, right?

A.   There have been cases where I haven't gotten to testify, yeah.

Q.   Do you know -- do you happen to know how many times your opinions have been deemed inadmissible?

A.   Totally?

Q.   Yeah.

A.   A handful.

Page 21

Q.   Do you know how many times your opinions -- and I want to make sure that we're talking about the same thing.  Is there a -- is a handful the number of times you're estimating for your opinions being completely inadmissible or does that include the occasions when the court might narrow the scope of your opinions?

A.   No, that -- that's -- that's when I didn't get to testify which, you know, is sometimes, but not always, because my opinions are inadmissible.  Sometimes they were redundant, you know, things like that but, yes.

Q.   And courts have found on occasion that you may lack, for example, the appropriate qualifications to render a particular opinion, right?

A.   Maybe once or twice.

Q.   And are there times they may have found that you failed to follow an accepted or reasonable methodology to reach your conclusions?

A.   I can only think of one.

Q.   And which one are you thinking of?

A.   SS Leatt.  But the -- another federal judge on the same facts with the same lawyers found the exact opposite so...

Q.   Okay.  And there's been times when courts

Page 22

have found that some of your opinions are not a right fit for the case and appropriate for the issues in litigation, right?

A.   I can think of once.

Q.   And which one are you thinking of?

A.   Clark Shores versus somebody.

Q.   You were retained in these cases by Craig Smith with the Koskoff firm, right?

A.   Yes.

Q.   Were you also retained by the law firm representing Associated Indemnity?

A.   Not that I'm aware of.

Q.   You're paid a fee of $2,450 per eight-hour day for research and analysis.  Is that right?

A.   Correct.

Q.   And do you charge by the day or by the hour for that?

A.   By the eight-hour day.

Q.   Okay.  So -- but if you work a four-hour day, then is it half?

A.   Yeah.

Q.   Okay.  Got it.

And you're paid 2,950 per day for deposition or trial.  Is that right?

A.   Yes, ma'am.

Page 23

Q.   And do you break that out by hour when you're actually sending an invoice or is that like --

A.   Well, if it's here in Boca and it lasts less than four hours, I'll charge half a day.

Q.   Do you know how much time you've spent to date on the Coello case?

A.   I think it's about -- to the time I wrote the report, about six days.

Q.   And how about is that -- is the six days -- is that for both the Coello and the Schmidt Meyer case or would you estimate another six days for -- I guess I just want to make sure I understand.

A.   Another six days.

Q.   So about six days on Coello, six days on Schmidt Meyer?

A.   Yes.

Q.   What did -- what did you do to prepare for your deposition today?

A.   Reviewed my file.

Q.   Did you review any -- let me take it back.

Is your file that you reviewed, is that the reports and the reliance materials that you cite?

A.   Yes.  I also had a chance to -- to read ConAgra's motion about some of the warnings issues so I brought some additional material on the effectiveness of

Page 24

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 20 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  **warnings.**
2      Q.    You brought it today to this deposition?
3      **A.    Yes.**
4      Q.    And are you relying on those materials for
5  opinions that you plan to offer in these cases?
6      **A.    Well, they're not new opinions.  They're just**
7  **new basis.**
8      Q.    And -- and I'm going to want to see those
9  materials.  Do you -- do you have them with you right
10  now?
11      **A.    Yes.**
12      Q.    Okay.  Can you -- do you have copies of them?
13      **A.    Yes.**
14      Q.    Okay.  How many -- is it articles or what is
15  it?
16      **A.    It's journal articles.**
17      Q.    Okay.  And how many articles?
18      **A.    Oh, six or seven, I think.**
19      Q.    Do you plan to supplement your report to cite
20  any of these articles?
21      **A.    Only at the request of Mr. Smith or**
22  **Ms. Rock.**
23      Q.    And what was the -- I guess I'm not quite
24  seeing the connection between the motion in limine
25  relating to one of ConAgra's witnesses and then your

1  desire to add six or seven articles to your report.  Can
2  you just walk me through what piece -- like what hole
3  are you trying to fill or what -- what that is about?
4      **A.    Sure.  I discussed it with Mr. Smith that he**
5  **felt that -- that the issue of effectiveness was --**
6  **based on the material he had, was going to be an issue**
7  **so I just came prepared.**
8      Q.    When you say the issue of effectiveness, are
9  you referring to the effectiveness of the label on the
10  Pam cans that were at issue in this litigation?
11      **A.    Yes.  It -- yeah.  The effectiveness of the**
12  **use of signal words, of descriptions, what they call**
13  **salience or noticeability, severity, explicitness.**
14      Q.    Were any of these articles published after
15  the date of your initial report in the case?
16      **A.    I don't think so.**
17      Q.    Did you -- so let me just make sure I kind of
18  understand the timeline.  So you wrote the report and
19  issued the report and then you went back and looked for
20  articles that supported the same opinions --
21      **A.    Yeah.**
22      Q.    -- that you had issued?
23      **A.    Yes.**
24      (Exhibit Number 2 marked for identification)
25  BY MS. AMBROSE:

1      Q.    I've handed you a document that's been marked
2  as Exhibit 2.  Do you recognize this as your current
3  curriculum vitae?
4      **A.    I do.**
5      Q.    And you have a bachelor's degree from the
6  University of Wisconsin from 1972, right?
7      **A.    Yes, ma'am.**
8      Q.    Majored in history and minored in political
9  science?
10      **A.    It wasn't actually a minor.  I had enough**
11  **credits in political science but they didn't do minors**
12  **at those times.**
13      Q.    Okay.  So majored in history?
14      **A.    I could have gotten my degree in political**
15  **science but I chose history.**
16      Q.    Was that UW Madison?
17      **A.    Yeah.  I'm a Badger.**
18      Q.    And then you have a law degree from
19  Washington College of Law, American University from
20  1975?
21      **A.    Correct.**
22      Q.    And then you -- did you take and pass the bar
23  exam in Missouri?
24      **A.    It's not on here but, yes.**
25      Q.    Did you take any other bar exams?

1      **A.    No.**
2      Q.    Okay.  And you were licensed to practice law
3  at some point, correct?
4      **A.    In Missouri?  I was.**
5      Q.    Anywhere.
6      **A.    Yeah.  Well, I also have an inactive license**
7  **with the District of Columbia.**
8      Q.    Okay.  So -- and is your license to practice
9  law in Missouri active?
10      **A.    No.**
11      Q.    Okay.  So at some point, you were licensed to
12  practice law in Missouri and D.C., District of Columbia?
13      **A.    Yes.**
14      Q.    Okay.  Got it.
15      Okay.  And you worked as a lawyer for the
16  Consumer Product Safety Commission from 1975 to 1981?
17      **A.    No.**
18      Q.    Okay.  What years did you work there?
19      **A.    No.  I never actually worked as a lawyer.  I**
20  **had some legal titles but, for example, in the Office of**
21  **Product Defect Identification, we were not a legal**
22  **office.  We did not have legal authority.**
23      Q.    Okay.  So why -- when you were in law
24  school -- let me strike that.
25      Were you hired, as far as you know, by the

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 21 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

**Page 29**

1  CPSC because of your background in history and your JD
2  from Washington College of Law?
3      A.   Well, probably not because of my history BA
4  but I actually started working for the commission in
5  February of 1974.  They had posted a job announcement on
6  the job board at the law school and I got a job in what
7  was then called the Section 15 Group, which became
8  OBD-I, which was responsible for recalls and corrective
9  action plans.
10     Q.   So fair to say at least that they wanted
11  somebody with a legal background for that position?
12     A.   Well, I can't speak for them but they -- you
13  know, the law school was close by and that's where they
14  recruited from.
15     Q.   And the name of their position was legal
16  advisor to the director?
17     A.   That was when I went full time.
18     Q.   Okay.
19     A.   Before that, I was a student assistant.
20     Q.   Okay.  And then CPSC, that's a federal
21  regulatory agency that was created in 1972 under the
22  Consumer Product Safety Act, correct?
23     A.   The act was passed in October of '72.  Not to
24  nitpick but the commission was created in May of 1973.
25     Q.   And you haven't worked for the CPSC in the

**Page 30**

1  past 37 or so years, right?
2      A.   Did you do the math?  It's 1981.
3      Q.   Yeah.  Okay.  So would you --
4      A.   I've worked with them on occasion but not for
5  them.
6      Q.   Okay.  Would you agree with me that anything
7  that you might know about the CPSC in the past 30 or so
8  years is based on kind of public information?
9      A.   Generally.  I -- you know, I've known a lot
10  of people there.  I've worked with them on compliance
11  seminars and other things, you know, so...
12     Q.   The things that are available to the public,
13  right?
14     A.   Not based on confidential data, no.
15     Q.   Okay.  You don't have kind of -- you agree
16  that you don't have personal insight on what the agency
17  is doing today, right?
18     A.   Well, I don't have personal info -- personal
19  information into the mind of the commission.  I have
20  insight into how the commission operates.
21     Q.   And do you -- is your insight any different
22  than somebody that, for example, never worked for the
23  CPSC?
24     A.   Of course.
25     Q.   And how so?

**Page 31**

1      A.   I have an in-depth knowledge of how the
2  commission operates.  I keep current in what they're
3  doing.  I have much more information and knowledge about
4  it than somebody who's never been involved with them
5  before.
6      Q.   And do you agree that the CPSC as an agency
7  has changed in different ways over the past 30 plus
8  years?
9      A.   In some ways, sure.
10     Q.   For example, there's been, you know,
11  additional statutes that have been enacted that have
12  affected the way the agency operates since the original
13  statute in 1972, right?
14     A.   Well, there have been additional regulations
15  for different products.  The processes under the Section
16  15, for example, where I worked, they're essentially the
17  same.
18     Q.   Okay.  In terms of any of the opinions that
19  you're offering in this litigation, are any of those
20  opinions based on some insider or specialized knowledge
21  that wouldn't be available, for example, to ConAgra?
22     A.   It would be available to ConAgra.  Whether
23  they avail themselves of it is a different issue but it
24  would certainly be available to them.
25     Q.   It would be available to anybody that wanted

**Page 32**

1  to obtain the information, right?
2      A.   Well, I don't -- I wouldn't say anybody but
3  somebody in the field who's examining and drilling down
4  into the issues as it relates to that, they could get
5  that information, sure.
6      Q.   Okay.  What specific -- can we be a little
7  more specific?  What kind of information are we talking
8  about?  Are we talking about regulations?
9      A.   Well, I'm talking about two things that I
10  talk about in my report.  One is compliance with the
11  Federal Hazardous Substances Act and the other is
12  compliance with Section 15 of the Consumer Product
13  Safety Act and the regulations.
14         There are certainly people who work in the
15  field of product safety that have knowledge about those
16  things.
17     Q.   So -- so specifically talking about
18  compliance with the Federal Hazardous Safety Act --
19     A.   Substances.
20     Q.   Sorry, Federal Hazardous Substances Act, is
21  there anything other than the regulations promulgated
22  under that act that you're refer -- that you're relying
23  on from the CPSC?
24     A.   Well, there's a history.  There's -- you
25  know, the regulations in the CFR are the top line.

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU Document 167-2 Filed 12/17/19 Page 22 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1 There's substantial writings and interpretations by the
2 commission, you know. You could probably find one of
3 it in the actual Federal Register notices but there's a
4 plethora of data supplementing those acts that if one
5 was interested, one could identify.
6 Q. Anything that you reference in your report
7 specifically?
8 A. Well -- yeah. Well, just I, you know,
9 referenced basically the act and the regulations.
10 Q. And with respect to compliance with the CPSC
11 Section 15, that's the report -- are you you're
12 talking about the reporting requirements, right,
13 generally?
14 A. Notification, yeah.
15 Q. And anything --
16 A. Corrective action.
17 Q. Anything other than that, you know, the CPSA
18 and the regulations under that that you're relying on?
19 A. Well, just my knowledge -- go ahead. I'm
20 sorry.
21 Q. Yeah, go ahead.
22 A. Just my knowledge of, you know, how it's been
23 operated for the past 40 years.
24 Q. And nothing -- your knowledge of how it's
25 been operating for the past 40 years is not as an

Page 33

1 employee of the CPSC, right?
2 A. Some of it is. I mean, from the time I was
3 there. Is my math wrong? I mean, 43 years.
4 Q. Got it.
5 And then you didn't cite -- nothing that you
6 cite to in your opinion, right?
7 A. Well, my background and experience but I
8 applied it to my analysis of the regulations to make an
9 opinion as to ConAgra's failure to adequately label the
10 can.
11 Q. When you were at the CPSC, you supervised --
12 did you supervise engineers, epidemiologists and human
13 factors specialists?
14 A. I did.
15 Q. What specifically was your role as a
16 supervisor?
17 A. Well, I was a program manager for the --
18 first sports and recreation and then power equipment
19 team. And as a program manager, my job was to develop
20 prospective standards, education campaigns, warnings,
21 things like that. Our big project was the publication
22 of the Federal Safety Standard for Walk-Behind Power
23 Lawn Mowers 16 CFR 205.
24 Q. While you were at the CPS, did you have any
25 experience relating to aerosol cans?

Page 34

1 A. No.
2 Q. So after you left the CPSC, you joined the
3 Institute For Safety Analysis where you were for two
4 years?
5 A. Yes, ma'am.
6 Q. And can you tell us what the Institute For
7 Safety Analysis is?
8 A. Well, it was an engineering consulting firm
9 that started in government contracts but by the time I
10 got there, was involved in litigation analysis.
11 Q. And what do you mean by litigation analysis?
12 A. They work as consulting engineers and for the
13 most part, Dr. Brenner, who had been the chief scientist
14 and deputy director at the National Highway Traffic
15 Safety Administration, testified in trial.
16 Q. Okay. And it says you were the vice
17 president and general manager.
18 A. I was.
19 Q. So what specifically was your -- what were
20 your role -- duties and responsibilities?
21 A. Well, I managed the staff of, at its peak,
22 about 30. I ensured that the material that they
23 submitted to Dr. Brenner was within the principles of
24 safety analysis. And toward the end of my tenure, I
25 began to review and testify in three lawn mower cases.

Page 35

1 Q. Since 1983, you've been a private consultant
2 and paid expert for Consumer Safety Associates?
3 A. I usually get paid, yeah.
4 Q. How many people today work for Consumer
5 Safety Associates?
6 A. My wife and myself.
7 Q. And the primary -- would you agree that the
8 primary business of Consumer Safety Associates is
9 testifying on behalf of personal injury plaintiffs?
10 A. No.
11 Q. Okay. What do you disagree with about that?
12 A. Well, I don't say I don't do that but the
13 business involves providing safety analysis and product
14 safety management services. Sometimes involving recalls
15 and warnings to attorneys, corporations and government
16 organizations and it often involves testimony.
17 Q. And I think I read about -- maybe this isn't
18 correct but that 95 percent of the revenue going into
19 the company is from litigation on behalf of personal
20 injury plaintiffs.
21 A. Yeah.
22 Q. Is that not right?
23 A. I'd say 90 plus percent.
24 Q. You wouldn't call that primary?
25 A. Well, yeah, but -- but the actual testifying

Page 36

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 23 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  is not the majority of what I do.
2    Q.   You have a certificate in safety management
3  from 1989.
4    A.   I do.
5    Q.   Okay.  And that's -- what did you need to do
6  to obtain that certificate?
7    A.   It was eight day's worth of seminars from the
8  American Society of Safety Engineers.
9    Q.   Okay.  Is there any requirement of continuing
10  education connected with that?
11    A.   No.
12    Q.   In your report, I think you call it an
13  executive certificate.  Is there a difference between
14  certificate or executive certificate?
15    A.   Well, that's a different program.
16    Q.   Okay.  So what program are you referring to
17  that you have an executive -- I think you say you have
18  an executive certificate also from the American --
19    A.   Right.
20    Q.   -- Society of Safety --
21    A.   That was a much longer program.  That was in
22  2007.
23    Q.   Okay.  Is this the program that's on your CV
24  as executive program --
25    A.   Sure.

Page 37

1    Q.   -- on safety management?  Okay.  And you
2  obtained what you're calling an executive certificate?
3    A.   I'm not calling it that.  They call it.
4    Q.   Who's they?
5    A.   The American Society of Safety Engineers.
6    Q.   I'll go somewhat in order there.
7  There's a reference to human factors engineering at the
8  University of Michigan in the summer of 1990.  Do you
9  see that?
10    A.   Yes.
11    Q.   Okay.  Is that just a single course or what
12  is that?
13    A.   That was 50 hours over five-and-a-half days
14  on campus in Ann Arbor.  Combination of lectures,
15  seminar, lab work.
16    Q.   Is there any continuing education requirement
17  or component with that?
18    A.   No.
19    Q.   Okay.  And then the executive program in
20  safety management in 2007.
21    A.   We covered that.
22    Q.   Yeah.  I have a couple more questions about
23  it?
24    A.   Oh.
25    Q.   Is that -- how many days -- is that -- I'm

Page 38

1  sorry.  Was that a course?
2    A.   That was about 120 hours.  It was --
3    Q.   Okay.
4    A.   -- I think seven courses.
5    Q.   And where were the courses through?
6    A.   My recollection is that most of them were in
7  Orlando.
8    Q.   Was it in like a conference center or --
9  sorry.  Or like a university or what?
10    A.   Conference center.
11    Q.   Okay.  Is there any continuing education
12  associated with that?
13    A.   No.
14    Q.   You mentioned -- or on your CV, sorry,
15  there's a reference to risk communication from Harvard
16  School of Public Health from March 2013.  Do you see
17  that?
18    A.   Yes.
19    Q.   Was that a course?
20    A.   It was a three-day course, yeah.
21    Q.   I'm guessing in March of 2013.
22    A.   Right.  On campus.
23    Q.   Okay.  And is there any continuing education
24  associated with that?
25    A.   No.

Page 39

1    Q.   Okay.  In your report, you had also mentioned
2  that you are a board certified product safety manager
3  and hazard control manager.
4    A.   Yes.
5    Q.   Is that on your CV somewhere?
6    A.   Uh-huh, second line under professional
7  safety.
8    Q.   Can you explain to us what that is.
9    A.   Sure.  The Board of Certified Products Safety
10  Management is an organization that requires an
11  examination in order to qualify.
12    Q.   And I think I may have read.  Is this like a
13  multiple choice test?
14    A.   Yes.  About three hours' worth.
15    Q.   And it came with like a -- did it have like a
16  handbook that you read beforehand?
17    A.   There was a study guide that pointed one to
18  other material.
19    Q.   Okay.  When -- do you remember when you took
20  that test?
21    A.   1983.
22    Q.   Is there any continuing education associated
23  with -- with that?
24    A.   I don't believe so.
25    Q.   All right.  You also note under your

Page 40

Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 24 of 140
William Kitzes - 4/5/2018
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1 professional associations that you're a member of the
2 Human Factors and Ergonomics Society.
3   **A.   Correct.**
4   Q.   How long have you been a member?
5   **A.   About 25 years.**
6   Q.   Is that an approximation?
7   **A.   Yeah.**
8   Q.   Okay.  And other than paying -- there's dues
9 for that organization, right?
10   **A.   Sure.**
11   Q.   Okay.  Other than paying dues, can you tell
12 us what else you had to do to become a member?
13   **A.   I had to be endorsed by two current members**
14 **that I had the requisite background in human factors.**
15   Q.   And what was considered the requisite
16 background in human factor -- factors?
17   **A.   My experience.**
18   Q.   And was this -- was the group different 25
19 years ago than it is today?
20   **A.   I hope so.**
21   Q.   In terms of how to get into the group, was it
22 much different?  Do you know?
23   **A.   It may be different now, yeah.**
24   Q.   Okay.  What was -- okay.  Because I -- this
25 question may be poorly worded but it seems like it's

Page 41

1 more of an intra-disciplinary group.  Are you testifying
2 that only people that are -- that have a human factors
3 expertise can be a member of this group?
4   **A.   That's the basis, yeah.**
5   Q.   And so what is it about your background that
6 you think qualifies you as a human factors -- as
7 qualified in the area of human factors?
8   **A.   Background and experience working with**
9 **product safety as it relates to human factors.  I don't**
10 **claim to be an expert in all of human factors.**
11   Q.   Okay.  And so maybe this is what we're
12 getting.  Human -- do you consider human factors kind of
13 a broad designation?
14   **A.   Well, it can include different disciplines.**
15   Q.   Okay.  And can you give some examples.
16   **A.   Well, it can include eye movement on computer**
17 **screens which is not my area and it can include safety**
18 **information and warnings which is my area.**
19   Q.   Okay.  And do you believe that all aspects of
20 warnings is your area or is there certain, you know,
21 area within the warnings field that you think that
22 you're qualified on?
23   **A.   Well, I am qualified in developing warnings**
24 **and evaluating the adequacy of warnings.**
25   Q.   And are you being very -- what kind of

Page 42

1 warnings are we talking about?
2   **A.   All different types.**
3   Q.   Okay.  So warnings on products?
4   **A.   Yes.**
5   Q.   Okay.  Are you familiar with the Code of
6 Ethics in the Human Factors and Ergonomics Society?
7   **A.   I'm sure I've seen it before.**
8   Q.   So article one, principle one is that
9 members -- members limit their practice to those areas
10 of human factors wherein they maintain a competence by
11 virtue of training and/or experience and not extend
12 their endeavors beyond their realm of competence.  How
13 do -- have you ever -- does that sound familiar to you?
14   **A.   Sure.  And I absolutely agree.**
15   Q.   Okay.  And can you elaborate on what you
16 think that that means?
17   **A.   Well, like I say, I don't specialize in -- in**
18 **eye movements or other -- the application of strobe**
19 **lights to the brain.  That's not my area.  But I**
20 **explained to you what my area is.**
21   Q.   And your area is all warnings?
22   **A.   Well, I never use words like all, okay, but**
23 **my area is in warnings, developing warnings and the**
24 **adequacy of warnings.**
25   Q.   Okay.  Are there any aspects of developing

Page 43

1 warnings or the adequacy of warnings that you would say
2 does not fall into your area of expertise?
3   **A.   Not that I've come across.**
4   Q.   Okay.  You seem to dispute the word all but
5 I -- it sounds like you think it's all.
6   **A.   Well, I've done -- I've evaluated warnings on**
7 **myriad consumer products, on marine products, on**
8 **industrial products, you know, as far as that's**
9 **concerned but adequate information, I believe that**
10 **that's within my expertise.**
11   Q.   Other than evaluating a warning in the
12 context of litigation, what else are you -- what else
13 are you referring to that contributed to your expertise?
14   **A.   I've developed warnings for may -- for a**
15 **number of companies.**
16   Q.   Okay.  So if an employee at a company
17 develops a warning, does that mean that they're an
18 expert in human factors in the area of warnings?
19   **A.   It doesn't mean that.  They may be but it**
20 **doesn't mean that.  Because there are certain rules.**
21 **There are certain standards.  There are all kinds of**
22 **issues related to warnings development that that person**
23 **may or may not be able to apply.**
24   Q.   Do any of these other professional
25 associations listed here relate to human factors or

Page 44

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU Document 167-2 Filed 12/17/19 Page 25 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  warning communication?

2  A.  Well, I gave a number of lectures at the

3  National Safety Council on injury prevention, on

4  warnings, on corrective action plans and they all

5  include warnings.

6  I've lectured many times at the International

7  Consumer Product Health and Safety Organization on those

8  issues.

9  And they're all listed on my CV.

10  Q.  Okay.  And I think I asked -- I was asking

11  specifically -- I appreciate your answer but on the

12  professional associations, any -- was it any of those

13  listed here that --

14  A.  Well, I think that answers that question,

15  doesn't it?

16  Q.  Okay.  So just so I'm clear, to the extent

17  any of these associations relate to human factors,

18  you're referring to specific -- the articles and

19  seminars that you have listed elsewhere in the CV?

20  A.  Well, those professional safety associations

21  have work in the area of human factors and that includes

22  ASSE, system safety, ICPHSO.

23  Q.  Okay.

24  A.  ICPHSO as they say.

25  Q.  Have -- have you relied on any -- is there

Page 45

1  any specific formal educational -- education that you've

2  received from these -- any of these professional

3  associations relating to your opinions in this

4  litigation?

5  A.  It's just part of my background.

6  Q.  Okay.  Are you familiar with -- do you

7  consider yourself familiar with peer reviewed research

8  relating to consumer behavior and reactions to warning

9  labels on products?

10  A.  You conflated a number of different things

11  but, yes, there are peer reviewed articles on human

12  behavior and there are peer reviewed articles on

13  warnings effectiveness.

14  Q.  And you would consider yourself familiar with

15  those articles?

16  A.  I can't say I'm familiar with all of them but

17  I brought a couple with me.

18  Q.  Okay.  And you -- you didn't cite any of

19  these articles in your written report in the Coello

20  case, correct?

21  A.  No.

22  Q.  And you did not cite any of this human

23  factors research in your report in the Schmidt Meyer

24  case, correct?

25  A.  Correct.

Page 46

1  Q.  And we're going to -- we're going to walk

2  through them today.

3  I apologize if this is a bit redundant but I

4  just want to make sure.  Are there -- are there any

5  other courses or work experience that we -- work

6  experiences that we haven't discussed that you think are

7  relevant to your qualifications to render opinions in

8  this litigation?

9  A.  Well, I don't know how to answer that.  I

10  mean, we discussed the work I did at the commission, at

11  the -- at the institute.  We really haven't discussed

12  that much of the work that I did, you know, at the

13  commission or subsequently but if we accept what's in my

14  vitae, then I think it's pretty much covered.

15  Q.  Did you work with any food products when you

16  were at the CPSC?

17  A.  No.  I did work with exploding cologne

18  bottles.

19  Q.  Okay.  And what was the nature of that work?

20  A.  Well, it actually was the basis of the

21  memorandum of understanding that I discussed in my

22  report.  It was bottles of -- I think it was Faberge

23  Brut back in the '70s that were exploding on drugstore

24  shelves and the FDA and the commission came to the

25  agreement that the commission would handle the container

Page 47

1  and the FDA would be responsible for the cosmetic

2  contents.

3  Q.  What kind of container was it?

4  A.  Glass.

5  Q.  Was there -- was there -- would you agree

6  that there was a team of folks working on that project?

7  A.  I guess, including me.

8  Q.  And was anybody on that team -- did anybody

9  on that team have education in human factors?

10  A.  I have no idea.

11  Q.  And do you know if anyone on that team had

12  education in epidemiology?

13  A.  I have no idea.  It was like 40 some years

14  ago.

15  Q.  Okay.  So you don't -- fair to say that, you

16  know, you might not remember all the specifics of that

17  project?

18  A.  Right.

19  Q.  Okay.  And so you're not -- are you relying

20  on your work in that project to support your opinions in

21  this litigation?

22  A.  Well, I'm relying on the MOU.

23  Q.  Okay.

24  A.  And I was there.  I don't --

25  Q.  Okay.  I want to talk about aerosol cans for

Page 48

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 26 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1 a moment.
2     A.   If we're going to shift gears, can we take a
3 break?
4     Q.   Yeah.  That would be great.
5         THE VIDEOGRAPHER:  Going off the record.  The
6 time is 10:13 a.m.
7         (Brief recess)
8         THE VIDEOGRAPHER:  Okay.  We are back on the
9 record.  The time is 10:25 a.m.
10 BY MS. AMBROSE:
11     Q.   Okay.  All right.  I think, as I mentioned
12 right before the break, I want to talk for a minute
13 about aerosol cans.
14         And you are not an engineer, right?
15     A.   No.
16     Q.   Have you had any formal education or job
17 related experience relating to packaging design?
18     A.   It's a little broad.  Can you be more
19 specific?
20     Q.   Maybe if I break it up.  You haven't had any
21 formal education on packaging design, right?
22     A.   No university education, no.
23     Q.   And when you say that, are you thinking maybe
24 you had some other kind of education that's formal
25 education on --

Page 49

1     A.   Well, I'm just trying to define what you're
2 asking me.
3     Q.   Yeah.  Can you think of any job related
4 experiencing you've had related to packaging design?
5     A.   Well, I'm not an engineer.  I don't design
6 pencil to paper packaging.
7     Q.   Okay.  And have you had any formal education
8 or job related experience relating to aerosol cans or
9 pressurized cans?
10     A.   I've had experience.
11     Q.   And what is that?
12     A.   I've handled a couple of cases involving
13 aerosols.
14     Q.   Okay.  So we mentioned the Argueta case or,
15 sorry.
16     A.   No.  We mentioned the Dickinson, the --
17     Q.   Got it.
18     A.   -- Roanoke case.
19     Q.   Yup.  Okay.  So that was with -- that was
20 when you were offering testimony on behalf of Aerofil
21 Technology.
22     A.   Right.
23     Q.   Does Aerofil actually manufacture the aerosol
24 can or do they fill it or what do they do?
25     A.   They fill it.

Page 50

1     Q.   They don't make the can?
2     A.   No.
3     Q.   Okay.  Is that the only -- is that the case
4 you're -- you're referring to or was there something
5 else?
6     A.   No.  I've had at least two other cases I
7 could think of with exploding aerosol cans.
8     Q.   And what are they?
9     A.   One was called Caslyn.  It was an air
10 freshener.  And the other I believe involved like a tire
11 inflator.
12     Q.   And these would have been more than --
13     A.   Four years ago.
14     Q.   More than four years ago.  Are they more than
15 ten years ago?
16     A.   I don't -- I don't think so.
17     Q.   And were you -- and this was -- obviously,
18 this was work in connection with litigation, right?
19     A.   Yes.
20     Q.   And were you hired by the lawyer representing
21 a plaintiff in a personal injury case for these?
22     A.   Yes.
23     Q.   And did you -- was your role to render
24 opinions regarding the design and technology of the
25 aerosol can?

Page 51

1     A.   Well, technology could mean anything, you
2 know.  It wasn't the design of the can in Caslyn so much
3 as I believe the labeling and the test regulations.
4     Q.   You don't believe that all aerosol cans are
5 unreasonably dangerous, do you?
6     A.   No, ma'am.
7     Q.   How about the tire inflater case.  Did that
8 involve an issue with the design of the aerosol can?
9     A.   Not for me.
10     Q.   It was another expert that testified on --
11 regarding the design?
12     A.   I imagine so.  I only have kind of a sketchy
13 recollection of that.
14     Q.   So other than your being hired by -- you
15 know, in the context of providing opinions in litigation
16 relating to alleged explosions involving these two
17 aerosol cans, is there anything else that you can think
18 of that related to any experience with aerosol cans?
19     A.   There was also a case involving an exploding
20 insecticide under a kitchen sink.  So -- I'm sorry.  Can
21 you give me the question again?
22     Q.   And, again, I'm trying to get -- just
23 understand any job related experience you have relating
24 to aerosol cans.  So you've mentioned two cases
25 involving -- you mentioned the Caslyn case and the tire

Page 52

William Kitzes - 4/5/2018
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.
Case 3:14-cv-01816-SRU   Document 187-2   Filed 12/17/19   Page 27 of 140

Page 53

1  inflater case and now you're mentioning the exploding
2  insecticide --
3  **A.  Yes.**
4  Q.  -- case.  And that was the case in which you
5  were hired by plaintiff's lawyer?
6  **A.  Yes.**
7  Q.  Okay.  And did you render an opinion as to
8  the actual design of the aerosol can itself?
9  **A.  No.  About the labeling.**
10  Q.  Okay.  Anything else?
11  **A.  Those are -- that's what I remember.**
12  Q.  Okay.  Do you consider yourself an expert on
13  the variety of technologies used in aerosol can designs?
14  **A.  I'm familiar with some.  I mean, I don't**
15  **claim to be an expert in engineering packaging.**
16  Q.  Have you ever done anything to educate
17  yourself about these technologies?
18  **A.  Just basic research.**
19  Q.  Any -- did you handle any of the cans that
20  use alternative technologies for aerosol cans?
21  **A.  I have.**
22  Q.  Okay.  And which cans?
23  **A.  Specifically bag-on-valve.**
24  Q.  And in what context did you handle the
25  bag-on-valve type container?

Page 54

1  **A.  My kitchen.**
2  Q.  Did you take any measurements?
3  **A.  Measurements?  No.**
4  Q.  Do you have an understanding of how that can
5  is manufactured?
6  **A.  I have an understanding as to the technology**
7  **that it employs.**
8  Q.  Okay.  And that's just based on the fact you
9  used it in your kitchen, right?
10  **A.  Well, that I did the research.**
11  Q.  Okay.  What research?
12  **A.  Research into the technology of how**
13  **bag-on-valve works.**
14  Q.  Okay.  Can you be more specific?
15  **A.  Well, it uses compressed air or nitrogen,**
16  **things that are nonflammable inside the can itself and**
17  **then in the can, there's a bag that's got the**
18  **ingredients.  They never touch the propellent.  And when**
19  **you activate the valve on top of it, the compressed air**
20  **squeezes the bag so that the contents are sprayed.**
21  Q.  And how did you learn about that?
22  **A.  Research.**
23  Q.  Okay.  I guess what I'm trying to elaborate
24  on is you're -- you're not telling me what -- what
25  specifically.  Did you review any patents?  Did you

Page 55

1  review articles?  What did you review in order to -- or
2  did you just -- you know it because you have the product
3  and you can just see what it does?
4  **A.  No, I couldn't do it from just seeing the**
5  **product because it looks just like an aerosol can that**
6  **employs extremely flammable propellent.  I researched**
7  **basically industry analyses and presentations on the**
8  **technology.**
9  Q.  Okay.  And how did you research it?
10  **A.  I found them on the internet.**
11  Q.  So you goggled -- essentially googled the
12  technology and then read articles about it?
13  MS. ROCK:  Object to the form.
14  THE WITNESS:  Well, I used google as a search
15  tool to find the data.
16  Plus, you know, I mean, apparently Pam was
17  sold in nonaerosol pump spray in the early '70s.
18  BY MS. AMBROSE:
19  Q.  Do you know whether the formulation of the
20  Pam was the same in the early '07s as it is today?
21  **A.  Well, they're using a pump spray again so I**
22  **don't know if there are any differences in the**
23  **formulation but it's clearly viable.**
24  Q.  And you don't know if the Pam Cooking Spray
25  sold in a pump container is the same formulation as the

Page 56

1  Pam Cooking Spray sold in an aerosol container, right?
2  **A.  Except for the propellent, my recollection is**
3  **that the ingredients are pretty much the same.  There's**
4  **I think a little bit more stuff in the nonaerosol spray**
5  **as far as sticking is concerned.**
6  Q.  So it's not the same formula?
7  **A.  Not exactly the same but it serves the same**
8  **purpose.**
9  Q.  And what -- how do you know it serves the
10  same purpose?
11  **A.  Because that's the way they advertise it.**
12  Q.  Okay.  So you're not -- what I guess I'm
13  trying to get at is it sounds like you're maybe an
14  educated consumer but beyond that, are you an expert --
15  are you saying that you're an expert on these
16  alternative technologies?
17  **A.  I'm an expert on the fact that they are**
18  **available and then comparing it to the extremely**
19  **flammable alternative and then looking at the labeling**
20  **as it relates to the two.**
21  Q.  And what makes you an expert on any of that?
22  **A.  Forty years of experience.**
23  Q.  With what?
24  **A.  With consumer products, labeling,**
25  **applications.**

Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 28 of 140
William Kitzes - 4/5/2018
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

**Page 57**

1  Q.   But we're talking about formulations, right?

2  A.   I didn't said I was an expert in the

3  formulation of Pam but if -- if -- if ConAgra's excuse

4  is that there are minor differences in the formulation,

5  I don't see where that negates the risk associated with

6  the use of an extremely flammable propellent that the

7  consumer's unaware of.

8  Q.   And what are you relying on to say that?

9  A.   The facts.

10  Q.   What facts?

11  A.   Looking at the ingredients on the -- on the

12  can and you look at the MSDS.  Those are all produced by

13  ConAgra.

14  Q.   And which MSDS are you referring to?  The

15  2007 and 2010 MSDS that's cited in your report?

16  A.   Both.

17  Q.   Do you know whether the technologies used in

18  aerosol can design have improved over the last several

19  decades?

20  A.   Much too broad a question.  If you're

21  asking -- well, it's much too broad a question.  I mean,

22  improved to do what?

23  Q.   To be safer.

24  A.   Than?

25  Q.   Than the cans in the 1970s.

**Page 58**

1  A.   I don't know.

2  Q.   Is it fair to say that you're not an expert

3  on industry standards relating to aerosol can design?

4  A.   Well, I'm not an expert but it's part of my

5  analysis.  I'm familiar with two piece versus three

6  piece versus venting.  These are really important safety

7  management issues.  I'm not an engineer.  I don't design

8  those packaging but I know how they operate and under

9  what conditions they'll spew extremely flammable

10  propellent into a kitchen, a place where they intended

11  to be used in a place where heat sources are abundant.

12  Q.   And did you have this knowledge before you

13  were retained to -- to provide expert testimony in these

14  matters?

15  A.   Well, I had the base knowledge and then

16  applied the facts of this case to my analysis.

17  Q.   So you had base knowledge of the difference

18  between a two piece and three-piece aerosol can before

19  being retained in this case?

20  A.   I didn't say that, did I?

21  Q.   I'm asking.

22  A.   Well, that's not what you asked before.  You

23  know, I educated myself on what ConAgra was doing

24  vis-à-vis two piece, three piece and vented cans and

25  then fit that into the principles of safety analysis

**Page 59**

1  that I've been publishing about since 1992.

2  Q.   Okay.  So you did not have a basic

3  understanding of the difference between a two piece or a

4  three-piece aerosol can before being retained in this

5  litigation, correct?

6  A.   Not consciously.

7  Q.   Okay.  Did you have an understanding of the

8  difference between a vented and nonvented aerosol can

9  before being retained in this litigation?

10  A.   No.

11  Q.   Did you have a basic base knowledge of the

12  formulation of cooking spray before being retained in

13  this litigation?

14  A.   Well, I knew that Pam was, you know --

15  Q.   You've heard --

16  A.   -- oil, canola oil, you know, olive oil,

17  organic olive oil and its various incarnations.

18  Q.   Okay.  You agree that aerosol cans are

19  pressurized, right?

20  A.   Yes.

21  Q.   Okay.  And if the pressure increases too much

22  due to overheating, the cans may vent or burst, right?

23  A.   Well, a vented can that's essentially used

24  for whipped cream and such would vent.  It's

25  nonflammable propellent and a -- whereas, a flammable

**Page 60**

1  propellent would create a whole host of safety issues

2  and a standard can has a much higher rating for

3  deformation and leakage under the transportation

4  standards.

5  Q.   Are you aware of a vented can that contains

6  whipped cream sold today?

7  A.   Today?  I don't know.  I -- you know, I do

8  know that ConAgra used it for whipped cream and then

9  changed back to a standard can.

10  Q.   And when you say standard can, what do you

11  mean by that?

12  A.   Nonvented.

13  Q.   Okay.  So I think -- I don't think you quite

14  answered my question.  Do you agree that -- you agree

15  that the aerosol cans are pressurized.  If the pressure

16  increases too much due to overheating, you agree that,

17  depending on the design of the can, it's going to either

18  vent or burst at some point?

19  A.   Well, but those are two different standards.

20  Q.   I'm just asking what the -- what the can

21  itself says, not the standard or regulation.

22  A.   Well, if it overheats, if it overpressurizes

23  to 180 psg -- ig, it's going to vent.  If it's over 2 --

24  270 for a nonvented can, it may or may not burst.

25  Q.   Okay.  You're -- it sounds like you're

Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 29 of 140
William Kitzes - 4/5/2018
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1 narrowly talking about two particular can technologies,
2 not aerosol cans in general, right?  You agree that
3 there's aerosol cans that have a variety of pressure
4 standards, 2P, 2N, all of those things?
5     A.   I agree with that.
6     Q.   So is there anything else that the can might
7 do besides vent or burst if it's overheated?  And I'm
8 talking generally.  You know, obviously, the answer's
9 going to be different in what it specifically will do
10 depending on the design of the can, right?
11     A.   Well, I've heard people use the word buckle
12 but it's nowhere to be found in the regulations.
13     Q.   The word buckle is nowhere to be found?
14     A.   It is not.
15     Q.   And you're referring to DOT regulations?
16     A.   Yes.
17     Q.   Okay.  So other than the fact that if a can
18 is overheated, it will either vent, buckle or burst, is
19 there any other consequences of being overheated in
20 terms of what the physical can will do?
21     A.   Well, in the context of the two-piece can,
22 that's correct.  I've heard say that in three-piece
23 cans, the dome could pop off but that's not really a
24 part of the issue here.
25     Q.   If the dome pops off, is that -- you don't

Page 61

1 consider that a burst?
2     A.   Yes, I do.
3     Q.   Okay.  Do you have an understanding that if
4 there's no vented -- venting feature on an aerosol can
5 and it's overpressurized, it will eventually burst at
6 its weakest seam?
7     A.   Eventually, you mean if you keep heating it
8 and heating it and heating it to failure?
9     Q.   Yes.
10     A.   It probably will, yeah.
11     Q.   Is there anything else it will do?
12     A.   Not that I know of.
13     Q.   This is just a matter of physics, right?
14     A.   Well, pressure will affect the weakest link.
15     Q.   Okay.  And if there is a venting feature, do
16 you agree that the can will vent and not burst?
17     A.   At a much lower pressure, yes.
18     Q.   Okay.  And then the fact that an aerosol can
19 will burst or vent if overheated, that's something
20 that's always been known about aerosol cans, right?
21         MS. ROCK:  Object to the form.
22         THE WITNESS:  I can't say it's always been
23     known.  I mean, are we going back how far?
24 BY MS. AMBROSE:
25     Q.   Since the invention of aerosol cans.

Page 62

1     A.   I can't say.
2     Q.   Do you know how long it's been known that
3 aerosol cans, if overpressurized or overheated, that
4 they will either vent or burst?
5     A.   Well, I think the --
6         MS. ROCK:  Object to the form.  Known by
7     whom?
8 BY MS. AMBROSE:
9     Q.   Let me rephrase the question.  Let me ask
10 another question first, just to make sure the record is
11 clear.
12         You mentioned a can might buckle, right?
13     A.   I didn't say that.  You said that.
14     Q.   Okay.
15     A.   I said the regulations don't account for
16 buckling.
17     Q.   Okay.
18     A.   I know what people say buckling is and I
19 think can that happen, yes.
20     Q.   Okay.  And if a can buckles but you keep
21 applying pressure to it, eventually it will burst,
22 right?
23     A.   It can, yeah.
24     Q.   So the end result -- and it may depend -- you
25 know, the amount of the pressure might be different

Page 63

1 depending on the design of the can but end result is
2 either going to be either a burst or a vent, the end
3 result of applying pressure?
4     A.   No, no.  There's no such thing as a vented
5 can bursting.
6     Q.   Right.
7     A.   So the way you phrase that question, it's
8 either going to -- in this case of the 2Q can, it's
9 either going to vent at 180 or burst above 270.
10     Q.   Right.  I think I said "or" but if I didn't,
11 I guess the record will speak for itself but the fact --
12 okay.  So the fact that aerosol cans, if overpressurized
13 can burst or vent, has that been generally known in the
14 aerosol can industry for the past several decades?
15         MS. ROCK:  Object to the form.
16         THE WITNESS:  I think that it's addressed in
17     the regulations.  They're not -- I think they're
18     from the '70s.
19 BY MS. AMBROSE:
20     Q.   And you don't really know what the industry
21 has known for decades, right?
22     A.   I don't know what's in their heads, no.
23     Q.   Okay.  And the fact that an aerosol can will
24 vent or burst if overpressurized is something that the
25 CPSC has been aware of for decades, right?

Page 64

William Kitzes - 4/5/2018
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1     A.   I can't say that.
2     Q.   You don't know, right?
3     A.   No.
4     Q.   Okay.  And despite the fact that aerosol cans
5   may burst or vent if overheated, they're still legal in
6   the United States, right?
7     A.   No, only -- it's only legal to use a vented
8   can if you get a special permit from DOT and it's
9   generally for product that cannot withstand the water
10  bath like whipped cream.  There is no exception for oil.
11  As far as I can tell, there's no special permit and as
12  far as I can tell, it's not acceptable to use a vented
13  can for extremely flammable propellent and cooking oil.
14    Q.   And, again, you're relying on DOT
15  regulations?
16    A.   And my research into the special permits.
17  It's not -- this -- the subject can is not even labeled
18  special permit which it would have to be in order to be
19  vented.
20    Q.   So setting aside the regulations for a
21  moment, is it your contention that it's illegal for
22  vented cans -- is there any other basis, sorry, for your
23  contention that -- that vented cans can't be sold in the
24  United States aside from DOT regulations?
25        MS. ROCK:  Object to the form.

Page 65

1   danger, extremely flammable, may burst when heated and
2   the GIS pictograms of explosion and fire.  That's about
3   as good a label as you're going to get if you're going
4   to sell it in that condition, which I think needs to be
5   addressed.
6     Q.   Okay.  Is there anything other than your
7   reliance on DOT regulations to conclude that vented cans
8   are inappropriate without a special permit?
9     A.   No.
10        MS. ROCK:  Object to the form.
11  BY MS. AMBROSE:
12    Q.   And you're referring specifically to --
13    A.   I mean --
14    Q.   -- 306?
15    A.   -- let me -- let me rephrase that.  From a
16  safety analysis point of view, knowing the danger, I
17  think that it's inappropriate to sell it regardless of
18  the regulation but I think the regulation lays it out
19  and given the hazard, the environment and foreseeable
20  consumer use in the kitchen, that can, the vented can
21  with extremely flammable propellent should never be sold
22  to consumers.
23    Q.   Okay.  With respect to the specific can in
24  the Coello matter, what did you do to familiarize
25  yourself with the design?

Page 67

1         THE WITNESS:  I didn't say that vented cans
2   couldn't be sold in the United States.
3   BY MS. AMBROSE:
4     Q.   Well, I thought --
5     A.   I said that --
6     Q.   -- you disagreed with my statement.
7         MS. ROCK:  Let him finish his answer.
8         THE WITNESS:  I said that vented cans of
9   cooking oil and extremely flammable propellent are
10  not cognizant under the regulation without a
11  special permit with which ConAgra does not have
12  for Pam.
13  BY MS. AMBROSE:
14    Q.   And by regulation, you're referring to --
15    A.   306.
16    Q.   Do you agree that with an adequate warning
17  aerosol cans can be safely sold in the United States?
18    A.   Which aerosol cans?
19    Q.   Are there some that you believe cannot be
20  safely sold to consumers regardless of the warning?
21    A.   Well, I don't believe that it's appropriate
22  to sell the subject can with -- vented can with canola
23  oil and extremely flammable propellent, period.  Now,
24  you know, the best one can do from a labeling standpoint
25  I think basically conforms to the Canadian label,

Page 66

1     A.   The same.  Nothing in addition.
2     Q.   Did you personally look at the can?
3     A.   No.
4     Q.   Did you examine any exemplar cans?
5     A.   Just the one I bought which is nonvented.
6     Q.   Do you know when the can in Coello was
7   manufactured?
8     A.   No.
9     Q.   Do you know when the can was filled and
10  sealed?
11    A.   No.
12    Q.   Did you review the specifications for the can
13  from DS Containers?
14    A.   Just as it relates to the can in Schmidt.
15    Q.   And what specifically did you look at?
16    A.   The emails back and forth, the -- the data,
17  the -- the -- the sizing.
18    Q.   And did you look at a document that was --
19  contained the actual specifications for the can,
20  thickness of the metal, size, you know, all the
21  dimensions, those kinds of things?  Does that sound
22  familiar?
23    A.   Well, I don't know if I saw such a document
24  but I know that they stated that they even, you know,
25  thickened the bottom plate to comply.

Page 68

Case 3:14-cv-01816-SRU   Document 187-2   Filed 12/17/19   Page 31 of 140
William Kitzes -- 4/5/2018
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  Q.   Did you review any manufacturing records
2  related -- relating to the can in Coello?
3  A.   Well, I saw some of the water bath results,
4  fire testing.
5  Q.   And what -- that's not referenced in your
6  report, right?
7  A.   Well, you asked me and I have it but it's
8  not -- it's not something that was relevant to my
9  opinion.
10  Q.   The manufacturing records relating to the can
11  wasn't relevant to your opinion?
12  A.   No.
13  Q.   Did you review any of the quality assurance
14  policies relating to the manufacture of the can in
15  Coello?
16  A.   I -- I saw whatever was available.
17  Q.   And what do you mean by that?  Who made
18  documents available to you?
19  A.   Mr. Smith, Ms. Rock.
20  Q.   So if they -- so you don't know what was
21  available just in general in litigation, right?  You
22  only know what they gave you?
23  A.   No.  It's really not part of my area.
24  Q.   The quality assurance policies relating to
25  the manufacture of the can is not your area?

Page 69

1  Q.   Do you know when the cans were filled and
2  sealed?
3  A.   No.
4  Q.   Did you review the specifications for those
5  cans with the -- DSC's specifications for those cans?
6  A.   Same answer.  Just what was in the material
7  but not part of my opinion.
8  Q.   And did you review any of the -- any
9  manufacturing records relating to the cans in Schmidt
10  Meyer?
11  A.   No.
12  Q.   Did you review any quality assurance policies
13  relating to the manufacture of the cans in Schmidt
14  Meyer?
15  A.   I don't know what that means.  I mean, I did
16  see some material about the water bath.  Is that
17  included in there?
18  Q.   Any material that you're relying on you would
19  have included in your report?
20  A.   Yes.  Except for those --
21  Q.   Okay.
22  A.   -- extra.
23  Q.   Okay.  I mean, I can represent to you that
24  there are several documents relating to quality
25  assurance policies on the manufacturing of the can and

Page 71

1  A.   No, I don't have an opinion about the quality
2  of the cans.  And I have an opinion about the safety
3  performance of the cans.
4  Q.   Did you know whether the can in Coello was
5  made according to its specifications?
6  A.   I have no idea.
7  Q.   Okay.  And with respect to the multiple cans
8  at issue in the Schmidt Meyer matter, what did you do to
9  familiarize yourself with the design of those cans?
10  A.   I read the material.  I looked at the
11  pictures.
12  Q.   Okay.  And by material, fair to say you're
13  referring to materials that you've referenced in your
14  report?
15  A.   Yes, ma'am.
16  Q.   Did you personally look at those cans?
17  A.   No.
18  Q.   Did you examine any exemplar cans?
19  A.   I bought a couple back in 2014.
20  Q.   And were these the same cans that were at
21  issue in the Schmidt Meyer matter in terms of design?
22  A.   No.  I couldn't find any vented ones.
23  Q.   Do you know when the cans at issue in the
24  Schmidt Meyer matter were made?
25  A.   No.

Page 70

1  you're not -- you agree with me that you didn't review
2  all those, right?
3  A.   I do not believe I did.
4  Q.   And do you know whether the cans in the
5  Schmidt Meyer case were made according to their
6  specifications?
7  A.   No idea.
8  Q.   And there were at least two Pam vented cans
9  found at the scene of the fire in that case, correct?
10  A.   Yes.
11  Q.   Do you know which one of the two cans vented
12  first?
13  A.   No.
14  Q.   Do you know whether or not they both vented?
15  A.   I don't know.
16  Q.   And you're not a chemist, right?
17  A.   That's correct.
18  Q.   You're not a food scientist?
19  A.   Correct again.
20  Q.   You don't have a hard science background?
21  A.   Hard science?
22  Q.   (Nods head.)
23  A.   I've taken some hard science courses but I
24  don't claim to be an expert in hard science.
25  Q.   And you're referring to courses you would

Page 72

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU  Document 167-2  Filed 12/17/19  Page 32 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  have taken at Madison?
2      A.   Yes.
3      Q.   And you have no formal education or job
4  experience relating to cooking spray formulations,
5  right, other than what you've done for this litigation?
6      A.   Well, as far as what actually goes into the
7  cooking sprays, I say that's true.
8      Q.   You have no formal education or job
9  experience relating to the propellents used in the
10  cooking sprays?
11     A.   Oh, I'm very familiar with the propellents.
12     Q.   Okay.  And what is your formal education
13  relating to propellents?
14     A.   Formal?
15     Q.   (Nodding head).
16     A.   What do you mean?
17     Q.   Okay.  Let me ask a different way.  Do you --
18  I had asked you both about formal education and job
19  experience.  I'm going to break that up.  Do you have
20  any formal education relating to propellents?
21     A.   Well, I don't have a degree in propellents.
22     Q.   Okay.  Do you have any job experience
23  relating to the propellents used in cooking sprays?
24     A.   I have lots.
25     Q.   Okay.  And what is that?

Page 73

1      A.   Well, I have many -- much involvement in
2  propane as it relates to -- to heating.  I have
3  experience in butane as it relates to cigarette
4  lighters.  And I am the public member of the Florida
5  Propane Research and Education Council.  It's on my
6  vitae.
7      Q.   Is it your understanding that the propellent
8  used in Pam Cooking Spray is propane?
9      A.   Well, it's liquid petroleum gas with the
10  major component of which is propane, butane and then
11  isobutane.
12     Q.   Are you familiar with the specific
13  formulation of that in terms of exactly what percentages
14  and, you know, kinds of --
15     A.   According to the MSDS, it's, you know, about
16  ten percent propane and less than seven butane and more
17  than seven isobutane, something like that.  It's on the
18  MSDS.
19     Q.   Okay.  And with respect to the specific
20  cooking spray formula used in the Coello matter, what
21  did you do to familiarize yourself with that formula?
22     A.   Just, you know, general awareness of the
23  actual ingredients.
24     Q.   And you reviewed the 2007 MSDS for Pam
25  Original, right?

Page 74

1      A.   Right.
2      Q.   And you reviewed the 2010 MSDS relating to
3  the Pam Original?
4      A.   Correct.
5      Q.   If I told you that the formulation at issue
6  was introduced in 2012, you would agree that you haven't
7  actually reviewed the formulation, right?
8      A.   Well, I haven't received anything past 2010
9  and that doesn't mean that that doesn't reflect the 2012
10  formulation, especially since no additional MSDS has
11  been at least provided to me.
12     Q.   But, again, you're relying on what materials
13  your -- the plaintiffs' lawyers have given you, right?
14     A.   Yeah, and what I got off ConAgra's website,
15  which is the 2010.
16     Q.   And you would anticipate that ConAgra would
17  announce its formulation on its website?
18     A.   They -- they announce their MSDS.
19          And you talked about the formulation for like
20  the propellent.  You know, the general ingredients down
21  to the end, I don't know but that's got to be printed on
22  the can so it's not as if it's a secret.
23     Q.   But you know -- so I guess what I think
24  you're saying is that you know the components of the
25  propellents that were included in Pam Cooking Spray at

Page 75

1  least under the formulation that was relevant to the
2  2010 MSDS and you know the ingredients of Pam Cooking
3  Spray from the label, right?
4      A.   Yeah.
5      Q.   But you don't actually know the recipe,
6  right?  You don't know the percentages, the exact
7  amounts of each or how it's made?
8      A.   I do of the propellent, not of the oil.
9      Q.   And what makes you think you know for the
10  propellent?
11     A.   They printed it.  It's in the MSDS.
12     Q.   They printed --
13     A.   But in any event -- in any event, the MSDS
14  claims that it is extremely flammable, that's ConAgra's
15  words, and that requires the signal word danger.
16     Q.   Okay.  And I think -- I think we actually
17  don't disagree that you're not really here to talk about
18  the very specific formulations, right?  You're here to
19  talking about the warning?
20     A.   Well, yeah, and the basis for them, yeah.
21     Q.   Okay.  Is it your understanding that this --
22  the exact amounts of the ingredients as well as the
23  exact amounts and proportions of the component of the
24  propellent -- is it your understanding that those do not
25  have a bearing on the pressure of the formula?

Page 76

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 33 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1    A.    I didn't say that.
2    Q.    And it's -- and is it your view that the
3  particular kind of amounts of each of the ingredient and
4  the, you know, ratios and amounts of the components of
5  the propellent that whether they have any bearing on the
6  flammability of the cooking spray?
7    A.    Absolutely.  According to ConAgra.  That's
8  not my opinion.  That's a fact.
9    Q.    I believe the 2007 MSDS references a
10  different propellent, nitrous oxide.  Does that sound
11  familiar to you?
12    A.    Well, actually, there are two 2007 MSDS, one
13  in June and one in July.  One of them notices nitrous
14  oxide and the other one liquid petroleum gas.  No, it's
15  not nitrous.  Isn't it ethanol?  One of them -- one of
16  them's ethanol.
17    Q.    With respect to Coello, do you know the
18  expected pressure of the cooking spray as it relates to
19  temperature?
20    A.    Well, at 131 degrees Fahrenheit, it's going
21  to vent at 180 psig.
22    Q.    So it's your understanding that if -- if
23  cooking spray reaches 131 degrees Fahrenheit, the
24  pressure is 180 psig?
25    A.    Not necessarily but that's the maximum that

Page 77

1  will cause it to vent.  And I don't know that it has to
2  reach 131 to get to 180.  That's just the -- the DOT
3  test.
4    Q.    So the DOT test actually ensures that the can
5  doesn't reach 180 at 131 degrees, right?  Otherwise, it
6  would vent, right?
7    A.    Well, it doesn't ensure it.  It says it
8  can't.
9    Q.    Okay.  So it can't.  So what I'm asking is
10  you don't really know the temperature at which cooking
11  spray in the Coello case the temperature of the spray
12  would have to reach in order to get to a pressure of 180
13  psig, do you?
14    A.    No.
15    Q.    And you would have no reason to disagree with
16  plaintiffs' expert Lester Hendrickson that the
17  temperature would need to exceed 200 degrees Fahrenheit
18  in order to reach a pressure of 180 psig?
19    A.    If that's what he said, I don't disagree with
20  him.
21    Q.    And you haven't done any flammability testing
22  relating to the cooking spray formula in Coello,
23  correct?
24    A.    I have done no flammability testing.
25    Q.    With respect to the specific cooking spray

Page 78

1  formula used in the Schmidt Meyer matter, what did you
2  do to familiarize yourself with that formula?
3    A.    Same thing.
4    Q.    Okay.  Do you -- do you -- and by the same
5  thing, you mean the same thing you did with respect to
6  your investigation in the Coello matter?
7    A.    Yes.
8    Q.    And do you know the formulation of the
9  cooking spray?
10    A.    I can't say I know the exact ingredients.
11    Q.    And you don't know exactly what propellent
12  was used either, do you?
13    A.    Well, again, as stated in the MSDS.
14    Q.    So your opinion depends on the propellent
15  being the same as it was -- in 2012, the same as it was
16  in the 2010?
17    A.    Well, unless -- unless you've got some other
18  information, which I'm happy to evaluate, that's my
19  understanding.
20    Q.    But you didn't -- you did not -- I will
21  represent to you that there were documents produced in
22  the litigation providing actual information about the
23  formulation, not the limited information that's on the
24  MSDS.  And you did not review those documents, right?
25    A.    No.

Page 79

1    Q.    Because you agree that formulation of Pam
2  Cooking Spray, that's proprietary, right?
3    A.    Well, I imagine the recipe probably is but
4  that doesn't mean that it can't be evaluated during
5  litigation.  That's my understanding.
6    Q.    And your view is that everything you need to
7  know for your opinion is based on these MSDSs from 2007
8  and 2010 as it relates to the formulation?
9    A.    As it relates to the propellent.
10  Formulation's not really on those MSDSs and, you know,
11  if there's some difference in the MSDS as it relates to
12  the 2012, then, you know, like I say, I'd be happy to
13  look at it.
14    Q.    Is it your view that that -- is it your
15  understanding, I should say, that the propellent is
16  separate from the rest of the cooking spray form --
17  ingredients?
18    A.    I don't know what that means.
19    Q.    So you don't know, right?  You don't know the
20  propellent interacts with the cooking spray, correct?
21    A.    Well, the propellent my understanding is used
22  to -- to push the spray out and, you know, is somewhat
23  separate from the canola oil inside the can.
24    Q.    And you don't -- what is your basis that it's
25  somewhat separate?

Page 80

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 34 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1   A.   That's just my understanding.

2   Q.   And just as with the Coello matter, for the

3   Schmidt Meyer case, you do not know how hot the cooking

4   spray would need to get in order to reach a pressure of

5   180 psig, correct?

6   A.   Not my area.

7   Q.   And no reason to dispute what Lester

8   Hendrickson says on that topic?

9   A.   It's not my area to dispute.

10   Q.   And you haven't done any flammability testing

11   relating to the cooking spray formula at issue in the

12   Schmidt Meyer case, right?

13   A.   Correct.

14   Q.   Let's look at the reports.

15   (Exhibit Number 3 and 4 marked for identification)

16   BY MS. AMBROSE:

17   Q.   All right.  And it looks like you've pulled

18   out a document.  What is that?

19   A.   It's my copy.

20   Q.   Okay.  I'd ask you to use the exhibit copy.

21   A.   No.

22   Q.   Okay.  Well, then I'm going to mark your copy

23   as an exhibit.

24   A.   That's fine.  And the only reason is is that

25   it's double-sided and we'll be here all day.  You know,

Page 81

1   plus I -- you're more than welcome to a copy of mine.  I

2   dragged a blue pencil across it occasionally.

3   Q.   So this is the report for Coello.  Do you

4   also have your own copy of the Schmidt Meyer report?

5   A.   I do.

6   Q.   Okay.  Are you planning to rely on that right

7   now or are you going to use this copy?

8   A.   Well, I'm happy to pull them both.

9   Q.   I assumed that you'd be fine using this copy

10   but whatever you feel comfortable with.

11   A.   Well --

12   (Exhibit Number 3 remarked for identification)

13   THE WITNESS:  Would you like to mark that,

14   too?

15   (Exhibit Number 4 remarked for identification)

16   BY MS. AMBROSE:

17   Q.   Looks like there's kind of a stray page 48.

18   A.   Oh, that's probably the -- the signed page,

19   the original signature.

20   Q.   Okay.  And are these reports, Exhibit 3 and

21   4, substantially similar than -- it's your understanding

22   that these are the same as the reports that were

23   produced in this litigation, right?

24   A.   Yes.

25   Q.   Okay.  And Exhibit 3 has been marked as your

Page 82

1   report in the Schmidt Meyer case and Exhibit 4 is your

2   report in the Coello case, correct?

3   A.   Yes.

4   Q.   I want you to turn to the pertinent facts

5   section of each report that spans pages 8 through 13.

6   A.   Hang on just one second.

7   Q.   My first question will be whether the

8   pertinent facts section from pages 8 through 13, that's

9   the same for each report, right?

10   A.   Yes.

11   Q.   Is this something that you wrote?

12   A.   Yes.

13   Q.   Okay.  One of the things you mention in here

14   is a nonaerosol version of Pam.  You suggest it's no

15   longer for sale but you're aware that there's a pump

16   spray currently available, right?  I think you mentioned

17   it elsewhere.

18   A.   Yeah.  I said in 1991, it was not available

19   in Chicago.  It is available through Wren Technologies

20   as far as last year is concerned.

21   Q.   Okay.  And you -- you mention that ConAgra

22   changed the Pam container from a three piece to a

23   two-piece can in 2011, right?

24   A.   Is that your understanding from reviewing the

Page 83

1   deposition exhibits of Steve Baker?

2   A.   Yes.

3   Q.   The two-piece can is stronger than the

4   three-piece can, right?

5   A.   Yeah, it has -- it's also cheaper.

6   Q.   My next question was, the two-piece can costs

7   more money to make than the three-piece can, right?

8   A.   No, the other way around.

9   Q.   And what's your basis for that understanding?

10   A.   Well, that was the whole idea about the cost

11   reduction program that was saving 3.8 million dollars by

12   changing the Pam container from three piece to two

13   piece.

14   Q.   Okay.  So Steve Baker explained that issue,

15   right, the cost reduction program during his deposition,

16   right?

17   A.   He addressed it, right.

18   Q.   And you reviewed that?

19   A.   Yeah.

20   Q.   And he explained that it costs more money to

21   make the two-piece can per can than the three-piece can,

22   didn't he or are you saying he didn't say that?

23   A.   Not my recollection but I won't say he didn't

24   say it but it doesn't make sense.

25   Q.   Why wouldn't that make sense?

Page 84

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 35 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  A.  Because they said they were going to save all
2  this money going from a three piece to a two piece.  If
3  a two-piece can costs more than a three piece, I don't
4  know that they would save that money.
5  Q.   Is it your understanding that the only factor
6  or input that was used in calculating 3.8 million was
7  the cost of making on a per can basis?
8  A.   My recollection is that there was a whole
9  analysis done and at the end, as far as this can was
10 concerned, it was going to save that money.
11 Q.   Okay.  And it could have saved money because
12 it would be cheaper to transport the cans because
13 they're lighter, right?
14 A.   I don't -- I don't think it said that but
15 it's possible.
16 Q.   And it could have said that it could have
17 been -- you know, save money because they could reduce
18 the total number of sizes of cans, for example, right?
19 A.   I'd have to go back and look.
20 Q.   Okay.  You agree that you don't personally --
21 you don't actually know that the two-piece can costs
22 more money to -- or, sorry, that the -- that the
23 two-piece can costs less money to make than the
24 three-piece can, right?
25 A.   Well, for the purposes of Pam, I think that

Page 85

1  piece.  If that adds other things in addition to the
2  actual cost of the can, if that's what it says, that's
3  what it says.
4  Q.   Right.  And if it explains that it actually
5  costs more to make the two-piece can than the
6  three-piece can, you don't have any reason to disagree
7  with that, right?
8  A.   I'd have to go back and look.
9  Q.   The document says what it says, right?
10 A.   I agree with that.
11 Q.   Steve Baker's deposition, he testified to
12 what he testified, right?
13 A.   Well, you know, I mean, this is my
14 recollection of what it said in the cost reduction
15 report.
16 Q.   And the cost reduction report, that was a
17 forecast, right?
18 A.   Well, it was what -- based on the information
19 that ConAgra had, that was what they believe would
20 happen.
21 Q.   And you don't know what actually happened,
22 right?
23 A.   I don't.
24 Q.   All right.  You say that the propellent used
25 in Pam is extremely flammable.

Page 87

1  the -- for whipped cream, it costs more.
2  Q.   Okay.  So for -- let's talk specifically
3  about -- okay.  Sorry.  Let me back up.
4        Is it your testimony that it costs a
5  different amount of money to make a two-piece vented can
6  if whipped cream is going to be in it versus a two-piece
7  vented can if cooking spray is going to be in it?
8  A.   Well, without looking back at the document,
9  that's what it seems to say.
10 Q.   So can we agree that you don't -- that this
11 isn't your area, that you don't know, in fact, what
12 costs more money?
13 A.   It's just a fact.  I didn't allude to it in
14 my opinions best of my recollection.
15 Q.   Okay.  So you're not relying on it for your
16 opinions?
17 A.   No.
18 Q.   And if the fact, as you stated, is actually
19 is incorrect as a matter of fact, for a better word, you
20 don't have any reason -- I mean, you -- you're basing
21 this off of your reading of Steve Baker's deposition and
22 the exhibits, right?
23 A.   Well, the one exhibit on cost reduction that
24 clearly said that for Pam, they were going to save 3.8
25 million dollars by changing from a three piece to a two

Page 86

1  A.   That's right.
2  Q.   What is your basis for that opinion?
3  A.   Well, it's -- according to the MSDS, it's
4  minus a hundred degrees Fahrenheit flash point and also,
5  according to the ConAgra MSDS, they label it as
6  extremely flammable.
7  Q.   Is it your understanding that the regulations
8  surrounding the creation of an MSDS are the same as the
9  regulations that deal with the labeling of Pam Cooking
10 Spray?
11      MS. ROCK:  Object to the form.
12      THE WITNESS:  Well, that's a complicated
13 question.  The answer is yes as it results for Pam
14 for industrial purposes.  For consumer use, it's
15 developed by OSHA but certainly applies to the
16 CPSC regulations.
17 BY MS. AMBROSE:
18 Q.   So if your --
19 A.   And --
20 Q.   Sorry.  Go ahead.
21 A.   And -- and, you know, the -- the Canadian can
22 spells it out honestly and says it's extremely
23 dangerous.
24 Q.   Okay.  So if -- okay.  Let's talk about --
25 you mentioned a flash point of negative a hundred

Page 88

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 36 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1 degrees Fahrenheit, right?
2    A.   (Nods head.)  Yeah.
3    Q.   And you learned that from where?
4    A.   From the MSDS.
5    Q.   If that assumption is wrong, do you have a
6 different basis for concluding that the product is
7 extremely flammable?
8        MS. ROCK:  Object to the form.
9        THE WITNESS:  Well, since they've used it
10       over again, you know, I mean, I'd be shocked if --
11       if they were wrong, number one.  Number two, they
12       themselves called it extremely flammable.  And
13       liquid petroleum gas is extremely flammable.
14 BY MS. AMBROSE:
15   Q.   Do you have an understanding of how to
16 measure flash point in aerosol -- of contents in aerosol
17 containers?  Is it possible to do?
18   A.   Well, you know, you've got the flash point
19 generally and then there's another test for aerosol
20 containers that has to do with flashback, a test that I
21 never saw accomplished.
22   Q.   Okay.  And so you -- do you know, one way or
23 another, whether the cooking spray at issue in Coello is
24 considered extremely flammable when applying the
25 relevant CPSC standard for determining the flammability

Page 89

1 of the contents in pressurized containers?
2    A.   I haven't seen those test results but I have
3 seen, again, ConAgra's own MSDS that clearly states that
4 it's extremely flammable.
5    Q.   So you don't -- you don't know, one way or
6 another, how it would perform on a -- on the CPSC
7 flashback standard, though, right?
8    A.   I haven't seen any results.
9    Q.   Okay.  And that you keep referring to how
10 ConAgra labeled it in the 2010 MSDS, right?
11   A.   Yeah.
12   Q.   And you don't know whether the formula is the
13 same in the Coello case as it was in the 2010, right?
14   A.   I don't.
15   Q.   All right.  And the same with the cans at
16 issue in the Schmidt Meyer case.  You -- you don't know,
17 one way or another, whether they're considered extremely
18 flammable when applying the relevant CPSC standard for
19 determining the flammability of contents of
20 self-pressurized containers, right?
21   A.   I haven't seen any test results.  They label
22 it combustible which is two steps below extremely
23 flammable.
24   Q.   Who labels it combustible?
25   A.   ConAgra.

Page 90

1    Q.   On where?
2    A.   On the cans of Pam aerosol.
3    Q.   Does -- do -- and are you referring to the
4 cans at issue in the -- in this litigation?
5    A.   Well, as best as I can see but also in the
6 exemplar cans that I bought.
7    Q.   Do you know whether the -- the cans at issue
8 or the cans -- sorry, the can at issue in Coello also
9 says that it's flammable, right?
10   A.   Combustible I think.
11   Q.   You don't recall whether it says flammable on
12 the can?
13   A.   It could on the back but I did note that in
14 some labeling they at least used red for flammable but
15 in these cans, there was nothing to make it salient
16 because it just is the same right justified, which is a
17 problem in itself, black text.
18   Q.   You disagree with black text?
19   A.   Well, for the text, it's okay but for the
20 signal words and the hazard, color contrast is clearly
21 more effective.
22   Q.   And do you agree that there's a high contrast
23 between black and white, right?
24   A.   Yes.  But it doesn't stand itself out from
25 the rest of the text.  That's what noticeability and

Page 91

1 salience is all about.  And they use it on some cans in
2 red but for some reason, not on this one and they used
3 red on other places on the can so it's not like it's
4 going to cost them extra.
5    Q.   Okay.  Now, in this pertinent facts, still in
6 this section of your report, for statements in the
7 report where you say what certain regulations allegedly
8 say and you have excerpts of various regulations, do you
9 agree that to the extent you have any errors that we can
10 just look to the regulation itself?
11   A.   I'm not aware of any errors but yes, we can
12 look to the regulation itself.
13   Q.   Okay.  So if the DOT regulation, in fact,
14 allows for 2Q rated cans to buckle at 180 psig, we
15 can -- we can agree -- and we can fight about what that
16 means but we can agree that the regulation says what it
17 says?
18   A.   I read that regulation ten times and the word
19 buckle I don't believe is in there.
20   Q.   Okay.  But if it is, the regulation says what
21 it says.
22   A.   If it is, it is, right.
23   Q.   You're not here -- do you consider
24 yourself -- sorry.  Let me back up.
25       Do you consider yourself an expert on the DOT

Page 92

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU  Document 167-2  Filed 12/17/19  Page 37 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  standards for aerosol cans?
2  **A.  Well, I have expertise in regulatory analysis**
3  **so I have expertise in the review and application of**
4  **regulations.**
5  Q.  Okay.  So I have expertise in regulatory
6  analysis.
7  **A.  Great.**
8  Q.  Right?  I'm a lawyer.  So beyond just being a
9  lawyer and being able to review the regulations, what
10  other -- is there anything else that makes you an expert
11  specifically on Department of Transportation standards
12  relating to aerosol cans?
13  **A.  I have no idea what your expertise is.  I**
14  **have been working with DOT regulations under PHMSA**
15  **pipelines for years.**
16  Q.  And I'm talking about aerosol cans.
17  **A.  Well, those are -- you know, my -- my**
18  **familiarity with other PHMSA regulations and applying**
19  **them to safety management and that's just what I'm doing**
20  **here.  I'm taking the facts and applying them to the**
21  **analysis that I've been doing for the last 40 years.**
22  Q.  Okay.  But your opinion is not -- with all
23  due respect, isn't -- that's not what the opinions say.
24  It seems like you're offering legal conclusions about
25  the interpretation of DOT regulations.  Do you agree --

1  Q.  Right.
2  **A.  It's certainly up to the judge to decide --**
3  Q.  Exactly.
4  **A.  -- however he wants to run his case.**
5  Q.  And I -- and I don't think we disagree.  I
6  think what I'm trying to do is figure out what your
7  considering to be kind of just facts or regulations on
8  which you're, you know, extrapolating to make an opinion
9  versus, you know, for example, you agree the regulation
10  says what it says.  Specifically whether they complied
11  with the regulation or what -- you know, what is -- what
12  it means to comply with the regulation, those are legal
13  questions, right?
14  MS. ROCK:  Object to the form.
15  THE WITNESS:  I'm just addressing these
16  issues from a safety management point of view.
17  You know, I guess it's up to the judge to
18  determine.  You know, all I'm trying to do is set
19  a basis for an opinion, you know, that includes
20  the fact that I don't believe ConAgra had any
21  authority to use Pam and a flammable -- extremely
22  flammable propellent in a vented can without a
23  special permit that they didn't have.  And in
24  order to say that, I got to talk about what the
25  regulation says.

1  MS. ROCK:  Object to the form.
2  BY MS. AMBROSE:
3  Q.  Do you disagree that, you know, the judge can
4  decide legal questions, right?
5  **A.  Well, the judge can decide legal questions.**
6  **My opinions are based on safety management as it applies**
7  **to the regulations but I agree that it's up to the judge**
8  **to determine what the law is.**
9  Q.  Okay.  So when you say something like, you
10  know -- let me find an example.
11  All right.  So on page 9, both reports,
12  Exhibits 3 and 4, you have language that says stuff
13  that -- you know, DOT standard, 2Q cans must be
14  constructed to prevent bursting and releasing extremely
15  flammable propellent at a minimum of 270 psig and so on
16  and so forth.  To the extent that you are just
17  referencing what your view of the regulations are, do
18  you agree that it's the role of the court to determine
19  what the regulations say?
20  **A.  Well --**
21  MS. ROCK:  Object to the form.  Asked and
22  answered.
23  THE WITNESS:  This is -- these -- I just
24  stated a fact, okay?
25  BY MS. AMBROSE:

1  BY MS. AMBROSE:
2  Q.  Right.  Okay.  And, similarly, you have some
3  statements in here about -- you know, statements by
4  regulatory agencies or press releases or memoranda, can
5  we agree that the statements say what they say?
6  MS. ROCK:  Object to the form.
7  THE WITNESS:  Okay.  It's called a predicate,
8  you know.  I mean, it's important for me to let my
9  audience know what the basis is for my opinion.
10  That's all.
11  BY MS. AMBROSE:
12  Q.  Right.  And I appreciate that.  I guess what
13  I'm referring to -- and maybe you are more confident in
14  your report and the accuracy than I am after having
15  found some errors but to the extent there is an error,
16  you know, a transcription type error, you -- you changed
17  the words or you omitted, you know, subsection three of
18  a four subsection, you agree that we can look to the
19  documents when it comes to documents that you cite about
20  from regulatory agencies or memoranda, right?
21  **A.  Of course.  If I eliminated a section, it's**
22  **because it wasn't relevant.**
23  Q.  Okay.  Right.  But we don't need to go
24  through every single document and cross-reference to
25  make sure that you've transcribed it right?

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU Document 167-2 Filed 12/17/19 Page 38 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  A.  We do not.
2  Q.  And I think this goes to what you just said
3  but you generally included in here what you think is
4  relevant to your opinions, right?
5  A.  Yes.
6  Q.  You haven't included, you know, all possible
7  statements by regulators regarding the design or
8  transportation of aerosol cans?
9  A.  I have not.
10  Q.  All right.  You mention a 1977 CPSC report on
11  page 11.  I'm going to talk about that.
12  A.  Yeah.  I -- I actually go into it a little
13  bit more detail a couple pages on.
14  (Exhibit Number 5 marked for identification)
15  BY MS. AMBROSE:
16  Q.  Okay.  I'm handing you what's been marked as
17  Exhibit 5.  Is this the 1977 report that you're
18  referencing in your opinions in Exhibits 3 and 4?
19  A.  Yes, it's the one I provided to you.
20  Q.  And you note that this report estimates 160
21  explosion injuries due to exposure of the can to heat,
22  right?
23  A.  Right.
24  Q.  There's a note in the report that you don't
25  mention on page 28.  The numbers are difficult.  I think

1  they have numbers on a few of the pages so...
2  Okay.  Twenty-eight might not be the right
3  page.  Let me try to find it.
4  Okay.  So what I'm referring to -- it seems
5  the page numbers are out of order here but there is a
6  page that precedes the page that looks like it's
7  page 29.  It says the word discussion on the top.  And
8  it -- on the opposite page, it shows valves.  Can you
9  find -- yeah, there you go.
10  A.  Okay.
11  Q.  Okay.  So I just want to point out the last
12  paragraph of the discussion here.  The report concludes
13  here that, although, aerosol cans are legally required
14  to caution against exposure of the container to heat,
15  "Many explosions occur because the victim is either
16  unaware that the container is near a heat source or is
17  not aware of the extreme temperatures to which the
18  product is being exposed."  Do you see that?
19  A.  Yeah.
20  Q.  Okay.  So would you agree with me that at
21  least since the 1970s, the CPSC has been aware of the
22  potential hazard relating to consumers inadvertently
23  allowing aerosol cans to be overheated?
24  A.  I'm sure.
25  Q.  Have you looked at any more recent data on

1  the number of explosion injuries due to aerosol cans?
2  A.  I tried.  I looked at the NEISS data.
3  Q.  Let me -- sorry.  That's data from emergency
4  room visits?
5  A.  Yeah.  The National Electronic Injury
6  Surveillance System, which is the same place that this
7  material was gathered, but they haven't done another
8  special study like this since then so I wasn't confident
9  in the data that I would be willing to rely on it
10  because it actually honestly came out twice as much.  It
11  came out 350 explosions with approximately the same
12  number of total incidents but I'm not going to rely on
13  it because I'm not confident in -- in the -- in my
14  ability to pick -- pick them out.
15  Q.  And can you just elaborate on what you mean
16  by your ability to pick them out?  I mean, you're not --
17  is it -- I mean, this is report -- this report, for
18  example, the 1977 report was prepared by an
19  epidemiologist, right?
20  A.  Who worked for me at one point.  Bill Barr.
21  Q.  Okay.  But so -- I mean, you agree with me
22  that you don't really have the -- quite the right
23  qualification to run your own epidemiology study based
24  on the NEISS data, right?
25  A.  Well, I'm not sure that's true.  I don't

1  have the resources to do it.  What they did here was
2  what they call a special study and they looked at, you
3  know, incidents within a specific time frame and did
4  some more in-depth work on it to get the numbers that
5  they did.  They haven't done that since so I don't think
6  it was fair to -- to -- to compare apples and oranges,
7  even though in the -- in my ability to dice the -- slice
8  the data, it seemed to come out higher but I'm -- I'm
9  not going to rely on that because I can't back it up.
10  Q.  And you don't know whether or not the cans
11  used in Coello is more or less safe than the cans that
12  were manufactured in the 1970s on which this report was
13  based, right?
14  A.  Well, I can't speak to all those cans but,
15  once again, using a vented can for extremely flammable
16  propellent is, from a safety point of view, highly
17  inappropriate and exacerbates the danger.
18  Q.  So what are you using the study for?
19  A.  Just some background as to the number of
20  injuries per year and the number that the commission
21  felt were due to explosions.
22  Q.  Okay.  And you don't know whether any of them
23  involved vented cans?
24  A.  I do not.  I'm not sure there were vented
25  cans back then but there may have been.

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 39 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  Q.   How closely did you read this study?
2  A.   I read it.
3  Q.   So if the study talks about vented cans,
4  you're just not remembering that as you sit here today?
5  A.   If the study talked about vented cans,
6  then -- where am I -- then they -- they did look at
7  vented cans.  I don't know for what products.
8       It doesn't show a vented can in their
9  diagrams.
10  Q.   So if you go ahead two pages, the top
11  paragraph.
12  A.   Ahead which way?  Back or forward?
13  Q.   Go forward two pages from where we were
14  before.
15  A.   Uh-huh.
16  Q.   The top paragraph begins with "In recent
17  years."  Do you see that?
18  A.   Yeah.
19  Q.   And there's a discussion of safety pressure
20  release devices.  Do you know what those are?
21  A.   Originally they were the RVR which is the
22  venting on top of the three-piece can.
23  Q.   Okay.  So are you -- is it your opinion -- I
24  guess are you suggesting RVR isn't a vent or what --
25  what are you saying?

Page 101

1  A.   Liquid petroleum gas which is the propellent.
2  And liquid petroleum gas is the combination of the
3  propane, butane and isobutane.
4  Q.   Okay.  So you -- so -- so your understanding
5  is that when the can vents, it releases gas.
6  A.   And cooking oil.
7  Q.   Okay.  But they're not combined?
8  A.   It could be atomized on the way out.  I don't
9  know.
10  Q.   You don't know?  You don't know?
11  A.   But it certainly creates a highly
12  flammable --
13  Q.   And you don't know that it's highly
14  flammable?
15       MS. ROCK:  Object to the form.
16  BY MS. AMBROSE:
17  Q.   I mean, we've already walked through that
18  several times.  You don't know what the formula is or
19  whether --
20  A.   I do know what --
21  Q.   -- it passes the highly flammable testing --
22  A.   I do know what the formula is for the
23  propellent because it's in the MSDS and I know what the
24  flash point is, which is very low, minus a hundred
25  degrees Fahrenheit.  Now, if you've got some data that

Page 103

1  A.   Well, it's not a bottom vent but it serves as
2  a vent on a three-piece can.
3  Q.   Okay.  So in terms of the safety of aerosol
4  cans and your opinions about whether it's appropriate or
5  not to have a vent, is it your opinion that a vent on
6  the top of the can would be safe?
7  A.   Depends on what the propellent is.
8  Q.   So we're talking about Pam Cooking Spray.
9  A.   I'm not -- I don't believe it would be safe
10  with -- with the liquid propane, liquid petroleum gas
11  propellent.
12  Q.   All right.  So you're -- I mean, you're
13  distinguishing, as we sit here, about all of -- the
14  location of the vent but in reality, your opinion is
15  that no vents are appropriate for the Pam Original
16  Cooking Spray, right?
17       MS. ROCK:  Object to the form.
18       THE WITNESS:  Anything that vents extremely
19   flammable gas into the air is not appropriate.
20  BY MS. AMBROSE:
21  Q.   Okay.  You say gas.  What do you mean by
22  that?
23  A.   Liquid petroleum gas.
24  Q.   So is it your -- is it your understanding
25  that when the vent opens, it's expelling gas?

Page 102

1  shows the results of the flashback test, I'll look at
2  it.
3  Q.   Okay.  And if that data shows that it's not
4  extremely flammable, you would accept that?
5       MS. ROCK:  Object to the form.
6       THE WITNESS:  If it's a valid test, it is
7   what it is.
8  BY MS. AMBROSE:
9  Q.   And --
10  A.   But, again, they did label the Canadian
11  product extremely flammable in their MSDS.
12  Q.   Okay.  And the Canadian product you looked
13  at, let's talk about that for a second.  What label --
14  where did you see the label?  Google?
15  A.   No, Mr. -- Mr. Smith sent it to me.
16  Q.   Sent it to you.  Okay.
17  A.   Actually, Miss Nastri might have sent it to
18  me.
19  Q.   Okay.  And do you know whether it is the
20  current label?
21  A.   There was no date on it so I don't know.
22  Q.   So you don't know.  I mean, we're talking
23  about cases -- we're talking -- in this litigation,
24  we're talking about incidences that occurred in 2013 and
25  2014.  Do you understand that?

Page 104

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU Document 167-2 Filed 12/17/19 Page 40 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  A.  Let's not be sarcastic.  Yes, I do.
2  Q.  Okay.  So -- and you don't know -- so you --
3  so what makes you think that the formulation in the
4  current Canadian can is even the same as the cans that
5  were at -- in use in 2013 and 2014?
6  A.  Because I don't know what they could put in
7  there to be more flammable than liquid petroleum gas
8  which is highly flammable and extremely flammable.
9  Q.  So it's just speculation?
10  A.  And -- and, you know --
11  MS. ROCK:  Object to the form.
12  THE WITNESS:  Well, it's not speculation.
13  You know, it's a fact that they labeled it
14  extremely hazardous -- extremely flammable and use
15  the icons that, you know, would probably come out
16  of the GIS.
17  BY MS. AMBROSE:
18  Q.  Would a warning in your view be inadequate if
19  it -- if it takes a conservative approach in terms of,
20  you know, labeling, for example, extremely flammable
21  instead of flammable, even though technically it's
22  flammable?  Does that make the label inadequate?
23  MS. ROCK:  Object to the form.
24  THE WITNESS:  I have no idea what you just
25  asked me.

1  BY MS. AMBROSE:
2  Q.  So you seem to be assuming facts about the
3  components or the physical properties of the formula
4  based on what is on the outside label in terms of
5  flammability warnings, right, for the Canadian --
6  A.  If it says --
7  MS. ROCK:  Object to the form.  Go ahead.
8  THE WITNESS:  If it says extremely flammable,
9  I don't have any reason to doubt that.
10  BY MS. AMBROSE:
11  Q.  Okay.  You -- you also don't have any reason
12  to doubt -- you don't have any independent basis, one
13  way or another, about the flammability, right?
14  MS. ROCK:  Object to the form.
15  THE WITNESS:  Well, I --
16  BY MS. AMBROSE:
17  Q.  You're just reading the label, right?  Beyond
18  reading the label, what do you know?
19  MS. ROCK:  Which cans are you talking about?
20  Are you talking about the Canadian can?
21  MS. AMBROSE:  Yeah.
22  MS. ROCK:  Can you be more specific?
23  MS. AMBROSE:  The Canadian can.
24  THE WITNESS:  I'll have to look but I think
25  that the MSDS covered the Canadian formulation.

1  But, you know, the Canadian label is -- is clear
2  and to the point.  The label on these cans, any
3  reference to heating and bursting was hidden in a
4  block of text, very difficult to read because of
5  right justification.  You know, when you right
6  justify text, your eye can't follow across to the
7  next line.  And it was embedded in the middle of
8  the text, worst possible place for a warning about
9  bursting and explosion, and I don't understand,
10  you know, the failure to make it noticeable.  I
11  mean, to make it so that people could understand
12  what the danger is.  The cost of compliance, which
13  is another issue in warnings and I'm sure we'll
14  get to when you read those documents, here is like
15  near zero.  It doesn't require you to do anything
16  other than move them.
17  BY MS. AMBROSE:
18  Q.  So you just referenced an eye moving across
19  the text.  Didn't we talk earlier about how you're not
20  qualified to testify on that topic?
21  A.  That's a -- that's a well-known concept in
22  fluency, that right justification is the most difficult
23  text to read.
24  Q.  Did you look at CPSC data regarding the
25  number of hospital visits for housewares and kitchen

1  appliances?
2  A.  Why would I?  That was taken care of in
3  Bittner versus Honda.  Comparative risks such as you're
4  talking about is irrelevant to the safety of aerosol
5  cans.
6  Q.  Is that a case that you were involved in or
7  are you just citing a legal precedent in general?
8  A.  I was involved.  Wisconsin Supreme Court.
9  Q.  So I guess I'm just having a hard time
10  understanding what it is you thought was relevant then
11  about the 1977 study.
12  A.  It just is information about the number of
13  aerosol can injuries and what sub-set of those involved
14  explosions.  That's all.  It's notice.
15  (Exhibit Number 6 marked for identification)
16  BY MS. AMBROSE:
17  Q.  Okay.  I'm handing you -- I've handed you
18  what's been marked as Exhibit 6 which is a hazard
19  screening report from the CPSC from 2005.  You see that,
20  right?
21  A.  Yeah.
22  Q.  Okay.  You haven't reviewed this document,
23  right?
24  A.  I don't know why I would.
25  Q.  Do you agree that personal injuries can occur

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 41 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1 from a wide variety of kitchen items?

2 A. Sure.

3 Q. And just because an injury can occur doesn't

4 mean the product is unreasonably -- is not reasonably

5 save for its intended use, right?

6 A. Not necessarily.

7 Q. I'm not going to spend a lot of time on this

8 document because you didn't review it but I'll just note

9 that the -- do you have any reason to dispute this data

10 from 2002 that there were more than 31,000 emergency

11 room visits related to injuries due to ranges not

12 specified?

13    MS. ROCK: Can you give a page number?

14    THE WITNESS: Where are you?

15 BY MS. AMBROSE:

16 Q. Page 11.

17 A. Yes.

18 Q. And there were 34,380 emergency room visits

19 relating to unpowered gadgets and four deaths, right?

20 A. Yes.

21 Q. Okay. And a category of cookware accounted

22 to 36 -- accounted for 36,480 emergency room visits and

23 11 deaths, right?

24 A. Right.

25    And when you go across -- I mean, I don't

Page 109

1 Q. So it seems like you find it important to

2 look at data from 1970 -- from a 1977 report relating to

3 aerosol can explosions but not relevant to look at data

4 relating to other kitchen related injuries.

5    MS. ROCK: Object to the form.

6 BY MS. ROCK:

7 Q. I'm just having a hard time understanding the

8 distinction you're making.

9 A. I don't understand why stoves are relevant to

10 our analysis of reducing injuries for aerosols. I just

11 don't understand what the purpose is, you know. I mean,

12 I agree the years are different but it's like -- it's

13 more than apples and oranges. It's, you know,

14 vegetables and minerals.

15 Q. The start of your analysis is on reducing

16 injuries for aerosols, right? Is that what you're

17 looking at?

18    MS. ROCK: Object to the form.

19 BY MS. AMBROSE:

20 Q. You're assuming that there's a need to reduce

21 the injuries from aerosols.

22 A. Because it's technically feasible to do so,

23 yeah. And whether or not it's technically feasible to,

24 you know, reduce the heat of -- of the window in a range

25 or prevent them from tripping over is a valid

Page 111

1 think it's relevant at all but if you're going to pull

2 out the chart, whereas 15 percent of explosion injuries

3 resulted in admittance to the hospital.

4 Q. That's in 1977?

5 A. Yeah. Here, it's 1.9 percent.

6 Q. For what? 1.9 percent for what? Sorry.

7 A. The total. That's, you know, the total of

8 all hospital emergency room treatments. It does not

9 tell me what the --

10 Q. I'm sorry. Can you explain what you think is

11 the 1.9 percent number?

12 A. It's just the percentage of all these

13 products as they relate to the total number of hospital

14 emergency room treatments, I guess. I was looking for

15 the actual admitted numbers but they're not here.

16 Q. Okay.

17 A. But there's -- the fact that there are

18 31,000, what did you say, 750 ranges not specified, that

19 may mean that one needs to approach ranges and provide

20 some corrective action but because I would -- I think

21 what you're saying is that there are fewer aerosols that

22 they don't to be addressed which is absurd.

23 Q. I didn't make that statement.

24 A. Well, but what's the purpose? Why are you

25 showing me this?

Page 110

1 consideration but has nothing to do with what we're

2 doing here. You've been asking me all day about aerosol

3 cans and ranges and other unpowered gadgets I think are

4 irrelevant to that analysis.

5 Q. What was the heat source in the Schmidt Meyer

6 case?

7 A. Some say it was a burner across the room.

8 Q. Who says that?

9 A. No, no, no. Well, some say that the -- the

10 heat source that caused the pressure was the range

11 on next to the counter where the Pam was but even there,

12 I still don't understand what that has to do with

13 ranges.

14 Q. And in the Coello case, the heat source was

15 what?

16 A. Also a stovetop.

17 Q. Okay. To the extent that your report

18 references specifications relating to the two-piece cans

19 at issue in the litigation, do you agree we can look to

20 the specifications and measurements themselves?

21 A. Sure.

22 Q. Okay. So in your report, you say that the

23 press -- you say that press reports identify two more

24 explosions prior to the subject incident and four

25 explosions after May 13, 2013, and I'm on page 11 for

Page 112

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU  Document 167-2  Filed 12/17/19  Page 42 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  that. I want to understand what you're trying to say
2  here.
3       Okay. So are you stating that you're aware
4  of six explosions in the past eight years from cooking
5  spray?
6  **A.   No. You got to take them in order. ConAgra**
7  **reported four explosion incidents prior to the subject**
8  **incident and then there were press reports of two more**
9  **explosions prior to the incident and four explosions**
10 **after May 13, 2013.**
11     Q.   Okay. So what does that mean that you have?
12 Am I wrong on the number? Is it ten, ten explosions
13 since 2013?
14 **A.   Well, it's ten all together, yeah.**
15     Q.   Okay.
16 **A.   But I think they're -- you know, the four**
17 **that ConAgra responded to prior to the incidence of the**
18 **much more telling ones.**
19     Q.   Yeah. And I guess I'm just trying to
20 understand what you're aware of so you're aware of these
21 ten explosions in the past eight years, right, from
22 cooking spray?
23 **A.   In the past eight years --**
24     Q.   I think the earlier report is from 2010.
25 **A.   All right. If that's true, then sure.**

Page 113

1  Q.   Okay. So we've got ten explosions. Are the
2  Coello and -- is the Coello case included among those
3  ten?
4  **A.   Not that I'm aware of.**
5  Q.   Okay. So is it your view that there are 11
6  that you're -- I'm asking what you're aware of?
7  **A.   Well, I guess Coello would be another one,**
8  **yeah.**
9  Q.   Okay. Is the Schmidt -- Schmidt Meyer
10 incident included?
11 **A.   No, I didn't include either of those two.**
12 Q.   Okay. So is it fair to say that you're aware
13 of 12 explosions relating to cooking spray since 2010 --
14 I mean --
15 **A.   Well, yeah.**
16 Q.   -- you cited 12 explosions, right?
17 **A.   I -- I didn't count the -- the two at issue**
18 **here but if you want to put them in there, you're more**
19 **than welcome.**
20 Q.   Yeah. I'm trying -- I just want to know --
21 I'm trying to understand the basis of your opinion so
22 you -- you're aware of 12 explosions relating to
23 cooking spray since 2010.
24 **A.   But I didn't say that in my opinion. I said**
25 **ten. I didn't count the two at issue.**

Page 114

1  Q.   Okay. I guess what I'm -- I'm just trying to
2  understand what your -- the facts you're aware of.
3  Okay. So other than the can in Coello, do you know
4  whether the other 11 cans involved the same can design
5  and cooking spray formulation as the can in Coello?
6  **A.   Well, I believe that the first four did that**
7  **ConAgra was aware of. I don't know about the other**
8  **ones.**
9  Q.   And why -- what makes you believe that?
10 **A.   Because they -- the complaints were responded**
11 **to by ConAgra and they specifically pointed out the**
12 **venting feature.**
13     THE VIDEOGRAPHER: Five minutes.
14 BY MS. AMBROSE:
15 Q.   Okay. And we can look to the reports
16 themselves, right?
17 **A.   We can.**
18 Q.   And would -- is your answer the same for the
19 Schmidt Meyer incident other -- so you've got the
20 Schmidt Meyer can and then of the 11 other cans, you
21 don't know which ones or how many of those had the same
22 design and formula as the Schmidt Meyer can, right?
23 **A.   Well, without -- without looking, I'm telling**
24 **you that the four that were produced by ConAgra did. If**
25 **you want to count Schmidt and Coello, that would be six**

Page 115

1  **and I just don't know because I don't think it's**
2  **reported in the press reports.**
3      MS. AMBROSE: Okay. We can take a break.
4      THE VIDEOGRAPHER: Okay. Going off the
5  record. The time is 12 p.m.
6      (Lunch recess)
7      THE VIDEOGRAPHER: We're back on the record.
8  The time is 12:37 p.m.
9  BY MS. AMBROSE:
10 Q.   Okay. In your reports in Exhibits 3 and 4,
11 there's a reference that consumers prefer nonaerosol
12 spray. Do you agree with me that you're not an expert
13 whether people prefer nonaerosol sprays?
14 **A.   Where are you pointing to?**
15 **     Oh, you know, that was not me saying it.**
16 **That was ConAgra's survey.**
17 Q.   Okay. Can you tell me what page -- sorry,
18 I'm going to turn it back on you -- what page you're on
19 or if you found it.
20 **A.   Yeah, it's on page 13.**
21 Q.   Okay. Got it.
22     Okay. And so to the extent you have
23 statements in your report about preferences of
24 consumers, you're basing it off of a survey that you
25 looked at?

Page 116

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 43 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1    A.   It's just a fact.  It's not my opinion.  It's
2 in the document.  It said that ConAgra did a survey and
3 found that people prefer nonaerosol spray and then they
4 went ahead and develop -- redeveloped I guess a
5 nonaerosol spray.  That's all.
6    Q.   Okay.  So you're not offering an expert
7 opinion on that, right, on the consumer preferences of
8 people?
9    A.   It's just a fact.  You know, part of the
10 basis I guess but, you know, it's not an opinion on --
11 it's not my opinion.
12    Q.   Okay.  You recognize that there's like
13 entire, you know, subjects of or experts -- let me think
14 of what the right word is.  That there -- you know,
15 there's an entire field of research and education,
16 et cetera, around, you know, survey -- consumer surveys,
17 consumer preferences, things like that.  You're not an
18 expert in that, right?
19       MS. ROCK:  Object to the form.
20       THE WITNESS:  Right.
21 BY MS. AMBROSE:
22    Q.   Okay.  As far as you know, consumers are
23 buying Pam in aerosol spray containers to this day,
24 right?
25    A.   I saw it on the shelf so I imagine somebody's

Page 117

1 buying it.
2    Q.   Okay.  So in the deposition, there's a
3 section of your report, pages 13 through 20 of
4 Exhibits 3 and 4 that provide -- it looks like summaries
5 of various depositions.  Is that fair to --
6    A.   Factual summaries extracted from the
7 depositions.
8    Q.   Okay.  And these summaries are the same for
9 each Exhibit 3 and Exhibit 4, right?
10    A.   Yes.  Is that Coello and Schmidt?
11    Q.   Yes.
12    A.   Yes.
13    Q.   Okay.  And are these your notes then?
14    A.   Of course.
15    Q.   They're not exact quotes, right?
16    A.   No.
17    Q.   And they don't include like a full recitation
18 of all the witnesses' testimony, right?
19    A.   No.  To do that, I would just include the
20 deposition.
21    Q.   Did you review the deposition transcript of
22 Miss Ramos?
23    A.   Miss?
24    Q.   Ramos.  That's the plaintiff in the Coello
25 matter.

Page 118

1    A.   Yes, I did.
2    Q.   Did you review the deposition transcript of
3 Hallie Meyer?
4    A.   Yes.
5    Q.   Did you review the deposition transcript of
6 Emma Schmidt?
7    A.   Yes.
8    Q.   Okay.  Turn to page 20 for Exhibit -- let's
9 start with Exhibit 3.  For the Schmidt Meyer report, you
10 dedicate you say a little less than half a page on the
11 incident itself, right?
12    A.   Yes.
13    Q.   Okay.  And where did you get the facts that
14 you included here?
15    A.   From the depositions, from statements,
16 complaint.
17    Q.   And you're not offering an opinion about the
18 cause of the fire in the Schmidt Meyer case, are you?
19    A.   No.
20    Q.   Okay.
21    A.   Not -- you know, not from a technical point
22 of view.
23    Q.   Okay.  And for the purpose of your expert
24 opinions, you're assuming that the cause of the fire is
25 as you describe?

Page 119

1    A.   That's my understanding, yes, ma'am.
2    Q.   Okay.  And you're not offering expert opinion
3 on the nature and extent of Hallie Meyer, Emma Schmidt's
4 alleged injuries, right?
5    A.   No.
6    Q.   Okay.  In the Coello report, which I think is
7 Exhibit 4, go to page 20.  And on that one as well, you
8 dedicate about a half page or less to the incident
9 itself, right?
10    A.   Right.
11    Q.   And where did you get the facts you included
12 there?
13    A.   From her deposition.
14    Q.   Okay.  And you're not offering an expert
15 opinion on the cause of the fire in the Coello case,
16 correct?
17    A.   Well, not what started the fire itself but
18 like in Schmidt, I do have opinions about the failures
19 of the vented can and the labeling as causative factors
20 but I'm not a causation guy per se.
21    Q.   Okay.  And you're assuming for the purpose of
22 your expert opinion that the facts as of the cause of
23 the fire as stated in your report?
24    A.   Yeah.
25    Q.   Okay.  And you're not offering an expert

Page 120

Case 3:14-cv-01816-SRU   Document 187-2   Filed 12/17/19   Page 44 of 140
William Kitzes - 4/5/2018
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  opinion on the nature and extent of Miss Ramos' alleged
2  injuries, right?
3   **A.   No.**
4   Q.   And now pages 21 through 33 has a chronology.
5  It says Chronology of Documents.  Is that chronology the
6  same for each report, Exhibit 3 and Exhibit 4?
7   **A.   Yes.**
8   Q.   Okay.  And this section appears to include
9  certain documents including some that were exhibits to
10  depositions taken in this litigation, right?
11   **A.   Right.**
12   Q.   Okay.  It also includes some news reports?
13   **A.   It does.**
14   Q.   Includes some MSDSs?
15   **A.   They do.**
16   Q.   Okay.  And as we discussed earlier, you don't
17  know whether the specific MSDS -- MSDSs referenced
18  correspond with the same cooking spray formula that was
19  used in the can in the Coello case, right?
20   **A.   Well, I can't say for certain but it's my**
21  **understanding it's the last one produced before 2012.**
22  **You know, the one before that that I have is 2007.  Now**
23  **there was a ten-year gap or an eight-year gap.**
24   Q.   And then the same question for the Schmidt
25  Meyer case --

1   **A.   Three-year gap.**
2   Q.   -- you don't know whether the MSDSs you
3  reference correspond with the cooking spray formula that
4  was used in the Schmidt Meyer case, right?
5   **A.   It's my understanding but I can't say for**
6  **certain.**
7   Q.   Okay.  And it seems like what I'm seeing here
8  are what appear to be bullet point notes following each
9  document reference.  Are these your notes?
10   **A.   Yes, they are.**
11   Q.   Okay.  And these aren't direct quotes, right?
12   **A.   No.**
13   Q.   They --
14   **A.   They're pretty close but I don't claim that**
15  **they're direct quotes.**
16   Q.   Okay.  And you agree we can look at the
17  documents themselves to see what was actually said,
18  right?
19   **A.   Sure.**
20   Q.   How did you decide which documents to include
21  in your chronology of documents?
22   **A.   Everything that was relevant to my opinion.**
23   Q.   Okay.  You reference a CPSC recall of a
24  Sherwin-Williams aerosol spray can.  Why did you include
25  that?

1   **A.   Well, just to show that the commission**
2  **applied jurisdiction under Section 15 to the -- to the**
3  **can.**
4   Q.   Do you agree that the CPSC would issue a
5  recall to a product that it deems unsafe?  That's part
6  of its job, right?
7   MS. ROCK:  Object to the form.
8   THE WITNESS:  No such word in the commission
9   as unsafe.
10  BY MS. AMBROSE:
11   Q.   Okay.  Do you agree that the CPSC has the
12  authority to issue recalls to products -- relating to
13  products?
14   **A.   It has the authority.  It's very rarely used.**
15  **Almost all recalls are done voluntarily in cooperation**
16  **with the manufacturer and distributor.**
17   Q.   And if there was a recall, it would relate to
18  the specific product in terms of the design and
19  formulation, right?  Probably the actual product number,
20  the SKU or --
21   **A.   No, not -- not true.**
22   Q.   Okay.  And why is that not true?
23   **A.   Well, because there are sometimes, you**
24  **know -- I mean, a company can make, you know, a hundred**
25  **SKU's that have the same defect.  And not so much now**

1  but rarely in the past, a recall might include numbers
2  **of manufacturers.**
3   Q.   Okay.  But in -- in some way, there's
4  identification of the particular products, right?  It
5  might be more than one product but you're going to
6  get -- the manufacturer's going to know which products
7  need to be taken off the shelves, right?
8   **A.   Yes.**
9   Q.   It's not like a general we're recalling
10  toasters, you know, without --
11   **A.   No.**
12   Q.   -- a specification as to which ones, right?
13   **A.   No.  That would be more likely to be a**
14  **standard than a reg recall.**
15   Q.   Okay.  And do you agree that the formulation
16  and can design for the Sherwin-Williams product is
17  different than the formulation and can design for the
18  cooking spray at issue in the litigation?
19   **A.   Sure.**
20   Q.   Okay.  So we're now up to page 33 in your
21  report.  Do you agree that -- that you've attempted here
22  to lay out the facts on which you rely in the first kind
23  of 33 pages here.  Is that a fair statement of your
24  organization of the reports, that the first 33 pages are
25  kind of the facts section, if you will?

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 45 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1   A.   Yeah.

2   Q.   Feel free to look through it.

3   A.   It -- it -- it lays out the data, the facts,

4   sure.

5   Q.   Okay.  And to the extent you reviewed other

6   documents, those were put in your materials -- those are

7   either going to be in the report or they're in the

8   materials reviewed section at the end of your report,

9   right?

10   A.   Right, plus the additional documents from

11   today.

12   Q.   Plus what you brought today?  Okay.

13   A.   Right.

14   Q.   Did you personally speak with Miss Ramos?

15   A.   No.

16   Q.   Did you personally speak with Miss Schmidt?

17   A.   No.

18   Q.   Did you personally speaking with Miss Meyer?

19   A.   No.

20   Q.   Did you review any physical evidence in the

21   case?

22   A.   Just by photograph.

23   Q.   Okay.  And what -- which photographs?  The

24   ones referenced in your report, right?

25   A.   Yeah, you know, there's the home, the cans,

1   you know.

2   Q.   Photos from the scene, that kind of thing?

3   A.   Right.

4   Q.   Okay.  All right.  Now, finally, let's talk

5   about the label.

6        (Exhibit Number 7 marked for identification)

7   BY MS. AMBROSE:

8   Q.   Okay.  Shoot, I meant the other one.  This is

9   mine.

10        All right.  I'm handing you what's been

11   marked as Exhibit 7.

12        MS. AMBROSE:  You want this?

13        MR. SMITH:  That would be great.  Thanks.

14   BY MS. AMBROSE:

15   Q.   Okay.  Do you recognize Exhibit 7 to reflect

16   the label of the can that was at issue in the Coello

17   case?

18   A.   Yes.

19   Q.   Do you recognize Exhibit 7 to reflect the

20   label of the can that was at issue in the Schmidt Meyer

21   case?

22   A.   Yes.

23   Q.   For a warning to be effective, you first need

24   to identify the nature of the hazard that you're trying

25   to communicate, right?  Do you agree with that?

1   A.   That's one of the things you have to do, yes.

2   Q.   And the potential hazard relevant to this

3   litigation relates to the potential of the can to

4   overheat or overpressurize and release its contents,

5   right?

6   A.   And catch fire.

7   Q.   Okay.  In your report, you contend that the

8   label in Exhibit 7 does not comply with certain federal

9   regulations and/or certain voluntary industry guidelines

10   that you say apply.  Is that fair?

11   A.   Yes, ma'am.

12   Q.   And those include the Federal Hazardous

13   Safety Act?

14   A.   Substances.

15   Q.   Sorry.  Federal Hazardous Substances Act,

16   right?

17   A.   Yes.

18   Q.   Which is also FHSA?

19   A.   Yes, it is.

20   Q.   Okay.  As well as the ANSI Z535 standard?

21   A.   Point 4.

22   Q.   And you also mention in your report DOT

23   regulations.  Do you agree that the DOT regulations are

24   not specifically relevant to your concerns about the

25   label?

1   A.   Well, yes and no.  They're not relevant as to

2   the need to label about vents but they are clearly

3   relevant.  I think that the consumer needs to know about

4   the danger of the combination of liquid petroleum gas

5   and vented cans for the cooking spray.

6   Q.   Okay.  So maybe I'll put it a different way.

7   The Department of Transportation generally doesn't have

8   jurisdiction, if you will, over the labeling of consumer

9   products, right?  That's not their area?

10   A.   I'd say that's fair.

11   Q.   Okay.  So setting aside the regulations and

12   the voluntary industry standards for the moment, I just

13   want to make sure that I understand kind of each, you

14   know, concern that you have with the label in Exhibit 7

15   so I'm going to walk through one by one and then ask --

16   ask you to add onto that, too.  I want to make sure that

17   we know -- we understand the concerns.

18        So one of the -- okay.  So one of your

19   concerns is that Exhibit 7 should include the word

20   danger.  Is that correct?

21   A.   Yes.

22   Q.   Where should the word danger be located?

23   A.   Well, somewhere in the area that the word

24   caution is.

25   Q.   Should it replace the word caution or go kind

Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 46 of 140
William Kitzes - 4/5/2018
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1 of alongside with the word caution?
2 A.   Replace.  Caution is something that applies
3 only to minor or moderate potential for injury.
4 Q.   Okay.  So do you believe that the inclusion
5 of the word danger would make the -- the warning in
6 Exhibit 7 more effective at warning consumers of the
7 hazards that we've discussed?
8 A.   Well, are we going to go in steps?  Danger is
9 better than caution.  Not adequate as a whole but better
10 than caution.
11 Q.   And are you relying on any research or
12 studies to support that belief?
13 A.   That what?
14 Q.   That -- your belief that the word danger is
15 better than caution.
16 A.   Well, yeah, the documents that I brought with
17 me plus the -- the Hazardous Substances Act as it
18 relates to the need to use it for extremely flammable
19 products.
20 Q.   Okay.  And so I'm going to -- this might take
21 a minute to mark these but I'm going to just -- you've
22 brought with you today kind of a stack of documents,
23 right?
24 A.   (Nods head).  Yes.
25 Q.   Okay.  And I am going to mark each of these

Page 129

1 as exhibits and we don't -- sitting here today, we don't
2 all have copies but we'll just have the exhibit copy be
3 the copy.  Sound good?
4 A.   Sure.
5     (Exhibits 8 - 17 marked for identification)
6 BY MS. AMBROSE:
7 Q.   Okay.  I'm going to hand you what has been
8 marked as Exhibit 8 through Exhibit 17.  And these are
9 the documents you brought with you today, right?
10 A.   Yes, ma'am.
11 Q.   Okay.  Now can you just tell us maybe by
12 exhibit number which of those reports you're relying on
13 to support your opinion that the word danger is better
14 than the word caution.
15 A.   Well, you start with the Westinghouse Product
16 Safety Label Handbook and they did an analysis of prior
17 standards going back to 1972 and the hierarchy of all
18 the standards start with danger then warning then
19 caution, danger being the most important.
20 Q.   Okay.  And then that -- just so the record is
21 clear, the Westinghouse study is Exhibit 8?
22 A.   Oh, I'm sorry.  Yes.
23 Q.   And what year was that --
24 A.   19 --
25 Q.   -- report?

Page 130

1 A.   Well, that's '85.  It was first published in
2 '81.
3 Q.   And then updated in '85.  Is that --
4 A.   Yes.  Well, I don't know if it changed
5 but --
6 Q.   All right.
7 A.   Number 11 is Hazard Level Perceptions of
8 Current and Proposed Warning Signs and Label Panels and
9 the result of their survey was that danger was perceived
10 as more hazardous than any other currently specified
11 signal word, i.e., warning or caution and that
12 noticeability, comprehension and compliance were the
13 most important issues.  And they actually did studies
14 with hazard ratings from various groups and danger was
15 always -- had the highest rating.
16 Q.   Okay.  And what year was Exhibit 11?
17 A.   Exhibit 11 is -- they don't put dates on
18 these things.  Looks like the mid '90s.
19 Q.   Okay.  Keep going.  Let me know as you go
20 through.
21 A.   Uh-huh.  Effectiveness of Warnings, Human
22 Factors Society 1987.
23 Q.   Which exhibit are you looking at?
24 A.   Exhibit 13.
25 Q.   And what about that report that -- what is it

Page 131

1 in that report that helps support your belief that --
2 A.   Well, it talks about --
3 Q.   I'm sorry.  Just let me finish the question
4 for the record.
5 A.   I'm sorry.
6 Q.   Go ahead.
7 A.   It talks about the use of danger as the
8 number one signal word.  Goes on to talk about, as you
9 started to ask, hazard statements, consequences and
10 instructions.
11     Explicitness of Consequence Information in
12 Warnings 1993.  Without identifying signal words, it
13 talks about explicitness of warnings, how the more
14 explicit the warning, especially on severity, which is
15 where danger comes in, the more likely it is to motivate
16 consumers.
17 Q.   And which exhibit number is that?
18 A.   Sorry.  That's 14.
19     This one doesn't talk about danger per se.
20 This is Research-Based Guidelines as Signal Words but
21 talks about salience and noticeability.
22 Q.   And what exhibit number is that?
23 A.   Fifteen.
24 Q.   And are you relying on Exhibit 15 to support
25 your opinion that danger is better than caution for this

Page 132

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU  Document 167-2  Filed 12/17/19  Page 47 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  label?
2  **A.   Well, no, it doesn't address that directly.**
3  **You know, and the last one is consumer**
4  **product warnings, The Role of Hazard Perception and it**
5  **says, "Willingness to read warnings was found to have a**
6  **strong positive relationship to perceived hazards."**
7  Q.   Okay.  And which exhibit number is that?
8  **A.   That's the last one, Number 16.**
9  Q.   And what year was that report?
10  **A.   1991.**
11  Q.   Okay.  Just to make sure we're clear, you're
12  relying on Exhibits 8, 11, 13, 14 and 16?
13  **A.   For that question, yes.**
14  Q.   Yes.  For the -- for your opinion that danger
15  is better than caution.
16  **A.   And also the ANSI standards.**
17  Q.   Right.  The ANSI standards and the
18  regulations?
19  **A.   Right.  And, right, the FHSA regulations.**
20  Q.   So is danger as a word always going to be
21  better than caution?
22  **A.   Always danger is -- caution is the least**
23  **motivating of the signal words.  Danger is used when**
24  **it's most likely that an injury will occur from the**
25  **particular hazard.**

Page 133

1  Q.   Okay.  Are you contending that the fire in
2  the Coello case would not have occurred but for the fact
3  that the label said caution instead of danger?
4  MS. ROCK:  Object to the form.
5  THE WITNESS:  I can't say that.
6  BY MS. AMBROSE:
7  Q.   Are you contending that the fire in the
8  Schmidt Meyer case would not have occurred but for the
9  fact the label said caution instead of danger?
10  MS. ROCK:  Object to the form.
11  THE WITNESS:  No.
12  BY MS. AMBROSE:
13  Q.   Okay.  And one of your -- I'm going to move
14  on now to another concern so another concern that you
15  had with Exhibit 7 is that it should state -- should say
16  extremely flammable.  Is that correct?
17  **A.   Yes.**
18  Q.   Okay.  And I think we've already discussed at
19  length the basis for your belief that the cooking spray
20  is, in fact, extremely flammable versus flammable,
21  right?
22  **A.   We have.**
23  Q.   Okay.  So what -- what research are you
24  relying on to conclude that the use of the phrase
25  extremely flammable would make a difference to how

Page 134

1  consumers understand the hazard compared to what the
2  label currently says?
3  **A.   Well, the label says combustible, you know,**
4  **which is kind of vague.  You know, it means it could**
5  **possibly burn.**
6  Q.   And can you -- sorry.  Where does the label
7  say combustible?
8  **A.   Gosh, this one doesn't.  Some of the other**
9  **ones did.**
10  Q.   So assuming that this Exhibit 7 is the label
11  that's at issue in Coello and Schmidt Meyer, do you
12  still believe that should say extremely flammable,
13  right?
14  **A.   Absolutely.  I mean, this doesn't give any**
15  **hint, you know.  A number of the documents that I've**
16  **already read say that the more explicit the hazard so**
17  **that the consumer understands, the more likely that**
18  **they'll take action, again, especially when compliance**
19  **is so low as it is in this case.  Basically just move it**
20  **some distance away.**
21  Q.   And when you say compliance is so low, can
22  you elaborate on what you mean by that?
23  **A.   Well, to -- to change your behavior because**
24  **of some warnings sometimes takes great effort and the**
25  **research is that the higher the effort, the, you know,**

Page 135

1  **more difficult it is for consumers to -- to follow the**
2  **advice but in this case, there hardly is any compliance**
3  **cost at all.**
4  Q.   Okay.  And when you made your -- in
5  connection with your opinion that Exhibit 7 should say
6  extremely flammable, did you consider other language on
7  the label related to the flammability warning such as
8  the word flammable, the phrase do not spray on heated
9  surfaces or near open flame, the phrase can may burst if
10  left on stove or near heat source and the contents under
11  pressure statement?
12  **A.   Well, contents under pressure is there, okay?**
13  **Do not spray on heat source is an instruction, not a**
14  **hazard.  The front of the -- of the container has to**
15  **contain the affirmative statements of the principal**
16  **hazards, the hazards are the capability in the product**
17  **to do harm.  And extremely flammable communicates that**
18  **danger, as does product may burst if heated, and that**
19  **belongs for noticeability and salience on the same**
20  **principal display panel under 121 of the Hazardous**
21  **Substances Act so that consumers have that information**
22  **where they're going to most likely read it instead of in**
23  **that block text on the side.**
24  Q.   So the extremely flammable statement you
25  contend should be on the front of the container or

Page 136

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU Document 167-2 Filed 12/17/19 Page 48 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1 how -- where -- where do you think it should be located?

2 **A. Any of those signal words is required to**

3 **be on the front under the hazardous substances stuff.**

4 Q. And we're -- regardless of whether it's the

5 regulations require it or it's under the -- or it's

6 governed by the regulations, just in terms of whether

7 the label itself is adequate, you're contending it

8 should be on the front. Is that fair?

9 **A. Oh, it has to be on the front, absolutely.**

10 Q. Got it.

11 Okay. And what -- so other than the

12 regulations and the ANSI standards, what is the basis of

13 your opinion that adding the phrase extremely danger --

14 or, sorry, extremely flammable on Exhibit 7 would make

15 the warning more effective in warning consumers of the

16 hazard?

17 **A. Because for 40 years, all of the regulatory**

18 **agencies and the voluntary standards have agreed that**

19 **the statement extremely flammable is the highest level**

20 **of hazardousness that will motivate consumers the**

21 **greatest.**

22 Q. Okay. And are you relying on any of the

23 studies that you brought today for that opinion?

24 **A. They don't specifically say extremely**

25 **hazardous but -- extremely flammable but they clearly**

Page 137

1 **discuss, you know, perceived hazards and the -- the**

2 **severity of the injury as the key motivating factor for**

3 **consumers.**

4 Q. Are you aware of research on whether it makes

5 any difference to consumers, you know, the phrase

6 extremely flammable versus flammable when they're not

7 comparing the two? In other words, you know, if a

8 consumer is looking at two items, one of them says

9 extremely flammable, one says flammable, that may impact

10 them but if they're by themselves, flammable versus

11 extremely flammable, are you aware of any research on

12 consumer behavior?

13 MS. ROCK: Object to the form.

14 THE WITNESS: No, not that specific.

15 BY MS. AMBROSE:

16 Q. Are you contending that the fire in the

17 Coello case would not have occurred but for the fact

18 that the label did not say extremely flammable on the

19 front?

20 **A. Not that alone.**

21 Q. Are you contending that the fire in the

22 Schmidt Meyer case would not have occurred but for the

23 fact that the label did not say extremely flammable on

24 the front?

25 **A. Not that alone.**

Page 138

1 Q. So your report you also say the word near in

2 connection with near heat source is not adequate. Is

3 that fair?

4 **A. Yes.**

5 Q. Okay. And you suggest that the label should

6 say that the can should be a minimum of X feet away. Is

7 that right?

8 **A. Right.**

9 Q. What distance should it say?

10 **A. I don't have a specific distance. I would**

11 **have to discuss it with the technical people.**

12 Q. And who are the -- who do you mean by the

13 technical people?

14 **A. Well, Mr. Hendrickson, maybe Mr. Baker, you**

15 **know. I mean, I think that, you know, if it's three**

16 **feet, two feet, four feet, six feet, you know, whatever**

17 **is appropriate. I mean, again, there's no cost. You**

18 **know, when you're using it, you're using it but when**

19 **you're storing it, there's no cost to putting it further**

20 **away.**

21 Q. So I think we just started mentioning this

22 but what would you need to do to figure out a specific

23 distance? You mentioned speaking to -- perhaps speaking

24 to Hendrickson or Baker or somebody with technical

25 expertise. Is that fair?

Page 139

1 **A. Yeah. Yeah.**

2 Q. Anything else that you would do to figure out

3 a specific distance to recommend?

4 **A. I don't know.**

5 Q. Okay. As you sit here today, you're not

6 planning to come to trial --

7 **A. With a number?**

8 Q. -- with a set distance?

9 **A. If asked, I guess I could do some --**

10 **something but I don't think so.**

11 Q. Is your opinion that qualitative information

12 such as the words near or far away are never appropriate

13 in warnings?

14 **A. I can't say never.**

15 Q. So when is it appropriate to use qualitative

16 language?

17 **A. Well, in a case where that number will**

18 **substantially reduce the risk of injury.**

19 Q. Okay. And then do you agree with me that the

20 distance from a heat source might depend on how hot the

21 heat source is?

22 MS. ROCK: Object to the form. Can you

23 rephrase?

24 THE WITNESS: Well --

25 BY MS. AMBROSE:

Page 140

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU  Document 167-2  Filed 12/17/19  Page 49 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

Q.   Yeah, I will rephrase.  Do you agree with me that to -- you know, to try to determine an adequate distance from a heat source, it might depend on how hot the actual heat source is, right?

A.   Well, it could but, you know, I mean, if you, you know, figured on a stove running, you know, full heat and, you know, you added some -- some vigorish, some margin of safety, I think you could reasonably come up with a minimum.

Q.   Okay.  But if the stove -- let's say I'm -- I'm cooking in my kitchen and I have the stove on low heat, wouldn't I be able to have the can a little bit closer than if I had it on high heat?

A.   Maybe but why?  I mean, why not, you know --

Q.   Okay.  Are you familiar with any ASTM standards that specifically require the use of qualitative language, like keep away from flame?

A.   I've seen warnings like that.

Q.   Okay.  Or keep away -- or, sorry, keep in well-vented area, for example.  You've seen that before?

A.   Horrible one.  What's well-vented?  You see, that's -- you put your finger on exactly the problem.  What's well-ventilated to you might be -- not be well-ventilated to me and yours can create an unreasonably dangerous condition.

Q.   So -- and I don't want to go too far afield but is it your view that consumers have an understanding of, you know, how ventilated a room is in terms of quant -- you know, a quantified way?

A.   I have had --

Q.   I mean, you give a warning.  They have to be able to understand it, right?

A.   I have had too many acetone explosion cases or, you know, paint sprayers where it said keep in well-ventilated area and people did what they thought was right but it --

Q.   Right.

A.   -- just wasn't.

Q.   And in those cases, did you recommend a warning that would have specifically quantified how well-ventilated the area should be?

A.   Yes.  I mean, I can't remember if it was on the product but certainly in the instructions.

Q.   And --

A.   Nineteen?

Q.   I think this was 17.  I think we're on Exhibit 18.

(Exhibit Number 18 marked for identification)

BY MS. AMBROSE:

Q.   Okay.  I'm marking -- we'll still be using

that one for a little bit but let me give you some -- a document that's been marked as Exhibit 18.

MR. SMITH:  Thanks.

BY MS. AMBROSE:

Q.   Okay.  So this is an ASTM standard that was developed with the CPSC related to portable gasoline containers, right?

A.   I'm not sure this is the latest incarnation but, yes, as of that time.

Q.   The warning uses qualitative language, specifically keep away from flame, right?

A.   Yes.

Q.   Do you believe that this warning is not adequate?

A.   Probably not.  It's -- it's not terrible, you know, because it's -- it's -- it's a directive, keep away from a flame.  Whether or not that's adequate to address the danger, I can't say off the top of my head but at a minimum, it just says -- you know, away is a different word than near.

Q.   And how is it -- how are you distinguishing away and near?

A.   Well, away is, you know, away.  You know, keep away.  Like I say, I don't think it's a very good word.

Q.   Do you have any -- are you relying on any research that consumers interpret the word away in a different way than they interpret the word near?

A.   No, other than it can be vague and --

Q.   And both can be vague, right, near and away?

A.   Yeah.

Q.   Okay.

(Exhibit Number 19 marked for identification)

BY MS. AMBROSE:

Q.   I'm handing you what's been marked as Exhibit 19.  This is a document that you gave to us.  Do you recognize this document?  It's a -- looks like a press release or some kind of release from the Washington State Department of Labor & Industries.

A.   Yes.

Q.   Okay.  And the press release says -- I'm looking at the third bullet point under Keep Workers Safe.  It says "Don't allow cans to be stored near kitchen ranges or other heat sources."  Do you see that?

A.   Yeah.  "Designate safe storage spaces (on counter away from heat sources)".

Q.   Okay.  So is the word near in this warning inadequate?

A.   I don't think it's the right word.

Q.   And are you -- is it your view that the word

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU Document 167-2 Filed 12/17/19 Page 50 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

**Page 145**

1 away is better than the word near or that neither of
2 them are adequate?
3    A.  I'd have to think about it, you know. I
4 mean, I think away is a little bit better than near.
5    (Exhibit Number 20 marked for identification)
6 BY MS. AMBROSE:
7    Q.  This is another document that you gave us,
8 okay? And this is a document from the Government of
9 Western Australia Department of Commerce.
10    A.  Uh-huh.
11    Q.  You agree?
12    A.  Yes.
13    Q.  And here it says under Recommendations, "Do
14 not place aerosol cans next to heat sources or in hot
15 areas in kitchens, such as next to lit gas burners,
16 close to electric stoves or on top of range hood."
17    A.  Uh-huh.
18    Q.  Is that warning adequate in your view?
19    A.  I don't think next to heat sources is very
20 good, you know. This one and the other ones, you know,
21 by adding the word anywhere near I think gives consumers
22 some more information about how close.
23    Q.  Okay. And what research, if any, are you
24 relying on to support this opinion that a specified
25 distance away from the heat would make any difference to

**Page 146**

1 how consumers understand the hazard as compared to what
2 the label currently says?
3    A.  Well, there is no research on those specs
4 specific a question but I think all the research here
5 and, you know, my experience says be as explicit as you
6 can in informing consumers both of the hazard and how to
7 avoid the danger.
8    Q.  And you -- when you say the research here,
9 are you referring to some of those studies that you
10 brought?
11    A.  Yes.
12    Q.  Okay. And which -- can you just tell us by
13 exhibit number which studies are relevant or that you
14 are using to help support your opinion that the use of a
15 specified distance would make this label more adequate.
16    A.  Well, none of them say a specified distance.
17 Again, that's way too specific. But Exhibit 11, 13,
18 especially 14, 15 and 16 address those issues.
19    Q.  And by those issues, do you -- can you just
20 elaborate a bit what -- what it is about those studies
21 that you're looking at.
22    A.  Well, they talk about consequences and they
23 talk about instructions on how to avoid the injury and
24 the more specific about the hazard and about avoidance
25 measures, the greater the opportunity to avoid injury.

**Page 147**

1    Q.  Are you contending that the fire in the
2 Coello case would not have occurred if the label had
3 provided a specific distance in terms of how far from
4 heat the container should have been?
5    A.  Not that alone.
6    Q.  And are you contending that the fire in the
7 Schmidt Meyer case would not have occurred if the label
8 had contained a specified distance from the heat source?
9    A.  Not that alone.
10    Q.  So you also say that Exhibit 7 should
11 identify a potential fire hazard in addition to the
12 contents being under pressure. Is that accurate?
13    A.  Extremely flammable, yeah.
14    Q.  Okay. And is that the same fire hazard,
15 extremely flammable or is there a different thing that
16 you're referring to?
17    A.  No.
18    Q.  Sorry. That was a double negative.
19    So with your concern about identifying a
20 potential fire hazard, that refers to your
21 recommendation or opinion that the words extremely
22 flammable should be on the can, right?
23    A.  On the principal display panel, yes.
24    Q.  Okay. Is there anything else on the label
25 relating to a potential fire hazard that you think

**Page 148**

1 should have been included?
2    A.  Well, I think on the principal display panel
3 it said can can burst and catch fire if heated, which is
4 essentially what's on the Canadian label.
5    Q.  Okay. So you think that Exhibit 7 should say
6 that the can can burst and catch fire?
7    A.  (Nods head).
8    Q.  And you think that should be on the front of
9 the label, the principal display panel?
10    A.  Absolutely.
11    Q.  Okay. And what research are you relying on
12 to conclude that the addition of the language can can
13 burst and catch fire make any difference in how
14 consumers understand the hazard as compared to what the
15 label currently says?
16    A.  Well, it's the principal panel and when it's
17 salient and -- and noticeable and, again, it's -- it's
18 consequences and avoidance and motivation. The whole
19 concept is a warning label should make consumers
20 understand what the damage is. First, they have to see
21 it and then they have to understand it and then they
22 have to be motivated to avoid injury.
23    Q.  And are you contending that if the label had
24 said can can burst and catch fire on the principal
25 display panel in the Coello case that the fire would not

Case 3:14-cv-01816-SRU Document 167-2 Filed 12/17/19 Page 51 of 140
William Kitzes - 4/5/2018
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1 have occurred?
2    A.   Well, again, not by itself but if you put
3 that whole label together as I described it, I think it
4 creates an opportunity.
5    Q.   What do you mean by an opportunity?
6    A.   Well, it provides the information that people
7 can use.  I can't predict what one person would do at
8 one particular time.  Nobody can.
9    Q.   And is your answer the same for the Schmidt
10 Meyer label?
11    A.   Yes.  I think that if they would have known
12 that there would have been -- all those things that I've
13 discussed on the label, I think it's more likely than
14 not that they had the information to avoid injury.
15    Q.   And what -- what -- you also say that
16 Exhibit 7 should say may explode if heated.  Is that
17 true or is that what -- I read that in your report.
18    A.   Well, burst or explode, you know.
19    Q.   All right.  It's fair to say like you
20 didn't -- you didn't prepare kind of an alternative
21 label here, right?
22    A.   No, I did not.  I mean, again, I -- I cited
23 in full the Canadian label, which the text of which I
24 think would have provided a reasonable text.
25    Q.   And the opinion that it should say may

Page 149

1 explode if heated, is that -- that's -- is that pretty
2 much the same as your opinion that the can -- the
3 specific can can burst and cause fire or are these two
4 different things that it should --
5    A.   No, it's basically the same.  You know, the
6 Canadian label uses the word explode, which actually I
7 think is a better word than burst.  Burst is a word they
8 use on the back of the label but they also use an icon
9 for exploding.
10    Q.   What's your understand -- like, when you use
11 the word explode, what are you describing?
12    A.   I'm describing the fact that the can will
13 disassemble itself and can move with some violent force.
14    Q.   Okay.  So the can -- you agree that the can
15 in the Coello case, it didn't like break apart into
16 pieces, right?  Or don't you know?
17    A.   No, it didn't.
18    Q.   And the same is true for the Schmidt Meyer
19 case, right?  The can didn't break apart into pieces?
20    A.   Yeah, except for the fact it was designed to
21 vent extremely flammable propellent at such a low
22 pressure that, you know, it's hard to understand why and
23 understand what reasoning because it's not in anybody's
24 deposition, they decided to go from whipped cream to
25 cooking oil for the use of the vented can.

Page 150

1    Q.   Is that your understanding that the
2 three-piece can prior to 2011 didn't have a vent?  Is
3 that what you believe as you sit here today?
4    A.   Not a bottom vent.  I think some of the
5 three-piece cans from some manufacturers had a rim vent.
6    Q.   Okay.  Do you know whether Pam Cooking Spray
7 had a vent, whether -- wherever it was on the can, a
8 vent, prior to 2011?
9    A.   I don't know.
10    Q.   Do you have any -- are you relying on any
11 research to support your belief that the word explode is
12 better at warn -- at providing information to consumers
13 than the word burst would be relating to the hazard?
14    A.   I think it's more graphic.  That's my
15 opinion.  I mean, somebody else could have a different
16 opinion, you know.
17    Q.   Okay.  But you're not -- there's no outside
18 research that you're looking to for that opinion?
19    A.   Not that I'm aware of.
20    Q.   So we got through what I read from the report
21 but I feel like today you've mentioned various other
22 concerns so are there any other concerns on Exhibit 7
23 that we haven't just discussed now?
24    A.   No, I think these are all pretty much
25 discussed so I don't --

Page 151

1    Q.   I think you earlier mentioned the inclusion
2 of symbols.  Do you think there should be a symbol on
3 Exhibit 7?
4    A.   I do, under the CPSC, under the ANSI Z535
5 under the GHS, the Globally Harmonized Labeling System,
6 that ConAgra uses in the 2010 MSDS.  It's not required
7 under the Federal Hazardous Substances Act.
8    Q.   Okay.  So which -- is it one symbol or
9 multiple symbols?
10    A.   Well, I like the two that they put on the
11 Canadian label.  They had one for fire and one for
12 explosion.
13    Q.   Okay.  And where should the symbols be
14 located on Exhibit 7?
15    A.   Just where they put them, to the -- to the --
16 one -- one to the left and one to the right of the
17 signal word and affirmative statement of the hazard.
18    Q.   And on the principal display panel?
19    A.   Yes.
20    Q.   Okay.  And any other concerns with Exhibit 7?
21    A.   Not that we haven't already discussed.
22    Q.   And with respect to, just to close the loop
23 of the -- with respect to the symbols, is it your
24 contention that the fire in Coello wouldn't have
25 occurred if there had been symbols located on the can?

Page 152

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 52 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1   A.   I think that if you put all those things
2   together from the signal word to the symbols to the
3   extremely flammable that you had -- you can reduce the
4   risk of injury.
5       Q.   And that's -- is that a general opinion or is
6   that specific to the fire in Coello?
7       A.   Well, it's specific to the Pam can.
8       Q.   Okay.  Did you review the shrink wrap -- any
9   of the shrink wrap packaging that's sold with these cans
10  at issue in the litigation?
11      A.   The shrink wrap packaging?  No.
12      Q.   Are you aware that the cans are sold in two
13  packs and they have shrink wrap around them?
14      A.   Oh, yeah.
15      Q.   You are aware of that?
16      A.   Yes.  At Costco anyway.
17      Q.   Is it fair to say that you haven't been asked
18  to make any opinions about the adequacy of the warnings
19  on the shrink wrap?
20      A.   I have not.
21      Q.   Okay.  I want to talk for a moment about the
22  Schmidt Meyer case.  Okay.  So regardless of what is
23  said on the label in Exhibit 7, you agree that both of
24  the plaintiffs in that case understood that they should
25  not allow the Pam containers to overheat and that the

Page 153

1   cooking spray inside the containers was flammable?
2           MS. ROCK:  Object to the form.
3           THE WITNESS:  Well, not what you just said.
4       I mean, I think they had some general notion but
5       clearly, they were unaware of the danger of
6       leaving the can on the counter next to the stove.
7   BY MS. AMBROSE:
8       Q.   And you're assuming that they, in fact, had
9   the cooking spray can too close to the heat source,
10  right?
11      A.   Well, I know that they had it on the counter
12  and that it exploded.
13      Q.   Okay.  So do you agree that Hallie Meyer
14  testified that she knew before the incident not to have
15  the Pam container within six inches of the stove?  Or do
16  you -- I mean, do you disagree?  Do you --
17      A.   No, I just don't recall.
18      Q.   And do you also -- do you disagree that
19  Hallie Meyer testified that she knew that cooking spray
20  was capable of catching fire and should not be near a
21  flame?
22      A.   I think she said that or something like it.
23      Q.   And Emma Schmidt testified that she
24  understood not to have aerosol containers too close to
25  heat, right?

Page 154

1       A.   Is that a paraphrase or is that a quote?
2       A.   That's a paraphrase.
3       A.   I don't specifically think she said that.
4       Q.   Okay.  What do you remember her saying?
5       A.   That she had some vague notion that it was
6   flammable but even that is not precise.
7       Q.   Okay.  Here's what she said.  "I had taken
8   physics and knew that any kind of container with
9   compressed anything inside has a high pressure and
10  shouldn't be too close to heat."
11      A.   Right.  That's a different thing, you know,
12  and if that's what she side, sure.
13      Q.   And then question:  "So you wouldn't, you
14  know, put a cooking spray can right next to a flame,
15  right?"  Answer:  "Correct."
16          MS. ROCK:  What's the question?  What's your
17      question?
18  BY MS. AMBROSE:
19      Q.   Do you agree with that?
20      A.   Disagree that she said that?
21      Q.   Right.
22      A.   I don't.
23      Q.   And did you consider the plaintiffs'
24  testimony in the Schmidt Meyer case in rendering your
25  opinions?

Page 155

1       A.   Sure.
2       Q.   You considered their specific knowledge about
3   the hazards that we're taking about today?
4       A.   Sure.
5       Q.   Okay.  And the hazards we're talking about
6   are the potential for the can to overheat and vent,
7   right, and then also to catch fire?  Those are the two
8   hazards you mentioned.
9       A.   Well, those are the general hazards.  I think
10  it's clear that they are unaware of the danger
11  associated with where they put the canisters.
12      Q.   So is it your understanding that the can --
13  that either one of the cans in the Schmidt Meyer case
14  actually overheated?
15      A.   Well, I think it overpressurized.  Got beyond
16  a hundred and 80.
17      Q.   A hundred and 80 pressure psi?
18      A.   Psig.
19      Q.   So if Lester Hendrickson is testifying that
20  the pressure didn't -- the can vent at temperatures very
21  low and not -- did not reach 180 psi, are you
22  disagreeing with his opinion or are you --
23      A.   No.
24      Q.   -- would you agree that he's the right person
25  to talk about that?

Page 156

Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 53 of 140
William Kitzes - 4/5/2018
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1   A.   He's -- he's the man.

2   Q.   Okay.  And -- okay.  So notwithstanding the

3   fact that both plaintiffs understood that the cooking

4   spray shouldn't be overheated and that cooking spray is

5   flammable, nevertheless, your opinion is that had the

6   label in Exhibit 7 been changed the way that you suggest

7   today that the fire in the Schmidt Meyer case would not

8   have occurred?

9   A.   I never said that.  I said it was less likely

10  to occur and that it was more likely that they would

11  have moved it away further.

12  Q.   Okay.  And what is the -- what is the basis

13  for that opinion?

14  A.   Well, we described what I considered to be a

15  highly adequate warning and, you know, these are two

16  women who went to Yale and I think that understanding

17  the danger in -- in explicit level raises the -- the

18  significance of the risk of injury and, again, without

19  repeating myself, especially since it was so easy to

20  avoid if they understood the danger.

21  Q.   So you're assuming that -- that the

22  plaintiffs in Schmidt -- in the Schmidt Meyer case would

23  have behaved differently even though they were already

24  aware of the risk?

25  A.   They would --

Page 157

---

1   point but is there anything specific that you're relying

2   on to support your opinion that these particular

3   plaintiffs would have acted differently had the label

4   been as you proposed in Exhibit 7?

5   A.   Well, you'll have to ask them.  I'm telling

6   you in general, based on the literature about perception

7   of hazards and risks that what I said was a reasonable

8   warning is shown to be what has the greatest chance of

9   motivating two reasonably smart women to prevent a

10  catastrophic accident with very, very little effort.

11  Q.   And if their response -- you said I'd have to

12  ask them.  If their response was I didn't put the Pam

13  can anywhere near a flame, if that's -- or any -- you

14  know, near heat or allow it to overheat or anything like

15  that, do you still think that the change in the label

16  would have made a difference?

17      MS. ROCK:  Object to the form.

18      THE WITNESS:  Well, I think that the change

19      in label is critical generally, okay?  If they

20      followed the instruction and it blew up anyway,

21      then we go back to the issue of they never should

22      have put Pam and an extremely flammable propellent

23      in a vented can.

24  BY MS. AMBROSE:

25  Q.   And let's talk about the Coello case for a

Page 159

---

1       MS. ROCK:  Object to the form.

2       THE WITNESS:  They were only generally aware

3       of the potential.

4   BY MS. AMBROSE:

5   Q.   Okay.

6   A.   You know, and that's not the same as knowing

7   that it could explode.

8   Q.   And do you know -- is it fair -- it's fair to

9   say that people don't always follow -- even if they know

10  of the risk, they don't always follow the warning,

11  right?

12  A.   Yes, that happens.

13  Q.   And it's also fair to say that even if

14  they're aware of the risk, they might go in willing to

15  take that risk, right?

16  A.   Not here.

17  Q.   Eyes wide open kind of thing.

18  A.   Not here.  I mean, you know, if they're going

19  waterskiing, you know, if you want to waterski, there

20  are certain risks associated with that and you go in

21  eyes wide open, to quote Tom Cruise, but in this case,

22  you know, you don't have to deal with the risk.  You

23  just have to get the information so that you can move it

24  and avoid the risk.

25  Q.   And I just -- I don't want to belabor the

Page 158

---

1   minute.  Regardless of what was -- of what was said on

2   the label in Exhibit 7, do you agree that Miss Ramos

3   understood that she should not allow the Pam container

4   to overheat?

5   A.   I don't recall her saying that.

6   Q.   Okay.  And do you recall her acknowledging

7   that she knew that the cooking spray contents were

8   flammable?

9   A.   I'd have to go back and look.  If she said

10  that, she said that.

11  Q.   Okay.  Is it your opinion that had the label

12  been changed in the ways you suggest here that the

13  specific fire in the Coello case would have been

14  prevented?

15  A.   I think in Coello, it would depend more from

16  a labeling point of view on her capability to understand

17  the labeling and I don't have an opinion about that one

18  way or another.

19  Q.   And is that because she doesn't speak

20  English?

21  A.   Yes.

22       That doesn't mean she can't read it.  I just

23  don't know.

24  Q.   So it's fair to say that you don't -- you

25  don't know whether the changes you -- you proposed would

Page 160

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 54 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1 have made -- would have prevented the fire in Coello.
2 It may have, it may not have. You don't -- you don't
3 know, right?
4    A.   As far as the labeling is concerned.
5    Q.   Let's talk about the Federal Hazardous Safety
6 Act.
7    A.   Substances.
8    Q.   God. Yeah. Okay. Let's talk about the
9 Federal Hazardous Substances Act that I have wrong
10 throughout my notes.
11       Okay. And your opinion is that the Federal
12 Hazardous Substances Act applies to the labeling of Pam
13 Cooking Spray, right?
14    A.   Absolutely.
15    Q.   And what is the basis for that conclusion?
16    A.   It's a hazardous substance under the
17 definition.
18    Q.   What is the hazard? The cooking spray?
19    A.   Well, the combination of the cooking spray
20 which can be flammable and the propellent which is
21 extremely flammable and it requires labeling under the
22 Hazardous Substances Act.
23    Q.   Sorry. I think that was kind of a -- so your
24 basis for your opinion that the Federal Hazardous
25 Substances Act applies is that it applies -- I'm sorry.

Page 161

1 insists on and then isn't there a statement there that
2 the manufacturer can certainly add other information
3 that's critical to protecting the consumer.
4    Q.   And the regulation itself doesn't require
5 that that added language be on the principal display
6 panel, right? The regulation itself doesn't require
7 that.
8    A.   I think it's silent as to exactly the
9 placement of it but given that 121 does provide for the
10 principal display panel formatting for all hazardous
11 substances, I think if there is another affirmative
12 statement of -- of the hazard, that that's, in fact,
13 where it belongs.
14    Q.   Okay. And that's kind of your legal
15 interpretation of how the different -- the regulation
16 and the different sections kind of interplay, right?
17    A.   Well, I've been doing this for a long time
18 from a safety point of view and yes, from a safety point
19 of view, that is my understanding.
20    Q.   So I guess I'm having a little trouble
21 understanding your distinction but -- so when you say
22 from a safety point of view, you're saying that it's
23 just more safe to have it on the principal display
24 panel. Is that fair?
25    A.   Well, I think that from a -- you know, I

Page 163

1    A.   Yes.
2    Q.   Could you --
3    A.   Yes. That's exactly right. It applies.
4    Q.   Okay. So if it has exclusion for food
5 products or something like that, you don't think those
6 should apply?
7    A.   It applies. And the MOU says to the
8 canister, you know, and the resultant injuries
9 associated with the failure of the canister.
10    Q.   Okay. And you're referring to the memorandum
11 of understanding between the CPSC and the FDA?
12    A.   Yes.
13    Q.   And you're familiar with 16 CFR 1500.130
14 which provides specific requirements for the labeling of
15 self-pressurized containers, right?
16    A.   Yes.
17    Q.   Okay. And that regulation expressly allows
18 for the use of the following language: Warning:
19 Contents under pressure on the front and elsewhere the
20 sentences, do not puncture or incinerate container, do
21 not expose to heat or store at temperatures above 120,
22 keep out of reach of children and it also says that you
23 can replace -- the word caution can be substituted for
24 the word warning, right? Is that a fair --
25    A.   Well, except for one thing. That's what it

Page 162

1 think that's true but I also think that just because
2 it's my opinion as a safety analyst is based on the
3 regulation doesn't make it a legal opinion.
4    Q.   Are you relying on anything other than the --
5 kind of the interplay of the regulation for -- for that?
6    A.   Well, just from a safety management point of
7 view and a warnings point of view, that's the right
8 place to put it.
9    Q.   Okay. And you don't want -- I mean, we can
10 agree to disagree on the legal requirements of the
11 regulation but we -- it's fair to say we've already --
12 you know, regardless of like which FHSA regulation may
13 or may not apply, we've discussed your specific concerns
14 with Exhibit 7 already, right? There's not additional
15 ones you are -- are just remembering now because we're
16 talking about the FHSA, right?
17    A.   No. You know, I think that some of the
18 precautionary language in the box needs to be
19 reformatted and addressed but that's not going to be, I
20 don't think, what addresses the danger here.
21    Q.   All right. You offer an opinion that ConAgra
22 failed to report to the Consumer Product Safety
23 Commission. And that's opinion number eight in your
24 report.
25    A.   Right.

Page 164

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 55 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

Q.   And your discussion relating to this opinion,
that's on pages 30 -- 36 to 40 of each report, right?

A.   Yes, ma'am.

Q.   You can look at your report if that's
helpful.  Okay.

     And your opinion regarding ConAgra's failure
to report a defect is based on the regulatory
requirements under 16 CFR part 115 and the CPSA, right?

A.   1115.

Q.   And the CPSA.  Is that right?

A.   It's really the regulations that enable it --
or that the statute enables the regulations and there
are many sections to prove up ConAgra's failure.  In
1115.4, for example, they give an example of a power
tool that doesn't come with adequate directions and even
though there's been no injuries, a report is required.
Probably half of the recalls the commission does are on
the basis of an analysis by a company that they have a
problem and not because they've had injuries.  There's
no requirement that you need an injury to report under
Section 15b.  That it contains a defect which could
create a substantial product hazard or present an
unreasonable risk of injury.  And under 1115.12(d) any
death or grievous bodily injury including burns requires
a report, period.  And --

Page 165

grievous bodily injury that was -- that has a defect
that can cause, could have caused, could have
contributed to causing a grievous injury including a
burn injury needs to be reported to the commission.

Q.   Yeah.

A.   And if you look at the definition of defect
under 1115.4, it's like any flaw or weakness in a
product in composition, in construction, in warnings,
in -- in performance when operated, you know, needs to
be addressed if it could create a substantial hazard or
a grievous bodily injury.

     And, you know, you've got the four incidents
admitted to of vents on Pam Cooking Oil releasing prior
to this incident, the Schmidt incident and Mr., I forget
his name, addressing it and his response to those people
was that's what it's supposed to do.  It's supposed to
burn you because the vents operated as they're supposed
to and I was like the absurdity of saying that because I
built it this way defectively and it did what it's
supposed to do and burned, it's not my fault and that is
callous.  And if you read his responses, they are
callous, they're uncaring, unempathetic and they made
the vents even though the vents shouldn't be there and,
therefore, they did what they're supposed to do.  I was
appalled.

Page 167

Q.   Sorry.  Can you -- can you say that
regulation again.

A.   1115.12(d).

Q.   .1115.12(d)?

A.   12(d) right.  .12(d).  And --

Q.   And you're -- sorry, let me break this up
because it's -- I want to make sure I understand.

     You're contending that 169 CFR 1115.12(d)
requires the manufacturer to report any injury -- any
serious injury.

A.   Well, that's not exactly what I said.

Q.   Let me finish the question.

A.   Well, but you're already misstating what I
said.

Q.   Well, let me finish the question so that the
record is clear.

     So are you contending that 16 CFR 1115.12(d)
requires a manufacturer to report any information
regarding injury -- regarding a serious injury?

A.   No.

Q.   What are -- I think that's what you had said
and maybe you misspoke.  So can you elaborate what --

A.   I did not misspeak.  That's not what I said.

Q.   Well, the transcript will speak for itself.

A.   What I said was that it requires any death or

Page 166

Q.   And whose testimony are you referring to?

A.   It's not testimony.  It's -- it's actual
documents recounting these people's injuries and there's
a guy, I forget his name, I can look it up if you want,
who responded to them as I described.

Q.   Okay.  You've included those documents in
your report, right?

A.   Yeah.

Q.   So I think where we had been thrown off is
when you initially talked about 16 CFR 1115.12(d), you
hadn't used the word defect so I want to make it clear
for the record and I think you corrected it, but the
mere occurrence of an injury alone is not -- does not
trigger a reporting requirement.  There has to be -- the
manufacturer has to receive information that a defect in
its product creates an unreasonable risk of serious
injury or death and as you said, defect is defined
further in the statute --

A.   Right.  That's one of the --

Q.   -- or the regulation.

A.   That's one of the triggers.

Q.   Okay.  And is that the trigger that you're
relying on to say that ConAgra failed to report?

A.   Well, that plus it contained a defect that
could create a substantial product hazard and they had

Page 168

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 56 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

Page 169

1 clear evidence of a defect which caused a grievous
2 bodily injury. You got all three.
3    Q.   Right. And those are all -- but that's
4 still -- that's the same reporting requirement, right,
5 that the manufacturer has information that there's a
6 defect and it could create an unreasonable risk of
7 injury, you're not referring -- like there's other
8 reporting requirements, like the company failed to
9 follow a particular standard or something else, those
10 don't apply, right?
11    MS. ROCK: Object to the form.
12    THE WITNESS: Well, that's true but that last
13    one, 1115.D -- 12(d) is very specific that if
14    there's a defect that creates a grievous bodily
15    injury, there's no discussion, there's no room.
16 BY MS. AMBROSE:
17    Q.   Right.
18    A.   A report has to be made.
19    Q.   Well, and I think we're -- we're maybe not
20 connecting here is that I don't think we're disagreeing
21 that, you know, the seriousness of the injury or whether
22 there's a -- you know, what the timeline is for
23 reporting. I think we're focusing on whether there's
24 reasonable information that a defect exists. Do you
25 understand that or do you think the --

Page 170

1    MS. ROCK: Object to the form.
2    THE WITNESS: Well, you know, it's -- if you
3    have four explosions and fires, a defect exists.
4    I don't know how you could say it doesn't.
5 BY MS. AMBROSE:
6    Q.   Okay. So as was noted in the, you know, 1977
7 report on aerosol cans, the CPSC has known for decades
8 that aerosol cans, you know, if overheated, can explode
9 and cause serious injury, right?
10    A.   Well, in those reports, they don't really
11 have an idea of the mechanism. In this case, it's
12 because of a specific defect and that's what Section 15
13 is all about.
14    Q.   And what is the specific defect?
15    A.   The inappropriate venting of extremely
16 flammable propellent and cooking oil.
17    Q.   And when you say inappropriate, you mean
18 because it -- in your view, it's -- it doesn't comply
19 with the DOT regulations --
20    A.   That's right.
21    Q.   -- for aerosol cans?
22    A.   Not without a special permit, it doesn't.
23    Q.   Okay. And in terms of the definition of
24 defect in 16 CFR 1115.4, you agree that there's a
25 discussion that some products like knives carry a risk

Page 171

1 but it doesn't mean that all knives are defective,
2 right?
3    A.   I agree because a knife does what it's
4 supposed to do. When the cans explode, they're not
5 supposed to but that was the problem with the -- with
6 the explanation of those four cases. He was saying that
7 it was supposed to explode so, therefore, there's not a
8 problem and that is appalling.
9    Q.   Do you know -- do you know if the cans hadn't
10 been designed with a vent, you don't know, one way or
11 another, whether there could have been more catastrophic
12 injuries if the can had burst at -- at a different seam
13 and shrapnel had fallen or something, you don't know,
14 right?
15    MS. ROCK: Object to the form.
16    THE WITNESS: Well, they had another 90 psig
17    to get there, number one. And I'm not even saying
18    that it would have burst at that point but nobody
19    approved the use of vents at the bottom of these
20    cans.
21    I mean, you know, when you read the
22    depositions of Mr. Baker and Mr. Kuehn, it just
23    sort of happened and there's no explanation, no
24    testing, no -- no application for a special permit
25    as to why they did it.

Page 172

1 BY MS. AMBROSE:
2    Q.   Is it your -- I mean, it seems like you're
3 extrapolating -- you've read very little information
4 about the facts leading up to the decisions relating to
5 the design of the can, right?
6    A.   Uh-huh.
7    MS. ROCK: Object to the form.
8 BY MS. AMBROSE:
9    Q.   You've read two depositions and a handful of
10 documents.
11    A.   And the documentation.
12    Q.   Right.
13    A.   Yeah.
14    Q.   You -- you haven't -- you haven't been privy
15 to information from, you know, the multiple other folks
16 on the team, other engineers, other -- I mean, your --
17 your --
18    MS. ROCK: Object to the form.
19 BY MS. AMBROSE:
20    Q.   Your opinion is dependant on what the
21 plaintiffs' lawyers gave you, right?
22    A.   Well, but Mr. Baker is the 30(b)(6). He's
23 the one who's supposed to have all the information about
24 this and he -- are you telling me he doesn't?
25    Q.   So we can agree to disagree that he was a

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 57 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1 30(b)(6) designee on the topics relating to these four
2 complaints.  He wasn't.
3     A.   No, to the --
4     Q.   But we can agree to disagree --
5     A.   -- to the can.
6     Q.   And what part of the can?  You think that he
7 was supposed to talk on behalf of the entire company
8 about the entire design of the can?
9         MS. ROCK:  Object to the form.
10        THE WITNESS:  My understanding was that he
11        was a designated person to talk about the
12        development and use of the can.  And, in fact, it
13        was in his deposition exhibits that those four
14        incidents were included.
15 BY MS. AMBROSE:
16    Q.   Okay.  And just because a plaintiff's lawyer
17 puts exhibits in front of a witness doesn't mean that --
18 that doesn't mean that that person is the most qualified
19 to talk about it, does it?  I mean, I put a number of
20 exhibits in front of you.
21        MS. ROCK:  Object to the form.
22        THE WITNESS:  Everything you put in front of
23        me was something I was supposed to discuss because
24        I had knowledge.
25        MS. ROCK:  Can we take a short break?

Page 173

1         MS. AMBROSE:  I'd like to finish this
2 section.
3         MS. ROCK:  How -- how much longer?
4         MS. AMBROSE:  I don't know.  Is it an
5 emergency?
6         MS. ROCK:  I'd like to use the restroom.
7         MS. AMBROSE:  Let me just ask two more
8 questions.
9         MS. ROCK:  Okay.
10 BY MS. AMBROSE:
11    Q.   All right.  So your opinion relating to the
12 existence of a defect under 16 CFR 1115.4, that's based
13 on testimony and exhibits that you've cited or
14 referenced in your report, correct, in terms of just the
15 factual background?
16    A.   Well, yeah, but it's based on the definitions
17 explicit in the regulation.
18    Q.   Okay.  So if you were shown or provided other
19 information that you hadn't seen when you rendered these
20 opinions, you agree that you would review that
21 information and potentially change your opinions?
22    A.   If I receive the information from Mr. Smith,
23 I'll read it and give you my honest opinions, just like
24 you've gotten here today.
25    Q.   And, in part, your opinion that you have

Page 174

1 today is based on your belief that you have, in fact,
2 received kind of the relevant information relating to
3 whether there's a defect or not?
4         MS. ROCK:  Object to the form.
5 BY MS. AMBROSE:
6    Q.   You're -- let me rephrase that.  Sitting here
7 today, is there -- is there some information you believe
8 you are lacking or do you think you have the whole
9 picture?
10    A.   I don't know.  My opinions are based on the
11 information that I've reviewed to date.
12    Q.   Okay.  And -- and you don't see any big holes
13 in that information, right?
14    A.   Well, I just said that, you know, there's no
15 explanation of why and whether it was safe to -- to go
16 to the vented can for Pam.
17    Q.   Okay.  And you I believe testified earlier
18 that you don't know whether the can was vented prior to
19 2011 either, right?
20    A.   Well, the two piece wasn't.
21    Q.   You think there was a two-piece can before
22 2011?
23    A.   No, I'm -- that's my answer.  They didn't
24 vent the two-piece can prior to 2011 because there was
25 no two-piece can.

Page 175

1         MS. AMBROSE:  Okay.  All right.  We can take
2 a break.
3         THE VIDEOGRAPHER:  Going off the record.  The
4 time is 2:04 p.m.
5         (Brief recess)
6         THE VIDEOGRAPHER:  Okay.  We are back on the
7 record.  The time is 2:19 p.m.
8 BY MS. AMBROSE:
9    Q.   I want to be -- I'm going to start where we
10 left off but I just want to make sure that we're clear.
11 What is the -- can you -- can you elaborate, what is the
12 specific defect that you believe should have been
13 reported by ConAgra to the CPSC?  And is it -- if it's
14 more than one, just explain that so I can make sure I
15 have it.
16    A.   The first one as we've described having
17 finitum is the failure to warn.  The second one is the
18 defect of the extremely flammable propellent in cooking
19 oil being expelled through the vent at 180 psig.
20    Q.   Okay.  And how do you know ConAgra has not
21 reported these two defects to the CPSC?
22    A.   Well, I don't.  I know that they have not
23 engaged in a corrective action plan because that would
24 be public.  If they have reported, I wouldn't know
25 because it would be confidential.

Page 176

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 58 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1    And, you know, let me just reiterate that on
2  page 46 of Exhibit 3 and 4, I go through many of the
3  things that we've already discussed about opinions so,
4  you know, those count as well.
5    Q.   Yeah.  Okay.  In terms -- I guess I'm
6  specifically thinking of opinion number eight which
7  relates to the reporting to the CPSC.
8    A.   Right.  Okay.
9    Q.   And I think -- so it sounds like the two
10  defects are failure to warn and then the extremely
11  flammable cooking oil being expended through vents.
12    A.   Right, which is the dangerous performance
13  which is a defect under .4.
14    Q.   Okay.  And under 16 CFR 1115.10(f), A
15  manufacturer is not required to report a defect if it
16  has actual knowledge that the CPSC is already informed
17  of the alleged defect.  Is that right?
18    A.   Well, that's what it says but the commission
19  has defined that as having filed a report under -- a
20  full report under the 1115 so it's not -- I think that
21  the commission knew you having had filed a report which
22  provides the commission with knowledge.
23    Q.   Okay.  Where did the commission elaborate on
24  that regulation?
25    A.   Oh, I'd have to look but that's always been

Page 177

1  their --
2    Q.   Okay.  So if ConAgra first learns of an
3  injury involving Pam through the CPSC, would you agree
4  that the CPSC has actual knowledge of that event?
5    A.   I'd have to see it but it's possible.
6    Q.   Okay.  And there's a variety of sources from
7  which the CPSC might obtain information regarding
8  alleged injuries regarding Pam?
9    A.   It's possible but the fact that the
10  commission sends let's say an IDI, EIR, an
11  epidemiological injury report to a company does
12  absolutely not absolve them from having to report under
13  Section 15.  That is not notice that the commission is
14  adequately informed.  There've been many cases where
15  it's the responsibility of the company given that
16  information to make a report.
17    Q.   Okay.  So your contention is that if the CPSC
18  informs ConAgra of an incident, ConAgra is required
19  to immediately report that incident back to the CPSC?
20    A.   I didn't say that.  They're required to
21  analyze that and see if that meets the requirements.
22    Q.   And I had started this question but there are
23  a variety of sources from which the CPSC may obtain
24  information regarding alleged injuries involving Pam,
25  correct?

Page 178

1    A.   Well, that's true but the requirement is for
2  the manufacturer to report, not that the commission can
3  go gather information someplace else.
4    Q.   Yeah.  I'm just asking that the CPSC learns
5  of these incidents from a variety of sources, right?
6    A.   Yeah.
7    Q.   And one of those is the National Electronic
8  Injury Surveillance System and EISS which monitors
9  emergency room reports?
10    A.   Not really.  They might learn them from EIRs,
11  from follow-up reports but just from the NEISS data
12  itself, generally not.
13    Q.   Okay.  And they sometimes find information
14  from death records, right?
15    A.   Yes.
16    Q.   And individuals can report incidents --
17  incidents directly to the CPSC, right?
18    A.   But not under Section 15.
19    Q.   I don't -- could you -- what do you mean by
20  not under?  Like I'm just asking where the CPSC can get
21  information.  Are you -- does it matter what section
22  it's under?
23    A.   Absolutely.
24    Q.   Okay.  And why does it matter what section
25  the CPSC --

Page 179

1    A.   Because --
2    Q.   -- obtains information under?
3    A.   Because reporting under 15 does not come from
4  consumers.  The consumer can call the hotline, they can
5  write a letter, they could file a report under
6  saferproducts.gov but that is not information cognizable
7  under Section 15.  The commission can look at that, you
8  know, but it's -- it's a -- it's a data point but it's
9  not a report.
10    Q.   Okay.  And I think that I'm just asking
11  generally where the CPSC can gather information about
12  products.
13    A.   Well, but your implication is different than
14  that.  They can gather information from all kind of
15  sources but the responsibility to report under
16  Section 15 resolves with the -- resides with the
17  manufacturer, distributor or retailer.
18    Q.   And -- and just to be clear, your view is
19  that even though 16 CFR 1115.10(f) says that a
20  manufacturer is not required to report a defect, if the
21  CPSC already has knowledge of it, that's been
22  interpreted in a way that --
23    A.   That's not --
24    Q.   Can you -- we have to --
25    A.   That's not what you said.

Page 180

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 59 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1    Q.   She's -- she's recording our questions so
2  wait until I finish asking the question and then answer,
3  please.  You're cutting me off in the middle of the
4  question.
5    A.   Because you're incorrect and, you know, we'll
6  be here all night.
7        MS. ROCK:  Well, you need to let her finish
8    the question.
9  BY MS. AMBROSE:
10   Q.   Okay.  So --
11       MS. ROCK:  Can you just start over?
12       MS. AMBROSE:  Yeah, I'm going to re-ask the
13   question probably in a better way.
14  BY MS. AMBROSE:
15   Q.   I guess I'm trying to understand.  I read
16  Section 16 CFR 1115.10(f) as saying that a manufacturer
17  is not required to report a defect if it has actual
18  knowledge that the CPSC is already aware of it.  You're
19  saying that there's something beyond that statute we
20  should be looking to.
21   A.   You misquoted it.
22   Q.   Okay.
23   A.   Until the commission has been adequately
24  informed.  It's in the statute, too.  And adequately
25  informed means they've received the report from the

Page 181

1  manufacturer under Section 15.
2        MS. AMBROSE:  I just have one copy of this
3    other than mine.
4      (Exhibit Number 21 marked for identification)
5  BY MS. AMBROSE:
6    Q.   Okay.  Attached here is a document that's
7  been marked as Exhibit 21, okay?  And is this 16 CFR
8  1115.10?
9        Oh, hold on.  It's two pages.  Okay.  Here's
10  the second page of that.
11   A.   Okay.
12   Q.   You agree this is the regulation, 16 CFR
13  1115.10?
14   A.   F.
15   Q.   The exhibit is 16 CFR 1115.10, right?
16   A.   Sure.
17   Q.   Okay.  So this -- this regulation relates to
18  persons who must report and where to report, right?
19   A.   Yes.
20   Q.   Okay.  So we've been talking about Section F
21  and I'll make sure I quote it.  "A manufacturer
22  including an importer, distributor or real" -- "or
23  retailer need not inform the commission under
24  Section 15(b) of the CPSA if that person has actual
25  knowledge that the commission has been adequately

Page 182

1  informed of the defect or failure to comply."  Is that
2  right?
3    A.   Yeah, you've quoted it correctly.
4    Q.   Okay.  And so is there something other than
5  this provision you're looking at to opine that ConAgra's
6  required to report back to the CPSC the information that
7  it learns from the CPSC?
8    A.   Well, it just doesn't say that.
9    Q.   And what doesn't say what?  What do you mean?
10   A.   It -- you know, you have to -- you have to
11  have actual knowledge that the commission is adequately
12  informed of the defect.  Just because they send you an
13  injury report doesn't mean they're -- they know what the
14  scope of the defect is, they know what the technical
15  issues are and that's why in order to be adequately
16  informed, you have to provide the information that's
17  required under a full report.
18   Q.   But, yet, the company isn't permitted any
19  time to do an investigation, right?
20   A.   Doesn't say that.
21   Q.   That's what you said earlier.  You said that
22  they have to report immediately.  You can't just hear of
23  an incident and then wait and actually investigate it.
24  Is that not fair?
25   A.   That is not what I said.

Page 183

1    Q.   Okay.  You said --
2    A.   I said that if they have information about a
3  defect that may have created or may have caused a
4  grievous bodily injury, that implies that that
5  investigation has already been done, that they then have
6  to do an initial report to the commission, yes.
7    Q.   Okay.  So the -- by the time -- so it sounds
8  like you agree that just hearing of an incident, just
9  hearing that something happened, for example, from the
10  CPSC, that's not enough to trigger an immediate report
11  back to the CPSC from the company, right?
12   A.   That's right.
13   Q.   Okay.  And sitting here today, you don't know
14  whether the CPSC has been adequately informed of the
15  alleged defects that you mentioned, correct?
16   A.   I have no evidence of it but, again, if
17  there's been confidential discussions between ConAgra
18  and the commission, I can't be aware of it, unless you
19  provide that information or Mr. Smith asks for a waiver
20  of the confidentiality so that he could get that
21  information from the commission.
22   Q.   So you're willing to make an opinion that
23  ConAgra failed to meet its reporting obligation without
24  actually knowing what reporting, if any, it's done,
25  right?

Page 184

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 60 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1    MS. ROCK: Object to the form.

2    THE WITNESS: My opinions, once again, are

3    based on the information I have to date. If you

4    want to provide me with any reporting that's been

5    made to the commission, that could change my

6    opinion.

7  BY MS. AMBROSE:

8    Q.    So your assumption going in is that there's a

9  failure to report until somebody shows me a report.

10   MS. ROCK: Object to form.

11  BY MS. AMBROSE:

12   Q.    Fair to say?

13   **A.    There's a failure to report unless a**

14  **corrective action plan has been accepted. If there's**

15  **something that has gone on confidentially, you can**

16  **provide that to me so that I can provide you with an**

17  **opinion or not but based on the information I have,**

18  **there's no indication that there's been a report.**

19   Q.    I'm going to hand you a document such as

20  Exhibit 22 and this document had also been produced with

21  a Bates stamp on it, which I can write on here later,

22  but this version of it has the Bates stamp on it. It's

23  been produced under a confidential designation which

24  I've written on here but the important thing is to know

25  it's confidential.

Page 185

---

1    (Exhibit Number 22 marked for identification)

2  BY MS. AMBROSE:

3    Q.    Can you read it?

4    **A.    Excuse me?**

5    Q.    I'm just -- I'll let you read it. Let me

6  know when you've read it.

7    **A.    I read it.**

8    Q.    Oh, okay. Have you seen this document before

9  today?

10   **A.    Last night.**

11   Q.    Okay. And do you recognize the incident here

12  as the incident in the Coello case?

13   **A.    Certainly looks that way.**

14   Q.    Okay. And this was a report provided to --

15  or, sorry, a letter provided to ConAgra from the CPSC.

16  You see that?

17   **A.    I do. From the Information Clearinghouse.**

18   Q.    What does that mean?

19   **A.    Well, it means that's from basically the**

20  **epidemiology side of the commission, not the compliance**

21  **division. Compliance would basically have no idea that**

22  **this was sent and may or may not have any idea that, in**

23  **fact, it was even created.**

24   Q.    Okay. And I think it says National Injury

25  Information Clearinghouse, Division of Hazard & Injury

Page 186

---

1  Data Systems. Is that what you're referring to?

2    **A.    Yes, ma'am.**

3    Q.    And what generally is that? What -- what

4  does that group do?

5    **A.    They collect these epidemiological**

6  **investigation reports and send them to the**

7  **manufacturers.**

8    Q.    Okay. And the epidemiologic investigation

9  report, that's included here, correct?

10   **A.    Yes.**

11   Q.    Okay. And this involves -- obviously, this

12  involves a can or a container that has the same label as

13  Exhibit 7, right, it's the Coello matter?

14   **A.    That's my understanding.**

15   Q.    Okay. And it also involves the alleged

16  venting of the can of cooking spray, right?

17   **A.    Yes.**

18   Q.    So at least some, you know, aspect of the

19  CPSC is aware of the two defects that you mentioned,

20  right, the -- the label and the --

21   **A.    Well --**

22   Q.    -- venting of the cooking spray?

23   **A.    -- the CPSC has got, I don't know, 4 or 500**

24  **employees.**

25   Q.    Yeah.

Page 187

---

1    **A.    This came from the field office. The**

2  **investigation was initiated about a month after the**

3  **incident. Looks like it may have been initiated by the**

4  **fire marshal or the fire department. And it was**

5  **collected in January and sent to the clearinghouse and**

6  **Ms. Shoma Ramaswamy, who's not a compliance or a**

7  **technical person, took this information per the**

8  **commission's procedure and sent it along to ConAgra.**

9    Q.    Okay. And what would be normally the next

10  step, if anything, that the CPSC would do, if you know?

11   **A.    Nothing based on this. I mean, like I say,**

12  **all the EIRs are available to -- to compliance but they**

13  **certainly don't look at most of them unless it comes to**

14  **their attention that there is an issue so this is sent**

15  **to ConAgra to basically initiate their -- their**

16  **evaluation of whether or not there's a defect which**

17  **could create a substantial hazard.**

18   Q.    And you don't know what the conclusion is of

19  ConAgra's investigation, do you?

20   **A.    No.**

21   Q.    Okay. Assuming for the sake of argument that

22  ConAgra did not report whatever information you are

23  asserting they should have reported to the CPSC, does

24  that make the incident, the fire in the Coello case more

25  likely to have occurred?

Page 188

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU  Document 167-2  Filed 12/17/19  Page 61 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1    MS. ROCK:  Object to the form.
2  BY MS. AMBROSE:
3    Q.   I guess I'm trying to connect the relevance
4  of this opinion to the lawsuit today.
5    A.   Well, you know, I mean, A, it's something
6  they had a safety obligation to do.  B, if they would
7  have done it, you know -- you know, this -- this -- this
8  is dated January of 2015.  We know that there have been
9  at least four, you know, five, six other incidents that
10  they're aware of -- no, five other incidents that
11  they're aware of.
12    Q.   Who's aware of?  Sorry.
13    A.   ConAgra.  So when you put all those together,
14  it's my opinion that they -- they should have reported
15  it and if they had done so, and like 75 percent of
16  companies avail themselves of the fast track, the
17  product may not have been on the shelf to buy.
18    Q.   Okay.  So in order for kind of this failure
19  to report to have had any impact on the fire in the
20  Coello case, you're assuming that -- or, sorry.  Let me
21  rephrase that question.
22      In order for this opinion regarding the
23  failure to report to have any impact on the likelihood
24  of the fire in the Coello case, you're assuming that the
25  product would have been pulled from the shelf?

1    A.   Well, I'm not assuming that.  I'm just saying
2  that a report -- that that's what it oftentimes leads to
3  in 90 percent of the Section 15 cases.  I can't speak --
4  if ConAgra wanted to fight with the commission about it,
5  it could go on for years but normally it gets resolved
6  fairly quickly, a couple of months.
7    Q.   So for it to have an impact on the Coello
8  case -- it would have had an impact on the Coello case
9  if the can wasn't available for sale, right?
10    A.   Right.
11    Q.   And is there any other way you can think of
12  that it would have had an impact on the Coello fire?
13    A.   Well, if it would have been -- Coello, that's
14  mainly how it would have gone down.
15    Q.   Okay.  And then in the Schmidt Meyer case,
16  the way -- the way that this may have -- this alleged
17  failure to report may have impacted the case is if the
18  product had been pulled off the shelves, right?
19    A.   Right and/or the labeling would have been
20  changed.  I mean, I think that pulling it off the shelf
21  is clearly preferable but that's another way it could
22  have affected it.
23    Q.   And the CPSC would have taken -- had of taken
24  some kind of action or the company would have
25  voluntarily availed itself of --

1    A.   Right.
2    Q.   -- changing it?
3    A.   Right.  If the -- if the company didn't
4  voluntarily agree, chances are it wouldn't happen in
5  time.
6    Q.   And you agree that -- do you agree that --
7  let me take that back.
8      I think you mentioned that some 90 percent or
9  more of reports lead to either a recall or something
10  like that.  Can you elaborate on that opinion?  Is that
11  historically or what -- what is that?
12    A.   Well, 75 percent of all recalls are initiated
13  under what they call the fast track system where the
14  company says all right, I got a problem and here's what
15  I'm going to do to fix it and it gets implemented fairly
16  rapidly.  If there is no agreement on a fast track, the
17  commission's staff has to make a preliminary
18  determination as to whether it creates a substantial
19  product hazard.  That takes longer.
20      And, you know, I don't know, 10, 20, above
21  the 75, if the commission makes that determination, the
22  manufacturer basically goes along and does the recall.
23  In a few cases, and I'm talking about really about a
24  handful over 30 or 40 years, the manufacturer says I'm
25  not doing it, then they have to have an administrative

1  litigation and that takes quite a while.
2    Q.   In terms of -- do you know the statistic, do
3  you know how many, you know, under the reporting
4  requirement, how many instances are reported eventually
5  lead to a recall of some sort whether it's voluntarily
6  or administrative or anything else?
7    A.   Well, the substantial majority.  I know that
8  the 75 percent that are fast tracked and then there
9  additional cases where the commission finds -- makes a
10  preliminary determination.  Then there are some cases
11  where the commission reviews it and says, you know,
12  thank you for your notice because notice doesn't mean a
13  recall --
14    Q.   Right, right.
15    A.   -- that they say you don't have to do
16  anything.  Then there's a small handful of case where
17  there's a debate.
18    Q.   And for this situation, you don't know, one
19  way or another, how -- what conclusion the CPSC would
20  reach with respect to these alleged defects, do you?
21    A.   Well, I know that in the 75 percent, they
22  would have initiated a recall.  If they had to make a
23  preliminary determination, I can't say.
24    Q.   Do you believe that -- that most companies
25  share your interpretation of the recording -- reporting

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU Document 167-2 Filed 12/17/19 Page 62 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1 requirement in terms of, you know, when to report? I
2 mean, other companies don't report, right?
3      MS. ROCK: Object to the form.
4      THE WITNESS: Oh, I think that happens. The
5 commission just hit Polaris with a 27 million
6 dollar fine for failing to report. And there've
7 been other -- let me finish. There've been other
8 civil penalties for failing to report but if
9 you're asking me if some companies hide and -- and
10 don't report and get away with it, I'm sure they
11 do.
12 BY MS. AMBROSE:
13      Q. Yeah. So I guess I'm -- you know, the 75 --
14 so to the extent that 75 percent of the reports lead to
15 some kind of a recall action --
16      A. That's not what I said.
17      Q. That's not what you said? Okay. Can you --
18 I thought you said 75 percent of the fact track --
19      A. Of fast track. All of those initially go to
20 a recall. The ones where the commission has to
21 evaluate, some of those go recall and some of them go
22 home and then there's the couple that argue.
23      Q. Okay. And then there's the ones -- in terms
24 of just trying to understand the scope of the picture,
25 there's some percentage out there that you don't know of

Page 193

1 cases where there was no report?
2      A. That they failed to report.
3      Q. That there -- yeah, there's no report.
4      A. I'm sure there are.
5      Q. Okay. And of those, you don't know if there
6 had been a report, which ones would have led to recall,
7 which ones wouldn't have, right?
8      A. How could I know?
9      Q. Okay. I want to talk now about the ANSI
10 standard. So this is the American National Standards
11 Institute ANSI Z535.4 standard.
12      A. Yup.
13      Q. Okay. Is it ever okay for a label not to
14 comply with the ANSI Z535.4?
15      A. Well, I don't think so but it's voluntary so
16 there's no punishment, except if they get sued, but it's
17 not a binding -- legally binding requirement.
18      Q. Have you ever reviewed a label that did not
19 comply with the ANSI Z535.4 standard that you concluded
20 was nevertheless adequate?
21      A. I probably have.
22      Q. Probably or are you thinking of something
23 specific?
24      A. I'm not thinking of something specific but,
25 you know, sometimes, you know, it's close but, you know,

Page 194

1 it's not within the strictures of the -- of the standard
2 and, you know, I'll say, well, okay, it's minimally
3 acceptable.
4      Q. Okay. And have you ever reviewed a label
5 that did comply with the ANSI Z535.4 standard that you
6 concluded was nevertheless inadequate?
7      A. Not that I recall.
8      Q. Can you give some examples of food products
9 sold in the United States that comply with ANSI Z535.4?
10      A. Well, any food product that's also a consumer
11 product would have to comply.
12      Q. Can you think of any?
13      A. Not off the top of my head.
14      Q. Okay. And you mentioned that these standards
15 are voluntary, right?
16      A. Yes, ma'am.
17      Q. And the CPSC did not require it, right?
18      A. Well, it depends. The CPSC uses it as the
19 basis of warnings that come with recalls.
20      Q. Okay. But the CPSC hasn't issued any kind of
21 a -- hasn't adopted this standard, right?
22      A. No.
23      Q. And FDA has not required it on food labels,
24 right?
25      A. No.

Page 195

1      Q. Okay. Have you seen any research showing
2 that compliance with the ANSI Z535.4 standard has any
3 impact on the effectiveness of the warning to consumers?
4      A. Well, there's research and we've already been
5 over it, that signal words such as danger and warning
6 have an effect. I don't know that -- I haven't -- I'd
7 have to think if there's research that specifically
8 addresses that area. I mean, the ANSI committee did a
9 lot of research that led up to the adoption of standard.
10      Q. What is the basis for your belief on that?
11      A. Just what I've read.
12      Q. Is there any -- looking at the stack of
13 documents you brought today, can you just point out
14 which specific studies support your -- support the view
15 that compliance with the ANSI Z535.4 standard has an
16 impact on the effectiveness of the warning?
17      A. Well, none of them say that specifically. A
18 couple of them talk about explicitness, about salience,
19 about noticeability which is all part of the ANSI
20 standard but I haven't seen research specifically that
21 addresses the entirety of the ANSI standard.
22      Q. You haven't seen research showing that there
23 is no impact on the effectiveness of the warning either,
24 right?
25      A. No. I mean, it could be that's somebody out

Page 196

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 63 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  there said that, you know, but I think that goes against
2  the vast body of literature.
3      Q.   And why do you -- I mean, that's just what
4  you think or are you thinking of specific literature?
5      A.   Well, because -- because all the literature
6  including this describes the -- the need for ANSI
7  formatted signal words, hazards.  If you look at this
8  one right here, the --
9      Q.   Say the exhibit number.
10     A.   The Exhibit 8.  It's a much bigger document
11  than just this, but it's all based on developing
12  warnings based on that format.
13     Q.   Okay.
14     A.   Even though it was published before the first
15  ANSI standard but after the older Z35 standard.
16     Q.   And is it your opinion that the ANSI Z535.4
17  standard is based on empirical research?
18     A.   Not numbers but it's -- it's more
19  qualitative.  I mean, it's not based on six.
20     Q.   Is that what you -- is that your -- when I
21  say empirical, you hear six or --
22     A.   Well, I hear numbers.
23     Q.   Okay.  So in your opinion number nine, you
24  say that ConAgra failed to comply with that standard and
25  you -- I'll find exactly which.

Page 197

1      You say with an appropriate message panel
2  including a signal word, a statement of the hazard, the
3  consequences of injuries and instructions on how to
4  avoid injury.  Did I read that fairly?
5      A.   Yes.
6      Q.   Okay.  Is that -- do you agree with me that
7  the concerns you have about the label that we've already
8  walked through in Exhibit 7 that you don't have
9  additional concerns or is -- or is there any other thing
10  we should be talking about?
11     A.   No, I think we basically described it and
12  I'll, again, take us back to the Canadian standard which
13  includes in words and pictorials all those issues.
14     Q.   So if you were to give an example of a
15  warning that would comply, you would point to the
16  Canadian Pam?
17     A.   Yeah, the only thing it doesn't have on the
18  front is precautionary measures, how to avoid it but
19  that could be addressed -- once the hazard and the
20  danger is clear, that could be addressed on the
21  precautionary panel on the side, if it's done
22  appropriately.
23     Q.   Okay.  And we've -- so we've addressed each
24  of your concerns about the label, correct?
25     A.   Yes.

Page 198

1      Q.   I'm going to switch gears to the DOT
2  regulation.  I don't -- I don't know if we want to take
3  a break or not.  Everybody okay?  Okay.
4      Okay.  So the Department of Transportation
5  regulations, including 49 CFR 173.306, relate to the
6  safe transportation of aerosol cans, right?
7      A.   Yes.
8      Q.   You talk about this in your report.
9      A.   I do.
10     Q.   And you acknowledge in your report that while
11  the DOT regulations govern the section and
12  transportation, you say, and I quote, "They do not
13  address the risk of injury to consumers."  Is that
14  right?  That's your view?
15     A.   They say that, not my opinion.
16     Q.   Okay.  So I'm reading on page 33 of your
17  report.  You say, "While the DOT regulations at
18  49 CFR 173.306 govern the shipping and transportation of
19  the aerosol can, they do not address the risk of
20  injuries to consumers."
21     A.   That's right.
22     Q.   Okay.  Is that -- you're saying that, right?
23     A.   No, they say that.  It's in the -- all the
24  special permits say that specifically.
25     Q.   Okay.  Do you have a different view?

Page 199

1      A.   No.
2      Q.   Okay.  So you -- you agree with that?
3      A.   Yeah.
4      Q.   They don't -- DOT regulations don't speak to
5  consumer safety, right?
6      A.   That's what they say.
7      Q.   And you agree?
8      A.   Yeah.
9      Q.   In your report, you say that the DOT
10  regulations require that the can must "contain its
11  contents at 270 psig."
12     A.   Well, you're clipping a piece out but that's
13  in a standard unvented can 2Q in a 131 degree Fahrenheit
14  water bath.
15     Q.   And does the regulation use the language
16  contain its contents?
17     A.   Yeah, I think so.
18     Q.   Okay.  And I'm looking at opinion three of
19  your report.  Does this kind of summarize your opinions
20  relating to the DOT regulations?
21     A.   Yeah.  It's very simple.  A 2Q can, without
22  an approved special permit, cannot exceed the inside the
23  container pressure at 131 degrees Fahrenheit and be
24  capable of withstanding bursting at a pressure of 1 --
25  at least one-and-a-half times or 270 psig.  Based on

Page 200

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 64 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  Mr. Kuehn of DS Containers, in his deposition states
2  **that the special permit 13601 allowing a vented bottom**
3  **for whipped cream does not apply to cooking spray and**
4  **that DSC didn't -- does not produce a 2Q vented can for**
5  **Pam Original.**
6      Q.   Sorry.  The part about DSC does not produce a
7  2Q vented can for Pam Original, what does -- what do you
8  mean by that?
9      **A.   He said that as a can manufacturer, they did**
10 **not provide a vented 2Q can to ConAgra for use with Pam.**
11     Q.   Is it your view that DS Containers didn't
12 know that Pam was being put in the container?
13     **A.   Well, later on in his deposition, he kind of**
14 **indicated that he did.**
15     Q.   I mean, they -- they produced the cans with
16 the label already on them, right?
17     **A.   Yeah.  And, you know, and this is where I'm**
18 **telling you that there's a hole in this data because it**
19 **just skipped over the whole rationale for allowing them**
20 **to use a vented can for Pam, to my mind, and failure to**
21 **comply are contravention of the DOT standards.**
22     Q.   Is it possible that the hole is caused by the
23 fact that maybe the plaintiff lawyer didn't ask the
24 right questions of Mr. Kuehn?
25     **A.   You guys got to deal with that.  I have no**

Page 201

1  idea.  All I know is what I read.
2      Q.   Yeah.  And your opinion is limited by what
3  you read, right?
4      **A.   Sure.**
5      Q.   Does -- do the DOT regulations expressly
6  preclude the use of -- the use of vents or pressure
7  release systems?
8      **A.   Without a special permit, it does.**
9      Q.   Okay.  And where does it say that?
10     **A.   It says it right in 306.  It says -- it**
11 **describes what a 2Q can is and then it says with a**
12 **special permit, you can get a variation like they did**
13 **for whipped cream.**
14     Q.   But the -- the special permit -- did you
15 review the special permit that you referenced here?
16     **A.   Yes.**
17     Q.   And it's not just about a vent, right?
18     **A.   It's about whipped cream.**
19     Q.   It's about whipped cream.  It's about --
20     **A.   And it's about --**
21     Q.   -- a bunch of aspects of the development of
22 the can?
23     **A.   It's about refrigerated contents that can't**
24 **take a water bath and then it provides for the vents.**
25     Q.   It provides -- other than the fact that there

Page 202

1  happens to be a special permit, 13601, is that your only
2  basis to conclude that the DOT doesn't just permit vents
3  without a special permit?
4      MS. AMBROSE:  Let the record reflect that
5  you're looking through your file.
6      THE WITNESS:  Let it reflect.
7      THE VIDEOGRAPHER:  Can we go off the record
8  just for one second while I change batteries?
9      MS. AMBROSE:  Sure.  Let's go off the record.
10     THE VIDEOGRAPHER:  Going off the record.  The
11 time is 3:05 p.m.
12     (Brief recess)
13     THE VIDEOGRAPHER:  We're back on the record.
14 The time is 3:08 p.m.
15     (Record read)
16 BY MS. AMBROSE:
17     Q.   Okay.
18     **A.   Well, the special permit 13601 --**
19     Q.   Okay.  Are you -- are you referring to a
20 document right now?  Let's mark it as an exhibit.
21     (Exhibit Number 23 marked for identification)
22 BY MS. AMBROSE:
23     Q.   Is this something that you pulled from your
24 file?
25     **A.   Yes, it is.**

Page 203

1      Q.   And is there anything that you brought here
2  today that you haven't shown us already?
3      **A.   No.**
4      Q.   Okay.  So everything in your file is stuff
5  that we've already -- it's already been produced, right?
6      **A.   Well, some of the depositions and, you**
7  **know --**
8      Q.   Right.
9      **A.   -- other things but everything in my file --**
10 **I mean, there's stuff in the file that's, you know --**
11     Q.   I want to make sure that we understand all of
12 the materials that you looked at to rely -- to form the
13 basis of your opinions.  So I guess my question is, are
14 there any items in that file that you haven't either
15 cited in the report or listed as a material reviewed or
16 produced today for us as exhibits?
17     **A.   I don't think so but after I answer your**
18 **question, I'll look.**
19     Q.   Okay.
20     **A.   All right.  There's a whole special permit**
21 **system.  It does not describe it in 173306 which**
22 **describes general pressure conditions and pressure**
23 **testing.**
24     Q.   Are you looking at another document now?
25     **A.   Yeah, this is --**

Page 204

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU Document 167-2 Filed 12/17/19 Page 65 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

Q. Let's mark that one.

(Exhibit Number 24 marked for identification)

BY MS. AMBROSE:

Q. I'm marking this document as Exhibit 24 which is another document that you brought with you today. It appears to be 49 CFR 173.306.

A. Six, right.

And going back to the 13601, it is specifically addressing nonflammable aerosol containing food stuffs at pressures exceeding those authorized so --

Q. I'm sorry. Go ahead.

A. -- it's nonflammable food stuffs.

Q. Yeah. I think we can agree that the special permit doesn't apply to Pam.

A. Okay. Good.

Q. Right. So I guess I'm asking is there any -- what is the basis of your opinion that Pam isn't allowed to be in a vented container or a pressure release type of container?

A. There's no provision in the regulations to allow that. And the one permit that they refer to in the MSDS is 11458 and that deals with packages exceeding 30 kilogram gross weight limit.

Q. So I think I understand that you're saying

Page 205

that the CFR doesn't expressly allow for a vent or a pressure release system. Is that fair?

A. Not this section, no.

Q. Okay. By this section, you're talking about --

A. 306.

Q. 306, okay. But you're going beyond the text of the regulation?

A. Right. Well, let me -- let me back up one sec. It does say under general pressure conditions, except as may be authorized by variations of a DOT specification type container so it provides for an exemption or special permit process.

Q. And -- but there's nothing in the regulation itself that expressly precludes the use of vents, is there? Can you point -- I mean, can you point to me anything in that regulation --

A. Well, but it --

Q. -- that says you can't use a vent or a pressure release system?

A. It doesn't mention vents at all but it has to meet the other requirements, in this case of a 2Q can, of a bursting pressure 270 psig and --

Q. Is it your opinion that a burst is the same -- is the same thing as a vent?

Page 206

A. There's -- there's -- there's no provision in here for a vent. It says a 2Q can has to meet the 270 psig requirement.

Q. For bursting, though, right?

A. Well, but that's --

Q. You can't burst below 270, right?

A. That's the only thing it addresses.

Q. It doesn't say whether or not, one way or another, whether it can vent below 270, right?

A. It does not address venting, you know, except apparently, you know, as far as a special permit is concerned.

Q. And the special permit, though, doesn't really -- the special permit is a special permit that relates to a number of factors other than --

A. Nonflammable food stuffs.

Q. Right, but it's -- it's not -- I think the pressure allowed is below 270. It's just a total --

A. I think it's higher actually but --

Q. It's not just -- or let me phrase it this way. Is it -- is it your opinion that Exhibit 23 is exclusively relating to whether or not there could be a vent and that's it?

A. Well, for certain nonflammable products, yeah.

Page 207

Q. Okay. So it just has to do with vent. It doesn't have to do with any of the testing or anything else that they need to do in the manufacturing process?

A. Well, it talks about what you need to do for a PRD, a pressure release device, that's what it's about, and about markings on the can which has to say DOT-SP 13601, all special permits need to be noted directly on the can and there's no such notation in the Pam labeling.

Q. I -- we keep going back to that. Pam doesn't -- we know that, right? We're not --

A. Well, I couldn't say that there's any special permit on the can -- on the Pam can.

Q. Right. Okay. And it's your opinion that the only purpose of the special permit is to allow the vent?

MS. ROCK: Object to the form.

THE WITNESS: That one, yeah. You know, ultimately, I mean, there's other provisions in there that relate to it but that's what it's about.

BY MS. AMBROSE:

Q. And -- and what's your basis for concluding that the driving reason behind seeking and obtaining the special permit has anything to do with the vent?

MS. ROCK: Object to the form.

Page 208

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 66 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1 THE WITNESS: Pressure release device.
2 BY MS. AMBROSE:
3    Q.   That's it?  The words -- the words pressure
4 release device?
5    A.   Yeah.
6    Q.   Did you read any of the, you know, the
7 applications or any of the paperwork around obtaining
8 the permit?
9    A.   Yeah.
10   Q.   Okay.  What --
11   A.   Just -- just this paperwork.
12   Q.   Okay.  So outside of Exhibit 23, did you look
13 at anything else relating to the application of the
14 permit?
15   A.   No.
16   Q.   So you're speculating when you say that the
17 reason that the permit was obtained was to allow vents?
18      MS. ROCK:  Object to the form.
19      THE WITNESS:  I'm not speculating at all.
20   It's the four corners of the document.  You got
21   another document, that's great but this is the
22   official special permit as issued by PHMSA,
23   P-H-M-S-A, and the Department of Transportation.
24 BY MS. AMBROSE:
25   Q.   And it references an application dated

Page 209

1    Q.   Okay.  Can you articulate any concern that
2 the Department of Transportation may have relating to
3 the transportation of aerosol containers that have vents
4 which prevent the cans from bursting in transport?
5      MS. ROCK:  Object to the form.
6      THE WITNESS:  I haven't seen anything.
7 BY MS. AMBROSE:
8    Q.   Are you familiar with 49 CFR 178.33d-3,
9 Variation 2?
10   A.   I looked at it.
11   Q.   And what is your understanding of that
12 regulation?
13   A.   I'd have to look at it again.  I don't recall
14 specifically.
15   Q.   But you know that you looked at it?
16   A.   Yes.
17   Q.   In the context of preparing for your -- your
18 deposition or --
19   A.   Yes.  I think it had do with the definitions
20 of -- of cans.
21      (Exhibit Number 25 marked for identification)
22 BY MS. AMBROSE:
23   Q.   All right.  I'll give you a minute.  Let me
24 know when you're ready.
25   A.   Okay.

Page 211

1 January 8th, 2014, right?
2    A.   That's right.
3    Q.   If this special permit didn't exist, would
4 you still believe -- what would be your basis to believe
5 that the DOT doesn't permit venting under any of the
6 regulations?
7    A.   I have not seen any regulation that allows a
8 2Q can --
9    Q.   Okay.
10   A.   -- to vent at 180.
11   Q.   And it's your view that unless it's expressly
12 stated in the regulation companies can't do it, right?
13   A.   Well, for this --
14      MS. ROCK:  Object to the form.
15      THE WITNESS:  For this purpose, if it's not
16   expressly allowed in the regulation, you can't do
17   it.
18 BY MS. AMBROSE:
19   Q.   And what do you mean by this purpose?
20   A.   Well, on this issue of pressure and cans, if
21 you -- it tells you exactly what you need to do in order
22 to comply and if a company takes it upon themselves to
23 do something else, it wouldn't be in compliance.
24   Q.   Do you know how Pam cans are transported?
25   A.   Trucks, trains.

Page 210

1    Q.   Okay.  Do you agree that under this
2 Department of Transportation regulation -- I'm sorry,
3 let me rephrase that question.
4      This Department of Transportation regulation
5 does expressly allow for pressure release system
6 including a vent, right?
7    A.   Doesn't say that but the rim vent it says.
8 It gives examples, a rim vent, a dome expansion device.
9    Q.   And it says a -- equipped with a pressure
10 release system, and then it gives some examples,
11 designed to buckle prior to the burst of the container.
12 Do you see that?
13   A.   Yep.
14   Q.   Do you -- are you offering an opinion that
15 this provision does not apply to the Pam Cooking Spray
16 containers that have vents?
17   A.   Well, it may but it doesn't provide for the
18 release of the propellent that -- other than what is
19 identified in 306.
20   Q.   Okay.  So is your understand -- I guess I'm
21 not following that.  A pressure release -- you agree
22 with me that if a -- if you have a rim venting release
23 or pressure release system, you're going to have
24 expelling of the contents in the can, right?
25   A.   At some point but not at the point where the

Page 212

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 67 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1 manufacturer decides to.

2   Q.   And what are you basing that opinion on?

3   **A.   It doesn't say that.  It just says that if it**
4 **has a pressure release, it should buckle prior to**
5 **bursting which is 270.  Buckling does not mean expelling**
6 **propane and other extremely flammable gases.**

7   Q.   Okay.  So what does buckle mean?

8   **A.   Buckle means the inversion of the end cap.**

9   Q.   Okay.  So when it says equipped with a
10 pressure release system, e.g., rim venting release, I
11 guess I'm confused by what you're saying here.  Is that
12 not a vent?

13   **A.   I can't help your confusion.**

14   Q.   Well, can you clarify what -- what's the
15 basis for your opinion that this regulation doesn't
16 allow for a vent?

17   **A.   I didn't say that.  I said it doesn't allow**
18 **for expelling of extremely flammable propellent below**
19 **burst strength.**

20   Q.   And what is your basis for that opinion?

21   **A.   It's just the plain language in the statute**
22 **which is always the best --**

23   Q.   What plain language?  It sounds like you're
24 making up language and then saying it's not included.

25       MS. ROCK:  Object to the form.  Is that a

1   question?

2 BY MS. AMBROSE:

3   Q.   Yeah.  What language are you pointing to?
4 You said that it doesn't say and then you said language
5 and then you said you're reading express language.

6       MS. ROCK:  Okay.  Well, to say that what he's
7       saying sounds like something, that wasn't a
8       question so please rephrase.

9       THE WITNESS:  I mean, I'm happy to read.  "A.
10      Manufacture.  Ends.  The end shall be designed to
11      withstand pressure and the container equipped with
12      a pressure release system designed to buckle,
13      invert at the bottom prior to the burst of the
14      container", so it does not object to the buckling
15      or the inversion of the end which provides more
16      space in the can before burst strength.

17 BY MS. AMBROSE:

18   Q.   I agree with you on that.  It doesn't object
19 to the buckling but where are you saying that it would
20 object to a vent?

21   **A.   It -- I didn't say it objected to a vent.  I**
22 **said it objected to spewing dangerous gas before**
23 **270 psig.**

24   Q.   And -- and -- but you're not relying on any
25 text to say that, right?

1       MS. ROCK:  Object to the form.

2       THE WITNESS:  I believe that -- that those
3       two lines say exactly that.

4 BY MS. AMBROSE:

5   Q.   So your view is that subsection A says that
6 you can't have vents that allow the expel --

7   **A.   If you keep trying to put words in my mouth,**
8 **we'll be here all day.  I didn't say it didn't allow for**
9 **vents.  I said it didn't allow for the expulsion of**
10 **flammable gas until burst strength at 270.  There's**
11 **nothing in here that says at any point can flammable**
12 **gases escape from the can.**

13   Q.   And you would anticipate it would be -- that
14 a CFR would be that specific to a particular product?

15   **A.   It just says what it says.**

16   Q.   And you haven't read any of the -- kind of
17 the history around the issuance of this regulation
18 including the comments and so on and so forth, have you?

19   **A.   It says what it says and the CFR is the CFR.**
20 **That's the regulation.**

21   Q.   Okay.  So I guess to answer my question, the
22 answer's no?

23   **A.   I haven't read the comments by industry.**

24   Q.   And have you read anything other than the
25 regulation itself --

1   **A.   You just put it --**

2   Q.   -- relating to Variation 2?

3   **A.   You just put it in front of me and that's**
4 **what I'm responding to.**

5   Q.   Yeah, but you're here today and you're
6 claiming to be an expert on DOT regulations so I'm
7 asking besides -- you know, what have you read, what are
8 you relying on for these opinions?

9   **A.   Just this.**

10   Q.   And what do you mean by that?

11   **A.   Just this text.**

12   Q.   Oh, just this.  I thought you said justice.

13   **A.   Oh, no.**

14   Q.   I was like that's a little vague.

15   **A.   Well, that's a good answer but --**

16   Q.   I was like okay --

17       MS. ROCK:  Can't go too wrong with justice.

18       MS. AMBROSE:  Just this, okay.  Got it.

19       THE WITNESS:  I like that.

20 BY MS. AMBROSE:

21   Q.   Okay.  And -- okay.  That's, I think, good.
22       And so you don't have -- do you have an
23 opinion -- okay.  Let me table that.
24       All right.  Is it your opinion or are you
25 offering an opinion that if the can in the Coello case

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 68 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  had not included vents, then it would have been set up
2  to withstand a pressure of --
3  **A.   At least 270.**
4  Q.   Let me finish the question.
5  **A.   Oh.**
6  Q.   If it would have been designed to withstand a
7  pressure of at least 270 psig, that the incident in
8  Coello wouldn't have occurred, that the fire wouldn't
9  have occurred?
10 **A.   I'd say it would be much less likely.**
11 Q.   But you don't know whether it would have
12 actually -- that would have been the thing that would
13 have made it not happen?
14 **A.   I don't think anybody knows the answer to**
15 **that.**
16 Q.   Well, I think that Dr. Hendrickson offered an
17 opinion that the psi in the can in Coello couldn't have
18 gotten even close to 180.
19 **A.   Right, but I don't know that he opined as to**
20 **what that is.  Let me put it this way.  I don't know.**
21 Q.   So if -- okay.  Fair enough.
22      And the same is true for the Schmidt Meyer
23 can, right?
24 **A.   Right.  A stronger can would make the**
25 **bursting less likely.**

Page 217

1  Q.   And then -- but in the particular case, you
2  don't know, for example, how high the pressure -- how
3  hot it was or how high the pressure was in the can and
4  whether it would have burst at 270 or not?
5  **A.   Well, but it was -- it was a vented can so I**
6  **know that it would expel the flammable gas at, you know,**
7  **much lower psig so I don't know what would have been the**
8  **situation with a nonvented can.  All I know is it would**
9  **be designed at least 90 psig stronger.**
10 Q.   And if the can for some reason vented at 50
11 psig, would you agree with me that it really wouldn't
12 have made a difference whether the contents were
13 released at 180 or 270 because, obviously, there's
14 something wrong if it's releasing at 50?  Is that fair
15 to say?
16 **A.   Yeah, I agree with that.  Fifty's worse.**
17 Q.   Yeah.  And you don't know how hot -- I mean,
18 you don't know -- you would be speculating if you were
19 to say that the injuries in the case would have been
20 less severe if the can had exploded, right?  By
21 exploded, I mean not vented but actually burst because
22 it doesn't have a pressure release.
23 **A.   I don't -- I don't know.**
24 Q.   And you're aware -- I mean, we've talked
25 about the reports from 1977 that people have been

Page 218

1  injured by exploding aerosol cans, right?
2  **A.   Yes.**
3  Q.   And in addition to the fire concerns that you
4  might have about the flammability, there's also concerns
5  about the impact of the can --
6  **A.   Sure.**
7  Q.   -- physically hitting somebody, right?
8  **A.   Sure.  I mean, you know, 30 to 40,000 people**
9  **a year die in car crashes but there are still defects in**
10 **cars that have to be addressed.**
11 Q.   And in terms of the transportation of the
12 cans, you'd agree with me that in order for the cans to
13 have reached the plaintiffs in these cases, they
14 obviously got through the transportation process, right?
15 They didn't explode, they didn't vent, they didn't cause
16 any problems that the Department of Transportation would
17 be concerned with.  Do you agree with that?
18 **A.   Best of my knowledge.**
19 Q.   Okay.  In the first couple of pages of your
20 opinions, you talk about evaluating a company's product
21 safety management program.  You list five accepted
22 safety principles to ensure the products are reasonably
23 safe.  Does that sound familiar to you?
24 **A.   It does.**
25 Q.   Okay.  And you've got these accepted

Page 219

1  principles on your website, too, right?
2  **A.   I do.**
3  Q.   And there's a video of you talking about them
4  on your website.
5  **A.   When I was working for AIG.**
6  Q.   When was that?
7  **A.   A bunch of years ago, they called me and**
8  **asked me to participate in developing a program for**
9  **their insureds about product safety.**
10 Q.   I saw a video yesterday and it didn't look
11 like you were extremely younger than you are today.  Is
12 that -- how -- are we talking about the same video?
13 **A.   I did look extremely younger?**
14 Q.   No, you look the same as you do now so I'm
15 confused --
16 **A.   Yeah.  It wasn't that long ago.**
17 Q.   Okay.  That's what I'm confused by.
18 **A.   I looked like this when I was 12.**
19      MR. SMITH:  That's good, right?
20 BY MS. AMBROSE:
21 Q.   Have the -- what steps are involved in
22 evaluating a company's product safety management
23 program?
24 **A.   The five steps there.  Identification of**
25 **hazards and severity, risk assessment, combining product**

Page 220

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 69 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1 hazards, the environment, foreseeable consumer use,
2 monitoring safety performance and taking corrective
3 action.
4    Q.   Okay.  So I think what you've just listed are
5 the five principles so I think I'm asking a different
6 question.  I'm asking what would -- what is involved in
7 evaluating whether a company -- just evaluating a
8 company's product safety management?
9    A.   Well, gathering the information and then
10 applying those principles, and if you looked at my
11 website, there's a more complete list of ten, you know,
12 and to see if they have the programs in place.  I did
13 that for an import company here in Miami a while back at
14 the request of the Justice Department and the Consumer
15 Product Safety Commission because they had been found in
16 violation and part of the consent decree required them
17 to hire a safety manager to develop a program for them.
18    Q.   And you -- so you mention gathering
19 information.  What -- what kind of information would you
20 gather if you're evaluating a company's product safety
21 management?
22    A.   Well, how they gather their information, what
23 kind of review they have of labeling and of the products
24 that they -- they manufacture or sell, marketing
25 situations.

Page 221

1    Q.   Okay.  Would you -- would you talk to some of
2 the folks that work at the company?
3    A.   I imagine I would.
4    Q.   And who would you want to talk to?
5    A.   Well, I'd start with the CEO and then work my
6 way down.
7    Q.   And you mentioned evaluating a company's
8 product safety management program.  I didn't catch the
9 name of the company again.  Can you say it?
10    A.   Oh, LM Imports.
11    Q.   Okay.
12    A.   It's on my vitae.
13    Q.   And can you -- how many hours did it take
14 to -- how many hours do you think it takes to do that?
15    A.   More than I billed for.
16    Q.   More than 50?
17    A.   Maybe.
18    Q.   And -- and what types of information did you
19 look at with respect to LM Imports?
20    A.   Well, they had some very specific issues.
21 They're basically an importer and a reseller so I had to
22 look at how they screened the material that they got
23 from China, whether or not there were certificates of
24 compliance, how to evaluate those products as they
25 related to safety, small parts, things like that.

Page 222

1    Q.   Are companies required to establish a product
2 safety management program to your knowledge?
3    A.   More and more the Product Safety Commission
4 is requiring that as part of a recall program.
5    Q.   Did you evaluate ConAgra's product safety
6 policies?
7    A.   As best I could with the information I had.
8 I didn't see a specific policy as to how they evaluate
9 their products.
10    Q.   So the answer is no, you didn't look at any
11 of the policies, right?
12    A.   I didn't see -- have any of the policies.  I
13 looked at some of the things that they did that would
14 relate to the policies but I didn't see the policies
15 per se.
16    Q.   Okay.  And what specific things did you look
17 at that they did?
18    A.   Well, all the emails, all Mr. Baker's
19 exhibits, his deposition.
20    Q.   And do you believe that that was sufficient
21 information about the company for you to render an
22 opinion as to the -- render an opinion evaluating the
23 company's product safety management program?
24    A.   Well, based on the information that I have,
25 I -- I did what I needed to do.

Page 223

1    Q.   Have you ever approached an opinion in
2 litigation which you concluded that you didn't -- that
3 you lacked the required information to offer the
4 opinion?
5    A.   Yeah.  I told you right here that I didn't
6 have the information as to why they started to put the
7 Pam in the can with the vents, sure.  You know,
8 sometimes there are holes that, you know, either it
9 hasn't been produced or I haven't seen it.  I just --
10    Q.   Do you -- did you request any documents or
11 information relating to this matter or did you rely
12 exclusively on information that was given to you?
13    A.   Well, we discussed what the documents were,
14 you know, and I basically relied on what they sent me
15 after that discussion.
16    Q.   And they didn't send you any -- any safety
17 policies?
18    A.   No.
19    Q.   You didn't -- you didn't review any testimony
20 or information from the company's -- anybody from the
21 department relating to the quality at ConAgra, did you?
22    A.   No.
23    Q.   No.  The information you looked at was from
24 the packaging director and the labeling director, right?
25    A.   That's correct.

Page 224

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU Document 167-2 Filed 12/17/19 Page 70 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  Q.   You didn't -- you don't know anything about
2  the procedures in place or anything around quality
3  control at the company?
4  A.   I -- no.  I -- it wasn't really relevant to
5  me.  I didn't see any information that indicated that
6  the can didn't perform as they intended and that, in
7  fact, was the problem, as I discussed in those -- in
8  those responses to the prior incidents.
9  Q.   You read the deposition testimony that
10  corresponded with those exhibits, right?
11  A.   Baker and Lackey?
12  Q.   Eakley?  Lori Eakley?  Is that --
13  A.   Yes.  Yes.  I confabulated.
14  Q.   So -- so I guess I'm just not -- so my
15  understanding of Baker's testimony is that he's not the
16  right one to talk to you about -- about what the company
17  does in terms of handling complaints but you're
18  extrapolating from that testimony enough information to
19  conclude that the rest of the folks involved are not
20  relevant in that you have enough information that the
21  product safety management program's inadequate?
22  MS. ROCK:  Object to the form.
23  THE WITNESS:  Well, you're talking about the
24  quality people and I don't have any information
25  that whether or not the cans were built to their

Page 225

1  specification is at issue here.  I -- I -- I got
2  the complaints, the four complaints that they
3  produced and the responses.
4  MS. AMBROSE:
5  Q.   Okay.  So looking at opinion number two,
6  maybe this will help me understand.  Is your opinion
7  related to ConAgra failing to apply accepted principles
8  of product safety management, is that specifically
9  relating to ConAgra's response to the four complaints
10  you talked about?
11  A.   No, its response to all of this material.
12  Q.   But how do you know what its response has
13  been to all of this material?
14  A.   I didn't say anything about a response.  I
15  get the emails, the depositions, the exhibits and all
16  this other material and my opinions are based on that.
17  Q.   And you think that that is sufficient -- that
18  you've received sufficient information relating to these
19  principles in order to conclude that ConAgra failed to
20  apply accepted principles of product safety management.
21  Is that fair to say?
22  A.   I was able based on the information that I
23  have to reach that opinion.  If I get more information,
24  I'm absolutely more than happy to review it.
25  Q.   Just let me do this.  Let me do this as --

Page 226

1  (Exhibit Number 26 marked for identification)
2  THE WITNESS:  Twenty-five, 26?
3  BY MS. AMBROSE:
4  Q.   Right.  I'm handing you what's been marked as
5  Exhibit 26.  Are these the four complaints you're
6  referring to?  These are Exhibits 19 through 23 in the
7  deposition of Steve Baker and they're referenced in your
8  report.
9  A.   Yes.
10  MS. AMBROSE:  Do you want a set?
11  MS. ROCK:  Sure.
12  MS. AMBROSE:  These are out of order.
13  MS. ROCK:  That's okay.
14  BY MS. AMBROSE:
15  Q.   Okay.  Let's look at the first one.  The
16  first document in Exhibit 26, which was Deposition
17  Exhibit Number 19, is -- okay.  Let's see.  Do you know
18  what, if anything, the company did following whatever
19  date this document was prepared?
20  A.   I don't understand the question.  What do you
21  mean what they did?
22  Q.   Well, so -- okay.  Let me -- let me back up.
23  You seem to think that this exhibit is relevant to your
24  opinion relating to the principles of product safety
25  management, right?

Page 227

1  A.   And other things but, yeah.
2  Q.   Okay.  So what is it about this document
3  that -- that you're relying on for your opinions
4  relating to the principles of product safety management?
5  A.   Well, here you have a consumer writing in or
6  calling in, said they had an explosion, wasn't using it,
7  on a shelf, on a portable stove outside, wasn't using
8  it.  Was four, five feet from the can and there was an
9  explosion and I was enveloped in a ball of flames.
10  Severe second degree burns.  Wasn't getting hot.  Was
11  about a foot-and-a-half away from heat roasting peppers
12  on low in barbecue box.
13  And then it says it was basically the can
14  buckled with the vents exposed.  No visual signs of
15  defect.  Conclusion:  No visual signs of defect to the
16  bottom of the can.  The bottom looks typical of a bottom
17  that has buckled other than the residue.  Can is
18  designed to vent when the internal pressure reaches
19  between 180 and 210.  The introduction of heat to the
20  can will raise the normal internal pressure.  So what
21  he's basically saying here, as he does in the other
22  three, that can worked great.  It spewed the flammable
23  gas at 180.
24  Q.   And is your opinion -- is it your
25  understanding that Rob Ewert is the person that reached

Page 228

William Kitzes   -   4/5/2018
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  the conclusion?  Do you know?
2     A.   That's what it says.  Center For Research
3  Quality and Innovation for ConAgra Foods.
4     Q.   Do you know what his job is?
5     A.   Responding to these consumer complaints?
6     Q.   Nope.  So he's the director or was the
7  director of packaging.
8     A.   Uh-huh.
9     Q.   So you don't know who else also responded to
10  this consumer complaint, do you?
11     A.   You guys provided this.  You produced this.
12  You didn't produce anything else so I don't know.
13     Q.   What's your basis for concluding that we
14  didn't produce anything else because you didn't get it?
15     A.   Anything else about this complaint?
16     (Nods head.)
17     A.   I didn't get it.
18     Q.   You were given this single document, right?
19     A.   Yes.
20     Q.   Okay.  And so you don't know who else at the
21  company responded to this complaint, right?
22     A.   I don't.
23     Q.   And you don't know, following Mr. Ewert's
24  visual analysis, what was done in order to respond to
25  the complaint, do you?

Page 229

1     A.   Well, I don't know anything other than what
2  it says here which is the can appears to have performed
3  as designed so, you know, it at least implies that
4  there's nothing that needs to be done.
5     Q.   Well, we're sitting here today because you're
6  saying the design is improper, right?  That's one
7  reason?
8     A.   No.  I'm saying the performance is improper.
9     Q.   So you're okay with the design of the can?
10     MS. ROCK:  Object to the form.
11     THE WITNESS:  No, it's the design of the can,
12     the application of the Pam to -- with the vents
13     that creates the performance problem.
14  BY MS. AMBROSE:
15     Q.   Okay.  So him stating that it performed as it
16  was designed, that's actually accurate, right?
17     MS. ROCK:  Object to the form.
18  BY MS. AMBROSE:
19     Q.   You're saying the design is flawed but it
20  did -- it did behave as designed, didn't it?
21     A.   Well, I guess it did but it's really callous,
22  isn't it?  I mean, these people got enveloped in a ball
23  of flame and he's saying the product is fine.
24     Q.   Well, you don't -- you're making assumptions
25  about what he, you know --

Page 230

1     A.   I'll just take the words as they --
2     MS. ROCK:  Is that a question?  Let her --
3     let her ask the question.
4  BY MS. AMBROSE:
5     Q.   Okay.  I guess I'll just say you are not
6  aware -- you just don't know, one way or another, how
7  this complaint was responded to by others at ConAgra
8  other than Rob Ewert who's responsible for packaging,
9  right?
10     A.   I don't know.
11     Q.   And going to the other -- let's go to the
12  second one here which is -- this one was attached as
13  Plaintiff's Exhibit 21.  And this -- this also appears
14  to be a conclusion from Rob Ewert, right?
15     A.   Yeah.
16     Q.   Okay.  And you don't know with respect to
17  this complaint what, if anything, anyone else at the
18  company did in order to respond to this complaint.  Is
19  that correct?
20     A.   No, ma'am, other than they conflate buckling
21  with venting.
22     Q.   And that's Rob Ewert, right?
23     A.   He's your guy, yeah.
24     Q.   So I'm asking beyond him and what's stated
25  here, you don't have any information about what others

Page 231

1  at the company did in response to this complaint, right?
2     A.   That's right.
3     Q.   Okay.  And you would agree it's the same for
4  the third and fourth document here which were
5  Plaintiff's Exhibit 22 and 23 of the deposition of
6  Rob Ewert.
7     A.   Well, it's the same.  I don't know who else
8  responded but it's also the same callous response that
9  we met every requirement they think they have and that's
10  the end of it.
11     Q.   And is that -- when you say that's the end of
12  it, you mean just from this statement by Rob Ewert.  You
13  don't know if that's the end of the investigation from
14  the company.
15     A.   That's all I got.
16     Q.   And Steve Baker testified -- these deposition
17  exhibits were attached to the deposition of Steve Baker,
18  right?
19     A.   Right.
20     Q.   And he said he knew nothing about these,
21  right?
22     A.   I don't recall but I'll take your word for
23  it.
24     Q.   Okay.  So there's nothing from his testimony
25  that helped you to elaborate on these documents, right?

Page 232

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 72 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1    A.   That's true.
2    Q.   Okay.  And you say -- in opinion ten, you say
3  that ConAgra "rejected consumer complaints claiming that
4  their cans meet the DOT standards and, therefore, no
5  action by ConAgra was required."  Are you also relying
6  on Exhibit 26 for that conclusion?
7    A.   Yes.
8    Q.   Anything other than Exhibit 26 for that
9  particular conclusion?
10    A.   No.
11    Q.   And is it your understanding that the
12  dates -- what is your understanding of the dates on the
13  pages on Exhibit 26?  Is that the date -- do you know
14  what that date refers to?
15    A.   I imagine it's the date of the incident
16  because they're disparate enough that this doesn't sound
17  like they were responded to in a batch but I can't be
18  sure.
19    Q.   And if it's the date of the incident, sitting
20  here today, you don't know which formulation of Pam
21  Original might have been involved in any of these
22  instances, right?
23    A.   I just understand that these were produced as
24  relevant to the issues in the case.
25    Q.   Do you know what the -- what the requests

Page 233

1  were for production?
2    A.   No.
3    Q.   Do you know whether the plaintiffs in this
4  case requested documents relating to ConAgra's product
5  safety management program?
6    A.   I don't know.
7    Q.   Okay.  And are you offering an opinion that
8  had ConAgra done something differently with respect to
9  its product safety management program that the fire in
10  the Schmidt case would not have occurred?
11    A.   Yeah, because they wouldn't have sold the
12  product.
13    Q.   Is it possible for a company to have an
14  adequate product safety management program but,
15  nevertheless, have to recall products for whatever
16  reason?
17    A.   Yes.
18    Q.   Can you explain then why your belief that --
19  let me -- let me ask a different question.  What would
20  you propose ConAgra change about its product
21  management -- product safety management program?
22    A.   Well, from what I could tell, they don't have
23  a process for hazard identification, for risk
24  assessment, for corrective action, just based on the
25  material that I have.  You know, even if they write it

Page 234

1  down someplace, you have to implement and observe a
2  written corporate safety policy.  And I don't understand
3  how through any reasonable corporate safety policy, they
4  would have allowed the use of Pam with flammable liquid
5  petroleum gas in a vented can.
6    Q.   So through -- kind of through these
7  principles that you talk about, at some point, you're
8  saying that somebody at the company would have made a
9  decision not to use a vented container for cooking
10  spray?
11    A.   Well, somebody, some committee, some
12  whatever, yeah.  If a safety analysis and product safety
13  management system was employed, I don't believe based on
14  the information I have because, again, I have no
15  information to indicate why.  I mean, they were making
16  them with standard 2Q cans.  I don't understand why they
17  began to fill the vented cans with Pam.
18    Q.   When you say they were making cans with
19  the -- Pam with the standard cans, you don't mean in the
20  12-ounce size, right?
21    A.   I have no idea what size but it doesn't make
22  any difference.  I mean, you want to make 12 ounce, do
23  it this way, you want to make 14 ounce -- it's no excuse
24  to say I need a 12-ounce can.  Therefore, I'm going to
25  make it unreasonably dangerous.

Page 235

1    Q.   Have you considered the safety benefits of a
2  vented can versus a nonvented can?
3    A.   Using flammable propellant, I just don't see
4  any safety benefit.
5    Q.   And what safety benefits have you considered?
6    A.   There are none.
7    Q.   So you haven't considered any?
8      MS. ROCK:  Object to the form.
9      THE WITNESS:  There are none.  I mean, you --
10  you're taking a can and you provided a mechanism
11  for the gas to escape at lower psi than --
12  substantially lower than the requirement in 306.
13  I mean, you might say that, and I've seen it said,
14  that it would -- might reduce the potential for a
15  projectile but the Schmidt case kind of belies
16  that because it became a projectile when it was
17  venting.
18  BY MS. AMBROSE:
19    Q.   Do you know whether each time you spray a Pam
20  Cooking Spray whether you're releasing the contents that
21  you say are highly flammable?
22    A.   A little bit.  A very little bit.
23    Q.   And a little bit, that assumes it's one spray
24  at a time.  Per spray you mean?
25    A.   Like a tenth of a second or a fifth of a

Page 236

William Kitzes - 4/5/2018
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 73 of 140

**Page 237**

1  second, I forget.  They say different things.
2      Q.   And in terms of the injury, whether
3  something's highly flammable or flammable, the issue
4  really is the fire, right?
5          MS. ROCK:  Object to the form.
6          THE WITNESS:  Well, it's extremely flammable
7  versus flammable, at least as far as the FHSA is
8  concerned, and no, it's the rate at which it
9  attaches.  You know, something that's extremely
10  flammable is going to catch fire before something
11  that's flammable.
12  BY MS. AMBROSE:
13      Q.   Do you know whether the plaintiffs in the
14  Schmidt Meyer case were burned -- were actually burned
15  by fire versus burned by hot oil?  Do you know?
16      A.   I don't know.
17      Q.   For the Coello case, do you know whether
18  Miss Ramos was burned by fire versus hot oil?
19      A.   Well, she caught fire so I imagine it was
20  fire.
21      Q.   Okay.  I'll disagree with that statement
22  but -- but your understanding it was fire?
23      A.   Well, that was -- that's my guesstimate.  I
24  really don't know and it doesn't make any difference.
25      Q.   Doesn't make a difference to you whether --

**Page 238**

1  when you're rendering an opinion about causation and
2  you're very concerned it seems like with flammability
3  and fire whether the plaintiffs were injured by a fire
4  versus hot oil?
5          MS. ROCK:  Object to the form.
6          THE WITNESS:  No, you don't really
7  understand.  Whether they were injured by hot oil
8  or fire, they were still horribly burned.  The
9  difference in extremely flammable means the
10  consumer is on heightened awareness that a fire is
11  imminent.
12  BY MS. AMBROSE:
13      Q.   Okay.  But we're talking about a couple of
14  different things and I hear your point on the warning
15  but in terms of you have made -- you said several times
16  that -- of concerns just about the actual release of
17  flammable contents from the vents themselves, right?
18      A.   I have.
19      Q.   Yeah.  And so the danger of that release is
20  that that material that gets expelled catches on fire,
21  right?
22      A.   The danger is the whole thing.  Whether
23  there's, you know, a fireball as in some of these
24  complaints or whether it launches it and sprays somebody
25  with -- with hot oil, it's the same result.  And the

**Page 239**

1  whole idea of the label is to be -- make people
2  understand that there's a real danger.  It's not to
3  describe exactly what's going to happen to them.
4      Q.   So cooking oil is flammable, right?
5      A.   Can be.  It's got a much higher flash point
6  than propane, LPG.
7      Q.   Is there a cooking oil that's not flammable
8  that you're aware of?  And I'm talking about not cooking
9  spray.  I'm talking about cooking oil.
10      A.   Well, the oil itself in its liquid state is
11  generally not flammable.  It becomes flammable let's say
12  on clothing or on a rag but when atomized, but it's --
13  it's ultimately flammable.
14      Q.   So in the -- in the Schmidt Meyer case, one
15  of the plaintiffs, Hallie Meyer was cooking, was deep
16  frying potato croquettes in a -- in an aluminum pan with
17  at least three inches of sizzling hot oil and there were
18  jugs of oil near -- near the burners.  Do you -- are you
19  with you me on that part of it?  Do you understand --
20      A.   So far.
21      Q.   -- that those are the facts?  Okay.
22          Is there a potential for the cooking oil to
23  catch fire?
24      A.   Yeah, but it didn't.
25      Q.   Your opinion is that the oil didn't catch

**Page 240**

1  fire?
2      A.   Not until the incident occurred.  I have no
3  information that the cooking oil caught fire prior to
4  the can.
5      Q.   And you're -- but you've -- I think you've
6  made clear that for that piece of it, the causation of
7  the fire, you're relying on other experts, right?
8      A.   That's right.
9      Q.   Have we covered the bases for your opinion
10  that the vented can is not safe?
11      A.   I think so.
12      Q.   You mention in your report that vented cans
13  are safe for Reddi-wip.  What's -- what's your basis for
14  that?
15      A.   Well, it's nonflammable, you know, so if it
16  vents, you know, you get sticky.  And, in fact, that's
17  why they stopped making them because the production line
18  was getting sticky.
19      Q.   The propellant used in Reddi-wip is different
20  than in cooking spray, right?
21      A.   Yeah, it's carbon dioxide I think.
22      Q.   You're speculating, right?
23      A.   Well, I read it someplace.  In any event,
24  it's inert.
25      Q.   What do you mean by that?

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU Document 167-2 Filed 12/17/19 Page 74 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  A.  Not flammable.

2  Q.  It seems like the only consideration you're

3 thinking about when you think about the safety of the

4 can design is about flammability.  Is there other -- I

5 mean, you --

6  A.  Flammability and --

7  Q.  -- recognize that there's other safety issues

8 out there to consider, right?

9  A.  Flammability and explosion but --

10  Q.  Right.

11  A.  -- other than that --

12  Q.  That's it?

13  A.  -- no.

14  Q.  You're focused on those aspects of the safety

15 of the can?

16  A.  I am.

17  Q.  You're not thinking about, you know, food

18 safety issues in terms of contaminants or things like

19 that?

20  A.  No, ma'am.

21  Q.  You're not thinking of, let's see, the

22 ability of the can to spray material into somebody's

23 eyes, for example?

24  A.  No.

25  Q.  Even though that's a known hazard for aerosol

1 cans, too, right?

2  A.  Well, if somebody's actuating it.  I haven't

3 seen spontaneous spraying.  I guess it could happen but

4 it's not the issue in this case.

5  Q.  So you're looking at what you've been told

6 has been the cause of the fire and then you're -- you're

7 evaluating essentially what -- how to avoid that risk.

8 Is that a fair assessment?

9  A.  I've been looking at all the information that

10 we've discussed, determining what I believe are the

11 defects that create the unreasonably dangerous condition

12 and through nonventing and warning, what things I say

13 can be applied to the can to reduce the risk of injury.

14  Q.  And even with a nonvented can, if somebody

15 puts it in their oven and turns the heat up, it's going

16 to explode, right?

17  A.  It certainly can.

18  Q.  So consumer misuse, you know, can lead to

19 injuries even if a product is otherwise safe?

20  A.  That's not misuse.  That's abuse.

21  Q.  Okay.  And what --

22  A.  And under the --

23  Q.  How are you distinguishing -- I'm sorry, how

24 are you distinguishing between misuse and abuse?

25  A.  Abuse means trying to defeat the product and

1 under the Hazardous Substances Act, you have to account

2 for reasonably foreseeable damage and abuse in your

3 labeling.

4  Q.  And Dr. Henderson issued an opinion where he

5 had the Pam container almost immediately up to the

6 burner on high for a long period of time and said that

7 it never reached a high enough temperature to vent.  Do

8 you disagree with that opinion?

9  A.  I don't disagree.  It's not my area.

10  Q.  Okay.  And so what types of foreseeable

11 misuses are you thinking of that the vented can is not

12 equipped, I guess, to handle?

13  A.  I have no idea what that question means.

14  Q.  Is it your belief that the can will vent if

15 it is next to a flame?

16  A.  I don't know.  I mean --

17  Q.  Sorry.

18  A.  Go ahead.

19  Q.  Do you know whether the can would vent if

20 it's within the distance of kind of the flash point of

21 the flame?

22  A.  That question, I'm sorry, doesn't -- doesn't

23 make sense.

24  Q.  Doesn't surprise me.

25      Do you know whether the can would vent if a

1 consumer puts the can right next to the stove and has

2 the gas burner on high?

3  A.  Depends on what -- what right next to means.

4 I mean, it might vent at 50.

5  Q.  Okay.

6  A.  You know, I mean --

7  Q.  And do you know what -- whether the can would

8 vent if it's placed on the stove as close to the flame

9 as possible without actually touching the flame?

10  A.  Probably has a greater chance.

11  Q.  But you don't know, right?

12  A.  No.

13  Q.  So when you're saying that the company needs

14 to account for foreseeable misuse, you don't actually

15 have any information today to say that the can at issue

16 in Coello and Schmidt Meyer didn't account for -- for --

17 for these types of misuses, for putting the can close to

18 a flame, for putting it on the stove, for putting it

19 near a flame, for putting it near a heat source?

20  A.  Well, for the many, many a time, I believe

21 that saying near and not giving more specific direction,

22 you know, what they might consider to be misuse, the

23 company, may very well be expected and intended and

24 normal consumer use because there is no specific

25 direction.

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 75 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  Q.  Okay.  So -- and I'm -- this is -- these
2  questions are following from answers that you've given.
3  I believe you said that the -- that the can failed to
4  account for foreseeable misuses and I'm trying to get
5  you to tell me what those misuses are.
6  **A.  Not the can.  The -- you know, since there's**
7  **no definition of where to put it, reasonable definition,**
8  **it's hard for it to be misuse.  I mean, you know, the**
9  **company seems to say anytime it -- it vents properly and**
10 **it explodes, that that's misuse and I'm saying that it's**
11 **not.**
12 Q.  And you're basing that off of Exhibit 26?
13 **A.  I am.**
14 Q.  Okay.  And maybe you're getting thrown off by
15 the word misuse.  Let me just back up and say are there
16 any uses, consumer uses of Pam Cooking Spray for
17 which -- that you're aware of that would cause the can
18 at issue in Coello or Schmidt Meyer to vent?
19 **A.  Well, I'll get past the fact that it**
20 **shouldn't vent but I guess that if it's in a place that**
21 **seems reasonable to the consumer but it explodes or**
22 **catches fire, that's foreseeable use, some might call it**
23 **foresee misuse because it happened, but it doesn't**
24 **really matter because the consumer is doing something**
25 **reasonable even if its result is not what they want.**

Page 245

1  Q.  And if that happens, do you -- do you know
2  whether it's the result of a design defect versus a
3  manufacturing defect?
4  **A.  I haven't seen any allegations of**
5  **manufacturing defects.  Could be.  I just haven't seen**
6  **it.  To my -- my mind, it's an issue of the use of the**
7  **vents and the failure to warn.**
8  Q.  If Dr. Hendrickson is opining there's a
9  manufacturing defect in the sense that the metal in the
10 bottom of the can was either weaker than the
11 specifications allow or it's less thick than the
12 specifications, do you have any basis to disagree with
13 his opinion?
14 **A.  I'm going to leave it to him.**
15 Q.  You're not offering kind of a competing
16 opinion, right?
17 **A.  No.**
18 Q.  Okay.  So on page 44 of your report, there's
19 a section called Other Technology.  Do you see that?
20 **A.  Yeah.  I think we talked about that earlier.**
21 Q.  I have more questions.
22     All right.  So one of the -- you mentioned
23 one of the alternative designs being the use of
24 nonflammable CO2.  Is that fair?
25 **A.  Right.  Like -- like they use in the organic**

Page 246

1  spray.
2  Q.  Okay.  And what analysis have you done, if
3  any, to determine that the use of CO2 propellent would
4  be, in fact, more safe than the formulation of the can
5  design at issue in this litigation?
6  **A.  It doesn't catch fire.**
7  Q.  That's it?
8  **A.  Yeah.**
9  Q.  What analysis have you done, if any, to
10 determine whether using CO2 as a propellent is feasible
11 for the Pam Original formula?
12 **A.  Well, it's feasible for the Pam organic**
13 **formula olive oil and they did it because using propane**
14 **or liquid flammable gas would render it inorganic so I**
15 **don't understand why if they could do it for the organic**
16 **olive oil, they couldn't do it for everything else.**
17 Q.  You don't understand, right?  I mean, that's
18 not your area of expertise, right, formulation and how
19 to design formulation.  Is that fair?
20 **A.  I just don't understand why it would be**
21 **different.  They might not want to.  There might be, you**
22 **know, cost issues but it's hard for me to believe that**
23 **there's a technical issue between olive oil, which they**
24 **make both ways, and canola oil.**
25 Q.  Okay.  For -- for them to use CO2 as a

Page 247

1  propellent, that would require changing the formulation
2  of the product.  Do you understand that?
3  **A.  Why?**
4  Q.  So you don't know that?
5  **A.  Well, no.  Why?  Why would it -- you know, I**
6  **mean, it's still going to be almost exclusively canola**
7  **oil.  If they have to put more Lecithin in it or --**
8  **or -- or potassium benzoate or whatever, it's a safety**
9  **issue.  If they can do it -- in fact, you know, when**
10 **they do the organic for olive oil, they don't put a lot**
11 **of that other stuff in it because it's organic.  I mean,**
12 **that's an excuse to say, well, I might have to change**
13 **something in order to protect my customers.**
14 Q.  Well, I'm just asking you whether -- whether
15 you understand that they would have to make changes.
16 **A.  Well, you're assuming that.  I don't know**
17 **whether they had to make changes or not.**
18 Q.  You don't know, right?  So is your answer I
19 don't -- I don't know?
20 **A.  Right.  And I don't --**
21 Q.  Do you know?
22 **A.  Unless something substantial was the problem,**
23 **it doesn't matter to me.**
24 Q.  All right.  Okay.  So for the use of the CO2
25 as a propellent, if ConAgra were to make that change, it

Page 248

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU  Document 167-2  Filed 12/17/19  Page 76 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1 would essentially reduce the number of products --
2 cooking spray products down to just that organic version
3 or don't you know?
4     A.   No.  You know, I mean, again, they could make
5 all their other products, which are basically all the
6 same product, as far as I could tell, with different
7 labels on them.
8     Q.   I think they would disagree with that.
9     A.   Well, okay.  You know, with CO2 or they could
10 make it -- make it more involved with pump sprays which
11 are reasonably safe.
12     Q.   Okay.  So I'm going to -- so for each of
13 these alternatives designs, the CO2 propellent, the use
14 of a nonaerosol pump spray, the use of trigger spray
15 bottles.
16     A.   And bag-on-valve.
17     Q.   And, yeah, sorry.  You're calling it, sorry,
18 what?  A bag on what?
19     A.   BOV.  Bag-on-valve.
20     Q.   Okay.  Are there any other alternatives or is
21 it --
22     A.   Those are the three that I listed.
23     Q.   I think there's four here, right?  There's
24 the CO2, pump spray, trigger spray, bag-on-valve.
25     A.   Right.  The pump spray and the trigger spray

Page 249

1 are pretty much the same.
2     Q.   Okay.
3     A.   Trigger spray is basically food service.
4     Q.   Okay.  And do you believe that you're
5 qualified based on your background and knowledge to
6 testify regarding feasibility of any of these designs as
7 it relates to cooking spray?
8     A.   Well, they're available and they're all in
9 use so whether ConAgra wants to use them or not is
10 another question but they've been proven to be
11 technically feasible.
12     Q.   For the products in which they're employed,
13 right?
14     A.   Yeah.
15     Q.   And they're not employed for the Pam Original
16 Cooking Spray?
17     A.   Except for the pump spray and the trigger
18 spray.
19     Q.   But the Pam Original formula in the pump, you
20 don't know whether that's the same as used in the -- at
21 issue in this case?
22     A.   It's my recollection that it's substantially
23 the same.  I mean, it's hard for me to understand why
24 you keep asking me.  You know, if you have to change the
25 formula to protect your customers, you make tiny, little

Page 250

1 tweaks and you have another product that's safe.  I
2 mean, they're already making the Pam in the -- in the
3 pump spray.
4     Q.   It seems like you're making a bunch of
5 assumptions and I'm just trying to understand how you're
6 getting to those assumptions.  So other than the fact
7 that these products, as you lay out here on page 44,
8 exist in the marketplace, is there any other research or
9 analysis or studies or anything you've done to show that
10 these are, in fact, feasible alternatives for the
11 product at issue in Coello and Schmidt Meyer?
12     A.   I haven't applied them to -- to Pam.  They've
13 been applied to similar products and, of course, the
14 pump and the trigger are Pam.
15     Q.   And that's, again, just the fact that they
16 exist in the marketplace, right?
17     A.   They're Pam.  And they exist in the
18 marketplace, that's right.
19     Q.   Okay.  So other than the fact that you've
20 seen these particular products in the market, is there
21 anything else that you did in terms of methodology to
22 reach your conclusion that these are alternative
23 designs?
24     A.   For the Pam products, I don't understand what
25 else I need.  They exist, okay?  For the bag-on-valve, I

Page 251

1 have the material on the chosen, if it's avocado oil and
2 formulation is pure avocado oil because the -- the
3 ingredient is separate from the propellant, you know, I
4 don't understand but no, I haven't done anything other
5 than what's here in the material that I have.
6     Q.   Did you -- I think we may have covered this
7 slightly but just to make sure I have everything, did
8 you review the expert report of Gregory Cahanin with
9 respect to the Coello matter?
10     A.   I looked at it.
11     Q.   And did you review his report, Mr. Cahanin's
12 report with respect to the Schmidt Meyer matter?
13     A.   I looked at that, too.
14     Q.   Are you relying on any of his opinions for
15 any of your opinions?
16     A.   No.
17     Q.   And was there anything in his opinions with
18 which you disagree?
19     A.   No.
20     Q.   And did you review the report of Lester
21 Hendrickson?
22     A.   I did look at it, yes.
23     Q.   And are you relying on any of Hendrickson's
24 opinions relating to the design and manufacture of the
25 can in Coello?

Page 252

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 77 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  A.  No.

2  Q.  Was there anything in his opinions with which

3 you disagreed?

4  A.  No.

5  Q.  Okay.  Are you relying on Hendrickson's

6 opinions relating to the design and manufacture of the

7 can in Schmidt Meyer?

8  A.  Just generally.  I'm not in a position to

9 evaluate it one way or the other.

10  Q.  Okay.  Was there anything in his opinions in

11 which you disagreed?

12  A.  Therefore, no.

13  Q.  Okay.  Do you agree that if the can in Coello

14 was never, in fact, placed near a heat source and it

15 never reached a temperature that would allow the vent to

16 open according to its design, then the fire was not

17 caused by an inadequate label?

18  MS. ROCK:  Object to the form.

19  THE WITNESS:  Don't know.

20 BY MS. AMBROSE:

21  Q.  Okay.  And the -- the proposed changes to

22 Exhibit 7 related to the concerns relating to the

23 venting and the fire hazard, right?

24  A.  Yes.

25  Q.  Okay.  So if the can had not -- was not

1 placed too close to a heat source, do you agree that

2 that particular fire wasn't caused by an inadequate

3 label?

4  A.  I have no idea.  You know, all I know is that

5 I've already said that the two defects in the can

6 substantially increase the risk of injury.  I don't know

7 where exactly it was placed.  I -- I don't have an

8 opinion.

9  Q.  And that's the same for Schmidt Meyer, right?

10  A.  Yeah.

11  Q.  Okay.  Do you agree that if the can in Coello

12 was not manufactured to its specification, that any

13 changes in the label wouldn't have made a difference?

14  A.  If it was not manufactured?

15  Q.  (Nods head).

16  A.  No, it definitely could have made a

17 difference.

18  Q.  And how is that?

19  A.  Well, the fact that it was not manufactured

20 to specifications doesn't mean that the information on

21 the label wouldn't have caused her to put it someplace

22 else.

23  Q.  And what would putting it someplace else have

24 to do with anything?

25  A.  Well, you just asked me if the label would

1 have made a difference if it was out of spec and I'm

2 saying, regardless of in and out of spec, the

3 information was there and she was able to act on it, it

4 would have had an impact on the outcome.

5  Q.  So you're assuming that the location of the

6 can is the relevant inquiry here?

7  A.  No.

8  Q.  She would have moved it or she wouldn't have

9 moved it?

10  A.  Well --

11  MS. ROCK:  Can we take a break for a moment?

12  MS. AMBROSE:  Sure.

13  THE VIDEOGRAPHER:  Going off the record.  The

14 time is 4:24 p.m.

15  (Brief recess)

16  THE VIDEOGRAPHER:  Okay.  We are back on

17 record.  The time is 4:36 p.m.

18 BY MS. AMBROSE:

19  Q.  Okay.  I think where we left off was we were

20 talking about whether or not if the can has a

21 manufacturing defect and whether or not, you know, the

22 adequacy of the warning is -- sorry, whether or not

23 changing the warning would have impacted the case or

24 not, if it turns out that the cause of the fire was a

25 manufacturing defect.  Is that generally kind of the

1 subject you agree where we left off?

2  A.  Yes.

3  Q.  I'm not trying to put words in your mouth.

4  Okay.  So can you just explain in your words

5 if it were -- if you took the conclusion that the --

6 that the fire in Coello was caused by a manufacturing

7 defect, specifically that the can was not manufactured

8 up to its specifications, in what ways would changing

9 the label -- as you have suggested for Exhibit 7, in

10 what ways would that have helped prevent the fire?

11  A.  Whether it's a manufacturing or a design

12 defect, the result is the same so a warning about the

13 dangers and, you know, what to do about it is equally

14 applied to both.

15  Q.  Okay.  And that -- and the same would be true

16 if there -- if it was determined that there was a

17 design -- or, sorry, if it was determined that there was

18 a manufacturing defect in one or both of the cans that

19 vent in the Schmidt Meyer case, that wouldn't -- you

20 still believe that changing the label in the way you

21 suggested Exhibit 7 would have helped prevent fire in

22 that case?

23  A.  It would have substantially reduced the risk,

24 yes.

25  Q.  Okay.  And in your view, when you say reduced

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU Document 187-2 Filed 12/17/19 Page 78 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1 the risk, is that different than causation in your mind?
2 When I say it caused the fire and you say it reduced the
3 risk, I just want to understand what you're -- what
4 distinctions you're making when you --
5     A.   You used the word prevent and neither I nor
6 anybody else can say that in a specific instance, a
7 warning would have prevented the injury so I said it
8 would substantially reduce the risk with a greater
9 likelihood, more likely than not, that it wouldn't
10 happen but I can't say prevent.
11    Q.   And you're -- that opinion -- you're stating
12 that opinion without having facts as to any of the
13 specifics about what the manufacturing defect is, right?
14    A.   Well, I assume from your question that you,
15 know, that it's not a bad nozzle that it results in the
16 same issues as a design defect as far as the vents are
17 concerned so under those circumstances, yes.
18    Q.   As a general matter, you wouldn't -- as a
19 general matter, for the purposes of just warnings on
20 products, it wouldn't be appropriate to have a warning
21 on a product that says something like might contain a
22 manufacturing defect, right?
23    A.   If you knew it might contain a manufacturing
24 defect, you fix it.
25    Q.   Right.  Exactly.  So I mean, it would confuse

Page 257

1 consumers, it wouldn't -- I mean, it's just not
2 appropriate, right?
3     A.   It doesn't make --
4     Q.   Putting something like this may contain a
5 manufacturing defect is not -- you're not suggesting
6 that here nor would it be appropriate for any product,
7 right?
8     A.   I can't think of any.  It wouldn't make any
9 sense.
10    (Exhibit Number 27 marked for identification)
11 BY MS. AMBROSE:
12    Q.   Okay.  Showing you a document that's been --
13 that I've just marked as Exhibit 27.  I'll represent
14 that this is the current safety data sheet for Pam
15 Original Cooking Spray.  And you haven't reviewed this
16 document, right, before?
17    A.   I may have seen it.  This is 7-17.
18    Q.   Okay.  But so do you know whether you've
19 reviewed this document?
20    A.   Well, I thought I saw something from '16 but
21 since it was subsequent, I didn't put it in my opinions.
22    Q.   Okay.  In your report, you only reference
23 safety data sheet from 2007 and 2010.  Are you
24 suggesting that there are additional -- additional ones
25 that you've

Page 258

1     A.   I didn't rely on anything else.  I didn't
2 rely on MSDS that are post-incident.
3     Q.   Okay.  So you may have seen it but you didn't
4 rely on it.  That's the distinction I'm making.
5     A.   Or another one in that age category.
6     Q.   That's fair.  I just want to understand.
7          Okay.  So since it's not a hundred percent
8 sure that you've seen it before, I'm going to let you
9 take a look at it and then I guess the question I want
10 to ask is, after you have a chance to review this, does
11 this change any of your opinions that you've talked
12 about today?  I'll give you a chance.  I just want to
13 make sure we don't show up at trial and you say, aha,
14 I've looked at this document now.
15    (Exhibit Number 28 marked for identification)
16 BY MS. AMBROSE:
17    Q.   I'll give you Exhibit 28 which is the 2010.
18 This may help.
19    A.   Okay.
20    Q.   Nothing in here in Exhibit 27 jumps out and
21 says something that would change any of your opinions
22 you've given today?
23    A.   Reenforce.
24    Q.   Okay, reenforces it.  What -- what
25 specifically reenforces your opinion?

Page 259

1     A.   Well, right up on the first page, hazard
2 statement H222, extremely flammable aerosol and that's
3 what I have been describing.
4     Q.   And hazard H222, does that come from -- where
5 does that come from?
6     A.   Well, the H222 is from GHS, the Globalized
7 Hazard System.
8     Q.   Is that connected with the UN?
9     A.   It was started by the UN, yeah.  OSHA pretty
10 much adopted it now.
11    Q.   And do you know, one way or another, whether
12 the standards used by OSHA or the GHS are the same, are
13 different from the CPSC's flammability testing for
14 aerosols -- for compressed air in aerosol cans that we
15 talked about earlier today?
16    A.   Compressed air?
17    Q.   Do you know -- sorry.  Whatever the
18 compressed gas.  I can pull up the right --
19    A.   Well, I don't know off the top of my head.
20 All I know is it's their understanding that it's an
21 extremely flammable aerosol and that should be made
22 available to consumers to assist them in their
23 understanding of the product.
24          And also on page 7, and this is true I
25 believe for the 2010 MSDS, the four at the top of the

Page 260

Case 3:14-cv-01816-SRU   Document 167-2   Filed 12/17/19   Page 79 of 140
William Kitzes - 4/5/2018
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1  diamond in red for flammability, four is the highest
2  flammability rating of -- of any product.  Now there are
3  other products that are fours, I didn't mean to say not,
4  but that is the highest.
5      Q.   Have you ever encountered a company that
6  takes a more conservative approach, for whatever reason,
7  on its MSDSs than what's actually required under the
8  regulation?
9      A.   Say again.
10     Q.   Have you ever encountered a company that
11 takes a more conservative approach on the MSDSs than
12 what's actually required under the regulation?
13     A.   Not that I'm aware of.  And, again, this one
14 is extremely flammable, it says so in two spots and the
15 highest flammability of four.  This is the 2010.  So
16 basically that's the same.
17     Q.   The CPSC, I think we talked about it earlier,
18 has its own flammability test, right, for aerosol cans?
19     A.   Yes.  It's -- it's -- it's an old test.
20     Q.   And you don't know whether or not it's the
21 same -- or you know it's not the same, frankly, as the
22 GHS test, right?
23     A.   No, I don't know that.
24     Q.   Okay.  You don't know one way or the other?
25     A.   You know, the -- the -- the temperature

Page 261

1  flammability test, you know, it gives you the same
2  result.  I don't know if the requirements are exactly
3  the same but what's most important is that in both 2010
4  and 2017, ConAgra labels their own product as extremely
5  flammable and, therefore, I think it behooves them and
6  is imperative that they provide that information to the
7  consumer on the label and don't call it combustible.
8      Q.   But Exhibit 7 doesn't say combustible, right?
9      A.   It doesn't say anything.
10     Q.   It says flammable.
11     A.   In the back.
12     Q.   And --
13     A.   Not on the principal display panel.
14     Q.   And on page 5 of Exhibit 27 where it talks
15 about the physical and chemical properties, here it just
16 says flammable aerosol, right, for flammability?  You
17 see that?
18     A.   Yeah.
19     Q.   Okay.  And for flash point, it says not
20 applicable to aerosols.  Do you see that?
21     A.   It says that but it doesn't say that in 2010,
22 but either way, they both say it's extremely flammable.
23     Q.   In looking at Exhibit 7, if you want to dig
24 that out, just look at the ingredients.  For the 2010
25 MSDS, which I marked as Exhibit 28, palm oil is not

Page 262

1  mentioned in that nonhazardous components, is it?  Or
2  did you notice --
3      A.   No.  Yeah.
4      Q.   -- when you were analyzing the ingredients?
5      A.   This one says canola and Lecithin.
6      Q.   But on the label, there's a mention of
7  additional things besides canola oil and Lecithin,
8  right?
9      A.   I don't know.  What's it say?
10     Q.   I had thought that you used the label.
11     A.   I just don't have it in front of me.
12     Q.   Well, sorry, dig it out, please.
13     A.   Well, I didn't want to destroy her nice pile.
14         Okay.  It says canola oil, palm oil, coconut
15 oil and Lecithin and then some chemicals.
16     Q.   And did you consider, when you were using
17 that S -- safety data sheet to understand the
18 formulation for Pam Cooking Spray the kind of mismatch
19 here between the ingredients on Exhibit 7 and then the
20 components listed on Exhibit 28?
21     A.   No.  I'm not sure it makes any difference.
22     Q.   And earlier you had -- when you were talking
23 about formulation, you said that you had enough
24 information from the MSDSs in terms of kind of the, you
25 know, proportions of propellents and things like that.

Page 263

1  Is that fair, to render your opinions at least, you felt
2  like you had enough information?
3      A.   Yeah.  And the 2017 bears me out because it's
4  also extremely flammable and it lists canola oil, palm
5  oil and coconut oil so it's irrelevant.
6      Q.   Okay.  And it says, for example, the
7  percentage by weight over seven percent, that's -- that
8  it gives you a specific enough understanding to
9  understand the formulation of Pam?
10     A.   Whatever it says it says.
11     Q.   Okay.  Okay.  Have you seen the expert
12 disclosures provided regarding your opinions in either
13 of these cases?
14     A.   I think we talked about it but I don't recall
15 seeing it in writing.
16     (Exhibit Number 29 and 30 marked for identification)
17 BY MS. AMBROSE:
18     Q.   Okay.  Exhibit 29 is the one for Coello.
19 Exhibit 30 is the one for Schmidt Meyer.  And I just
20 want to confirm.  I'll give you a chance to look at them
21 but I want to confirm that there aren't additional
22 opinions in this disclosure that we haven't already
23 either talked about today or that are included in your
24 written report, right?
25     A.   Looks accurate to me.

Page 264

William Kitzes - 4/5/2018
Case 3:14-cv-01816-SRU Document 167-2 Filed 12/17/19 Page 80 of 140
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

1   Q.   Okay.  And I just have one more question
2   which is, can you just do me a favor and look through
3   the file you brought today and let me know if there's
4   anything in there that you haven't already produced to
5   the defendant either today or prior to your deposition.
6        MS. AMBROSE:  Maybe we can go off the record.
7        THE VIDEOGRAPHER:  Going off the record.  The
8   time is 4:52 p.m.
9        (Brief recess)
10       THE VIDEOGRAPHER:  Okay.  We're back on the
11  record.  The time is 4:54 p.m.
12  BY MS. AMBROSE:
13       Q.   I want to say there was a pending question
14  but maybe I'll ask it again.  Is there anything -- now
15  that you've had a chance to go through the file that you
16  brought here today, is there anything else that you
17  brought that you've -- you are relying on in connection
18  with making your opinions in either the Coello or the
19  Schmidt Meyer matter?
20       **A.   There's nothing that's not in my report and**
21  **what I subsequently sent you as far as the material that**
22  **I added.  I don't really rely on this but -- and I don't**
23  **remember if I sent it to you or not but this is just**
24  **from the DOT search on special permit numbers.**
25       MS. AMBROSE:  Okay.  Let's mark it as an

Page 265

1   exhibit, just so that we have it.
2        (Exhibit Number 31 marked for identification)
3   BY MS. AMBROSE:
4        Q.   There's nothing sitting here today specific
5   that you think --
6        **A.   No.**
7        Q.   -- matters?  Okay.
8        MS. AMBROSE:  I think that's all I have.
9        THE WITNESS:  Great.
10       MS. ROCK:  Okay.
11       THE VIDEOGRAPHER:  Going off the record.  The
12  time is 4:55 p.m.
13       THE COURT REPORTER:  Are you ordering?
14       MS. AMBROSE:  Yes.
15       THE COURT REPORTER:  Did you guys want a
16  copy?
17       MS. ROCK:  Yes.
18       (Deposition concluded at 4:55 p.m.)
19
20
21
22
23
24
25

Page 266

Case 3:14-cv-01816-SRU Document 167-2 Filed 12/17/19 Page 81 of 140
William Kitzes - 4/5/2018
Emma Schmidt and Hallie Meyer vs. Conagra Foods, Inc., et al.

```
 1

 2                    CERTIFICATE OF OATH

 3

 4   STATE OF FLORIDA  )

 5   COUNTY OF BROWARD )

 6

 7           I, Sheryl N. Bussinger, CSR, and Notary Public,

 8   State of Florida, certify that WILLIAM KITZES personally

 9   appeared before me on April 5, 2018, and was duly sworn.

10           Signed this 11th day of April, 2018.

11

12

13

14

15

16

17

18                   _____
                     Sheryl N. Bussinger, CSR
19                   Notary Public - State of Florida
                     My Commission No.: FF 199740
20                   My Commission Expires: April 19, 2019

21

22

23

24

25
```

# EXHIBIT 4

# Consumer Safety Associates, LLC

4501 N.W. 25th Way
Boca Raton, Florida  33434

(561) 241-1900

<div style="display:flex; justify-content:space-between;">

Wm. F. Kitzes, J.D.
Board Certified
Product Safety Manager

———

Safety Analysis
Warnings
Expert Testimony

Safety Management
www.productsafety .com
kitzes@productsafety.com

———

FAX:
(561) 241-1903

</div>

March 1, 2018

J. Craig Smith, Esquire
Koskoff Koskoff & Bieder, PC
350 Fairfield Avenue
Bridgeport, Connecticut  06604

Re:  Schmidt and Meyer v. ConAgra Foods

Dear Mr. Smith,

The following report is preliminary and based on information available to date.  The issues described below are subject to change as additional information becomes available.

### *__Product Safety Management__*

Product safety management is a system that a reasonably prudent manufacturer puts in place <u>before</u> the first product is conceived to ensure that the final product, along with its warnings, packaging and marketing materials, is reasonably safe. It starts with a statement of commitment for product safety from top management and develops a company's procedures to <u>identify hazards</u>, <u>assess the risk</u>, <u>apply adequate safety measures to eliminate hazards</u> from the design, places a <u>guard between users and potential injury</u> and to <u>warn users of all hazards</u> that have not been eliminated or

adequately guarded through technically feasible and economically practical safety measures.

Product safety management theory has been published and reviewed by scholars in the field for over 50 years. As can be shown from the wide dissemination and acceptance by academia, business and legal professionals, these concepts are widely used and accepted throughout the safety community.

Safety management is primarily a tool to protect consumers before they purchase products. When used correctly, these principles are a reasonable model for injury prevention. It is only after an injury that they are applied to determine if the managers failed to apply the accepted principles.

When evaluating a company's product safety management program, it is incumbent upon a reasonably prudent manufacturer to apply the following accepted safety principles to ensure that the products are reasonably safe.

1.     Establish and observe a written safety policy. This policy should emphasize commitment to safety. In writing, it will insure all employees obtain clear guidance on safety issues. The policy should set forth a method for discussing safety responsibilities.

2.     Adequately identify and evaluate product hazards. A hazard is the inherent capability of a product to do harm. Manufacturers, distributors, and retailers must review the potential injury-causing energy and evaluate severity and foreseeability.

3.     Perform an adequate risk assessment integrating product hazards, the environment, and foreseeable consumer use. Once hazards are identified, the reasonably prudent manufacturer/distributor/retailer must consider the conditions of use under which the injury-causing mechanism (hazard) can cause harm to the user.

Analysis of the environment where the product will foreseeably be used, especially in light of product promotion, is critical in discerning how the consumer may foreseeably use the product, even if it is not the use intended by the manufacturer.

The product must be reasonably safe prior to distribution in commerce.  If it is not possible to eliminate the hazard, the reasonably prudent manufacturer, distributor, and retailer must take steps to guard against the hazard, to adequately inform users of the danger inherent in the product, and to motivate them to avoid that danger.

4.     <u>Monitor the safety performance of the product after sale and use, and take corrective action where necessary</u>.  Once products are distributed to consumers, a responsible manufacturer/distributor/retailer must determine where injuries can occur, or if a product defect (including lack of adequate labeling and safety information) could create injuries.  Where corrective action is needed to substantially reduce or eliminate injuries, consumer notification and additional corrective measures must be implemented to insure consumer safety.

5.     <u>Develop adequate warnings and training to motivate consumers to understand and avoid dangers</u>.  This is critical and relatively inexpensive.  When consumers have sufficient data to make an informed decision about safety, they are in a better position to address safety issues.

*       *       *       *       *

A key precept of safety management concerns products with inherent capability to do catastrophic harm.  In priority order, the duty of a reasonably prudent manufacturer is to <u>eliminate the hazard</u>, or, if this is not possible while preserving utility, <u>guard against the hazard</u>.  At a minimum, the manufacturer must properly <u>inform users of the danger inherent</u> in the product and motivate them to avoid injury.

The first concept is the safety engineering hierarchy of priorities:

- Eliminate hazards

- When hazards cannot be eliminated, provide feasible safeguards against them

- Provide warnings and personal protective equipment against remaining hazards

<u>National Safety Council</u>
<u>Product Safety Management Guidelines, 1989</u>

\*        \*        \*        \*        \*

In 1931, H. W. Heinrich, Assistant Superintendent for the Engineering and Inspection Division of the Travelers Insurance Company published the primary modern text of Safety Management, *Industrial Accident Prevention, A Scientific Approach*.  The results of his in-depth analysis of more than 5000 accidents revealed four fundamental principles of scientific accident prevention:

1. Executive interest and support
2. Cause-analysis
3. Selection and application of remedy
4. Executive enforcement of corrective practice

These concepts, developed by Heinrich for the Joliet Steel Works, have evolved into modern day safety management practices.  Scholarly research has further developed the foundation for safety management practices.

The Consumer Product Safety Commission incorporated these principles in its 1975 publication, updated in 2006, *Handbook and Standard for Manufacturing Safer*

*Consumer Products*.  The Commission addressed executive action, design review, distribution and corrective action.

In 1983, Harold Roland of the University of Southern California Institute of Safety and Systems Management and Brian Moriarty authored *System Safety Engineering and Management,* outlining the need for product safety policy and analysis to prevent injuries.  They evaluated hazard identification, severity and a systematic approach to identify defects.

The National Safety Council first published *Product Safety Management Guidelines* in 1989 describing the relationship between marketing, manufacturing, and safety communications as a key to corporate accident prevention.  Their analysis includes the hierarchy of safety management and prevention programs to substantially reduce or eliminate injuries.

### **_Background and Qualifications_**

I am a Board Certified Product Safety Manager and Hazard Control Manager.  I hold an Executive Certificate in Safety Management from the American Society of Safety Engineers, and I am a member of the Human Factors and Ergonomics Society.  I hold a Certificate in Risk Communication from the Harvard School of Public Health. For the past 30 years, I have provided risk assessment and product safety management services to attorneys, corporations and government organizations.

From 1974 to 1981, I worked at the U.S.  Consumer Product Safety Commission (CPSC), part of which time I served as Legal Advisor to the Director, Office of Product Defect Identification, and was responsible for identifying products which contained a defect which could create a substantial product hazard, developing voluntary corrective action plans under Section 15 of the Consumer Product Safety Act including

the recall of substantially hazardous consumer products, and notification to the public of the danger through warnings and other media.  (See attached Curriculum Vitae).

As CPSC *Program Manager for Sports, Recreation and Power Equipment (1977-1980)*, I supervised a team of engineers, epidemiologists, human factors specialists, and technical communication staff in the evaluation of injury statistics, engineering data, and product use information to achieve a reduction in consumer products injuries.  Injury prevention tools combined mandatory and voluntary standards, on-product warnings, and safety education campaigns resulting in publication of the *Federal Safety Standard for Walk-Behind Power Lawn Mowers 16 CFR 1205 (1979)*.  I served as Commission representative to various industry groups and standards development committees, including American National Standards Institute (ANSI), American Society for Testing & Materials (ASTM), the Outdoor Power Equipment Institute and the Sporting Goods Manufacturers Association.

I have been retained as a consultant for a number of major manufacturers, including the *Toro Company* on product safety issues, the *Vendo Company* for developing warning labels and safety bulletins, the *Jensen Corporation* for warnings and safe operation of industrial equipment, *Nobel Chemical Company* for adequacy of warnings, *Corning Glass* for evaluation of recalls, *BernzOmatic*, a division of the Newell Group, for development of point-of purchase recall displays, warnings, and advertising, *Arctic Cat, Inc*. for analysis of all-terrain vehicle off-road safety, including owner's manuals, instructions, warnings and foreseeable use, and *Visioneer*, Inc. in developing a program to upgrade computer scanners.  I have developed a program for *Global Industries* to improve executive chair stability, reviewed warnings on heavy equipment for *Daewoo Heavy Industries America*, investigated safety issues for Carson Industries, Inc. and assisted *CISCO Systems* in recall development.  I have designed a warning label for *Whisper Communications, Inc*., and assisted *Wham-O, Inc*. in recall procedures.  I have provided risk analysis, recall assistance and consumer warnings and instructions to Restoration *Hardware, Inc*., have developed warnings for *Plastics Research Corp*. concerning use of decorative building materials as protective barriers.  I have reviewed

advertising and promotional material for *ACH Foods* and assisted *Hilton Hotels* on recall issues.  I have advised *Swimways Corporation* on product safety management and warnings.  I have advised *AsiaEXP* on risk assessment, labeling and product standards and have assisted *Dick's Sporting Goods* in developing safety communications and warnings.  I served as Product Safety Coordinator for compliance with a Department of Justice/CPSC Consent Agreement and Order for *LM Imports*.   For *Rollz International* (Netherlands), I revised the user manual for American and Canadian markets.  I provided research and analysis on ATV safety for the National Association of Attorneys General and served as the Chairman of the *Florida Consumer's Council* (1993-2007).

I have developed on-product warnings and instructions for a number of manufacturers and distributors.  A few examples include:

- Vendo Company for vending machine warnings
- Arctic Cat, Inc. for ATV's
- Whisper Communications for electrocution hazards
- Plastics Research Corp. for building material warnings
- Daewoo Heavy Industries America for labeling of heavy machinery
- Swimways Corporation for warnings on children's pool products
- Dick's Sporting Goods for fitness equipment

I have lectured at the National Safety Council Annual Congress and Exposition on the following topics:

- When Risk Can't Be Eliminated:  Building Adequate Warnings, Los Angeles, California, 1998
- Injury Prevention Analysis:  Guidelines for Product Safety Managers, Chicago, Illinois, 1997
- Post Sale Corrective Action Plans - Recalls and Consumer Notice, Orlando, Florida, 1996

I have also addressed industry groups on warnings issues for the International Consumer Product Health and Safety Organization and the CPSC.

In 1991, I wrote an article for Professional Safety, the Journal of the American Society of Safety Engineers (ASSE), entitled *Safety Management and the Consumer Product Safety Commission*. Reviewed and accepted by the ASSE editorial board, the section on warnings reads in part:

> VI. *Warn users of product dangers and motivate them to avoid injury.*
>
> In addition to hazard elimination, product warnings and instructions must help the user avoid dangers, including those that remain after thorough attempts to eliminate or guard. An explicit warning that includes a signal word, statement of the hazard, appropriate behavior and description of the danger's consequences is required. A pictogram illustrating consequences often helps communicate the danger, especially to those who cannot read.

**_Pertinent Facts_**

- In 1961, the founders of PAM began to distribute their cooking spray in an aerosol container.

- In 1976, the U.S. Department of Transportation (DOT) published 49 CFR 173.306, a regulation requiring aerosol can to meet certain safety requirements to prevent such cans from bursting during transportation and creating an unreasonably dangerous condition.

- In 1991, in an article in the Chicago Tribune, writer Pat Dailey noted that a non-aerosol version of PAM, previously available, had vanished from store shelves in Chicago.

- Linda Mulrenan, director of consumer affairs for American Household (Home) Products, was quoted in the Tribune article stating that PAM cooking spray was packaged in a non-aerosol pump bottle, but there was not sufficient demand in Chicago. She stated that any market that carries PAM could order it in the pump bottle.

- PAM Organic Olive Oil Spray uses non-flammable $CO_2$ as a propellant.

- In 2011, a ConAgra cost reduction program saved 3.8 million dollars by changing the PAM container from a 3-piece to a 2-piece can. The propellants used to create the spray were "extremely flammable," as defined by the Consumer Product Safety Commission (CPSC) under the Federal Hazardous Substances Act (FHSA), a substance with a flashpoint of under 20°F. The ConAgra Material Safety Data Sheet (MSDS) for PAM Original states that the flashpoint is -100°F.

- ConAgra changed some of the PAM containers from standard unvented 2Q burst rated at 270 psig cans to vented bottom cans with a which would release extremely flammable contents at 180 psig. DOT standard 2Q cans must be constructed to prevent bursting and releasing the extremely flammable propellent at a minimum of 270 psig, the pressure created inside the can when heated to 130°F (49 CFR 173.306(a)(3)(ii). Vented cans are not referenced in the regulation and require a Special Permit(SP) for specific use. To modify the 270 psig requirement, the regulation requires a Special Permit. The DOT regulations only apply to shipping and transportation of aerosol cans and do not address consumer safety.

- ConAgra claims that vented cans provide a controlled release of pressure, rather than a risk of explosion or possible projectile events

- The water bath test under 49 CFR 173.306(a)(3)(v) requires pressure testing "such that the internal pressure reaches that which would be reached at 131°F." No leakage for permanent deformation is permitted.

- For a chemical mixture with a flashpoint of -100°F, such as PAM, the FHSA required the words "Extremely Flammable" displayed as a principal hazard on the principal display panel. The Act also requires the signal word Danger to be prominently displayed next to Extremely Flammable. Neither the signal word "Danger" nor the hazard "Extremely Flammable" were included in the labeling on the subject can. Neither did it state " Container May Explode if Heated."

- Under the FHSA labeling requirements, Signal Words and Affirmative Statements of Principal Hazards must be placed on the principal display panel, visible during retail display.

- Such affirmative statements of principal hazard musts include "Extremely Flammable" and "Container May Explode If Heated." An extremely flammable substance requires the signal word Danger.

- Under a 1976 Memorandum of Understanding signed by the Consumer Product Safety Commission and the Food and Drug Administration:

> Food Containers (Mechanical Hazards). Food containers may present mechanical risks of injury not related to food contamination or spoilage, e.g., a defect in the container which leads to an explosion or breakage of the container, sharp edges presented by the container, defects in the nozzle, etc. Because such articles do not present hazards by becoming components of food, they are subject to regulation by CPSC under CPSA.

- In 1977, the CPSC estimated that there were 5,600 hospital emergency room treatments associated with aerosol cans, and approximately 160 explosion injuries due to exposure of the can to heat.  Fifteen (15) percent of those explosion injuries were serious enough to be admitted to the hospital.  That is three times the national average of 5 percent.

- ConAgra states that minimum "buckle pressure" for a standard bottom can is 250 psig and minimum burst pressure is 270 psig.

- The pressure relief mechanism of a vented can, like the subject PAM Original, is designed to activate between 170 and 210 psig.

- ConAgra produced reports of four explosion incidents prior to the subject incident, including ConAgra's response.

- Press reports identify 2 more explosions prior to the subject incident and 4 explosions after May 13, 2013.

- ConAgra's August 3, 2010 MSDS of PAM Original published prior to the advent of the vented can includes:

  - Pictogram of fire

  - Flash Point   -100°F

  - Extremely Flammable

  - NFPA fire rating 4  --  Highest rating of flammability

  - Containers generate pressure when heated and could cause bursting and dangerous propelling.

11

- Hazardous Components

    Petroleum gas (liquified)
    Propane
    2-methylpropane
    Butane

- DOT SP 11458

- ConAgra's Director of Packaging states he is not aware of whether a can can be heated if it's not directly on a burner or whether it can be heated if it's near but not on a stove.

- PAM Organic Olive Oil cooking spray uses non-flammable $CO_2$ as a propellant as opposed to the extremely flammable hydrocarbon propellent in the subject PAM Original cooking spray.

- PAM Original cooking spray manufactured in Canada is labeled

DANGER

EXTREMELY FLAMMABLE • CONTAINER MAY EXPLODE IF HEATED

on the principal display panel.  The label also includes international symbols for fire and explosion.

- In addition to evaluating the labeling under the FHSA, the CPSC has in the past regulated an exploding aerosol can under Section 15 of the Consumer Product Safety Act [15 USC 2064] and the CPSC regulations on Substantial Product Hazards at 16 CFR 1115.

- The statute and regulations on Substantial Hazard Reporting require manufacturers to report information which reasonably supports the conclusion that their product "contains a defect which could create a substantial product

hazard.  Reports are also required for Death or Grievous Bodily Injury [16 CFR 1115.12(d)].

• In the past few years, ConAgra has conducted a consumer based survey and found that people prefer a non-aerosol spray, resulting in the current non-aerosol pump spray.

• Non-aerosol PAM is sold to food service / restaurant supply with a trigger spray nozzle.

### ***Deposition of Steven Baker***

• Director of packaging at ConAgra

• Team basically overseas structural side of packaging development.

• There's nobody at ConAgra with more knowledge with regard to the use of vented versus non invented canisters.

• When I came to ConAgra, aerosol canisters for Reddi Wip and PAM were both 3-piece cans, but different specs.

• I was the project manager of the 3-piece to the 2-piece can project, probably in 2009.

• 2-piece can was qualified in 2011.  Cans rated 2Q, which require that the maximum pressure inside the can is 180 psig, and the burst pressure is 270 psig.

• I know that the 2Q vented can from that perspective is designed to buckle and allow the contents to flow out at a minimum of 180 psi.

• There are 2Q canisters that are vented and 2Q canisters that are not vented.

• The only thing I'm aware of in general terms is that there is a special permit for vented cans.

- The design of the vented can is to buckle and then flow if it reaches over 180 minimum psi.

- The pressure for inside a can of whipped cream is higher than it is for cooking spray, but it does not exceed the limitation for the can specification.  It does not exceed 180 psi.

- The can is suitable for that as long as it is handled in the right conditions and not misused.

- The testing we did was around the cans and made sure that performed according to spec.

- As long as the cans were not placed on an open or a heat source there's no reason for us to believe that they would have increased any pressure to cause any concern or issue.

- Placed on a heat source means placed directly on a burner.

- As far as whether a can can be heated when it's not on a burner based on the regulations, if a can is sitting in an ambient room and held below 120° there's no reason the can should increase in temperature, increase in pressure.

- I'm not aware whether or not a can can be heated when it's not directly on a burner.

- I'm not aware whether a can can be heated if it's near a stove but not on a stove.

- I have not been made aware of any can that has vented when it is not on a burner.

- A vented can will buckle at 180 psi and then flows versus a can with a standard bottom which will buckle and then burst at 270 psi.

- There is no burst pressure for a vented can because it flows at a controlled rate.

- A burst can can fly all over the room.

- Controlled release in a vented can would release and flow until it's evacuated, under some pressure.

14

Volume 2

- Cans should not vent or are designed not to vent unless they are "on or near a heat source."

- As I stated before in order for a can to vent, according to ConAgra, it has to be on a heat source.

- I'm not going to keep a PAM cooking spray product near the stove to be around any area of the stove or a heat source.

- I don't know whether near a stove is 3 inches, 6 inches, a foot or 2 feet.

- The current PAM product uses $CO_2$ as a propellant and it is not vented. These are for the organic product.


### _Deposition of Matthew Kuehn_

- Vice president of sales, marketing and technical support for DS Containers for the last 10 years.

- DS Containers started operations in late 2005.

- DS Containers commands roughly 25% market share.

- There's nobody at DSC with more knowledge about the design, manufacture, testing or sale to ConAgra.

- The subject PAM canister manufactured by DSC with a vented bottom DOT 2Q.

- We do not produce the spray nozzle.

- All we do is produce an empty can and someone else buys the can and they need to get additional components from other manufacturers, but that's not our business.

- The notation .35 PRM is a description of the bottom end that was used to apply to that can.

- .35 is a description of the thickness of the metal.  PRM is a notation for pressure release mechanism.

- There are DOT 2Q can regulations for the United States.

- SP 13601 is a DOT special permit that deals with whipped cream products and only whipped cream products.

- 13601 would specify certain attributes of the can that they meet in part DOT 2Q specifications.

- DOT 2Q vented bottom cans meet the special permit requirements that DSC produces.

- They would only be subject to the special permit requirements if they are used on a can that was marked identifying the can prescribing that special permit.

- I don't believe DSC produces a 2Q vented can for PAM Original that are required to meet the special permit requirements of 13601.

- I believe it's correct that special permit 13601 does not deal with cooking spray or cooking oil.

- I don't know why that is.

- It is my understanding that PAM cooking spray is not placed in those cans that are subject to that special permit.

- The specification DOT 2Q with vented bottom cans our test expectations are 180 psig minimum buckle 1.0 cfm minimum flow.

- There are two results we're seeking from the buckle flow/flow test with the vented bottom.  The first one is 180 psig minimum buckle.

- Buckle is a description given to the permanent deformation when the bottom end reverses from a concave geometry to convex.

- The second test result that's described 1.0 cfm minimum flow, the second thing that's measured during the buckle/flow test is the flow, the movement of air through the vents that are open. CFM is cubic feet per minute.

16

- Do any of the documents indicate how many cans actually were produced of PAM Original that were 2Q vented cans?  No, I don't believe they do.

- I would not have an estimate from the documents as to PAM Original in 2Q vented cans, how many were produced.

- The can is marked DOT 2Q M5749 which is the registration number.

- The code indicates that the artwork was produced that day for the PAM Original.

- One box says buckle and then it has in parentheses venting pressure.  Those things are the same for DSC.

- That box is describing the pressure resistance of the container, the buckle or venting pressure which would be interchangeable in this case.

- That is based on the DOT 2Q regulation 49 CFR 173.306.

- The regulation says for 2Q cans, the internal pressure is between 160 psi and 180 psi, and it says that to be a 2Q can it needs to be able to hold that without any leakage or permanent deformation.

- Permanent deformation means it will not return to its original form.

- I have seen permanent deformation that does not include leakage.

- A permanent deformation without leakage would be an example, would be an end of an aerosol can without a venting feature buckles.

- A buckle on a container without vents would be the reversal of geometry in the bottom end.

- My understanding of the term leakage means contents from the inside of the can leaking to outside, escaping the can.

- The vents are designed to open when the bottom end buckles.

- The vented cans are subject to the 270 psig minimum burst regulations.

- If they were to burst, but those cans by design do not burst.

- My interpretation of our understanding of a burst is when you know there is a forcible separation of the can and a seam bursts open.

- When a can bursts, the contents will be expelled from the can.

- For a 2Q can container without a vented bottom, we are trying to prevent that burst from occurring at pressure less than 270 psi.

- The difference between a burst and a venting event is that one is by design a controlled release of the pressure and the other can be a violent and uncontrolled release with potentially a projectile involved were the can to rupture and burst in a catastrophic manner.

- That's my interpretation, there is no such thing as a burst for a vented can if the vent functions properly.

- For a 2Q can with a vented bottom we are not measuring burst, we are measuring buckle and flow.

- So in the absence of a venting mechanism you are going to be measuring performance on a buckle/burst test.  In the presence of a venting mechanism, you are going to be measuring the buckle and flow.

- DSC made application for special permit 13601.

- DSC never made a special permit application specifically for a DOT 2Q vented bottom.

- 13601 was developed for whipped cream which is sensitive to heat and they didn't want the cans to be spoiled in a hot water bath.

- It's correct to say that 13601 doesn't govern the 2Q cans used for cooking spray.

- 2Q canisters with vented bottoms are still being sold for cooking spray.

- DSC produces non vented 2Q canisters for PAM cooking spray.

- The selection of different cans was a decision and a choice made by ConAgra.

- Yes, we produce certain cans for PAM cooking spray with a vented mechanism and certain cans without.  One of the differences between them would be the size and diameter of the cans.

- We designed the can to perform a specific function, venting upon reaching a certain pressure.

- DSC never did any testing to specify the types of products that should or should not be used or recommended to be used in the can.

- I think certainly because it was incorporated in an application for a special permit, we would have presented this as a package suitable for whipped cream.

- We present the options that are available within our portfolio and leave it up to the customer to make the selection based on pressures and whatever other features of the can.

- ConAgra first became a customer of DSC in 2011.

- ConAgra asked us if we could produce whipped cream cans without a vent and we asked DOT to obtain approval.

- The approval for a non vented whipped cream can came in either late 2011 or early 2012.

- The cooking spray cans were DOT 2Q, that's the only marking, the only regulation on the can.

- The whipped cream, the venting features designed to specify to activate within a range, whereas the DOT 2Q for cooking spray is designed to occur at no less than minimum, there's a minimum requirement.

- If that container is marked as DOT 2Q and that's the only regulation which the container is required to comply, if the buckle pressure is less than 180 then it would not be in specification.

- The vents open and the contents spray out, they are propelled.

- When the vents open, you are moving from an area of higher pressure to lower pressure and the contents from the inside of the can are expelled.  DSC has not

done any testing or become aware of any testing with regard to the risks associated with spraying cooking oil and isobutane into a kitchen environment.

•     I don't recall ConAgra asking for any particular testing before they purchased the 2Q vented canisters for use with PAM cooking spray.


### *Deposition of Laurie Eakley*

•     Director of food labeling for ConAgra.

•     Our team is not responsible for generating warning labels, that comes from our legal team.

•     I don't personally incorporate warning language into the labeling, that is provided by our brand design teams.

•     For PAM original the graphics are the same except for certain aspects like net weight and servings per container.


### *Incident*

On May 13, 2013, Hallie Meyer and Emma Schmidt were cooking at Ms. Meyer's parents home in Washington, Connecticut. They were catering an event for graduating seniors at Yale. They were making deep fried potato croquettes, which did not include the use of cooking spray. There were 2 cans of PAM Original cooking spray with vented bottoms on the counter about a foot and a half from the stove. There were olive oil, vinegar and other condiments on the counter next to the PAM.

The vents on the bottom of the cans released extremely flammable propellant. One can became a projectile and hit Emma in the leg.

Emma had second degree burns over the entire surface of her legs requiring surgery and a pigskin graft. Hallie was burned from her elbow to her waist.

***Chronology of Documents***

<u>February 1974</u>
<u>CPSC Hazard Analysis</u>
<u>Pressurized Containers, Aerosol Cans</u>

- During the study period, the one year of July 1, 1972 to June 30, 1973

- Explosion due to factors other than incineration accounted for 12 cases. Two (2) involved puncturing the can. Several others resulted from the close proximity of the can to a heat source.

- Explosive Hazard -- The pressure results from vaporization of the propellant, usually a liquefied gas.

- The pressure inside the can rises markedly with an increase in temperature.

- If the pressure becomes too great, the can may explode hurling fragments as fast as 400 feet per second.

- There have been reports of people being killed or maimed by exploding aerosol cans. Proximity of a can to a source of heat may result in explosion.

<u>June 1977</u>
<u>CPSC Hazard Analysis of Injuries Relating to Aerosol and Pressurized Containers</u>
<u>CPSC Bureau of Epidemiology</u>

- During 1975, there were approximately 5,600 aerosol container related injuries treated in hospital emergency rooms in the United States.

- One of several major hazards was container explosion.

- Almost all of the investigations involving explosions were due to exposure of the container to heat. Indirect exposure involved placing the container near a stove or other heat source as well as exposure to sunlight.

- During 1975, CPSC estimated frequency of emergency room treatments for aerosol related injuries for explosion / ignition at 160 incidents.

- 15% of all explosion ignitions resulted in hospitalization of emergency room treated injuries as opposed to just under 5% for all emergency room treatments.

  (The NEISS estimate of hospital emergency room treatments for aerosol cans in 2011 was 5,376.)

March 28, 1991
No Non-stick Sprays in Pump Bottles Here, But you Can Make Your Own
Chicago Tribune

- The author states years ago she gave up using such nonstick sprays as PAM.

- The manufacturer later brought out not aerosol pumps which proved fine; but these vanished from the shelves more than a year ago.

- The article states that PAM cooking spray is packaged in a non-aerosol pump bottle which is no longer available in Chicago, according to Linda Mulrenan, director of consumer affairs for American Household Products makers of PAM, because there is not sufficient demand for it.

- She stated, however, that with increased interest, the product could return to grocery shelves in the Midwest. Any market that carries PAM can order it in the pump bottle.

August 3, 2007
CPSC press release
Severe Facial Injury from Explosion of Aerosol Can Prompts Sherwin-Williams Recall

- Hazard: The aerosol cans can over pressurize and explode, posing a risk of injury to consumers.

- Sherwin-Williams has received one report of a consumer who suffered serious facial injuries including a broken jaw when a can exploded.

September 21, 2010
Email from Brian Hughes (ConAgra) to Steven Baker (ConAgra)
Baker Exhibit 11  CA21233

- Our current 2Q cans are modified with a thicker bottom due to bottom inversion issues we had early on in Organic production.  We haven't had any bottom inversion issues since, but we do regularly experience popped domes.

- 2Q are rated at 180 psig which tells me we can exceed at least 180 on occasion or our current supplier is not holding to the 2Q spec.  I doubt the latter.

- We're gassing so close to the limit, that it doesn't take much.

- In order to avoid a huge mess in the water bath, I need to guarantee we could never exceed the limit of the can buckle strength.  Right now I can't guarantee we won't exceed 180 psi.

- We've had bottom of can inverts which compromise the bottom double seam and will pose the risk of the can separating from the bottom.  We've had this happen before and we've had people injured from it, which is why we're running the 2Q with heavy bottom.

- Cans have ended up on the opposite side of 120 foot building.


November 2010
2pc Can for Aerosol Cooking Sprays
Project Type 4: Cost reduction
ConAgra Engineering
Baker Exhibit 14  CA07541-CA07556

- Executive Summary

- The 2-pc can conversion is a cost reduction project for ConAgra's aerosol cooking spray products.

- Spray Oil will see a $3.8 million savings.

- Current Organics product line is gassed with $CO_2$ at a higher gas pressure than hydrocarbon propellant products.

- Current 3-pc $CO_2$ cans can bulge at the top dome which is the weakest part of the assembly.

- The new 2-piece cans have no top dome component.  The weak point in the can is the bottom dome.

- There is no method to inspect failed 2-piece cans, but the occurrence of a bulged bottom in the water bath would cause cans to jam causing a major down time event and potential safety hazard.

April 26, 2011
Katie Marston (ConAgra) to Steve Baker (ConAgra)
Subject:  Update on PAM 2-piece vs 3-piece can
Baker Exhibit 13  CA07535

- The new 2-piece can with DMPS + P-MDG formula is performing well.

- 2-piece can with water base is performing approximately equally well.

May 2, 2011
PAM ConAgra Food Service
News Release
Baker Exhibit 13  CA07534

- PAM cooking sprays introduces new environmentally friendly two-piece aerosol can.

- Additionally, the new design features special tabs on the bottom of the can that serve as a safety release mechanism when subjected to excess heat or pressure.

June 21, 2011
Email from Matt Kuehn (DS Containers) to Steven Baker (ConAgra)
Re:  Vented Bottom Overview
Baker Exhibit 9  CA08787

• Summary of testing and development and commercialization of our vented bottom end.

• The feature was developed to satisfy a requirement for a pressure relief mechanism, a component of DOT specifications within Special Permits for certain foodstuffs, like whipped cream.

• The mechanics of our venting feature are predicated upon deformation and therefore the only suitable location is on the bottom end, as no other location on our can is subject to deformation from overpressurization.

• The vents are intended to provide a safety feature in the event of overpressurization.

• Rather than risk explosion or possible projectile events, the vents provide a controlled release of pressure, especially for whipped cream which do not undergo the hot water bath requirements.

• The design is within a specific range of pressure from 175 to 210 psig.

• Testing focused primarily on providing the desired controlled release without explosion or creating a projectile.

• We verified through numerous tests that the vents performed as intended – pressure was released in a controlled fashion without causing a projectile.

December 15, 2011
Email from Julie Neuhalfen (ConAgra) to Dawn Allison (US Foods)
Re:  New 2pc can with no vents
Baker Exhibit 10  CA19621

• The vents are intended to provide a safety feature in event of overpressurization or mishandling of the container during distribution.

25

- The standard non-vented bottom is designed to withstand higher pressures than the vented bottom.

- For the standard can bottom, the minimum buckle pressure is around 250 psig and the minimum burst pressure is above 270 psig.

- The pressure relief mechanism is designed to activate between 170 and 210 psig.

- Chart shows relationship between internal pressure of cans of Reddi Wip at various temperatures.  Under normal conditions, the internal temperature of the cans should not get close to buckle or burst pressures.

- Reddi Wip requires a DOT special permit.

November 15, 2012
Diversified CPC
Cooking Oil Product Fire Test Observations 11/15/2012
Baker Exhibit 12  CA09739

- In excess of 20 cans burst during the test.  A few rocketed a fair distance and one can traveled over between 100 and 200 feet.

- Ruptured cans separated the bottom dome.

November 15, 2013
Email from Paula Dornisch (ConAgra) to Jeremy Reece (ConAgra)
Baker Exhibit 25  CA18916

- Retirement center employee burned.

- Can of Multipurpose Qualify burst and ignited.

- Bottom released  --  loud pop  --  big flash flame.

26

<u>February 11, 2015</u>
<u>Email from Kevin Richards (DS Containers) to John Kennedy (ConAgra)</u>
<u>Re:  ConAgra Can Pressure Rating</u>
<u>Baker Exhibit 8   CA00027</u>

•     The DOT pressure ratings are effectively established by the product pressure at 131°F and established by the customer and the cans as produced by DS are marked accordingly.

•     All of the cooking pan spray cans that we produce are marked as DOT 2Q at 180 minimum buckle / 207 minimum burst.

***Incidents Reported to ConAgra***
***Exhibits to Steven Baker's Deposition***

<u>May 9, 2012</u>
<u>Consumer Complaint 103020  (Exh. 22)</u>

•     ConAgra Wesson vegetable oil Baking Spray

•     Can sitting on shelf above the flat top grill (as we have done for 10 years) Bottom of can overheated  --  rolled off shelf, sprayed oil  -- exploded in large fire ball

ConAgra:

•     Can buckled with vents partially activated.
No visible defect
2Q can rated to 180 psi before bottom buckles

<u>October 27, 2012</u>
<u>Consumer Complaint 60686123  (Exh. 21)</u>

- PAM Original

- Standing 2 feet from stove, huge explosion, severe injuries to face and back
  Huge ball of flame, can exploded all the way to the living room
  It was a few feet away from the stove

ConAgra:

- Bottom of can buckled with vents exposed
  Significant dent at top dome of can
  No visible signs of defect
  2Q cans pressure rating to 180 psi
  Looks typical, performed as designed

<u>January 16, 2013</u>
<u>Consumer Complaint 102298  (Exh. 23)</u>

- ConAgra Beyond Pan Spray

- Can of spray on shelf above grill, it exploded
  Cook has burns on face and arms

ConAgra:

- Bottom of can buckled with vents exposed with black residue
  Significant dent on top dome of can
  No visible defects
  2Q pressure rating to 180 psi

<u>September 18, 2013</u>
<u>Consumer Complaint 61690955  (Exh. 19)</u>

- PAM Original

- Explosion  --  On shelf on portable stove.  I was enveloped in ball of flame. Can wasn't getting hot, about a foot and a half away from heat.

ConAgra:

- Bottom of can buckled with vents exposed.
  No visible defect
  Bottom looks typical
  Can performed as designed

### *Explosion Incidents in News*

May 2010
Explosion of Aerosol Can in Cafe
Government of Western Australia
Safety Alert 5/2010

- Two chefs received flash burns to their upper bodies when an aerosol can of cooking oil exploded in a busy café.

- The aerosol can was placed on the kitchen work bench next to lit gas burners.  As a result, the contents inside the aerosol can heated up, causing them to expand until the can could not withstand the internal pressure.

April 2012
Two Injured after Can of Cooking Spray explodes at Kenosha Steakhouse
Summitdaily.com

- Fire officials believe the aerosol can of cooking spray was left near an open flame on the stove.  The heat caused it to expand and explode igniting a flash fire, a "sudden, intense fire," according to the release.

29

November 9, 2013
Cooking spray can explosion injures 5
Cape Town, South Africa
news24.com

• Five people were injured when a can of cooking spray exploded in a restaurant.

• The explosion was caused when a can of Spray and Cook was left near the restaurant's oven.


January 2017
State of Washington Department of Labor and Industries
Aerosol Cooking Oil Products Can Explode
Date of actual incidents unknown

• Canned aerosol products, a common sight in commercial kitchens and other food businesses, can overheat, explode and cause fires.

• An aerosol can of cooking oil overheated and exploded. The can labeled "Caution: Flammable Spray" had been stored on a metal shelf about 21 inches above a hot griddle.

• An aerosol can of cooking oil left on a table next to an operating gas range overheated and ruptured, creating a fireball that burned two kitchen workers.

• Don't allow cans to be stored near kitchen ranges or other heat sources.


July 3, 2017
Explosion at assisted-living home injures employee
Southeast Missourian

• Firefighters answered a call after an accidental explosion injured employee in an assisted-living home in Missouri.

• An aerosol can of cooking spray placed above a stove top exploded, blasting hot oil onto a cook's leg.

August 3, 2017
Can of Cooking Spray Explodes
thedailymeal.com

•      A Toms River, New Jersey, woman suffered second and third degree burns to her face last week after a can of cooking spray she'd left near a burner on the stove exploded.  The explosion started a fire that ignited the woman's clothing.

***Material Safety Data Sheets***

July 30, 2007
MSDS
ConAgra Foods PAM Original Cooking Spray

•      Lower explosive limit 1.9%
        Upper explosive limit 9.5%

•      Flashpoint   -100°F

•      Hazardous Ingredients:
        Isobutane
        Propane
        Butane

•      Unusual Fire and Explosions Hazards:
        Containers generate pressure when heated and could cause bursting and dangerous propelling of containers.

<u>February 8, 2008</u>
<u>MSDS</u>
<u>J.M. Smucker Company Crisco No-Stick Cooking Spray</u>

- Hazardous Ingredients:
  Propane / Isobutane
  Vegetable Oil

- Flammability and Reactivity
  Flash point:  -131°F propellant
  Explosive Limits:  1.8% to 9.5%

- Unusual Fire Hazards:
  Exposure to temperatures over 120°F may cause cans to burst.  Exploding
  cans make travel great distances spewing burning material.


<u>August 3, 2010</u>
<u>MSDS</u>
<u>ConAgra Foods PAM Original</u>

- Contains the pictograph for fire

- Lower explosive limit 1.9%
  Upper explosive limit 9.5%

- Flashpoint   -100°F

- Extremely Flammable

- NFPA fire rating of 4  --  the highest rating of flammability

- Unusual Fire and Explosions Hazards:
  HIGHLY FLAMMABLE:  Will be easily ignited by heat, sparks or flames.

  Containers generate pressure when heated and could cause bursting and
  dangerous propelling.

- Hazardous Components
    Petroleum gas (liquified)
    Propane
    2-methylpropane
    Butane

- DOT Special Permit DOT SP 11458

August 2011
MSDS
Par-Way Tryson Company
Vegalene Buttery Cooking Spray & Food Release

- Flammability rating 4

- Fire and Explosion Data
    Exploding cans may travel great distances spewing burning materials.
    Exposure to temperatures over 120°F may cause cans to burst.

## ***Consumer Product Safety Commission***

While the DOT regulations at 49 CFR 173.306 govern the shipping and transportation of aerosol cans, they do not address the risk of injury to consumers.  The Consumer Product Safety Commission enforces the Federal Hazardous Substances Act and the Consumer Product Safety Act.  These standards and regulations are intended to protect the public from unreasonable and substantial risks of injury.

Federal Hazardous Substances Act

In 1960, the original Federal Hazardous Substances Act (FHSA) [15 USC 1261 et seq.] was enacted to ensure that precautionary labeling was applied to hazardous household chemical products. The Act required specific labeling on the

immediate containers of "hazardous substances" to assist consumers in using and storing products, in identifying principal hazards and precautionary measures, and in providing information about immediate first aid. In 1973, the Consumer Product Safety Commission (CPSC) published regulations pursuant to the FHSA at 16 CFR 1500, further defining the labeling requirements pertaining to household chemical products.

For many years, the CPSC Office of Compliance has published a "Regulatory Summary" of the requirements under the FHSA. The Commission states that there are no formal guidelines to evaluate exposure and the risk of injury. Among things a manufacturer must consider are:

1.    The content and form of the product that might cause an injury

2.    The product's intended handling, use and storage

3.    Any accidents that might foreseeably happen during handling, use or storage that could cause injury to the purchaser.

The Federal Hazardous Substances Act at Section 2(f) [15 USC 1261(f)] and the Consumer Product Safety Commission regulations at 16 CFR 1500.3(b)(4) define a "Hazardous Substance" as

Any substance or mixture of substances which is toxic, corrosive, an irritant, a strong sensitizer, flammable or combustible, . . . that may cause substantial personal injury or substantial illness during or as a proximate result of any customary or reasonably foreseeable handling or use.

Under the Federal Hazardous Substances Act at 15 USC 1261(p) and at 16 CFR 1500.3(b)(14), a hazardous substance will be determined to be a misbranded hazardous substance and may not be distributed in commerce if the container fails to bear a label containing, in part,

34

(B)    The common or usual name or the chemical name if there is no common or usual name

(C)    A signal word such as Danger

(D)    A signal word such as Warning or Caution

(E)    An affirmative statement of the principal hazards associated with the product, such as Flammable, Combustible, Vapor Harmful, Causes Burns, Absorbed Through Skin, or similar wording descriptive of the hazard

(F)    Precautionary measures to be followed or avoided

(I)    Instructions for handling and storage of packages which require special care in handling or storage

Section 1500.121 of the FHSA governs how the labeling required under Section 1500.3(b)(14) is displayed for prominence, placement and conspicuousness on the container, or immediate package.

Section 1500.121(a)(2)(iv) and 1500.121(c)(1) defines the principal display panel. It is the area that bears the labeling designed to be most prominently displayed or examined under conditions of retail sale. For PAM Original cooking spray, the principal display panel, at a minimum, must include the signal word Danger, the affirmative statements of principal hazards including "Extremely Flammable" and can will explode if exposed to heat. Precautionary statements can be on either the principal display panel or a secondary panel and must include precautions for handling and storage if special handling is required. In the case of PAM Original cooking spray, advising consumers not to leave the can "on stove or near heat source" is not adequate. To protect consumers from injury "near" does not provide enough information to substantially reduce the risk of injury. Hallie Meyer stated that the PAM was on the countertop 18 inches from the stove.

The consumers complaints from Mr. Baker's deposition (Exhibits 19-23) state the PAM was "about a foot and a half away from the heat," "a few feet away from the stove," "on shelf above the flat top grill (as we have done for 10 years)" and "on a shelf above the grill."

As these placements are reasonably foreseeable and reasonably anticipated by ConAgra, more specific instructions, like never place PAM above the stove, and always a minimum of __X__ feet away to reduce the risk of bursting or explosion, are required to comply with the FHSA and the federal regulations, and to substantially reduce or eliminate the devastating risk of fire explosions and can projectiles.

Consumer Product Safety Act (15 USC 2051 et seq.)
Section 15 of the CPSA (15 USC 2064)
Substantial Product Hazard Regulations (16 CFR 1115)

Section 15(b) [15 USC 2064(b)] of the Consumer Product Safety Act requires manufacturers of a consumer product and every distributor and retailer of such product to report to the Consumer Product Safety Commission when they obtain information that reasonably supports the conclusion that their product:

- Fails to comply with any rule, regulation or standard under any Act (including the FHSA) enforced by the Commission

- Contains a defect which could create a substantial product hazard

- Creates an unreasonable risk of serious injury or death

- Caused, may have caused or could cause a death or grievous bodily injury

unless the manufacturer, distributor or retailer has actual knowledge that the Commission has been adequately informed of the defect or failure to comply.

The CPSC regulations at 16 CFR 1115 further define these responsibilities.

Section 1115.4 defines defect, at a minimum, as flaw, fault, weakness or failure in a product.  It can be a defect in manufacture or design.  At a minimum, defect includes the dictionary or commonly accepted meaning of the word.  Thus, a defect is a fault, flaw, or irregularity that causes weakness, failure, or inadequacy in form or function.  In addition, the design of and the materials used in a consumer product may also result in a defect.  Thus, a product may contain a defect even if the product is manufactured exactly in accordance with its design and specifications, if the design presents a risk of injury to the public.  A design defect may also be present if the risk of injury occurs as a result of the operation or use of the product or the failure of the product to operate as intended.  A defect can also occur in a product's contents, construction, finish, packaging, warnings, and/or instructions. In addition, this section states that most defects could present a substantial product hazard if the public is exposed to significant numbers of defective products or if the possible injury is serious or is likely to occur. Subject firms are urged to report if in doubt as to whether a defect could present a substantial product hazard.  The Commission provides examples of "defects" to be evaluated, including this definition at 16 CFR 1115.4(d).

> (d)  A power tool is not accompanied by adequate instructions and safety warnings.  Reasonably foreseeable consumer use or misuse, based in part on the lack of adequate instructions and safety warnings, could result in injury.  Although there are no reports of injury, the product contains a defect because of the inadequate warnings and instructions.

The rule requires reporting within 24 hours of reasonably obtaining the necessary information.  The Commission allows up to 10 days to gather and analyze information, if necessary.

Section 1115.6 concerns "Reporting of unreasonable risk of serious injury or death" and requires a manufacturer, distributor or retailer to notify the CPSC immediately upon obtaining information concerning an unreasonable risk of serious injury or death.

Section 1115.6(b) *Unreasonable risk* specifically states that the Commission shall attach considerable significance if a firm obtains information which reasonably supports the conclusion that its product violates a standard or ban promulgated un the Federal Hazardous Substances Act.

Section 1115.6(c) *Serious injury or death* defines serious injury to include injuries necessitating hospital treatments, fractures, lacerations, concussions, injuries to the eyes or internal organs.  Death needs no further definition.

Section 1115.8(a) describes the importance of compliance with voluntary standards.  The Commission staff participates in many voluntary standards committees and strongly encourages all firms to comply with voluntary standards.  In exercising its authority under Section 15 of the CPSA, the Commission staff may find non-compliance with voluntary standards relevant to the reporting requirements and to the Commission staff's preliminary determination as to whether a product presents a substantial product hazard.

The reporting requirements make clear that the threshold for reporting a defect is obtaining information that reasonably supports the conclusion that a product "could create" a substantial product hazard.  Section 1115.12(a) reiterates the Commission's view, and states that companies should not delay reporting to determine to a certainty the existence of a defect.  The firm is not required to admit the existence of a defect, but is required to report information about the potential danger to the CPSC so that an evaluation of the hazard and the need for corrective action such as a recall can be reviewed.  There is no requirement that an injury occur before reporting.

Further, under 16 CFR 1115.12(a):

Subject firms should not delay reporting in order to determine to a
certainty the existence of a reportable noncompliance, defect or
unreasonable risk.  The obligation to report arises upon receipt of
information from which one could reasonably conclude the existence
of a reportable noncompliance, defect which could create a
substantial product hazard, or unreasonable risk of serious injury or
death.  Thus, an obligation to report may arise when a subject firm
received the first information regarding a potential hazard,
noncompliance or risk.

Section 1115.12(c) states:

*Unreasonable risk of serious injury or death*. A subject
firm must report when it obtains information indicating that a
consumer product which it has distributed in commerce creates
an unreasonable risk of serious injury or death.

Section 1115.12(d) states:

*Death or grievous bodily injury.*  Information
indicating that a noncompliance or a defect in a consumer
product has caused, may have caused, or contributed to the
causing, or could cause or contribute to the causing of a death
or grievous bodily injury (e.g., mutilation, amputation/
dismemberment, disfigurement, loss of important bodily
functions, debilitating internal disorders, severe burns, severe
electrical shocks, and injuries likely to require extended
hospitalization) must be reported, unless the subject firm has
investigated and determined that the information is not
reportable.

Under Section 1115.12(f), the Commission lists examples of information
that a company should study and evaluate to determine whether to report to the
Commission.  These include:

- Engineering, quality control or production data
- Safety-related production or design change(s)
- Product liability suits and/or claims for personal injury or damage
- Information from independent test labs
- Complaints from a consumer or consumer group

Section 1115.12(d) *Death or grievous bodily injury* states that information, including a failure to comply or a defect which has caused, may have caused or could cause "severe burns" must be reported.

In the past, the CPSC has chosen to regulate aerosol explosions under Section 15 of the CPSA [15 USC 2064]. A case in point is the August 2007 recall of Sherwin Williams Thermo-Tec Hi-Heat aerosol coating, initiated by one report of overpressurization and explosion causing very serious facial injuries including broken facial bones. The current version of Thermo-Tec Hi-Heat contains a mixture of hydrocarbons and is identified as "Extremely Flammable."

ConAgra failed to comply with Section 15 of the CPSA and the regulations at 16 CFR 1115 by failing to report to the CPSC knowledge that vented 2Q aerosol cans of PAM Original cooking oil spray contain a defect which "could create" a substantial product hazard. By using a vented can for a product containing an extremely flammable vapor, allowing the vents to expel the gas at 180 psig rather than the DOT burst pressure of 270 psig, the can contains a defect that may be in manufacture and/or design. PAM is sold in both vented and standard unvented cans. Allowing the extremely flammable gas to intentionally vent at 180 psig creates an unreasonable risk and a substantial product hazard. The CPSC states that a product may contain a defect even if manufactured in accordance with its design. Inadequate labeling, even in the absence of injuries, can cause a product to be defective.

## _Vented Cans_

There is no question, through a review of Steven Baker's deposition and exhibits, that ConAgra intended to use 2Q vented cans that spew extremely flammable propellant at 180 psig, even though they did not apply for nor did they obtain a special permit to do so. There is also no question that in developing the standard 2-piece can, ConAgra added additional strength to the bottom of their 2Q can to reduce the potential for the can to burst at 270 psig. There appears to be no question as to ConAgra's appropriate application of a vented 2Q can for non-flammable nitrous oxide based whipped cream as identified in the Department of Transportation's approval of DS Containers Special Permit 13601, which is identified on every can of Reddi Wip as required by regulation. There is no SP designation on cans of PAM Original cooking oil spray.

It is not clear why, and under what authority, ConAgra chose to fill vented 2Q cans, which deform and expel flammable vapor at a pressure 90 psig below the burst strength of a standard, non-vented 2Q can. It appears that both vented and standard non-vented cans were in use for PAM Original cooking spray simultaneously.

According to the Wiley Encyclopedia for Packaging Technology, vented cans are used for non-flammable propellants, especially for whipped cream products, produced with high pressure nitrous oxide that cannot be tested for vent strength by water bath without spoiling the product. Venting of a high pressure nitrous oxide whipped cream can can certainly make a mess, but will not produce a substantial fire when used in a kitchen. ConAgra provides no assistance to consumers in determining the minimum safe distance from a stove, oven or other heat producing cooking appliances, other than do not place "near" heat. Mr. Baker could not define how far "near" is. This is critically important since PAM is intended to be used around stoves, ovens and other cooking appliances.

There is nothing in the material I have reviewed that explains why, or under what authority, ConAgra decided to package PAM Original cooking spray in a vented can.

Matt Kuehn's email to Steven Baker on June 21, 2011, describing the vented can discusses only whipped cream (Baker Exhibit 9). He states that a pressure relief mechanism requires a DOT Special Permit for certain food stuffs. He states that vents are intended as a safety measure, providing controlled release of pressure and that this is particularly necessary for whipped cream, which are not subject to water bath requirements. He states in his deposition that DS Containers does not have a special permit for vented cans for use with PAM Original cooking oil spray.

Finally, it is important to note that PAM Organic olive oil spray uses $CO_2$ as a propellant to maintain its organic certification. There has been no explanation why the non-flammable propellant cannot be used in PAM Original cooking spray.

The safe construction of aerosol cans in the U.S. is regulated by the DOT rules at 49 CFR 173.306 only the the purpose of shipping and transportation. The regulation specifies requirements for maximum pressure and the minimum pressure that can cause a 2Q can to burst. Section 306(a)(3) states:

> (ii)  General pressure conditions. The authorized metal aerosol containers and associated pressure limitations are provided in the following table. Pressure inside the container may not exceed 180 psig at 54.4°C (130°F) except as may be authorized by variations of a DOT specification container type. In any event, the metal container must be capable of withstanding without bursting a pressure of at least one and one-half times the equilibrium pressure of the contents at 54.4°C (130°F).

| If the gauge pressure (psig) at 54.4°C (130°F) is . . . | Authorized container |
|---|---|
| Greater than 160 but not exceeding 180 | DOT 2Q, DOT 2Q1 |

There is nothing in the regulation that identifies a pressure whereby the can may permanently deform or buckle, or release its contents before 270 psig.

The only way that any exception to 49 CFR 173.306 rules is possible is by applying for and getting approval for a Special Permit from DOT. DS Containers obtained such Special Permit for non-flammable propellant (nitrous oxide) in whipped cream cans (SP 13601) that cannot be subject to a heated water bath without destroying the product.

Such cans need to be clearly labeled DOT-SP. PAM canisters do not have such designation. I can identify no evidence from DOT that a Special Permit was granted to allow a vented bottom on PAM canisters using isobutane and propane that permits spewing extremely flammable propellant when the can reaches 180 psig, which is 90 psig below the required burst strength. DS Containers developed the bottom vented can for whipped cream, and without explanation, ConAgra began filling the vented cans with extremely flammable PAM.

DS Containers received approval for SP 13601 that the company states was intended for non-flammable propellants in certain food stuffs. Section 2(b) of the Special Permit states:

> The safety analyses performed in development of this special permit only considered the hazards and risks associated with transportation in commerce. The safety analyses did not consider the hazards and risks associated with consumer use, use as a component of a transport vehicle or other device, or other uses not associated with transportation in commerce.

43

## *Other Technology*

As previously described, the former manufacturer and distributor of PAM cooking spray, American Household (Home) Products, stated to the Chicago Tribune that non-aerosol pump spray PAM cooking oil was available in the early 1990's. After some gap in the market, it was re-marketed by ConAgra in 2017.

Food service suppliers sell a large non-aerosol spray bottle of PAM with a trigger stray. It is available on the internet to anyone, but is not marketed to consumers.

Chosen Foods, a small manufacturer of avocado oil and other products in San Diego, markets an air pressure, non-flammable aerosol system that sprays pure oil from a bag inside the can. The inside of the can, around the bag, is filled with pressurized air, which squeezes the bag when the valve is activated, spraying the oil without the use of hydrocarbon filled extremely flammable aerosol.

The Chosen system contains 4.7 oz. of pure avocado oil and provides 538 servings. The PAM non-aerosol contains 7 oz. of canola oil and other ingredients and provides 198 servings.

The air pressure aerosol avocado oil sells at Publix Supermarket in Florida for $5.99. The PAM pump spray sells for $5.19. Per serving, if the Chosen Food non-flammable aerosol used canola oil, instead of avocado oil at four times the price, the Chosen Food system would certainly be price competitive.

## *ANSI 535.4 Standard for Product Safety Signs and Labels*

In 1991, the American National Standards Institute (ANSI) first published the industry developed voluntary standard for on-product warnings Safety Specification for Safety Signs and Labels. The applicable version of the standard, 2011, delineates the

elements of an adequate warning.  It does not supersede the FHSA, but does form the basis for evaluating warnings under Section 15 of the CPSA.  The Standard states:

2.1       Scope
This standard sets forth requirements for the design, application, use, and placement of safety signs and labels on a wide variety of products.

4.12.2    product safety sign or label: Sign, label, cord tag, or decal affixed to a product that provides safety information about that product.

4.12.2.1  permanent safety sign or label:  A sign that is to be permanently affixed to the product so that it cannot be easily removed.  Permanent safety signs typically provide information about potential exposure to hazards inherent in the normal use associated with the product, or which might be created during other reasonably anticipated product use or misuse.

4.12.3.1  hazard alerting sign:  Sign directly related to a hazard that identifies the hazard, the level of hazard seriousness, the probable consequence of involvement with the hazard, and how the hazard can be avoided. When information on consequence, avoidance, or type of hazard is readily inferred, this information may be omitted from the message panel (see Annex B3.1).

9.1       Location
Product safety signs and labels shall be placed such that they will: (1) be readily visible to the intended viewer and (2) for hazard alerting signs, alert the viewer to the hazard in time to take appropriate action.

Warning consumers about hazards inherent in normal use as well as reasonably anticipated product use or misuse is critical to an adequate warning. Specific description of hazards and potential consequences can inform users of dangers they might otherwise fail to appreciate.

Clearly, the labeling on the PAM Original cooking spray fails to meet the requirements of the industry developed voluntary ANSI Z535.4-2011.

### *Opinions*

The opinions contained herein are stated to a reasonable degree of certainty in the areas of safety management, warnings and safety communications.

1.     ConAgra Foods, Inc. failed to act as a reasonably prudent manufacturer to adequately protect users from the catastrophic risk of fire and explosion under reasonably foreseeable conditions of use.

2.     ConAgra failed to apply the accepted principles of product safety management to adequately:

a)     Establish and observe a written corporate safety policy

b)     Identify product hazards and evaluate severity

c)     Perform a risk assessment to adequately integrate product hazards, the environment and foreseeable consumer use

d)     Monitor the safety performance of their product

e)     Take adequate corrective actions to eliminate, guard or warn consumers of the danger and motivate them to avoid injury.

3.      ConAgra failed to comply with the DOT rules for aerosol containers 49 CFR 173.306.  Their 2Q can, without any variation approved by Special Permit, cannot exceed pressure inside the container of 180 psig at 131˚F, and must be capable of withstanding without bursting a pressure of at least 1 1/2 times the internal pressure at 130˚F, or at least 270 psig.  The can must contain its contents at 270 psig.  Mr. Kuehn of DS Containers in his deposition states that DSC SP 13601 allowing a vented bottom for whipped cream does not apply to cooking spray, and that DSC does not produce a 2Q vented can for PAM Original.

4.      ConAgra failed to comply with the requirements established by the Federal Hazardous Substances Act (FHSA) to adequately label the PAM Original aerosol cooking spray.  ConAgra failed to use the signal word Danger, the affirmative statement of principal hazard Extremely Flammable and the statement Container may explode if heated on the principal display panel.

5.      On the reverse side of the principal display panel, ConAgra failed to provide adequate precautionary measures by informing users of the distance from cooking appliances and other heated surfaces that it is safe to store PAM aerosol.  This is especially important since PAM is a cooking spray intended by ConAgra to be used in the kitchen in proximity to cooking appliances, as required by the handling and storage provisions of 16 CFR 1500.3(b)(14)(I).  This section requires instructions for handling and storage of the aerosol cans that require special care.

6.      As required by 16 CFR 1500.130, ConAgra failed to provide a warning statement on aerosol cans of PAM "adequate for the protection of the public health and safety" because it presents a fire hazard in addition to the contents being under pressure.

7.      Labels on Canadian cans of PAM aerosol cooking spray appear to comply with the U.S. regulations for the principal display panel under the FHSA, stating Danger, Extremely Flammable, Container may explode if heated.  Such complying language has

not been used in the United States.  The fires and explosion pictograms are not required by U.S. regulations, but companies are free to use them to warn consumers of the danger.

8.     ConAgra has failed to report to the Consumer Product Safety Commission (CPSC) that PAM cooking spray aerosol cans "could create a substantial product hazard." ConAgra had sufficient information about the use of adequate label, and the fact that foreseeable use of PAM aerosol creates a defect that causes, could cause or contributes to the cause of death or serious bodily injury.

9.     Under the ANSI Standard for Product Safety Signs and Labels, ConAgra has failed to comply with an appropriate message panel including a signal word, a statement of the hazard, the consequences of injuries and instructions on how to avoid injury.

10.     As evidenced by ConAgra's response to PAM aerosol cooking spray can explosions, the company failed to address the danger in a responsible way and rejected consumer complaints claiming that their cans meet the DOT standards and therefore no action by ConAgra was required.


*Conclusion*

        ConAgra's responses make clear that foreseeable use of PAM cooking spray can exceed the 180 psig buckle and and reach the venting limit.  If a consumer is catastrophically burned, there is nothing ConAgra will do to reduce those injuries because they claim that the can meets their unreasonably dangerous specification.  There is no evidence of any effort to go back to their designers to reduce the risk of explosion and fires, and no effort to reach consumers with the unreasonably dangerous cans on their kitchen shelves or in their pantries, or to work with the CPSC to warn owners and recall and replace their vented cans of PAM Original cooking spray.

48

*Wm F Kitzes*
*March 1, 2018*

# EXHIBIT 5



Redacted Confidential

**EXHIBIT 6**

# Consumer Safety Associates, LLC

4501 N.W. 25th Way
Boca Raton, Florida  33434

(561) 241-1900

Wm. F. Kitzes, J.D.
Board Certified
Product Safety Manager

_____

Safety Analysis
Warnings
Expert Testimony

Safety Management
www.productsafety .com
kitzes@productsafety.com

_____

FAX:
(561) 241-1903

## CURRICULUM VITAE

### William F. Kitzes

<u>Education</u>

University of Wisconsin, B.A.; 1972

Washington College of Law, American University, J.D.; 1975

Certificate in Safety Management (1989)
   American Society of Safety Engineers

University of Michigan, College of Engineering,
     Human Factors Engineering, Summer 1990

Executive Program in Safety Management (2007)
     American Society of Safety Engineers

Risk Communication
      Harvard School of Public Health, March 2013


<u>Professional Safety Associations</u>

National Safety Council  •  American Society of Safety Engineers
Board of Certified Product Safety Management, Executive Level
Board of Certified Hazard Control Management, Master Level
Human Factors Society  •  System Safety Society
International Consumer Product Health and Safety Organization
Florida Propane Gas Safety, Education and Research Council
Chairman, Florida Consumers' Council  (1993-2007)


<u>Work Experience</u>

<u>U.S. Consumer Product Safety Commission</u>
<u>Washington, D.C.  20207</u>

1975-1981

| 1975 - 1977 | Legal Advisor to the Director, Section 15<br>Office of Product Defect Identification |
|---|---|
| 1977 - 1980 | Program Manager<br>Sports, Recreation & Power Equipment<br>Office of the Executive Director |
| 1980 - 1981 | Regulatory Counsel<br>Office of the General Counsel |

<u>The Institute for Safety Analysis, Inc.<br>Rockville, Maryland 20850</u>

1981 - 1983<br>Vice President and General Manager

<u>Consumer Safety Associates</u>

1983 - Present<br>Safety Analyst, Product Safety Manager

<u>Professional Experience</u>

Mr. Kitzes has extensive experience in safety analysis, regulatory development, and management systems.  His background includes the following activities:

- o  Managed and supervised professional staff of 18 in preparing safety engineering analysis for nationally-known technical consulting firm which specialized in evaluating the safety performance of automotive and consumer products

- o  Developed the <u>Federal Safety Standard for Power Lawn Mowers</u>, 16 CFR 1205; February 1979

- o  Developed programs to identify and analyze safety performance data to evaluate compliance with the reporting requirements of Section 15 of the Consumer Product Safety Act

- o  Negotiated voluntary corrective action programs and consent agreements with major manufacturers to recall defective products

o     Managed interdisciplinary task force of engineers, epidemiologists, attorneys, and investigators in developing standards and communications programs for sports, recreation, and power equipment

o     Conducted special studies of nationwide injury patterns using the National Electronic Injury Surveillance System (NEISS)

o     CPSC Awards include the Silver Medal for Meritorious Service, 1977 and the Superior Achievement Award, 1979

Seminars and Workshops

Mr. Kitzes is an active speaker, author, and educator on safety-related issues. The following is a partial list of seminars, workshops, and lectures given by Mr. Kitzes since 1975:

Compliance Issues and The Consumer Product Safety Act, Diebold Research Group, 245 Park Avenue, New York, 1975

Government Action Under the Consumer Product Safety Act with Professor Robert Vaughn, Washington college of Law, American Bar Association, Washington, D.C., 1975

Consumer Safety Officer Training in accident analysis and implementing the provisions of Section 15 of the Consumer Product Safety Act (CPSA), U.S. Consumer Product Safety Commission, New York, Chicago, Minneapolis, and San Francisco, 1975 and 1976

Manufacturers Compliance Seminar on safety analysis and accident investigation for Sections 15 and 19 of the Consumer Product Safety Act (CPSA), U.S. Consumer Product Safety Commission, Kansas City, Missouri

Marketing Analysis and Government Action, panel with Dr. Salvatore Davita, George Washington University, Washington, D.C. 1976

Reporting Requirements and Corrective Action Plans Under Section 15 of the CPSA, Product Safety Conference, Washington, D.C., 1976

Implementing the New Requirements for Notification and Reporting: 16 CFR 1115, Product Safety Conference, Washington, D.C. 1977

Changes in the Proposed Standard for Power Lawn Mowers, Outdoor Power Equipment Institute, Washington, D.C. 1978

The Federal Regulatory Process, National Institute for Paralegal Training, Philadelphia, Pennsylvania, 1978 & 1979

The Art of Applying Technology in Personal Injury Lawsuits,
Regulatory Data -- A Buried Treasure, National Center for Technology
in Law, Hunt Valley, Maryland, 1981

The Human Factor:  a safety/needs analysis of the modern fire fighting
environment, with Richard L.P. Custer, Foundation for Fire Safety, Cliffside
Manor, Harpers Ferry, West Virginia, 1981

CPSC and ATVs, AIEG, October 1986, and May 1987

ATV Safety, National Association of Attorneys General, October, 1987

Safety Analysis and the CPSA, American Pleasure Boat Safety Association,
January, 1988 and 1989

Safety Management and the CPSC, James Tuck Memorial Lecture, Keynote
Address, Detroit, Michigan, June 1990

Safety Analysis and Product Safety Management, Texas Trial Lawyers Product
Liability Seminar, Houston, Texas, April 1994

Safety Management and the Consumer Product Safety Commission, The Academy
of Florida Trial Lawyers, Orlando, Florida, January 1995

Panel on Child Safety, International Consumer Product Health and Safety
Organization, Orlando, Florida, March 1995

Recalls, Defects and Public Disclosure:  Panel Discussion, International Consumer
Product Health and Safety Organization, Orlando, Florida, March 1996

National Safety Council Congress and Exposition, Session #51
Post Sale Corrective Action Plans - Recalls and Consumer Notice, Educational
Resources Division, Orlando, Florida, October 1996

National Safety Council Congress and Exposition, Session #152
Injury Prevention Analysis:  Guidelines for Product Safety Managers, Educational
Resources Division, Chicago, Illinois, October 1997

Worldwide Juvenile Product Safety Panel, International Consumer Product Health
and Safety Organization, Orlando, Florida, February 1998

The Faces of the Future Seminar, Keenan's Kids Foundation, Atlanta, Georgia,
May 1998

The Role of the Safety Analyst,  Kentucky Academy of Trial Attorneys, Louisville,
Kentucky, May 1998

National Safety Council Congress and Exposition, Session #69
When Risk Can't Be Eliminated:  Building Adequate Warnings, Educational
Resources Division, Los Angeles, California, October 1998

<u>Freedom of Information</u>, CPSC-ABA Forum, International Consumer Product Health and Safety Organization, Orlando, Florida, February 1999

<u>Protecting Our Kids</u>, Faces of the Future Seminar, Keenan's Kids Foundation, Atlanta, Georgia, March 1999

<u>CPSC Compliance Workshop</u>, Preparing, Developing and Implementing a Successful Recall Program, Los Angeles, California, October 1999

<u>CPSC Compliance Workshop</u>, Conducting a Recall - Fast Track vs. Traditional, International Consumer Product Health and Safety Organization, Orlando, Florida, February 2000

<u>CPSC Compliance Workshop</u>, Designing, Producing and Distributing Safer Consumer Products, International Consumer Product Health and Safety Organization, Orlando, Florida, February 2001

<u>Ten Principles of Product Safety Management</u>, Kentucky Academy of Trial Attorneys, Louisville, Kentucky, May 2001

<u>CPSC Compliance Course</u>, Recall Success Stories, International Consumer Product Health and Safety Organization, Orlando, Florida, February 2002

<u>Masters in Trial</u>, American Board of Trial Advocates, Chicago, Illinois, June 2002

<u>CPSC Compliance Course</u>, CPSC and ICPHSO -- 10 Years Later, International Consumer Product Health and Safety Organization, Orlando, Florida, February 2003

<u>CPSC Compliance Course</u>, Section 15 Reporting Obligations, Panel, International Consumer Product Health and Safety Organization, Orlando, Florida, March 2004

<u>Creating Safe Products--Practical Applications of Hazard Assessment</u>, International Consumer Product Health and Safety Organization, Orlando, Florida, February 2005

<u>Warnings and Instructions, Human Factors Symposium</u>, ICPHSO and CPSC, International Consumer Product Health and Safety Organization, Bethesda, Maryland, September 2005

<u>Introduction to Product Safety</u>, AIG UK Limited, Human Focus, Web based video Instruction Programme, Accredited by the Royal Society for the Prevention of Accidents, London, England, United Kingdom, 2007
<u>Risk Assessment</u>, AIG Consultant, Inc., New York, 2008

<u>Risk Management 101</u>, ICPHSO and CPSC Compliance and Training Seminar, International Consumer Product Health and Safety Organization, Chicago, Illinois, May 2008

<u>Safety Testing:  Beyond the Statutes</u>, International Consumer Product Health and Safety Organization, Orlando, Florida, February 2011

<u>Safety Management:  NASA and the FAA</u>, Lawyer-Pilots Bar Association, Albuquerque, New Mexico, July 26, 2014

<u>50 States  -  Managing Risk in a Patchwork of Laws and Regulations</u>, International Consumer Product Health and Safety Organization, Orlando, Florida, February 2017

<u>Publications</u>

<u>Standards, Regulations and Safety Guidelines to Protect Children from Injury</u>, Children and Injuries, Joe Frost, ed., Lawyers & Judges Publishing Company, Inc., Tucson, Arizona, 2001

Columnist, <u>Product Safety:  An In-Depth Analysis</u>, Consumer Product Safety Guide, CCH, Chicago, Illinois, 2000 - 2001

<u>Risk Analysis in Product Liability Litigation</u>, 2000 Wiley Expert Witness Update, New Developments in Personal Injury Litigation, Aspen Law & Business, New York, 2000

<u>Protecting Our Kids - Everyone Plays a Part</u>, Forum, Consumer Attorneys of California , Volume 27, No. 10, December 1997

<u>Forensic Safety Analysis:  Investigation and Evaluation</u>, 1996 Wiley Expert Witness Update, New Developments in Personal Injury Litigation, John Wiley & Sons, Inc., New York, 1996

<u>The Role of the Safety Analyst in Product Liability Litigation</u>, Trial Diplomacy Journal, Vol. 18, No. 2, March/April 1995

<u>Safety Management and the Consumer Product Safety Commission</u>, Professional Safety, Vol. 36, No. 4, April 1991

<u>ATVs -- The Hidden Danger</u>, Journal of Law, Medicine and Health Care, Vol. 17, No. 1, Spring, 1989

<u>Private Causes of Action Under the Consumer Product Safety Act</u>, Trial Lawyers Quarterly, Vol. 17, No. 1, 1985

<u>Administrative Civil Penalties Are Here To Stay, But How Should They Be Implemented</u>?  Wm. F. Kitzes and David Schmeltzer, American University Law Review, Vol. 26, No. 4, Washington, D.C., 1977

<u>Substantial Hazards in Consumer Products</u>, (Investigators Manual), Wm. F. Kitzes, U.S. Consumer Product Safety Commission, 1977

## Consumer Safety Associates, LLC

- Safety Analysis
- Warnings
- Recalls
- Expert Testimony

**Wm. F. Kitzes, J. D**

Board Certified
Product Safety Manager
———————
Hazard Control Manager

561-241-1900



Children's Products

Sports & Recreation

Power Equipment

Motor Vehicles

Household Products

Workplace & Industrial

Hazardous Substances

4501 N.W. 25th Way
Boca Raton, FL 33434

Bill Kitzes has over 30 years of safety management experience at the U. S. Consumer Product Safety Commission, the Institute for Safety Analysis and Consumer Safety Associates, where he currently serves as Principal Safety Analyst and Product Safety Manager.  Mr. Kitzes is a Board Certified Product Safety Manager and Hazard Control Manager, and holds a Certificate in Safety Management from the American Society of Safety Engineers and has completed their more advanced Executive Program in Safety Management.  He has testified in  over 115 trials in 28 states, Canada and Australia.

From 1974 to 1981, Mr. Kitzes worked at the U. S. Consumer Product Safety Commission (CPSC).  For 3 years, he served as Legal Advisor to the Director, Office of Product Defect Identification, and was responsible for identifying product defects, implementing recalls and developing voluntary corrective action plans under Section 15 of the Consumer Product Safety Act.

As CPSC Program Manager for Sports, Recreation and Power Equipment (1977-1980), Mr. Kitzes directed the application of injury statistics, engineering data, and foreseeable consumer use to achieve a reduction in injuries, through standards, warnings, and safety education campaigns.  He led the development of the Federal Safety Standard for Walk-Behind Power Lawn Mowers (16 CFR 1205)  in 1979.  Mr. Kitzes served as Commission representative to various standards development committees, including American National Standards Institute (ANSI) and American Society for Testing & Materials  (ASTM).

Mr. Kitzes has been retained as a consultant for a number of major manufacturers, including the *Toro Company* on product safety issues, the *Vendo Company* for developing warning labels and safety bulletins, the *Jensen Corporation* for safe operation of industrial equipment, *BernzOmatic*, a division of the Rubbermaid/Newell Group, for development of point-of-purchase recall displays and advertising, *Arctic Cat, Inc.* for analysis of all-terrain vehicle off-road safety, including instructions, warnings and foreseeable use, and *Visioneer, Inc.* in developing a program to upgrade computer scanners. He has developed a program for *Global Industries* to improve executive chair stability, reviewed warnings on heavy equipment for *Daewoo Heavy Industries America*, investigated safety issues for *Carson Industries, Inc.* and assisted *CISCO Systems* in recall development.  Bill has designed a warning label for *Whisper Communications, Inc.*, and assisted *Wham-O, Inc.* in recall procedures.  He has provided risk analysis, recall assistance and consumer warnings for *Restoration Hardware, Inc.* and has developed warnings for *Plastics Research Corp.* for use on decorative building materials.  He has reviewed advertising and promotional material for *ACH Foods* and assisted *Hilton Hotels* on recalls.  Bill has advised *Swimways Corporation* on product safety management and warnings.  He has assisted *Dick's Sporting Goods* in developing safety communications and warnings.  He served as Product Safety Coordinator for compliance with a Department of Justice/CPSC Consent Agreement and Order for *LM Imports*.  For *Rollz International* (Netherlands), he revised the user manual for American and Canadian markets.

Mr. Kitzes has served as an advisor to the National Association of Attorneys General, the State of New York and is the former Chairman of the Florida Consumers' Council (1993-2007).  He is the author of numerous articles in professional journals on risk analysis, standards development, forensic safety and children's safety issues.

Mr. Kitzes has been an active speaker at the *National Safety Council* and the *International Consumer Product Health and Safety Organization*.  He has worked with the CPSC staff in presenting compliance seminars to manufacturers, distributors and retailers around the country.

**www.productsafety.com**