# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| EMMA SCHMIDT and HALLIE MEYER,     ) | |
|                               ) | |
|     Plaintiffs,                ) | |
|                               ) | Case No.: 3:14-CV-01816 (SRU) |
|     v.                      ) | |
|                               ) | |
| CONAGRA FOODS, INC.          ) | |
|                               ) | |
|     Defendant.              ) | |
|                               ) | DECEMBER 17, 2019 |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................3

   I.    THE PAM PRODUCT AT ISSUE IN THE CASE .......................................................3

   II.   THE KITCHEN FIRE .................................................................................................5

   III.  THE ALLEGED ORIGIN OF THE FIRE ..................................................................7

   IV.  EXPERTS FIRST CONCLUDE THAT A PROPERLY MANUFACTURED
        PAM CONTAINER WILL *NOT* OVERPRESSURIZE UNDER THE
        CONDITIONS ALLEGED BY PLAINTIFFS ............................................................12

   V.   PLAINTIFFS OFFER THREE THEORIES FOR *HOW* A PAM
        CONTAINER COULD VENT "UNDER PRESSURE" .............................................14

   VI.  DIRECT MEASUREMENTS OF THE SUBJECT CAN ...........................................16

   VII. PLAINTIFFS' TESTIMONY RELEVANT TO FAILURE TO WARN
        CLAIM .......................................................................................................................17

ARGUMENT .......................................................................................................................18

   I.    THE CPLA AND SUMMARY JUDGMENT STANDARD ......................................18

   II.   SUMMARY JUDGMENT IS WARRANTED BECAUSE THERE IS
        INSUFFICIENT EVIDENCE THAT THE PAM PRODUCT WAS THE
        ORIGIN OF THE FIRE ............................................................................................19

   III.  SUMMARY JUDGMENT IS WARRANTED BECAUSE THERE IS
        INSUFFICIENT EVIDENCE FROM WHICH A REASONABLE JURY
        COULD CONCLUDE THAT A MANUFACTURING DEFECT
        CAUSED PLAINTIFFS' ALLEGED INJURIES .......................................................21

        A.   Because Plaintiffs Do Not Know Which of the Two Vented Cans
            Allegedly Started the Fire, They Cannot Point to Any Specific
            Manufacturing Defect .........................................................................................22

        B.   Plaintiffs' Manufacturing-Defect Based Theories Fall Short of
            Establishing Causation .......................................................................................22

        C.   Direct Measurements of the Subject Can Conclusively Disprove
            Plaintiffs' Manufacturing-Defect Based Theories ..............................................24

i

D.   The "Malfunction Theory" Does Not Apply and Cannot Save Plaintiffs' Manufacturing-Defect Based Claims ................................................................25

IV.   PLAINTIFFS CANNOT ESTABLISH A DESIGN-DEFECT CLAIM ....................27

A.   Plaintiffs Cannot Satisfy the Elements of a Design-Defect Claim Where They Admit that the Product, as Designed, Would Not Vent Under Reasonable and Intended Use, Or in the Specific Use Alleged Here ................27

B.   Plaintiffs Cannot Recast their Failed Manufacturing-Defect Claims as Design Defect Claims ...........................................................................................28

V.   SUMMARY JUDGMENT ON PLAINTIFFS' FAILURE-TO-WARN BASED CLAIMS IS ALSO WARRANTED ...............................................................29

A.   There is No Duty to Warn of An Alleged Manufacturing Defect Unique to the Subject Can ....................................................................................30

B.   Plaintiffs Other Criticisms of the Product Label Are Disconnected to Causation ...........................................................................................................31

VI.   PLAINTIFFS CANNOT ESTABLISH CPLA CLAIM BASED ON THE (UNSUPPORTED) ALLEGATION THAT THE PRODUCT DID NOT COMPLY WITH U.S. DEPARTMENT OF TRANSPORTATION REGULATIONS ......................................................................................................32

VII.   ASSOCIATED INDEMNITY'S SUBROGATION CLAIMS FAIL FOR THE ADDITIONAL REASON THAT ITS ALLEGED DAMAGES ARE UNSUPPORTED ......................................................................................................33

CONCLUSION .....................................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*Acevedo v. Fitness Quest, Inc.*,
  No. CV075011713S,
  2009 WL 5342499 (Conn. Super. Ct. Dec. 7, 2009) ............................................................ 28

*Allen v. Prince George's County*,
  737 F.2d 1299 (4th Cir.1984) ........................................................................................... 16

*Amtrust N. Am. v. Kohler Co.*,
  No. CV166009420S, 2018 WL 4390120 (Conn. Super. Ct. Aug. 28, 2018),
  *on reconsideration*, No. CV166009420S, 2018 WL 7107309 (Conn. Super. Ct.
  Dec. 18, 2018) ................................................................................................................... 26

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .......................................................................................................... 19

*Aspiazu v. Orgera*,
  205 Conn. 623,
  535 A.2d 338 (Conn. 1987) .............................................................................................. 24

*Bifolck v. Philip Morris*,
  152 A.3d 1183 (Conn. 2016) ................................................................................... 18, 27, 29

*Booth v. Black & Decker, Inc.*,
  166 F. Supp. 2d 215 (E.D. Pa. 2001) ............................................................................... 21

*Byrne v. Liquid Asphalt Sys., Inc.*,
  238 F.Supp.2d 491 (E.D.N.Y. 2002) ................................................................................ 33

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .......................................................................................................... 19

*Coffey v. Dowley Mfg., Inc.*,
  187 F. Supp. 2d 958 (M.D. Tenn. 2002),
  aff'd, 89 F. App'x 927 (6th Cir. 2003) ............................................................................. 24

*Daggett v. United States*,
  No. 08-21026-CIV,
  2010 WL 11553196 (S.D. Fla. Feb. 4, 2010) .................................................................... 16

*Daily v. New Britain Mach. Co.*,
  512 A.2d 893 (Conn. 1986) .............................................................................................. 18

*Danise v. Safety-Kleen Corp.*,
  17 F. Supp. 2d 87 (D. Conn. 1998) ............................................................................ 21, 31

*Decato v. Brandfon Motors, Inc.*,
  No. NNHCV116021419S,
  2013 WL 4873069 (Conn. Super. Ct. Aug. 20, 2013) ...................................................... 26

*Fallon v. Matworks*,
  918 A.2d 1067 (Super. Ct. 2007) ................................................................................ 21, 22

*Gershberg v. Camera Wholesalers, Inc.*,
   No. FSTCV126014627S,
   2014 WL 1283077 (Conn. Super. Ct. Feb. 26, 2014) ............................................................ 22

*Graham v. Fireline, Inc.*,
   No. 3:03CV00990 (AWT),
   2006 WL 1646165 (D. Conn. June 14, 2006) ................................................................. 19, 21

*Izzarelli v. R.J. Reynolds Tobacco Co.*,
   136 A.3d 1232 (Conn. 2016) .................................................................................................. 18

*Karavitis v. Makita U.S.A., Inc.*,
   243 F. Supp. 3d 235 (D. Conn. 2017),
   *aff'd*, 722 F. App'x 53 (2d Cir. 2018) .................................................................................... 32

*LaMontagne v. E.I. Du Pont De Nemours & Co.*,
   41 F.3d 846 (2d Cir. 1994) ..................................................................................................... 30

*Marisco v. Allegre Banquets, Inc.*,
   No. CV085018088,
   2009 WL 2785069 (Conn. Super. Ct. Aug. 6, 2009) ............................................................. 22

*Matsushita Electric Industrial Company v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ................................................................................................................ 19

*Metro. Prop. & Cas. Ins. Co. v. Deere & Co,*,
   25 A.3d 571 (Conn. 2011) ................................................................................................. 25, 26

*Moss v. Wyeth Inc.*,
   872 F. Supp. 2d 162 (D. Conn. 2012) ............................................................................... 21, 29

*Prokolkin v. Gen. Motors Corp.*,
   365 A.2d 1180 (Conn. 1976) ................................................................................................... 30

*Quinn v. Syracuse Model Neighborhood Corp.*,
   613 F.2d 438 (2d Cir. 1980) ................................................................................................... 19

*Sharp v. Wyatt, Inc.*,
   31 Conn. App. 824, 627 A.2d 1347 (1993),
   *aff'd*, 230 Conn. 12, 644 A.2d 871 (1994) ....................................................................... 29, 31

*Walters v. Howmedica Osteonics Corp.*,
   676 F. Supp. 2d 44 (D. Conn. 2009) ....................................................................................... 22

*Wasko v. Manella*,
   87 Conn. App. 390, 865 A.2d 1223 (Conn. App. 2005) ................................................... 33, 34

*White v. Mazda Motor of Am., Inc.*,
   99 A.3d 1079 (Conn. 2014) ........................................................................................ 21, 22, 25

*Willow Springs Condo. Ass'n, Inc. v. Seventh BRT Dev. Corp.*,
   245 Conn. 1, 717 A.2d 77 (Conn. 1998) ................................................................................. 34

*Zuchowicz v. United States*,
   140 F.3d 381 (2d Cir. 1998) ................................................................................................... 24

**Statutes**

Conn. Gen. Stat. § 52-572m(b) .......................................................................... 18

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................ 19

**Other References**

Wigmore, John Henry, Evidence in Trials at Common Law § 1873 (1976) ................................ 16

## INTRODUCTION

This is a products liability case brought under the Connecticut Products Liability Act ("CPLA"), arising from a May 13, 2013 kitchen fire that injured Plaintiffs Hallie Meyer and Emma Schmidt while they were deep frying potato croquettes in a large pan of hot oil. Plaintiffs allege that a can of PAM® cooking spray in the kitchen caused the fire when it spontaneously vented at a pressure and temperature far below its design specification. As designed, the product will not vent unless it reaches a pressure of 180 psi (pounds per square inch) or more, but Plaintiffs allege it vented somewhere between 90-120 psi. Two cans of PAM were found at the scene, but Plaintiffs have alleged that only one can caused their injuries (the "Subject Can"). In their complaint, Plaintiffs pled claims for manufacturing defect, design defect, and failure to warn. Plaintiffs did not plead a claim based on malfunction theory.

Plaintiffs have no direct evidence tying a can of PAM to their injuries, and thus have relied on experts to prove their claims. Conagra has moved to exclude all of Plaintiffs' experts, but as set forth herein, even with Plaintiffs' experts' testimony, summary judgment is warranted.

*First,* Plaintiffs have not adduced direct or indirect evidence from which a reasonable jury can conclude — without speculation — that the fire causing Plaintiffs' injuries originated with the "under-pressure" venting of a PAM can.

*Second,* even if Plaintiffs could establish that the fire originated with a can of PAM, Plaintiffs' manufacturing-defect based claims also fail because (1) Plaintiffs do not know *which* of the two vented PAM cans found after the fire allegedly caused their injuries (and cannot, therefore, identify a mistake in the assembly of either one of them as the cause of the fire); (2) the various hypotheses offered by Plaintiffs' experts as to possible variations in manufacture that could

lead to "under pressure" venting are not tied to causation under the facts of this case, and (3) the theories are inconsistent with the *actual measurements* of the Subject Can.

**Third,** Plaintiffs cannot pursue their claims based on a "malfunction theory." That theory does not apply, as a matter of law, because (1) it was not pled in the complaint; (2) it is not available where, as here, the product still exists; and (3) kitchen fires generally, and the venting of a vented can specifically, can occur in the absence of a product defect.

**Fourth,** Plaintiffs design-defect based claims fail because their experts agree that, as designed, the PAM product would have safely retained its contents and therefore, there would have been no fire. While Plaintiffs' experts may contend that "stronger" cans or "less flammable" contents may exist, such contentions are irrelevant when it is not disputed that, as designed, the Subject Can would not have vented and caused the fire absent a manufacturing defect in the Subject Can.

**Fifth,** Plaintiffs' failure-to-warn based claims do not survive summary judgment because Conagra had no duty to warn about a (still unproven) manufacturing defect that may lead to "under pressure" venting. Even Plaintiffs' warnings' expert agrees as much. There is also no plausible link between the alleged criticisms of the existing label and causation where it is undisputed based on Plaintiffs' sworn testimony that they did not read the label or recall what was on the label, they already understood the risks warned against, and they claim to have acted accordingly.

**Sixth,** Plaintiffs have long threatened to base their defect claims on their allegation that the product fails to comply with certain Department of Transportation (DOT) regulations. Plaintiffs have never supported that allegation with evidence, nor would compliance or non-compliance with the DOT regulations be relevant in this personal-injury claim, when it is undisputed that the regulations do not apply to consumer safety.

**Seventh,** Plaintiff Associated Indemnity, standing in the shoes of its insured (the homeowners), seeks to recover property damages as a result of the fire. Associated Indemnity's claims fail for all the reasons that the Plaintiffs claims fail, plus, Associated Indemnity has failed to adduce sufficient evidence — including any expert evidence — to support its alleged damages.

For each of these reasons, and as discussed further in this Memorandum and any Reply, summary judgment is appropriate. Plaintiffs have come up with a very specific theory for what they claim happened — they claim that a fire started because of the "under pressure" venting of a PAM container at nearly-room temperature — but have not put forth sufficient *evidence* to support their theory, and to the contrary, the unrebutted evidence conclusively disproves it.

## FACTUAL BACKGROUND[1]

### I.     THE PAM PRODUCT AT ISSUE IN THE CASE

Conagra sells the PAM® cooking spray product at issue in the case, known as PAM® Original (12 oz). (SOF ¶ 1.) The cooking spray is an aerosol, and was sold in a pressurized container, which was designed and manufactured by a non-party, DS Containers, Inc. (*Id.*) Relevant to this case, the container includes four U-shaped score lines on the bottom of the can. (*Id.* ¶ 2.) The can is designed to buckle (or evert its bottom), when the can exceeds a minimum pressure of 180 psi (pounds per square inch).[2] (*Id.*) When the can buckles, the U-shaped scores open (or "vent") *Id.*

Below is a photograph of a vented container:

---

[1] Citations to the factual record are to Conagra's separately filed "Local Rule 56(a)(1) Statement of Undisputed Material Facts" ("SOF"), and the support cited therein.

[2] The Parties, and the experts, have used "PSI" and "PSIG" (pounds per square in gauge) interchangeably.



(*Id.* ¶ 3.)

Aerosol cans are pressurized, and the cooking spray inside is flammable. Like many products and equipment used in the kitchen, the product must be used responsibly. Here, the PAM product includes several warnings and directions for use to prevent a user from allowing the can to overheat, including:

- "CAUTION: CONTENTS UNDER PRESSURE"

- "DO NOT STORE ABOVE 120 °F"

- "CAN MAY BURST IF LEFT ON STOVE OR NEAR HEAT SOURCE"

- "FLAMMABLE"

- "DO NOT SPRAY ON HEATED SURFACES OR NEAR OPEN FLAME"

- "USE ONLY AS DIRECTED"

(*Id.* ¶ 4 (and Exhibit 3).)

## II.    THE KITCHEN FIRE

On May 13, 2013 there was a kitchen fire at the residence of Audrey and Daniel Meyer, in Washington, Connecticut.  (SOF ¶ 5.) Plaintiffs Hallie Meyer (Meyer), the homeowners' daughter, and her friend and business partner, Emma Schmidt (Schmidt), had been cooking from the morning (neither can recall what time they started), until approximately 10:22 p.m., to prepare various food items for an off-campus catering job for an expected 400 Yale seniors. (*Id.* ¶ 6.)  The two friends had started a "baking and catering company at Yale University with total revenue over $15,000"

the previous Spring. (*Id.* ¶ 7.) The Yale-seniors event would "definitely" be the biggest event Plaintiffs had ever catered. (*Id.* ¶ 7.)

At the time of the fire, Meyer was standing in front of the Wolf Dual Fuel Range, deep frying potato croquettes in a large pan of hot oil. (*Id.* ¶ 8.) To make potato croquets, Meyer would mash potatoes, roll the mashed potatoes into balls, dip the balls in bread crumbs, and then fry the individual balls. (*Id.*) Once the rolled balls are in the pan of hot oil, she would allow for them to sizzle for 1-2 minutes on each side, and then remove them from the pan and place them on "a plate of some kind" nearby. (*Id.* (quoting Ex. 4, Meyer Dep. 73:9-74:9.)). There can be no question that deep frying potato croquets can be a messy endeavor.

Plaintiffs set a deadline to finish cooking at 10:30 p.m. (*Id.* ¶ 10.) At approximately 10:22 pm, while Meyer was facing the stove, a fire started.  (*Id.* ¶ 11.) Plaintiffs each testified that they did not see what caused the fire and they did not see a container of PAM cooking spray. (*Id.* ¶ 12.) Meyer, for instance, recalled seeing a flame and hearing "a flame sound." (*Id.* ¶ 13 (quoting Ex. 4, Meyer Dep. 77:18-19).) She then "ran straight from where [she] was standing through an exit that was directly in front of [her]." (*Id.* (quoting Ex. 4, Meyer Dep. 77:16-17).) Schmidt, on the other hand, had her back turned to the stove. (*Id.* ¶ 14.). She also did not see the fire start and recalled only that she "suddenly found [her]self on the ground" and she "didn't know what had happened." (*Id.* (quoting Ex. 6, Schmidt Dep. 81:9-13).) She vaguely recalled a "warm liquid" on her legs, which she could not identify. (*Id.* (quoting Ex. 6, Schmidt Dep. 81:19-82:7.) She did not know how she ended up on the ground and did not recall hearing any noises before she fell. (*Id.*)

Schmidt then recalled pushing herself up and answering a ringing phone inside the house; she described the caller as an alarm company asking if help was needed. (*Id.* ¶ 15.) She remembers that the kitchen was smoky, and that Meyer had already run out of the house. (*Id.*) She then recalls

running out of the house, through a back door near the kitchen. (*Id.*) Schmidt then testified that she

went *back inside* the house (on at least one trip, but maybe more) to retrieve her cell phone from a

dock to the left of the stove area, and to retrieve "some of the items that we had cooked and put

them in the car that I had brought." (*Id.* ¶ 16 (quoting Ex. 6, Schmidt Dep. 84:7-86:24; 87:19-

88:17).) At the time, she "believed we were still going to cater the event the next day." (*Id.* (quoting

Ex. 6, Schmidt Dep. 88:2-3).) On one of her trips back inside the house, she saw "something on

the ground that either was burning or had burned and made me feel unsafe." (*Id.* (quoting Ex. 6,

Schmidt Dep. 86:5-9).) She did not know what the object was. (*Id.*)

As for their injuries, Meyer, who had been standing at the stove at the time of the fire,

testified that she was burned on her face, her left forearm and hand, and her right hand. (*Id.* ¶ 17.)

Schmidt, whose back was to the stove when the fire started and who was in varying locations in

relation to the fire on her trip back into the house after the fire started, testified that both of her

legs were burned. (*Id.* ¶ 18.)

The Washington Fire Department and an insurance adjuster both investigated the cause of

the fire immediately after it happened. (*Id.* ¶ 19.) The Washington Fire Chief reported that it was

an "an "apparent grease fire" and said that the injuries (presumably to Ms. Schmidt) occurred while

she was "trying to put out the fire." (*Id.* ¶ 20.) The insurance adjuster also documented the fire as

"a grease fire." (*Id.*)

## III.    THE ALLEGED ORIGIN OF THE FIRE

Plaintiffs retained fire investigator, Gregory J. Cahanin, C.P., to provide expert testimony

as to the *origin* of the fire but not its cause. (*Id.* ¶ 20 (quoting Ex. 10, Cahanin Dep. 10:19-11:1

(distinguishing between the origin of a fire, which is where it begins, and the cause of a fire, which

is why it begins, or "the origin of the fire is where it begins. It's – it's the coffee maker that started it. The cause may be a short in the coffee maker.").)

Cahanin (in a heavily flawed opinion that Conagra seeks to exclude), opines that a PAM container, ***but he does not know which,*** was the origin of the fire. (*Id.* ¶ 21.)

Among the debris from the fire were six or seven aerosol cooking spray cans, at least three of which were PAM cooking spray containers of the same model. (*Id.* ¶ 22) A photograph of the three PAM containers of the same model is shown below:



(*Id.* ¶ 22 (and Ex. 13).) Two of the three cooking spray containers (the two on the left) were found in a "vented" condition. (*Id.*)

Cahanin admitted in his deposition that he does not know which of the two vented cans found at the scene was the origin of the fire.  (*Id.* ¶ 23.) Cahanin also testified that "the likelihood, in my opinion, of two cans simultaneously exploding is very, very narrow, so we could have a condition where one of them exploded and the other one that was very hot due to the action of the

explosion, buckled, vented, and – and then was part of a fireball that occurred." (*Id.* (quoting Ex. 10, Cahanin Dep. 75:6-11).)

Plaintiffs retained a different expert, Dr. Lester Hendrickson, a metallurgist, to opine on *how* and *why* a container of PAM vented. (*Id.* ¶ 24.) In his Report, Dr. Hendrickson attempted to identify the PAM container that was the alleged origin of the fire (the "Subject Can") by incorrectly stating that one of the PAM cans was "found within the area Ms. Schmidt testified she was in when she was knocked down." (*Id.*) Dr. Hendrickson cites to a photograph that he attached as Exhibit E to his report:



But the photograph Dr. Hendrickson relied on in identifying the Subject Can was staged. (*Id.* ¶ 25.) It shows a PAM container sitting on the kitchen's island, next to a water bottle. (*Id.*) Below is a picture from the evening of the fire, showing the same kitchen island, and the same water bottle — but no PAM container:



(*Id.* ¶ 25 (Ex. 14).) Below is another photograph showing what the floor in the kitchen looked like immediately after the fire in the location that Schmidt had said she had fallen, and there is no PAM container:



(*Id.* ¶ 26 (Ex. 15).)

      In his deposition, Dr. Hendrickson concedes that he was not offering an expert opinion as to the Subject Can. Instead, he states (incorrectly): "I don't think there's any question that this can on the left is what started the fire. And then the other can, the second one on the -- next to it is the -- vented as a result of the excessive fire heat from just a general fire." (*Id.* ¶ 27 (quoting Ex. 12, Hendrickson Dep. Tr. 109:14-18).).

## IV.   EXPERTS FIRST CONCLUDE THAT A PROPERLY MANUFACTURED PAM CONTAINER WILL *NOT* OVERPRESSURIZE UNDER THE CONDITIONS ALLEGED BY PLAINTIFFS

It is undisputed — based on extensive analysis and testing by both sides' experts — that a properly manufactured PAM product will not reach, or even come close to reaching, the minimum buckle/vent pressure of 180 psi under the conditions alleged by Plaintiffs and assumed by Plaintiffs' experts.

Assuming that a PAM container was the origin of the fire, Plaintiffs' expert Dr. Hendrickson was retained to examine *how* and *why* the Subject Can vented. To do this, Dr. Hendrickson first analyzed the temperature at which the can would reach the designed minimum pressure specification at which it would buckle and vent — 180 psi. (*Id.* ¶ 28.) To do this, he created a pressure-versus-temperature curve, attached as Exhibit 2J of his report:



Pressure v. Temperature data for PAM Original measured using peer reviewed Pressure Chamber method.

(*Id.*) Relying on that data, Dr. Hendrickson opined that, to reach a pressure of 180 psi, the contents must be heated to an equilibrium temperature of approximately 198°F. (*Id*. ¶ 29 (quoting Ex. 14, Hendrickson Am. Rep. 13 ("A pressure of 180 psig is not reached until a temperature of near 200F is reached.")).) (This conclusion is generally consistent with the work of Conagra's expert, Dr. Russell Ogle, although the values are slightly different. (*Id.*)

Next, to determine whether the Subject Can *could* have reached the temperature needed to buckle and vent based on Plaintiffs' testimony as to the location of the container and relative heat sources, Dr. Hendrickson created a simulation to approximate the "set-up Ms. Meyer was using when she was frying croquettes." (*Id.* ¶ 30.) He had two cans, set up about 6 inches from the burner of the gas stove (or three inches from the pan), and let the cans heat for more than two hours. (*Id.*) Afterwards, he noted that the maximum temperature reached on the outside of either can ***was 104.2°F***. (*Id.* at 12.) His "set up" is shown below:



Photo F-1

(*Id.*)

As Dr. Hendrickson describes it, this cooking simulation test (consistent with others he performed or relied on), together with his temperature versus pressure analysis, establish that "the temperatures reached by exemplar vented PAM cans, in an aggressive heating test with the test can positioned as close as possible to the gas burner, were *well below* the temperature expected to

activate the pressure release system designed into the bottom of the can." (*Id.* ¶ 33 (quoting Ex. 14, Hendrickson Am. Rep. at 9).)

Another metallurgist retained by Plaintiffs, Dr. Mitra L. Taheri, echoed this conclusion in her Report. Using a mathematical equation, she concluded that the "heat transfer" from the Meyers' stove to the location where Meyer says the PAM container was located, "was less than 120 degrees Fahrenheit." (*Id.* ¶ 31.)  Thus, even according to Plaintiffs' own experts, the pressure allegedly inside the Subject Can was between approximately 90 to 120 psig (*id.* ¶ 31), meaning Plaintiffs allege the Subject Can vented at between 60 to 90 psig below its specification. Plaintiffs, through their experts, concede that such "under pressure" venting could not have occurred absent a specific manufacturing defect in the Subject Can

## V.   PLAINTIFFS OFFER THREE THEORIES FOR *HOW* A PAM CONTAINER COULD VENT "UNDER PRESSURE"

Again assuming that a PAM container was the origin of the fire, and developing their analysis on this faulty assumption, Plaintiffs' experts developed potential theories for *how* a defectively-manufactured PAM container could theoretically vent at a pressure below 180 psi[3]:

***Dr. Hendrickson's FEA Theory.***  Dr. Hendrickson's theory, which is based on a computer model he labels Finite Element Analysis (FEA), is that the average thickness and strength of the raw sheet of metal used to make the can bottom may have been too thin or too weak, thereby allowing for under-pressure venting.[4] (SOF ¶ 35.) Conagra has moved to exclude Dr. Hendrickson's opinions on this topic. But even if his testimony is considered, Dr. Hendrickson

---

[3] As explained further in the Argument section, "below 180 psi" does not explain how the Subject Can allegedly vented at a pressure alleged to be closer to 90-120 psi. *See infra,* at ___.

[4] As a corollary, if the product is manufactured according to its specification, Dr. Hendrickson's FEA shows that the product is not expected to begin buckling (or venting) until it reaches a pressure of at least 186 psi. (SOF ¶ 36.)

admitted that his FEA does not predict any hypothetical can venting at a pressure as low as the Subject Can is alleged to have vented in this case. (*See* SOF ¶ 37 (quoting Ex. 12, Hendrickson Dep. 211:17-22 ("Q. Doctor Hendrickson, does your FEA model show any failures at the pressures as low as what you claim the subject can in the Schmidt-Meyer -- A. No. Q. -- incident failed at? A. No.").)

**_Dr. Taheri's Fracture Mechanics Theory._**   Dr. Taheri's theory, which is purportedly derived from a discipline of science — fracture mechanics — that does not apply, and for which she admits she is not qualified to opine on, is that the U-shaped vents could introduce "cracks" or "areas of susceptibility" in the metal, and, based on various equations (which also do not apply, based on the specific geometry of the can), she concludes that "it is possible" (not probable) that the Subject Can "began to vent at pressures well below 180 psi, and as low as ~100 psi." (Taheri Rep. at 5.)[5] (SOF ¶ 38.)

Plaintiffs also offer a third theory for how the Subject Can may have been manufactured defectively, but that expert (Dr. Eagar) does not make any effort to tie his analysis to the expected pressure at which the Subject Can would vent:

**_Dr. Eagar's Microscopic Variations Theory._** Dr. Eagar opines that images taken of the Subject Can using a Scanning Electron Microscope (SEM) show variations in "coarseness" and "thickness," which could evidence a manufacturing defect. (SOF ¶ 39.) Dr. Eagar was offered solely as a "rebuttal" witness, and therefore, even if his opinions are admitted notwithstanding Conagra's motion to exclude, they would be limited to "counter new facts presented in the

---

[5] Dr. Taheri labels her opinion as design-defect, rather than manufacturing-defect opinion. But it is undisputed that the PAM container is *designed* to withstand a minimum pressure of 180 psi. (And Plaintiffs predict that the possibility of a defect allowing the under-pressure venting in this case is extremely low – less than "one in a million" (SOF ¶ 39.) Accordingly, Conagra addresses Dr. Taheri's theory in the context of a manufacturing-defect claim.

defendant's case in chief." *Allen v. Prince George's County*, 737 F.2d 1299, 1305 (4th Cir.1984) (citing John Henry Wigmore, Evidence in Trials at Common Law § 1873 (1976)); *see also Daggett v. United States*, No. 08-21026-CIV, 2010 WL 11553196, at *1 (S.D. Fla. Feb. 4, 2010) ("plaintiffs cannot rely on experts designated solely as rebuttal experts in their case-in-chief to try to avoid summary judgment"). This opinion by Dr. Eagar does not "counter new facts presented" by Conagra and would, therefore, be improper "rebuttal." *See Allen*, 737 F.2d at 1305. Still, even if Dr. Eagar's opinion was considered at summary judgment, Dr. Eagar made no attempt to examine *how* or *if* the alleged variations would impact the pressure at which the Subject Can may have vented, which is the relevant question in the case. (*See* SOF ¶ 39.)

## VI.  DIRECT MEASUREMENTS OF THE SUBJECT CAN

Over Plaintiffs' objection, the Court granted Conagra's request to permit destructive testing of the Subject Can to allow the parties to take direct measurements in rebuttal of Dr. Hendrickson and Dr. Taheri's theories. After the Court's ruling, the parties (with input from Dr. Hendrickson) agreed on the parameters for the testing, and on the independent laboratory on which the testing was performed.

In short, the laboratory took approximately 50 measurements of the thickness of the metal in the bottom of the can. (SOF ¶ 40.) "The objective of the thickness survey was to assess the nominal thickness of the manufactured condition of the steel sheet comprising the can bottom." (*Id.*) The average measurement was 0.0136 inches, which showed that the can's bottom was within the tightly controlled tolerance for the steel used to manufacture the can bottoms (.0138 inches ± 0.0003). (*Id.*) The average measured yield strength of the subject can was 62 ksi, also well within tolerance of 63 ± 7 ksi. (*Id.* ¶ 41.) These direct measurements of the Subject Can proved the raw material used to make the Subject Can was within its design specification.  Even Dr. Eagar, the

only of Plaintiffs' experts to issue an opinion after the testing, admitted the Subject Can was made within specification, or "probably was." (*Id.* ¶ 42 (quoting Ex. 19, Eagar Dep. 146:1-2; 149:16-150:3).)  Dr. Sarah Easley, who analyzed the results of the destructive testing and opined that the Subject Can was made as designed. (*Id.*)

Thus the *actual* measurements of the Subject Can render irrelevant Dr. Hendrickson's model because his model attempted to explain how the Subject Can could have "under pressure" vented was premised on the Subject Can being made with raw material that was weaker and/or thinner than permitted by its design specification. Furthermore, examination of the Subject Can also allowed for a better understanding of the Subject Can's geometry, further undercutting several of Dr. Taheri's assumptions made in her fracture-mechanics analysis that were premised on an incorrect assumptions that the Subject Can's vents opened without buckling and that the can's bottom was cylindrical when it instead is (half of) a sphere, requiring the application of equations applicable to a sphere and not a cylinder.

Based on the objective and indisputable evidence the raw material used to form the Subject Can was within specification (refuting Dr. Hendrickson's theory). Plaintiffs have adduced no evidence of any other defect in the Subject Can causally tied to the alleged "under pressure" venting.

## VII.   PLAINTIFFS' TESTIMONY RELEVANT TO FAILURE TO WARN CLAIM

Plaintiffs testified that they did not read, or did not remember, the warnings that were provided. (*See* SOF ¶ 44 (quoting Ex. 6, Schmidt Dep. 122:25-123:2 (did not recall ever reading the label)); Ex. 4, Meyer Dep. 118:13-19 (when asked if she had read the label, she replied "I think so," but she could not recall anything about what the label said).) Nevertheless, regardless of the label, the Plaintiffs testified that they were aware of the well-known hazards of aerosol containers

and flammable contents even without the label. (*See id.* ¶ 45 (quoting Ex. 6, Schmidt Dep. 124:13-18 ("I had taken physics and knew that any kind of container with compressed anything inside has a high pressure and shouldn't be too close to heat. Q. Okay.  So you wouldn't, you know, put a cooking spray can right next to a flame; right? A. Correct.")); Ex. 4, Meyer Dep. Tr. 120:7 ("I would not spray [cooking spray] onto an open flame" and "I would not keep it, as I said, within five inches" of a heat source.).)

## **ARGUMENT**

### I.     **THE CPLA AND SUMMARY JUDGMENT STANDARD**

The  Connecticut  Products  Liability  Act  ("CPLA")  provides  the  exclusive  remedy  for product  liability  claims,  including  claims  for  personal  injury  caused  by  the  manufacture, construction,  design,  assembly,  warnings,  instructions,  packaging  or  labeling  of  any  product. Conn. Gen. Stat. § 52-572m(b); *Daily v. New Britain Mach. Co.*, 512 A.2d 893, 899 (Conn. 1986) ("the  products  liability  statute  provides  an  exclusive  remedy  and  the  plaintiffs  cannot  bring  a common law cause of action for a claim within the scope of the statute").

To prevail in a claim under the CPLA based on a specific defect, a plaintiff must prove that:

> (1) the defendant was engaged in the business of selling the product;
> (2) the product was in a defective condition unreasonably dangerous to the consumer or user;
> (3) the defect caused the injury for which compensation was sought;
> (4) the defect existed at the time of the sale; and
> (5) the  product  was  expected  to  and  did  reach  the  consumer  without substantial change in condition.

*Bifolck v. Philip Morris*, 152 A.3d 1183, 1202 (Conn. 2016) (citing *Izzarelli v. R.J. Reynolds Tobacco Co.*, 136 A.3d 1232, 1239 (Conn. 2016)).

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). A defendant may demonstrate the nonexistence of a genuine issue of material fact by simply pointing out the absence of evidence to support the plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A plaintiff must present affirmative evidence in order to defeat a properly-supported motion for summary judgment and "may not rest upon mere conclusory allegations or denials as a vehicle for obtaining a trial." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980) (citations and quotations omitted); *Anderson*, 477 U.S. at 256. A plaintiff opposing a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Company v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the plaintiff must come forward with sufficient evidence to support a jury verdict in its favor. *Anderson*, 477 U.S. at 263.

## II.   SUMMARY JUDGMENT IS WARRANTED BECAUSE THERE IS INSUFFICIENT EVIDENCE THAT THE PAM PRODUCT WAS THE ORIGIN OF THE FIRE

Plaintiffs testified that they did not see what caused the fire and they did not see a container of PAM cooking spray. (SOF ¶ 12.) Because there was no witness to the origin of the fire, it was even more important for Plaintiffs to adduce expert testimony that would allow a trier of fact to conclude, without speculation, that it is *more likely than not* that the origin of the fire was a container of PAM. Without such proof, Plaintiffs cannot meet their burden of proving that the Subject Can was defective and caused Plaintiffs' alleged injuries. *See, e.g.*, *Graham v. Fireline, Inc.*, No. 3:03CV00990 (AWT), 2006 WL 1646165, at *7 (D. Conn. June 14, 2006) ("at the summary judgment stage, the plaintiffs have the burden of producing evidence that could establish

that it is more probable than not that a defective [product] failed," and, where the witnesses could not "describe how the accident happened based on what they saw" it was "not a case where a jury could find proximate causation from its consideration of the product and a witness' description of how the accident happened"; rather, expert testimony must establish that the product "actually failed during the incident in question because of a defect.").

Even if Plaintiffs' fire expert, Gregory J. Cahanin, is permitted to testify (and Conagra has filed a separate motion to exclude his opinions), his testimony is insufficient. This is because he failed to consider, much less rule out, the overwhelming probability that Plaintiffs' deep-frying activities started the grease fire, which then caused the two PAM containers to overheat and vent.

Conagra's expert (Dr. Russel Ogle) pointed out this flaw more than a year ago. (SOF ¶ 46.) Rather than address it, Cahanin issued an "addendum" to his report on June 18, 2019. In it, he agreed that he had overlooked evidence showing the existence of at least "3 large bottles of olive oil in the area of the explosion and fire." (*Id.* ¶ 47.) He then opined that the burn patterns in the kitchen and on the floor in the area in which Schmidt was allegedly burned were consistent with "continued burning" of this "larger quantity of oil." (*Id.*) Accordingly, Cahanin admits there was a grease fire outside the pan (something he had not done previously), yet, he made ***no effort*** to render an opinion on whether it was more-likely-than-not that the fire originated with the grease fire or with the Subject Can.

Accordingly, assuming the disputed facts in Plaintiffs' favor (as required for summary judgment), the fire originated from an "under-pressure" venting of a PAM container (as Plaintiffs contend), ***or***, it originated from the spilling of oil or grease (a possibility that is consistent with the evidence, and one that Cahanin does not refute). With two possibilities, and Plaintiffs' expert failing to address this critical question, there is no evidentiary basis from which a jury can reach

the conclusion that it is more likely than not that a sustained kitchen fire started with a defective PAM container (instead of a grease fire). *See Graham*, 2006 WL 1646165 at *7 (observing that plaintiffs have burden to produce evidence to establish that "it is more probable than not" that the events occurred as they say); *Booth v. Black & Decker, Inc.*, 166 F. Supp. 2d 215, 222 (E.D. Pa. 2001) ("It is not enough [to defeat summary judgment] for plaintiffs to create a metaphysical possibility that the toaster oven was a cause of the fire."); *see also Danise v. Safety-Kleen Corp.*, 17 F. Supp. 2d 87, 98 (D. Conn. 1998) (finding in favor of defendant after a bench trial where plaintiff's expert "has not excluded all other sources of ignition as possibilities.").

Because Plaintiffs have failed to adduce evidence that it is more-likely-than-not that a defective PAM container started the fire, rather than a grease fire, summary judgment should be granted in Conagra's favor.

### III. SUMMARY JUDGMENT IS WARRANTED BECAUSE THERE IS INSUFFICIENT EVIDENCE FROM WHICH A REASONABLE JURY COULD CONCLUDE THAT A MANUFACTURING DEFECT CAUSED PLAINTIFFS' ALLEGED INJURIES

Plaintiffs primarily rely on a manufacturing-defect based theory – that is, that "under pressure" venting, venting below the product's design specification, caused the fire. *See Moss v. Wyeth Inc*., 872 F. Supp. 2d 162, 166 (D. Conn. 2012) ("Generally speaking, a manufacturing defect is a mistake in the assembly process, which results in a product that differs from the manufacturer's intended result."). It is Plaintiffs' burden to prove the presence of a manufacturing defect. *See White v. Mazda Motor of Am., Inc.*, 99 A.3d 1079, 1089 (Conn. 2014) ("Ordinarily, a plaintiff relies on direct proof of a specific manufacturing or design defect to prove his product liability claim . . ."); *Fallon v. Matworks*, 918 A.2d 1067, 1075 (Super. Ct. 2007) ("If a manufacturing defect causes a product accident, usually the plaintiff can prove the defect and its causal relation to both the manufacturer and the accident largely by direct evidence.").

**A. Because Plaintiffs Do Not Know Which of the Two Vented Cans Allegedly Started the Fire, They Cannot Point to Any Specific Manufacturing Defect**

Even if a jury could reasonably conclude that *a* PAM container was the origin of the fire (and Conagra disputes that it could), there were *two* vented cans found at the scene, and Plaintiffs' experts do not know *which* of the two cans started the fire. (Cahanin Dep. Tr. 74:23-75:2; 76:9-10.)

Because Plaintiffs do not know which can alleged started the fire, it should go without saying that they cannot reasonably identify any specific manufacturing defect in the can. *See, e.g.*, *Walters v. Howmedica Osteonics Corp.*, 676 F. Supp. 2d 44, 50 (D. Conn. 2009) (granting summary judgment on manufacturing defect claim where plaintiff could not identify which allegedly-defective medical tray caused her injury); *Gershberg v. Camera Wholesalers, Inc.*, No. FSTCV126014627S, 2014 WL 1283077, at *4 (Conn. Super. Ct. Feb. 26, 2014) (granting summary for a stool manufacturer on a manufacturing-defect claim where the plaintiff could not identify what portion of the stool collapsed, causing his injury); *Marisco v. Allegre Banquets, Inc.*, No. CV085018088, 2009 WL 2785069, at *5 (Conn. Super. Ct. Aug. 6, 2009) (granting summary judgment for the defendant where "neither the plaintiff nor anyone else saw or had any knowledge of what caused his injuries.").

**B. Plaintiffs' Manufacturing-Defect Based Theories Fall Short of Establishing Causation**

As noted above, it is Plaintiffs' burden to prove that the alleged manufacturing defect in the Subject Can actually *caused* the alleged injuries. *See White*, 99 A.3d at 1089; *Fallon*, 918 A.2d at 1075. Although Dr. Hendrickson and Dr. Taheri have hypotheses for what could theoretically cause a hypothetical PAM container to vent prematurely at pressures below 180 psi (referred to as "under-pressure venting"), they have done nothing to establish that *the Subject Can* vented at a pressure and temperature consistent with the facts alleged by *these* Plaintiffs in *this* case.

Dr. Hendrickson admitted that his FEA does not predict any hypothetical can venting at a pressure as low as the Subject Can is alleged to have vented in this case. (*See* SOF ¶ 37 (quoting Ex. 12, Hendrickson Dep. 211:17-22 ("Q. Doctor Hendrickson, does your FEA model show any failures at the pressures as low as what you claim the subject can in the Schmidt-Meyer -- A. No. Q. -- incident failed at? A. No.").)

Similarly, Dr. Taheri admitted that she never even looked at the Subject Can and she did not even know whether it had buckled and vented, or whether the U-shaped tabs had somehow opened without buckling. (SOF ¶ 38.) Because she does not know what the Subject Can looked like, she admitted she has no way of piecing together any coherent prediction of the pressure at which it vented. (*See id.* (quoting Ex. 23, Taheri Dep. 208:1-209:8 ("Q. Okay. And would the pressure of the can change when the can, when the volume increases due to the buckling? A. I can't speak to that. Q. The internal pressure? A. I have not calculated that. I cannot speak to that at all. Yes or no, I cannot speak to that.").)

As Dr. Taheri put it, "we want to look at the theoretical model as well as the actual evidence. There are always variations in the materials. . . . So there has to be a range and that's why my theoretical calculation was formed . . . But I always believe, whether it's for fundamental research, you know and next generation materials or whether it's a litigation case such as this, that mathematical calculations and quantitative calculations should be put together with actual experimental validation." (*Id.* (quoting Ex. 23, Taheri Dep. 216:3-14).) For this reason, and others, Dr. Taheri concedes that her calculations are "general" and a "range" (*id.*), and in the end, she can only opine as to a mere "possibility" that there was low-pressure venting under the facts of the case.

An opinion as to a mere "possibility" — rather than a probability — is insufficient to withstand summary judgment. *See, e.g.*, *Zuchowicz v. United States*, 140 F.3d 381, 389 (2d Cir. 1998) ("plaintiff's reliance on experts must meet the substantive requirements of Connecticut law. Under that law, '[t]he expert opinion that seeks to establish the causal connection between the injury and the alleged negligence 'must rest upon more than surmise or conjecture.'" . . . The expert must deal not in mere possibilities"(quotations omitted)); *Aspiazu v. Orgera*, 205 Conn. 623, 632, 535 A.2d 338, 342 (Conn. 1987) ("Any expert opinion that describes a 'condition' as possible or merely fifty-fifty is based on pure speculation.").

### C. Direct Measurements of the Subject Can Conclusively Disprove Plaintiffs' Manufacturing-Defect Based Theories

Even if Plaintiffs had connected their theories to causation — and they did not — any shred of relevance was lost when the *direct measurements* taken of the Subject Can established that the Subject Can was properly manufactured as to all the parameters raised in Dr. Hendrickson and Dr. Taheri's theories.

As to Dr. Hendrickson's theory, direct measurements of the Subject Can conclusively established that the average thickness and strength of the bottom of the Subject Can were consistent with the Subject Can's specifications. Where actual testing disproves the model, the model is of no use to the jury. *See, e.g.*, *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 976 (M.D. Tenn. 2002), aff'd, 89 F. App'x 927 (6th Cir. 2003) ("Where a product is actually available, actual testing is preferable. While, Dr. Wilson's second finite element analysis was undertaken using accepted engineering procedures, its very use constitutes an unreliable method—the wrong tool for the wrong job.").

Direct measurements and observations on the Subject Can also confirmed that Dr. Taheri's inputs were inconsistent and incompatible with the true geometry of the Subject Can: Dr. Taheri

assumed that the Subject Can's vent's would open without buckling of the bottom, and that the Subject Can's bottom was cylindrical when it instead is (half of) a sphere, requiring an analysis based on spherical geometry. (SOF ¶ 43.) Neither Dr. Hendrickson, nor Dr. Taheri have addressed the direct measurements in this matter.

### D. The "Malfunction Theory" Does Not Apply and Cannot Save Plaintiffs' Manufacturing-Defect Based Claims

Likely realizing they could not identify any evidence of a specific defect in the Subject Can, Plaintiffs asserted in a recent court filing that they "will offer evidence of defect pursuant to the malfunction theory." (Dkt. No. 159 at 3.) In limited circumstances, and only when direct evidence is not available, the courts have permitted a plaintiff to rely on a "malfunction theory" to establish that the product was in a defective condition and the defect existed at the time of the sale. *Metro. Prop. & Cas. Ins. Co. v. Deere & Co,*, 25 A.3d 571, 583 (Conn. 2011). This theory cannot be used here because (1) it was not pled in the complaint; (2) it is not available where, as here, the product still exists; and (3) kitchen fires generally, and the venting of a vented can specifically, occur in the absence of a product defect.

### i.   Plaintiffs Did Not Plead Reliance on the Malfunction Theory

"To rely on a malfunction theory, in addition to a manufacturing or design defect theory, a plaintiff must separately plead that claim in the alternative." *White v. Mazda Motor of Am., Inc.*, 99 A.3d 1079, 1095 n.9 (Conn. 2014); *id* at 1089 (a plaintiff cannot proceed at summary judgment under malfunction theory where he "did not reference the malfunction theory in his pleadings, nor did he present any allegations relative to its elements" but instead "pleaded only a specific defect theory"). There is no question that Plaintiffs failed to plead reliance on the malfunction theory in their complaint. (*See generally,* Compl. at ¶¶ 21-24.)

### ii. The Malfunction Theory Is Not Available Where Direct Evidence is Available

Even if Plaintiffs had pled a malfunction theory, it is unavailable in this case because the Connecticut Supreme Court has limited use of the malfunction theory to cases where the allegedly-defective product is unavailable to ensure fairness and "not to diminish a plaintiff's burden of proof." *See Metro. Prop.*, 25 A.3d at 578-80.

Connecticut courts have strictly followed this rule, precluding the use of malfunction theory where the allegedly-defective product "was available for inspection, and the plaintiff was not prevented from gathering evidence from [the product] in order to present direct evidence of a specific product defect." *Decato v. Brandfon Motors, Inc.*, No. NNHCV116021419S, 2013 WL 4873069, at *7 (Conn. Super. Ct. Aug. 20, 2013); *see also Amtrust N. Am. v. Kohler Co.*, No. CV166009420S, 2018 WL 4390120, at *3 (Conn. Super. Ct. Aug. 28, 2018), *on reconsideration*, No. CV166009420S, 2018 WL 7107309 (Conn. Super. Ct. Dec. 18, 2018) (refusing to consider a malfunction theory where the allegedly-defective product was not destroyed).

Here, the allegedly-defective Subject Can exists and was made available for joint inspection and direct measurements. Accordingly, the malfunction theory is not available.

### iii. Even if the Malfunction Theory Were Available, Plaintiffs Cannot Satisfy Their Burden

Even if the malfunction theory were available, Plaintiffs have not and cannot establish the elements of the claim. To establish a manufacturing defect under the malfunction theory, a plaintiff must establish, *inter alia*, that "the incident that caused the plaintiff's harm was of a kind that ordinarily does not occur in the absence of a product defect." *Metro. Prop.*, 25 A.3d at 583–84.

Here, there can be no dispute that there exists a myriad of potential causes for kitchen fires in general, or even the venting of a PAM container (if one were to assume the fire originated with

a vented can), other than a manufacturing defect in the PAM container. Indeed, the PAM containers are *designed* to vent in the event of exposure to enough heat to allow over-pressurization. To this point it is notable that Plaintiffs agree that the "other" vented PAM container found at the scene, *i.e.*, the container *not* arbitrarily designated by Plaintiffs' counsel to be the can that caused the fire, vented for reasons other than a manufacturing defect.

***

In sum, because Plaintiffs cannot prove which vented PAM container allegedly caused the fire, and because Plaintiffs' various hypotheses for a how a can may hypothetically vent under pressure were either disproved during destructive testing of the Subject Can, or otherwise failed to satisfy Plaintiffs' burden on causation, and because Plaintiffs cannot maintain a malfunction theory as a matter of law, Plaintiffs cannot establish their CPLA claim based on a manufacturing-defect theory.

## IV.    PLAINTIFFS CANNOT ESTABLISH A DESIGN-DEFECT CLAIM

### A. Plaintiffs Cannot Satisfy the Elements of a Design-Defect Claim Where They Admit that the Product, as Designed, Would Not Vent Under Reasonable and Intended Use, Or in the Specific Use Alleged Here

A plaintiff pursuing a CPLA claim based on an alleged design defect, must be able to prove, *inter alia*, that the existing design was "unreasonably dangerous" and the existing design "caused the injury for which compensation was sought." *Bifolck v. Philip Morris, Inc.*, 324 Conn. 402, 434, 152 A.3d 1183, 1202 (Conn. 2016).

Plaintiffs cannot establish that the existing design, when used as intended or in a reasonably foreseeable manner, is "unreasonably dangerous." *Id.* Quite the opposite, Plaintiffs' own experts performed numerous "simulations" and "calculations" involving the product, and have concluded — in agreement with Conagra's experts — that, even when placed in close proximity (immediately

adjacent) to a gas burner on high, the PAM product will not reach temperatures approaching what would be required for the can to reach a pressure of 180 psi. (SOF ¶ 33.) Accordingly, Plaintiffs admit that, had the subject PAM product been made according to its specifications, it would have "safely retained" its contents. (*Id.* (quoting Ex. 14, Hendrickson Am. Rep. Add. 26 ("[A]bsent a manufacturing defect . . . the subject PAM can . . . would have safely retained their explosive contents").)

Accordingly, Plaintiffs have identified no ordinary or foreseeable risk with which to evaluate. While Plaintiffs' experts may offer suggestions as to make the product theoretically "safer" if it *were* to reach pressures exceeding 180 psi — such as utilizing a non-vented can that can withstand even greater force, or utilizing an alternative propellant, which if vented, may be less flammable — these suggestions do not render the existing design (which again, will *not vent* under intended and reasonable uses) unreasonably dangerous.  As one court in Connecticut accurately stated, "[t]he mere fact that there is a better way to do something, however, does not mean that the product is defective in its design because it did not use such a method." *Acevedo v. Fitness Quest, Inc.*, No. CV075011713S, 2009 WL 5342499, at *4 (Conn. Super. Ct. Dec. 7, 2009).

Because the parties agree that the PAM container is designed to withstand a pressure of 180 psi before venting, and that there is no intended or reasonable use (or use in *this case*) that would lead to pressures approaching 180 psi, Plaintiffs' CPLA claims based on design defect must fail.

### B. Plaintiffs Cannot Recast their Failed Manufacturing-Defect Claims as Design Defect Claims

Plaintiffs' experts have muddied the waters by labeling some of their manufacturing-defect opinions as evidence of a design defect by asserting that the design *allows* for the manufacturing defect: in other words, expected "variations" in the design allow for under-pressure venting in

some products. (Plaintiffs' expert speculates that perhaps up to "one in a million" PAM products might have a defect that would allow under-pressure venting, although his speculation is based on pressure *still* higher than what is alleged in this case. (*See* SOF ¶ 39.)

A prediction that one in a million cans (or whatever smaller number that would be associated with the pressures alleged here) *may theoretically* suffer from a manufacturing defect does not make it a viable design defect theory. "Generally speaking, a manufacturing defect is a mistake in the assembly process, which results in a product that differs from the manufacturer's intended result. A design defect, in contrast, exists when the product is otherwise properly manufactured, but is nonetheless unreasonably dangerous because its attributes can cause unexpected injury." *Moss v. Wyeth Inc.*, 872 F. Supp. 2d 162, 166 (D. Conn. 2012) (citation omitted). So even if one out of a million or billion cans may vent at pressures in the range of what is alleged here, that just means that that one out of a million or billion cans may have a manufacturing defect. As is appropriate, Plaintiffs' manufacturing-defect theories (regardless of how they are labeled) are evaluated as such above. *See Bifolck*, 152 A.3d at 1202–03 ("The plaintiff's theory of recovery dictates the scope of a further instruction on the second element.").

## V.   SUMMARY JUDGMENT ON PLAINTIFFS' FAILURE-TO-WARN BASED CLAIMS IS ALSO WARRANTED

A plaintiff can assert a CPLA claim based on failure to warn where the plaintiff can prove "a manufacturer or seller failed to warn of the product's unreasonably dangerous propensities." *Sharp v. Wyatt, Inc.*, 31 Conn. App. 824, 833, 627 A.2d 1347, 1353 (1993) (citing cases), *aff'd*, 230 Conn. 12, 644 A.2d 871 (1994). But Plaintiffs cannot sustain failure-to-warn based claims here as a matter of law, where (1) the alleged "risk" of under-pressure venting is based on a manufacturing-defect theory involving Plaintiffs' individual PAM product, and it would be unreasonable for Conagra to "warn" against an unanticipated, and unforeseeable manufacturing

defect; and (2) Plaintiffs' other criticisms of the existing label are completely disconnected from causation.

### A.  There is No Duty to Warn of An Alleged Manufacturing Defect Unique to the Subject Can

There is no duty to warn of a hypothetical hazard about which the "seller does not know and has no reason to know." *LaMontagne v. E.I. Du Pont De Nemours & Co*., 41 F.3d 846, 859 (2d Cir. 1994) (applying the CPLA); *see also id.* (that "a seller's duty to warn is premised on the existence of its knowledge or its reason to know of the hazards is evident"). Plaintiffs' theory of the case — although ultimately unsupported by the evidence — is that the individual subject PAM product vented "under pressure" or below the pressure at which it was designed to vent. There is no evidence that Conagra was specifically aware of the existence of this alleged defect, and therefore, could have warned against it.[6]

The Supreme Court of Connecticut recognized the futility of a failure to warn of potential manufacturing-defect claims, explaining:

> A true duty-to-warn case, it seems to us, is one in which the product is constructed as planned but there is some danger in its use against which a warning is necessary. According to the *Handler* case, in order to get the benefit of the statute, defendant-manufacturer would have had to label his package with a warning that a cartridge was dangerous if defectively made. Doesn't everyone know this? Every product may be potentially dangerous if defectively made

*Prokolkin v. Gen. Motors Corp.*, 365 A.2d 1180, 1185 n.6 (Conn. 1976). Even Plaintiffs' warnings expert, William F. Kitzes, agrees that there is no duty to warn of an unknown potential manufacturing defect:

---

[6] Indeed, even now, after years of litigation and examination of the Subject Can, there remains no evidence of an actual defect in the Subject Can. *See* Section __, *supra.*

Q. As a general matter, you wouldn't -- as a general matter, for the purposes of just warnings on products, it wouldn't be appropriate to have a warning on a product that says something like might contain a manufacturing defect, right?

A. If you knew it might contain a manufacturing defect, you fix it.

Q. Right. Exactly. So I mean, it would confuse consumers, it wouldn't -- I mean, it's just not appropriate, right?

A. It doesn't make --

Q. Putting something like this may contain a manufacturing defect is not -- you're not suggesting that here nor would it be appropriate for any product, right?

A. I can't think of any. It wouldn't make any sense.

(SOF ¶ 46 (quoting Ex. 21, Kitzes Dep. at 257:18-258:9).)

Because there is no basis on which to conclude Conagra had a duty to warn these Plaintiffs' of the alleged manufacturing defect in their individual PAM product, Plaintiffs' failure-to-warn-based claims fail as a matter of law.

### B. Plaintiffs Other Criticisms of the Product Label Are Disconnected to Causation

To be sure, Plaintiffs' expert raises several abstract criticisms of the existing product label — all of which are related to "the potential of the can to overheat or overpressurize and release its contents" and "catch fire." (SOF ¶ 46 (quoting Ex. 21, Kitzes Dep. 127:2-6).) As set forth above, this general hazard — the potential to overheat — is not what Plaintiffs' allege happened in this case, and therefore, these opinions are irrelevant. But even in the abstract, Plaintiffs' criticisms would still not be enough to survive summary judgment.

"[I]n order for a lack of warning to have proximately caused the injury, the plaintiff must show that a warning would have altered his or her behavior in such a way as to prevent the harm that occurred." *Danise v. Safety-Kleen Corp.*, 17 F. Supp. 2d 87, 95 (D. Conn. 1998); *Sharp*, 627 A.2d at 1361 (recognizing that proposed changes to a label are meaningless where "the users were

fully aware of the dangers of [the product]"); *see also Karavitis v. Makita U.S.A., Inc.*, 243 F. Supp. 3d 235, 254 (D. Conn. 2017), *aff'd,* 722 F. App'x 53 (2d Cir. 2018).

Plaintiffs testified that they did not read, or did not remember, the warnings that were on the Subject Can. (*See* SOF ¶ 44 (quoting Ex. 6, Schmidt Dep. 122:25-123:2 (did not recall ever reading the label); Ex. 4, Meyer Dep. Tr. 118:13-19 (when asked if she had read the label, she replied "I think so," but she could not recall anything about what the label said).) And regardless of the label, the Plaintiffs testified that they were aware of the well-known hazards warned against on the Subject Can's label even without the label. (*See id.* ¶ 45 (quoting Ex. 6, Schmidt Dep. 124:13-18 ("I had taken physics and knew that any kind of container with compressed anything inside has a high pressure and shouldn't be too close to heat. Q. Okay.  So you wouldn't, you know, put a cooking spray can right next to a flame; right? A. Correct.")); Ex. 4, Meyer Dep. 120:7 ("I would not spray [cooking spray] onto an open flame" and "I would not keep it, as I said, within five inches" of a heat source.).) Plaintiffs also testified that the PAM cooking spray containers in this case were at least six inches from any heat source prior to the accident. (*Id.*)

Because Plaintiffs contend that they kept the PAM product away from a heat source such that it would not overheat, or vent (and Plaintiffs' experts agree that they kept it a safe distance from heat based on their simulations and heat transfer calculations), which is the very hazard warned against on the Subject Can's label, Plaintiffs' abstract criticisms on warnings are irrelevant, and not tied to causation.

## VI.   PLAINTIFFS CANNOT ESTABLISH CPLA CLAIM BASED ON THE (UNSUPPORTED) ALLEGATION THAT THE PRODUCT DID NOT COMPLY WITH U.S. DEPARTMENT OF TRANSPORTATION REGULATIONS

Plaintiffs' experts claim that the product failed to comply with certain U.S. Department of Transportation regulations relating to the transportation of aerosol containers because they

contained vents and/or because their contents were flammable. Plaintiffs have not put forth a single shred of evidence that the Subject Can failed to comply with DOT regulations.[7] And regardless, the DOT regulations are irrelevant and not tied to the CPLA claims. *See, e.g.*, *Byrne v. Liquid Asphalt Sys., Inc.*, 238 F.Supp.2d 491, 492 (E.D.N.Y. 2002) (OSHA standards not relevant to liability related to consumers).

This is confirmed by Plaintiffs' expert, Dr. Hendrickson, who explained: "It is important to note that the DOT Regulations 49 CFR 173.306 only considers factors relevant to the <u>safe transportation</u> of aerosol type products. They do not consider any issues pertaining to <u>consumer safety</u> related to normal or reasonable foreseeable use of the products." (SOF ¶ 49.) There is no question that the Subject Can was safely transported from its place of manufacture to its sale, the only circumstances governed by the DOT regulations. The DOT regulations are thus irrelevant to Plaintiffs' product liability claims and should be disregarded for purposes of summary judgment.[8]

## VII.  ASSOCIATED INDEMNITY'S SUBROGATION CLAIMS FAIL FOR THE ADDITIONAL REASON THAT ITS ALLEGED DAMAGES ARE UNSUPPORTED

Associated Indemnity has asserted a subrogated property-damage claim on behalf of the homeowners, Audrey and Daniel Meyer. Associated Indemnity seeks reimbursement for the approximately $560,000 it allegedly spent rebuilding the Meyer home, replacing the Meyers' personal property, and other expenses. (SOF ¶ 50.) Associated Indemnity's right to reimbursement is no broader than the Meyers' rights would be, if they themselves had sued for property damage. *Wasko v. Manella*, 87 Conn. App. 390, 399, 865 A.2d 1223, 1229–30 (Conn. App. 2005).

---

[7] The regulation referenced by Plaintiffs, essentially, is that one-and-a-half times the equilibrium pressure of the product at 130°F should not exceed 270 psig. Plaintiffs have put forth no evidence that the Subject Can did not comply with this regulation.

[8] Conagra will be moving to exclude testimony relating to the irrelevant DOT regulations, which only serves to confuse, and mislead the jury.

Therefore, to recover damages from Conagra, Associated Indemnity bears the burden of proving not only liability (which, as set forth above, it cannot do for the same reasons Plaintiffs cannot do so), but that its alleged damages were caused by the May 13, 2013 kitchen fire.

While the alleged damage to the home "may be determined by the cost of repairing the damage," repairs that enhance the value of the property, or repairs that have nothing to do with the fire, cannot possibly count. *Willow Springs Condo. Ass'n, Inc. v. Seventh BRT Dev. Corp.*, 245 Conn. 1, 59, 717 A.2d 77, 107 (Conn. 1998). Associated Indemnity has made no effort to identify *reasonable* repair costs. Instead, it has simply produced a stack of "estimates" and "receipts" and it seeks reimbursement for all of them. These not only include the actual repairs made by the contractor (which comprise just $360,000 of the alleged damages), but expenses paid to various other service providers for a variety of services. (SOF ¶ 50.) There are no witnesses — and specifically, no expert witnesses — to explain why each repair was made, or why various seemingly unrelated, or unnecessary repairs were made throughout the property.

As to the personal property items — which comprise approximately $147,000 of the damages sought (SOF ¶ 50) — damages must be measured by "the fair value of the property at the time that it was destroyed." *Wasko v. Manella*, 87 Conn. App. 390, 399, 865 A.2d 1223, 1229–30 (Conn. App. 2005). Associated Indemnity is seeking the *replacement* costs of personal property (approximately $60,000 worth), as well as approximately $80,000 in related "services." (SOF ¶ 50.) This is not permitted. *See id.* ("Notwithstanding that Middlesex paid to the insureds the replacement cost of the contents up to the policy limit, it can only succeed to the rights of the insureds, who are ***entitled to recover, at most, the fair market value of the contents at the time they were destroyed***." (emphasis added).) Associated Indemnity has identified no witness that can offer testimony as to the fair market value of verified property lost — or *what* was even lost. *See*

*id.* (rejecting evidence on the list of items replaced, and explanation that witness "obtained replacement cost figures by contacting retailers, describing the destroyed item and requesting the price of a comparable item" because witness did not "offer any testimony about the value of the items at the time of the fire."). Indeed, Associated Indemnity has identified no expert witnesses on the subject of its damages, even though the "fair market value" and reasonable repair costs *in 2013* cannot possibly be within the lay knowledge of the jury.

Without admissible evidence of recoverable property damage, Associated Indemnity has no viable claim as a matter of law, and summary judgment should be granted on its claims for this additional, independent reason.

## <u>CONCLUSION</u>

Because Plaintiffs have not met their burden to produce facts that could entitle them to judgement on any of their product liability theories, Conagra request that the Court grant summary judgment in favor of Conagra.

Respectfully submitted,

December 17, 2019

/s/ Mary S. Young
Mary S. Young (Pro Hac Vice)
Emily A. Ambrose (Pro Hac Vice)
Blackwell Burke P.A.
431 S. 7th Street, Suite 2500
Minneapolis, MN 55415
Te1: (612) 343-3200
Fax: (612) 343-3205
myoung@blackwellburke.com
eambrose@blackwellburke.com

Todd R. Michaelis (ct28821)
Carmody Torrance Sandak & Hennessey LLP
50 Leavenworth Street
Waterbury, CT  06721-1110
Tel: (203) 573-1200
Fax: (203) 575-2600
tmichaelis@carmodylaw.com

*Counsel for Defendant ConAgra Foods, Inc.*

## CERTIFICATION

     This is to certify that on December 17, 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

    /s/ Todd R. Michaelis (ct28821)

Todd R. Michaelis
