# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EMMA SCHMIDT and HALLIE MEYER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.: 3:14-CV-01816 (SRU) |
| v. | ) | |
| | ) | |
| CONAGRA FOODS, INC. | ) | |
| | ) | |
| Defendant. | ) | January 17, 2020 |
| | ) | |

## PLAINTIFFS' OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION .............................................................................................1

I.      SUMMARY JUDGMENT STANDARD ...............................................2

II.     THE FACTUAL RECORD BEFORE THE COURT .......................................4

        A.      CONAGRA AND PAM .................................................................4

        B.      THE FLASH FIRE ..................................................................7

        C.      ADDITIONAL EXPERT TESTING AND OPINION EVIDENCE ....................9

III.    SUMMARY JUDGMENT MUST BE DENIED ..........................................10

        A.      THE PAM CAN WAS THE ORIGIN OF THE FIRE ...........................12

        B.      THE EVIDENCE SUPPORTS A FINDING THAT THE PAM CAN
                VENTED DUE TO DEFECT ..................................................14

        C.      THERE IS SUBSTANTIAL EVIDENCE AS TO WHICH OF
                THE TWO VENTED CANS CAUSED THE FIRE ...............................17

        D.      THERE IS A GENUINE ISSUE OF MATERIAL FACT AS
                TO CAUSATION ...........................................................18

        E.      THE MEASUREMENTS OF THE TESTED CAN DO NOT
                DISPROVE MANUFACTURING DEFECT ........................................20

        F.      THE MALFUNCTION THEORY APPLIES ......................................22

        G.      THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO
                WHETHER THE PRODUCT WAS DEFECTIVE IN DESIGN ........................25

        H.      CONAGRA FAILED TO GIVE CRITICAL WARNINGS ...........................26

        I.      CONAGRA FAILED TO COMPLY WITH DOT REGULATIONS,
                AND ITS NONCOMPLIANCE IS RELEVANT ...................................29

IV. CONCLUSION...............................................................................32

i

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................2

*Bifolck v. Philip Morris, Inc.*, 324 Conn. 402 (2016) ................................................14, 15, 16, 32

*Booth v. Black & Decker, Inc.*, 166 F. Supp. 2d 215 (E.D. Pa. 2001) .........................................14

*Byrne v. Liquid Asphalt Sys. Inc.,* 238 F.Supp.2d 491 (E.D. N.Y. 2002),
*denying reconsideration*, 250 F.Supp.2d 84 (2003) .....................................................................32

*Cappellini v. McCabe Powers Body Co.*, 713 F.2d 1 (2d. Cir. 1983) ...........................................32

*Danise v. Safety-Kleen Corp*, 17 F. Supp. 2d 87 (D. Conn. 1998) ..............................................14

*Dister v. Continental Grp., Inc.*, 859 F.2d 1108 (2d Cir. 1988) ................................................2, 3

*Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) ......................................................................23, 24

*Fassbinder v. Pennsylvania R. Co.*, 322 F.2d 859 (3d Cir. 1963) ...............................................23

*Frederick v. Deco Salon Furniture, Inc.*, 2018 WL 2750319
(D. Conn. Mar. 27, 2018) .............................................................................................................16

*Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302 (2d Cir. 2013) ............3

*Gawel v. Am. Specialties, Inc.*, 2018 WL 1747046 (D. Conn. Apr. 11, 2018) ..........................3, 4

*Graham v. Fireline, Inc.*, 2006 WL 1646165 (D. Conn. June 14, 2006) .....................................14

*Hawkins v. Laboratories*, 2015 WL 12683962 (D. Ariz. Aug. 20, 2015) ...................................23

*Higgins v. Consol. Rail Corp.*, 638 F. Supp. 254 (D. Conn. 1986) .............................................23

*Izzarelli v. R.J. Reynolds Tobacco Co.*, 321 Conn. 172 (2016) ........................................ 15, 17, 22

*J.D.O. ex rel. Oldenburg v. Gymboree Corp.*, 2013 WL 6196970 (D. Minn. 2013) .............10, 11

*LaMontagne v. E.I. Du Pont de Nemours & Co, Inc.,* 41 F.3d 846 (2nd Cir. 1994) ...................27

*Lewis v. American Cyanamid*, 715 A.2d 967 (N.J. 1998) ...........................................................11

*Metro. Prop. & Cas. Ins. Co. v. Deere & Co.*, 302 Conn. 123 (2011) .........................................24

ii

*Nicholson v. United Techs. Corp.*, 697 F. Supp. 598 (D. Conn. 1988) ...........................................4

*Perfection Paint & Color Co. v. Konduris*, 258 N.E.2d 681 (Ind. App. 1970) ...........................11

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002) ......................................................3

*Philadelphia Indem. Ins. Co. v. Lennox Indus., Inc.,* 2019 WL 1258918
(D. Conn. Mar. 19, 2010) .........................................................................................................23, 24

*Pollack v. Bridgestone/Firestone, Inc.*, 939 F. Supp. 151 (D. Conn. 1996) .................................4

*Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199 (1997) ........................................15, 16, 17

*Reeves v. Coopchik*, 2009 WL 3571307 (D. Conn. Oct. 27, 2009) ................................................3

*Rivera v. Home Depot USA, Inc.*, 776 F. App'x 4 (2d Cir. 2019) ..................................................3

*Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42 (2d Cir. 2015) .......................................3

*Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.,*
391 F.3d 77 (2d Cir. 2004) ..............................................................................................................3

*Wegryn v. Smith & Nephew, Inc.*, 2011 WL 590759 (Conn. Super. Jan. 24, 2011) ...................26

*White v. Mazda Motor of Am., Inc.*, 313 Conn. 610 (2014) ....................................................22, 23

*Wilson v. Sherwin-Williams Co.*, 2010 WL 2569179 (W.D. Wash. 2010) ...................................15

## STATUTES

Conn. Gen. Stat. § 14-163g ...........................................................................................................31

Conn. Gen. Stat. § 52-572m ............................................................................................................4

## FEDERAL RULES

Fed R. Civ. P. 56(a) .........................................................................................................................2

## MISCELLANEOUS

*Unreasonable Flammability of Fabric,* 6 Am. Jur. Proof of Facts 3d 195 ...................................11

**<u>INTRODUCTION</u>**

A metal canister contains a substance that, if it is released from the canister, will immediately create an extremely flammable, expanding gaseous cloud. If any part of that cloud contacts open flame, the entire cloud will explode in a 1000-plus degree fireball. Those are the naked facts that will determine this case, and they are undisputed.

Cooking sprays are about ninety percent oil and ten percent propellant. Conagra has a choice of propellants, some extremely flammable and some not at all. It chooses to use A70, an extremely flammable propane/butane mixture, as the propellant for PAM Original. As a result, each can of PAM Original is a flash fire waiting to happen. All that keeps that fire from happening is the integrity of the metal canister. In 2011, to increase profits in its cooking spray division, Conagra adopted a can design that weakened the can's structural integrity. Some of the new cans release their contents merely because they are sitting on the shelf above a heated grill, or on a counter adjoining a stove that is on, enveloping the area in a gas cloud and then incinerating it when the cloud contacts open flame.

Conagra knew this was happening well before May 12, 2013, when Emma Schmidt bought two new-design cans of PAM Original containing the A70 propellant. It knew this was happening throughout this case, as it has manufactured excuse after excuse for its new design – and continued to sell millions more new-design cans of PAM Original. It is important, and appropriate, that Conagra be held to account for its conduct.

Conagra's Motion for Summary Judgment must be denied because the record evidence, including the plaintiffs' testimony and statements, and Conagra's own admissions concerning the nature of its product, establish the fire began with the PAM can. For these reasons alone, summary judgment must be denied. Moreover, the testimony of fire cause and origin expert

1

Gregory Cahanin and extensive additional evidence establish the fire in the Meyer kitchen began as a flash fire, caused when the newly purchased new-design can of PAM Original failed. The sturdier can Conagra used before it decided to increase profits would not have failed under these circumstances. Conagra blows smoke to try to obscure this evidence – it ignores testimony by the plaintiffs, and completely misstates Mr. Cahanin's testimony.

In addition, Dr. Lester Hendrickson will explain that the can vented because of the new can design adding "vents," which served no purpose except to weaken the can. The new design includes a thinner can bottom that fails to provide a sufficient margin of safety to protect against anticipated variations in the manufacturing process. Conagra's own experts accept Dr. Hendrickson's testing methodologies and actually concede many of his findings are accurate. Neither Conagra's disagreement with his conclusions and plan to cross-examine him, nor its misstatement of Mr. Cahanin's testimony is a basis for summary judgment.

And William Kitzes, a warnings expert, will explain both that Conagra has been on notice that it must alert consumers to the extreme hazard of storing PAM Original in a kitchen, and that its warnings are inadequate. Again, Mr. Kitzes' opinions are well founded in the record and in his particular expertise, and provide a further basis for the denial of summary judgment.

## I.     SUMMARY JUDGMENT STANDARD

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that he is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law" and is "genuine" if, based on that fact, "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Dister v. Continental Grp., Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988) (mere

existence of alleged factual dispute will not defeat summary judgment motion). The moving

party may satisfy that burden "by showing ... that there is an absence of evidence to support the

nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per

curium) (internal quotations omitted; citations omitted).

The party opposing the motion for summary judgment "must come forward with specific

evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v.

Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). In reviewing the

record, the District Court must "construe the evidence in the light most favorable to the non-

moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enters., L.L.C. v.

Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any

evidence in the record from which a reasonable factual inference could be drawn in favor of the

non-moving party regarding the issue on which summary judgment is sought, then summary

judgment is improper. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391

F.3d 77, 83 (2d Cir. 2004).

Summary judgment is not to be granted merely because a party disputes the meaning of

expert testimony.  *See, e.g., Reeves v. Coopchik*, 2009 WL 3571307, at *5 (D. Conn. Oct. 27,

2009) (Dorsey, J.) ("Deciding the weight to afford each expert's testimony and assessing

their credibility are necessary to choose between their differing conclusions, but not proper on a

motion for summary judgment."); *Rivera v. Home Depot USA, Inc.*, 776 F. App'x 4, 7 (2d Cir.

2019) ("[S]ummary judgment is often inappropriate where the evidence bearing on crucial issues

of fact is in the form of expert opinion testimony ... [as] the trier of fact is entitled to evaluate

the credibility of witnesses, including experts, and weigh their testimony[.]"); *Gawel v. Am.

Specialties, Inc.*, 2018 WL 1747046, at *1 n.4 (D. Conn. Apr. 11, 2018) (Arterton, J.) (referring

to parallel oral decision denying summary judgment and "leaving the experts' credibility and reliability for determination by a jury."); *Nicholson v. United Techs. Corp.*, 697 F. Supp. 598, 601 (D. Conn. 1988) (Dorsey, J.) ("Although portions of Mr. Norton's depositions may discredit his opinion, his credibility is to be decided by the trier of fact and not on a motion for summary judgment."); *see also Pollack v. Bridgestone/Firestone, Inc.*, 939 F. Supp. 151, 154 (D. Conn. 1996) (Eginton, J.) (citing *Nicholson*)).

## II.    THE FACTUAL RECORD BEFORE THE COURT

The plaintiffs proceed under the Connecticut Product Liability Act, Conn. Gen. Stat. §§ 52-572m *et seq.*, alleging strict liability defect, failure to warn, and negligence claims, and claiming punitive damages. A comprehensive description of the facts is set forth in Plaintiffs' Rule 56(a)(2) Statement ("SOF"). The statement below highlights the most important facts.

### A.    CONAGRA AND PAM

Conagra sells millions of cans of PAM Original, an aerosol cooking spray for frying and baking. SOF ¶ 51 (quoting Ex. D, Kuehn Dep. at 170-171 ("I would estimate 150 million")).  It expects consumers to use PAM in kitchens, in a "cooking environment" and to store PAM in the kitchen. SOF ¶ 51. PAM Original's primary ingredient is canola oil. SOF ¶ 52. A propane/butane blend, known as A70, pressurizes the oil.  *Id.*[1] PAM Original, consequently, is an "extremely flammable aerosol," *id.* at CA0028193.

The product "[w]ill be easily ignited by heat, sparks or flame…. Containers generate pressure when heated and could cause bursting and dangerous propelling." SOF ¶ 54. If the

---

[1] In other cooking products, Conagra uses a less flammable propellant.  For example, the propellant for PAM Organic Olive Oil is nonflammable carbon dioxide. SOF ¶ 53. The propellant for Reddi-Wip, another Conagra product, is nonflammable nitrous oxide. *Id.*

structural integrity of a PAM Original can fails, a rapidly expanding extremely flammable cloud streams out. SOF ¶ 55. The cloud is "heavier than air." *Id.* (quoting Ex. L, Cahanin Dep. at 77). It naturally flows downward, or it will flow toward an exhaust fan. *See id.* If any part of the cloud contacts an open flame, the entire cloud instantly ignites into a 1000 plus degree fireball. *Id*. This is no surprise to Conagra. It acknowledges that with a gas stove, "you have the ignition point with the flame." SOF ¶ 56 (quoting Ex. B, Conagra Packaging Designee/Baker Dep. at 104).[2]

The extremely flammable nature of the contents of PAM Original pose a severe burn hazard to consumers; all that protects consumers from that danger is the strength of the PAM Original can. Until 2011, Conagra gave due consideration to the importance of can strength. It sold PAM Original in a can designed to withstand 270 psig. SOF ¶ 58.[3] Then Conagra offered a new can design by can manufacturer DS Containers, Inc. ("DSC"). SOF ¶ 59. The new design was originally intended for whipped cream products, which use a non-flammable propellant (nitrous oxide). SOF ¶ 90. Conagra, however, chose to use the new-design can for cooking sprays as well, even though most of those products use A70 propellant, which has the highest NFPA fire hazard rating of 4 (severe). SOF ¶ 61, 90. Conagra made this change to increase profits. *See* SOF ¶ 62. For sunk costs of approximately $5 million, it expected to enjoy

---

[2] A vented Conagra cooking spray can releasing its contents and creating a fireball was documented on video in a restaurant kitchen in Texas. A copy of the video was hand-filed on Nov. 26, 2019.  DN 160. Dr. Ogle, the defense fire and origin expert, testified that this video appears to show a flash fire due to the venting of a cooking spray can. SOF ¶ 57. Plaintiffs' experts agree. *Id.*

[3] Aerosol can strength is measured in pounds per square inch gauge (psig). As the external temperature around a can increases, its internal temperature increases. The increase in internal temperature correlates to a rise in internal pressure (psig).

an annual net savings of $1.8 million. *Id.* If the loss on whipped cream products is taken out of the equation, the annual net savings to the cooking spray division would be $3.8 million. *Id.* The new can is designed to withstand only 180 psig. SOF ¶ 63.

Conagra received multiple complaints that the new can failed catastrophically. In October 2012, a consumer wrote that his wife was cooking when a new-design PAM can exploded, creating a "huge ball of flame," knocking her to the ground. "The Kitchen was on fire, she has to see a bone specialist today." SOF ¶ 64 (quoting Conagra's consumer complaint records, CA19752). Conagra concluded that the can "appears to have performed as designed." *Id.* In May 2012, another complaint documents that a vented cooking oil spray can that was sitting "on a shelf above the flat top grill … overheated and became unstable[,] rolled off the shelf spraying oil on the cooking equipment. After 2 second delay the oil combusted and exploded in a large fireball." *Id.* (quoting Conagra's consumer complaint records, CA-19754). Again, Conagra concluded the can was to specifications: "there are no visible signs of defects to the bottom of the can." *Id.* In January 2013, another complaint documents that a can of cooking spray being stored "on shelf above a grill … exploded when it was not in use," burning the cook on her face, arms and side. *Id.* (quoting Conagra's consumer complaint records, CA-19750). Conagra concluded the can had "performed as designed." *Id.*[4] Conagra *knew* the vented design cans would explode into kitchen fireballs under normal use, it *knew* that the vented can "perform[ing]

---

[4] When Conagra had problems using the new-design cans with Reddi-Wip – merely the problem that the cans sometimes vented when dropped and it was "messy" – it switched back to non-vented cans. SOF ¶ 67.

as designed caused such fireballs," and it kept selling the new-design cans for its cooking spray products.[5]

## B.    THE FLASH FIRE

At approximately 10:22 p.m. on May 13, 2013, Hallie Meyer was standing in front of the stove in her parents' home, frying potato croquettes. SOF ¶¶ 8, 11. A can of PAM Original cooking spray, bought the day before by Emma Schmidt, was sitting on the counter to her right, next to the burners she was using to cook the croquettes. SOF ¶ 12. The stove was functioning normally. *Id.* As Hallie cooked croquettes there was nothing out of the ordinary from all the times she had cooked other things. *Id.* The oil for the croquettes was not flaming. *Id.* Then "there was, like, a combustion … of the can. And then … I saw a flame above the stove – like on the hood of the stove." SOF ¶ 13 (quoting Def. Ex. 4, Meyer Dep. at 77). Emma screamed and was thrown to the ground. SOF ¶¶ 13-14. Hallie turned back to the stove and saw the croquettes were "perfectly fine" but the cabinet was "in flames." SOF ¶ 13. The backs of Emma's legs were severely burned instantly. SOF ¶¶ 14, 18.[6] She tried to push herself "up off the ground, and felt a warm liquid on my legs, and tried to brush it off, and came up with hands full of skin…I just pulled my hands up…and they were covered in skin from my legs." SOF ¶¶ 14, 18, 75.

The Town of Washington Fire Marshal responded to the scene and put out the fire. SOF ¶¶ 19, 77-79. The Fire Marshal also investigated the cause of the fire and issued a report. *Id.* He

---

[5] Conagra buried this information. Its corporate designee on the design of the PAM Original can testified that he had no knowledge of these complaints. SOF ¶ 65. And despite these complaints, Conagra claims it does not know whether the product can be heated when it is near a heat source, and it cannot define "near." SOF ¶ 66. And it has done no testing to determine how close the product can be to the stove without venting. *Id.*

[6] Emma was facing away from the stove when the explosion occurred.

determined that "[a]n aerosol can of cooking spray was in close proximity to the operating front right burner being used for frying. The aerosol can over pressurized and vented." SOF ¶ 19 (quoting Ex. K, Fire Marshal Report at 3). The finding "was based upon burn patterns, lines of demarcation, witness statements, fuel loads, and area of damage." *Id.*; *see also* SOF ¶¶ 19, 77-79.  The fire then "extended to other combustible objects within the immediate surroundings of the range, including two plastic containers of olive oil," "wooden kitchen cabinets," and "contents of the cabinets." SOF ¶ 77 (quoting Fire Marshal Report at 3). "An over pressurized aerosol can of cooking spray was found on the floor in between the kitchen sink and island area." SOF ¶ 78 (quoting Fire Marshal Report at 5). The photograph of this can (Photo #75) is attached to the Report. SOF ¶ 78. The can is a vented can; its bottom is everted and has burn marks. SOF ¶ 78; *see also* Ex. K (Photo 75).  It is otherwise relatively undamaged by fire. *Id.*

Plaintiff's fire cause and origin expert, Gregory Cahanin, testified similarly, that "the cause of the fire was a failure in the can." SOF ¶¶ 20-21, 80 (quoting Ex. L, Cahanin Dep. at 26-27). "[T]he explosion initiated on the right side, counter." SOF ¶ 80 (quoting Ex. L, Cahanin Dep. at 77). The fire was started by the vented PAM can sitting to the right of the stove. SOF ¶¶ 20-21, 80-83.

The venting of a PAM can, which causes a drifting, expanding gaseous cloud, leaves a burn pattern like the one in the Meyer kitchen. SOF ¶¶ 2, 61, 81, 82. The venting burn pattern also shows up in plaintiffs' injuries: the burns on the backs of Emma Schmidt's legs were directly in the path of the expanding cloud. SOF ¶ 81. When the upper part of the cloud touched the flame on the stove, everything within the gaseous cloud would have instantly flamed, reaching temperatures of over 1000 degrees Fahrenheit. *Id.* Dr. Thomas Eager, one of the plaintiffs' expert metallurgical engineers, explained: "The description of Ms. Meyer of the skin

of her leg coming off in her hand is a consequence of flesh burning by radiation which travels at the speed of light and is essentially instantaneous." *Id.* (quoting Ex. Q, Eager Report at 24).

### C.    ADDITIONAL EXPERT TESTING AND OPINION EVIDENCE

Dr. Lester Hendrickson, a metallurgical engineer specializing in design failure analysis, did various tests to ascertain the conditions under which the vented can to the right of the stove failed, and to assess why it would fail. SOF ¶¶ 24, 85. He determined that it is not possible to heat a vented can of PAM Original such that its internal pressure exceeds 180 psig when the can is more than two inches from the burner and on a separate surface (like a countertop). SOF ¶ 86.[7] Conagra agrees that this is true. DN 168, Def. Mem. at 5, 13. The new-design standard requires venting at no less 180 psig, SOF ¶ 86, but the simulation testing shows this can could not have reached 180 psig before it vented.

Dr. Hendrickson testified that the new, vented design is defective in multiple respects. SOF ¶¶ 87-90. The vents "are defects in the can." SOF ¶ 87 (quoting Ex. F, Hendrickson Dep. at 42-43). Conagra's failure to incorporate a "factor of safety" into the vented design means that new design fails to account for well-known variances in metal thickness and yield strength that commonly occur during the manufacturing process. SOF ¶ 88. The result is that some cans will fail well below even the low standards set by Conagra for the vented cans. *Id.* The can that caused the Meyer fire likely was compromised in thickness or strength, resulting in below-180 psig venting. SOF ¶ 88.  The old-design can, which was designed to withstand at least 270 psig, would not have vented under these circumstances. SOF ¶ 89. An additional defect is the use of the A-70 propellant, which causes flash-fire fireballs when it vents. SOF ¶ 90. A reasonable

---

[7] The can that vented in this case was at least six inches from the burners, on the countertop. SOF ¶ 86.

alternate propellant would be *non-flammable* nitrous oxide, which, if vented would result in a "harmless liquid and vapor com[ing] out…." *Id.* (quoting Ex. F, Hendrickson Dep. at 210).

In addition, William Kitzes will testify that Conagra failed to act as a reasonably prudent manufacturer to protect consumers by its failure to warn consumers of the inherent risks Conagra created by placing extremely flammable propellants and cooking oil into a vented canister designed and manufactured to release those ingredients at low temperatures, and failed to comply with relevant regulations. SOF ¶¶ 94, 96-97. Kitzes compared the front label Conagra uses on its Canadian PAM cans and concludes that it would be an adequate warning to consumers of the fire risk, while Conagra's US label – the one at issue here – is inadequate. SOF ¶ 98. In short, the warnings on the can are deficient in various ways, including that they do not include a "DANGER" warning or warn that the can contents are "extremely flammable." SOF ¶¶ 92, 94. Emma would not have bought the product if it had had this warning, SOF ¶ 45, and Hallie understands only now that a PAM can should not be kept in a kitchen, even though she thinks she read the product label. SOF ¶¶ 44-45.  In addition, had Conagra complied with product safety regulations requiring them to report multiple consumer complaints of fires/burns prior to the subject incident, the plaintiffs' injuries most likely would never have occurred because the Consumer Product Safety Commission ("CPSC") investigation would have required that some corrective action be taken with regard to this defective product. SOF ¶ 94.

Additional evidence will be discussed as needed.

## III.    SUMMARY JUDGMENT MUST BE DENIED

Unnecessary or excessive flammability is a familiar design defect. A manufacturer or seller of highly flammable clothing may be held strictly liable in tort for injury to the plaintiff caused by a design defect. *See, e.g*., *J.D.O. ex rel. Oldenburg v. Gymboree Corp.*, 2013 WL

6196970 (D. Minn. 2013); *Unreasonable Flammability of Fabric*, 6 Am. Jur. Proof of Facts 3d 195. A highly flammable insecticide fogger that causes an explosion may be a design defect. *Lewis v. Am. Cyanamid Co.*, 715 A.2d 967, 970-71 (N.J. 1998). And an extremely flammable lacquer remover was admittedly defective. *Perfection Paint & Color Co. v. Konduris*, 258 N.E.2d 681, 689-90 (Ind. App. 1970).

It is another basic principle of product liability that the package should contribute to product safety, not increase the hazard the product poses to consumers. "The nature of the product may place unique packaging demands in terms of package materials and design," *The package as a cause of accidents*, *Prod. Liab.: Design and Mfg. Defect*s § 16:5 (2d ed.), as the use of the extremely flammable A70 propellant and the intended use of the product near open flame does here. Whatever its contents, the package should anticipate the dangers they pose. "The package should not cause accidents." *Id.*

PAM Original is unreasonably dangerous in the first instance because it uses an extremely flammable propellant, even though the spray is intended for use in kitchens – which will *necessarily* expose the product to heat and often mean it is near an ignition source. Putting PAM Original in the new, weaker can design takes the problem of its extreme flammability to a whole new level. Conagra should have known all this because it designs the product. And in fact, it did know this because it had been advised of at least three instances where its new-design cooking spray cans failed during ordinary use, each one causing a flash fire. The can to the right of the stove in the Meyer kitchen failed in the same way: it vented simply because it was being used adjacent to a stove in use, causing the trademark A70 flash fire.

Conagra makes multiple scattershot arguments, which are addressed one by one below. Each of the arguments misstates or understates the evidence, and most do both. While these

arguments show how Conagra plans to cross-examine plaintiffs' experts, that is all they do. None is a basis for summary judgment, and Conagra's Motion for Summary Judgment must be denied.

### A.      THE PAM CAN WAS THE ORIGIN OF THE FIRE

Conagra argues that summary judgment must be granted because in its view the evidence fails to establish that the PAM can was the origin of the fire.  DN 168-2, Def. Mem. at 19-20. In support of this argument, Conagra asserts primarily that Mr. Cahanin made "no effort" to offer an opinion that the fire originated with the can, rather than originating as a grease fire. *Id.* at 20. This is not a basis for preclusion of Mr. Cahanin's opinion that it was the PAM can that started the fire even if it were true. *See* DN 174, Pl. Objec. to Mot. to Preclude Mr. Cahanin's Testimony, filed this day. It also completely misstates Mr. Cahanin's testimony: he considered and ruled out a grease fire, and he testified clearly that he had done so. It also ignores the Fire Marshal's conclusion and the plaintiffs' testimony, which separately or together with Mr. Cahanin's testimony, support the finding that the cause and origin of the fire was the PAM can.

Based on his training and experience and his review of witness statements and other investigative materials, Mr. Cahanin found that the fire was started by the vented can of PAM cooking spray that was sitting on the countertop to the right of the stove. SOF ¶¶ 20-21, 80-81. He tested the hypothesis that the PAM can started the fire by considering other possible causes, concluding that "[t]he only viable material present in the kitchen readily available for rapid ignition (fire/explosion) is the highly flammable contents of the PAM can." SOF ¶ 83 (quoting Ex. L, Cahanin Dep. at 27; Def. Ex. 11, Cahanin Report at 12); *see also* SOF ¶¶ 48, 80-82. He considered "a gas stove malfunction" as a potential cause of the fire but found no evidence to support that theory. SOF ¶ 83. He also considered and ruled out a cooking oil fire – that is, a grease fire – originating from the croquette pan. *Id.* When liquid oil ignites, the flame usually

extends twelve to fourteen inches from the surface of the oil.  Unlike an aerosol cloud fire, an oil

fire is "confined" to where the oil is. Asked if the cooking oil in the frying pan could have

ignited first, Mr. Cahanin clearly replied "[n]o," giving a number of reasons as previously

outlined in his report for this conclusion. SOF ¶ 48.[8]

In short, it is unclear why Conagra made this argument. Mr. Cahanin testified that he

considered and ruled out a grease fire, and Conagra's contention otherwise simply misstates the

evidence. The final nail in the coffin on this argument, is that even Conagra's fire cause and origin

expert, Dr. Russell Ogle, also rejected grease fire as a cause. Dr. Ogle determined that this ignition

scenario was "an unreasonable theory."  SOF ¶ 47 (quoting Ex. T, Ogle Dep. at 106).

In this section, Conagra also argues that expert testimony on the fire cause and origin is

necessary, because – it claims – the plaintiffs' testimony standing alone fails to establish that the

PAM can started the fire.  DN 168-2, Def. Mem. at 19. In fact, the plaintiffs' testimony

*independently* supports a finding that the PAM can started the fire.  Hallie Meyer stated that

"[t]here was, like, a combustion … of the can. And then … I saw a flame above the stove – like

on the hood of the stove." SOF ¶ 12 (quoting Def. Ex. 4, Meyer Dep. at 77). At the time that she

heard the sound of the explosion, at least one PAM can was "on the counter next to the

burners." *Id.* (quoting Def. Ex. 4, Meyer Dep. at 78). The stove was functioning normally. *Id.*

As Hallie cooked croquettes there was nothing out of the ordinary from all the times she had

cooked other things.  The oil for the croquettes was not flaming. *Id.* Then she heard Emma

"make a kind of… screaming noise and I turned around and she was on the ground and she saw

---

[8] Mr. Cahanin does agree that the oil in the pan eventually caught fire, noting that the heat from the
vented PAM can likely exceeded 1,000 degrees Fahrenheit (well beyond the ignition temperature
for oil), but he excluded the oil as the initial source of the fire, concluding that there was no
evidence showing how the oil could have ignited, at least before the PAM can exploded. SOF ¶ 83.

a burning can of PAM next to her…[f]laming." *Id.* (quoting Ex. H, Meyer Ins. Statement at 28).

Hallie turned back to the stove and saw the croquettes were "perfectly fine" but the cabinet was

"in flames." *Id.* (quoting Ex. H, Meyer Ins. Statement at 29)*. Emma Schmidt testified that her

skin was immediately burned off the backs of her legs, SOF ¶ 14, an injury that could only be

consistent with a fireball from a venting can.[9]

Conagra also cites to a newspaper article concerning the Fire Marshal's investigation

and ignores his report. *See* SOF ¶ 19. The reason why is obvious: the Fire Marshal, like

Cahanin and the plaintiffs, understood the fire began when the PAM can failed. S*ee* SOF ¶ 23.

In sum, the evidence supports a jury finding that the PAM can to the right of the stove

started the fire, and summary judgment cannot be granted on the basis of Conagra's first

argument.

## B. THE EVIDENCE SUPPORTS A FINDING THAT THE PAM CAN VENTED DUE TO DEFECT

The test for defect in Connecticut is simply whether the product was in a condition

"unreasonably dangerous to the consumer or user." *Bifolck v. Philip Morris, Inc.*, 324 Conn. 402,

---

[9] Even the cases cited by Conagra acknowledge that "[q]uestions regarding the existence of a causal link classically are reserved for determination by the trier of fact." *See Graham v. Fireline, Inc.*, 2006 WL 1646165 at *7 (D. Conn. June 14, 2006). The cases cited by Conagra are also distinguishable because they involve situations where the plaintiff failed to present *any* evidence that a defective product was the cause of the fire. *See Graham*, 2006 WL 1646165 at *8 (summary judgment proper where there were no eyewitnesses to the explosion and plaintiff's expert merely hypothesized that the defective product was one of seven possible causes of the explosion; the expert admitted that he was never asked to determine whether or not the defective product was a proximate cause of the plaintiffs' injuries, and he could not say that the defective product was a more likely cause than his six other possible causes); *Booth v. Black & Decker, Inc.*, 166 F. Supp. 2d 215, 222-223 (E.D. Pa. 2001) (because there was no evidence that the toaster oven was defective, plaintiff could not show that a defect was the cause of the fire rather than other potential sources of a fire); *Danise v. Safety-Kleen Corp*, 17 F. Supp. 2d 87 (D. Conn. 1998) (factual finding in favor of defendant at bench trial proper where plaintiff failed to show that fire could actually occur in the manner he theorized, and there were other potential causes of the fire).

433-34 (2016).[10] The evidence is that the PAM Original to the right of the stove vented its

contents, causing a 1000-plus degree fireball. SOF ¶¶ 2, 12-21, 55, 61, 70-82. That can contained

A70, an extremely flammable propellant, when other non-flammable propellants were available.

SOF ¶¶ 52-53. Conagra packaged that extremely flammable propellant in a can that it knew

sometimes fails when stored adjacent to normal kitchen activities, SOF ¶ 64, and when it fails

near an open flame, the results are catastrophic, *id.*; *see also* SOF ¶¶ 2, 57, 61. The jury may find

that the PAM Original was "dangerous to an extent beyond that which would be contemplated by

the ordinary consumer who purchases it, with the ordinary knowledge common to the

community as to its characteristics," *Bifolck*, 324 Conn. at 436 (quoting *Restatement (Second) of*

*Torts* § 402A (1965)), and hence defective; *see also Wilson v. Sherwin-Williams Co.*, 2010 WL

2569179 (W.D. Wash. 2010), *passim* (denying summary judgment on exploding paint can case

as to plaintiffs' consumer expectations, risk-utility and manufacturing defect claims).[11]

     The jury may also find defect based on the modified consumer expectation or risk-utility

test. Under this test, "a product is in a defective condition unreasonably dangerous to the

consumer or user" if "[a] reasonable alternative design was available that would have avoided or

reduced the risk of harm and the absence of that alternative design renders the product

---

[10] The vented can on the counter was newly-bought, and Conagra does not dispute that its
condition during use in the Meyer kitchen existed at the time of the sale.

[11] Although "[u]nder *Potter,* the modified consumer expectation test is [the] primary test," in
Connecticut the ordinary consumer expectation test, which is reserved for cases "in which the
product failed to meet the ordinary consumer's *minimum* safety expectations, such as res ipsa
type cases," *Izzarelli v. R.J. Reynolds Tobacco Co.*, 321 Conn. 172, 194 (2016), is plainly
appropriate here. *See also id.* at 201 (pointing out that "ordinary consumer expectation test" is
reserved "for those products that fail to meet legitimate, commonly accepted minimum safety
expectations, provides a safety incentive that is consonant with our state's public policies.").

unreasonably dangerous." *Bifolck*, 324 Conn. at 434-35. Under the modified consumer

expectation test, factors

> "a jury *may* consider include, but are not limited to, the usefulness of the product,
> the likelihood and severity of the danger posed by the design, the feasibility of an
> alternative design, the financial cost of an improved design, the ability to reduce
> the product's danger without impairing its usefulness or making it too expensive,
> and the feasibility of spreading the loss by increasing the product's price."

*Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199, 221-22 (1997). The jury may consider on

this issue that Conagra already uses nonflammable propellants (carbon dioxide in PAM Organic

olive oil and nitrous oxide in Reddi-Wip) in other pressurized food products that it successfully

markets. SOF ¶ 53. The jury may also consider that the sturdier can design that was used for

PAM Original before the vented can design was adopted, and that continues to be used for some

PAM cans, is Plainly feasible, and would have avoided the fire entirely. SOF ¶ 89. It may

consider that the danger posed by the A70 propellant is a spreading gaseous cloud that will

become a flash fire fireball in consumers' homes, SOF ¶ 2, 57, 61, 64, and that the danger posed

by the new, weaker can design is the same. *Cf.* SOF ¶ 89 (older design can would not vent under

these circumstances).[12] In short, Conagra is wrong when it asserts that plaintiffs "primarily rely

on a manufacturing-defect based theory." DN 168-2, Def. Mem. at 21. Plaintiffs' claims are not

nearly so narrow.

Conagra's attempt to shoehorn plaintiffs' claims into a claim of exclusively

manufacturing defect cannot be reconciled, moreover, with its own documents. When it was

---

[12] The evidence is this case easily exceeds other modified consumer expectations cases in which
summary judgment has been denied. *See, e.g. Frederick v. Deco Salon Furniture, Inc.*, 2018 WL
2750319, at *7 (D. Conn. Mar. 27, 2018) (in case involving salon chair that posed tripping
hazard, modified consumer expectations evidence sufficient where plaintiff offered expert
testimony that "reasonable alternative design was available that would have avoided or reduced
the risk of harm and the absence of that alternative design renders the product unreasonably
dangerous") (quoting *Bifolck*, 324 Conn at 416).

advised by two separate customer complaints that vented cooking spray cans stored on shelves above the customers' grills had exploded, Conagra did not suspect a manufacturing defect and begin a process review. *See* SOF ¶ 64. Rather, it reached the frightening conclusion that the cans had "*performed as designed.*" *Id.* (quoting Ex. W, CA-19750) (emphasis supplied)). Reckless to the risk to consumers, Conagra chose profit over safety and continued to use the new-design can.

Lastly, Conagra's premise – that proof of what can be called a manufacturing defect must be mutually exclusive of proof of design defect – ignores Connecticut law. Connecticut product law is intentionally expansive, rather than reductive. *See generally Izzarelli*, 321 Conn. at 199 (2016) ("*Potter* expanded our product liability tests to remove impediments to recovery."). One claim of defect is not exclusive of another:

> Manufacturing defects, failure to warn, and design errors are not mutually exclusive. Failure to warn may be viewed as a type of design defect....[W]hether a defect results from manufacture or design is not always obvious. One characteristic of a design defect is conscious planning. A defect in manufacturing usually occurs because of insufficient quality control. A manufacturer may, by design, adopt a method of quality control testing and inspection which he or she knows will not be as effective as some more costly or cumbersome method would be, recognizing that as a result of the choice there will be a greater number of production defects.

Lewis Bass & Thomas Redick, *Types of defects – When is a design or warning defective?*, Prod. Liab.: Design and Mfg. Defects § 4:11 (2d ed. Westlaw) (emphasis supplied).[13]

## C.   THERE IS SUBSTANTIAL EVIDENCE AS TO WHICH OF THE TWO VENTED CANS CAUSED THE FIRE

Conagra's arguments that plaintiffs must pinpoint a specific manufacturing defect overstate plaintiffs' burden to show defect and ignore plaintiffs' right to proceed in design defect. It is *not* critical to know which can of PAM Original vented first. *Cf.* DN 168-2, Def.

---

[13] Dr. Hendrickson described this relationship between manufacturing and design defect in his discussion of Conagra's failure to provide for a factor of safety in its design. SOF ¶¶ 36, 88. *See generally* Ex. CC, *Factor of Safety*, 1 Engineering Evidence § 4:50 (4th ed. Westlaw).

Mem. at 22 (arguing plaintiffs' claims fail because "Plaintiffs' experts do not know *which* of the two cans started the fire"). The evidence is that a can of PAM Original sitting on the counter to the right of the stove vented and caused the fire. *See* SOF ¶ 23. The Fire Marshal's Report states that the fire originated with the PAM can on the counter to the right of the stove. SOF ¶ 23 (citing Fire Marshal Report, which states "[t]he aerosol can of cooking spray over pressurized and vented."). The same can was identified and photographed by the Fire Marshal as the "over pressurized aerosol can" that was "found on the floor in between the kitchen sink and island area." *Id.* (citing   Fire Marshal Report at 5; *id.* Photo List at 3 (describing photo #75 as "a can of cooking spray, found on the kitchen floor"); Ex. K, Fire Marshal Photo #75). The can shown in Photo #75 is relatively undamaged by fire. It is clearly distinguishable from the other two cans shown in the photograph attached as Defendant's Exhibit 13. A jury may find that the can that vented was likely the relatively clean can pictured in Photograph 75, aka the Subject Can. The Fire Marshal's report reached this conclusion, and Lester Hendrickson agreed. *See* SOF ¶¶ 23, 24, 78; *see also* SOF ¶ 27 (explaining why vented can that is less burned is also likely the can that started the fire).

Conagra makes much of Gregory Cahanin's testimony which acknowledges that it is not certain which of the two vented PAM Original cans vented first. To be sure, Conagra may use that testimony in cross-examination of Mr. Cahanin. But it is not a basis for summary judgment. One of the cans vented simply because it was sitting on a counter by an active stove. Conagra cannot avoid liability simply because there was another can nearby that also vented.

## D.   THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO CAUSATION

Pursuing its mischaracterization of plaintiffs' claim to its outer limit, Conagra argues that plaintiffs' experts "have done nothing to establish that the alleged manufacturing defect in the

Subject Can actually *caused* the alleged injuries." DN168-2, Def. Mem. at 22. As we have said before, a jury may find that the product was unreasonably dangerous under the consumer expectation test, or under the modified consumer expectation test based on the fact that it contained A70 propellant and/or a can too weak to contain that propellant. The result of these shortcomings is the flash fire fireball that burned the plaintiffs. *See, e.g.*, SOF ¶ 2.

In addition, proof of causation is further supported by Mr. Cahanin's fire cause and origin evidence, which identifies a venting can of propellant as what started the fire. SOF ¶80. The finding of the Fire Marshal supports this as well. SOF ¶¶ 77, 78, 79. And so does Conagra's own conduct. If more evidence were necessary – and it is not – Dr. Hendrickson (and plaintiffs' other experts, Dr. Mitra Taheri and Dr. Eager) then explain how the specific shortcomings in Conagra's design choice to use A70 propellant, and then its additional design choice to use the new vented cans led to flaws in a certain proportion of cans, including, more likely than not, the Subject Can. SOF ¶¶ 27, 36, 38, 39, 42, 82, 88, 90.[14] Finally, Dr. Hendrickson's finite element analysis supports his view that the new design fails to incorporate a factor of safety – i.e. sufficient safeguards to avoid can failure due to expected manufacturing variations. SOF ¶ 36, 88. It is his opinion that more likely than not this design led to below-180 psig venting events, such as the one in this case. SOF ¶ ¶36, 88.

Conagra repeatedly misquotes plaintiffs' experts' testimony and misstates their opinions as the basis for its argument that the plaintiffs provide no proof of causation.  For example, Conagra cuts short Dr. Taheri's complete response to questioning, arguing that Dr. Taheri

---

[14] Conagra correctly cites *Zuchowicz v United States* for the proposition that, under Connecticut law, the expert opinion that seeks to establish the causal connection between the injury and the alleged negligence must rest upon more than surmise of conjecture. 140 F.3d  381, 389 (2nd Cir. 1998). The *Zuchowicz* court goes onto state, however, that "it is well-established that causation 'may be provided by circumstantial evidence." *Id.*

testified that her opinions offered a mere "possibility" when she clearly testified (on the very next page in her deposition) that her opinion, the Subject Can vented at a pressure below 180 psig was rendered to a "reasonable degree of engineering certainty."  SOF ¶ 38.  Conagra also mischaracterized Dr. Taheri's testimony about her methodology, wrongly asserting that Dr. Taheri failed to look at the evidence in the case when she clearly testified that she did.  Dr. Taheri explained, again as part of the same answer only partially quoted by Conagra, that her opinions were informed by her mathematical calculations showing the how minor variations present in the metal affected buckle pressure as well as the other evidence in the case. SOF ¶ 38. Conagra also misleadingly quotes Dr. Eagar, asserting that he agreed that the metal in the can was "within specifications," failing to note that he was talking about the raw steel that was within specification, before it was stretched into a dome by the manufacturer and stamped with four U-shaped score marks. SOF ¶ 42. Conagra presents a constant pattern of taking excerpts from Dr. Hendrickson's and Dr. Taheri's testimony out of context or outright misquoting them. *See* SOF ¶ 37-38.  Conagra's misrepresentations, of course, are not evidence and do not provide a basis for summary judgment.

### E. THE MEASUREMENTS OF THE TESTED CAN DO NOT DISPROVE MANUFACTURING DEFECT

Measurements of the tested can will not conclusively establish the condition of the can before it vented; *a fortiori*, post-explosion measures cannot entitle Conagra to summary judgment. *Cf.* DN 168-2. As Dr. Hendrickson explained, when metal is exposed to heat and pressure sufficient to cause a release event, it changes shape in unpredictable ways. SOF ¶ 43. He said "When we look at this can, if you wanted to measure the thickness, you would have to know, first of all, how much it stretched in that particular spot before you could even begin to estimate how thick it was before.  It's impossible to do that." *Id.* (citing Hendrickson Dep. at 146-47). Taking

measurements of thickness and yield strength on a can when you don't know "how much it stretched in that particular spot" is unlikely to lead to reliable results regarding the exact point of failure. *Id*. Thus, a limited number of measurements taken in random microscopic spots on the can bottom (like the destructive testing performed by Conagra in this case) show no more than general patterns of after-deformation can thickness and strength in one tiny spot (strength was only tested by measuring the force it took to pull apart a sliver of the metal on the bottom of the can one time). SOF ¶ 40.

Still, Conagra misrepresents the very measurements it touts as determinative, which in fact provide evidence of the exact defect that Dr. Hendrickson opined was most likely. In truth, *sixteen* (16) out of the 50 measurements of thickness on the bottom of the Subject Can were below tolerance representing 32%, or nearly 1/3, of the total measurements recorded by Conagra's own expert, Dr. Sarah Easley, with multiple measurements thin enough to cause a release of contents at unacceptably low internal pressures. SOF ¶ 40. Moreover, the pattern of measurements showed an approximate half-inch ring of lower than tolerance thickness measurements that was even recognized by Dr. Easley. SOF ¶ 40.

Averaging measurements, which is how Conagra calculates whether the Subject Can was within tolerance, does not actually establish the Subject Can would not buckle at below 180 psig.[15] It is resistance to pressure at *each point* on the can bottom that determines its strength, not

---

[15] Dr. Easley also admitted she did not perform measurements on "obviously deformed" parts of the can bottom, which were observably thinner than the other parts of the can, and that measurements on the edges of the can would have shown even thinner readings and that, had those measurements been included, her "average thickness" would also have substantially decreased. SOF ¶ 40. She agreed that at least 32% of the measurements that were included in her analysis on the bottom of the can, which made up less than 2% of the entire can bottom surface, showed measurements of thickness below the tolerances specified by Conagra, and the lowest measurements (that she did not throw out) form a pattern reflecting a half-inch radius of thinner metal - thickness below tolerances - around the entire flat central disc. *Id.*

a hypothetical average of all the points.  Like a chain that is under pressure, one weak link will

cause the chain to break. SOF ¶ 40. "Every - every piece of metal, regardless of how well you try

to identify it as being identical, varies in strength from point to point. And buckling will start at

one point where a dimple forms. And once that dimple forms, the metal around the edges of that

dimple is mechanically deformed now, and the stresses there go way up.  And that dimple just

spreads until the whole bottom - bottom pops out." SOF ¶ 40 (quoting Ex. F, Hendrickson Dep.

at 192). Conagra's packaging designee confirmed this basic principle, testifying: "[In a can

bursting event], [i]t's going to find the weakest part of the can when it hits that pressure." SOF ¶

40 (Ex. B, Baker  Dep. at 80).

### F.      THE MALFUNCTION THEORY APPLIES

Plaintiffs do not need to rely on the malfunction theory: there is ample evidence to prove

defect directly. Nonetheless, malfunction theory is certainly available.[16] A new PAM can that

vents its flammable contents due to a nearby heat source is an incident of the "kind that

ordinarily does not occur in the absence of a product defect." *White*, 313 Conn. at 624; *see also*

*Izzarelli*, 321 Conn. at 230-31 (explaining malfunction-theory liability reasoning as, for example,

"predicated on the notion that, in the absence of other possible causes, televisions do not

ordinarily catch fire during normal use in the absence of some product defect").

Rule 8 requires no more than a "short and plain" statement of the plaintiffs' claim. The

Complaint alleges malfunction theory, despite Conagra's claims otherwise. DN 168-2, Def.

Mem. at 25 (arguing malfunction theory is not available because it is not sufficiently alleged).

---

[16] *See Izzarelli v. R.J. Reynolds Tobacco Co.*, 321 Conn. 172, 194 n.12 (2016) (indicating
malfunction theory "does not fall squarely within either the ordinary or modified consumer
expectation test, but to some extent overlaps with both tests").

Plaintiffs allege that a recently purchased PAM can was sitting on the countertop "to the right of the stove" while they were cooking on the stovetop. DN 1, Compl. ¶¶ III.1-3. That can "over-pressurized and vented, spraying its flaming contents onto the plaintiffs and igniting a fire…." *Id.* ¶ III.13. The PAM spray involved in this fire was defective "as designed, manufactured and/or sold" "in that it over-pressurized and vented flammable contents, creating a risk of fire and burn injury to persons using it." *Id.* ¶ III.21.

To the extent Connecticut pleading rules would require a more detailed statement, they do not apply here. Malfunction theory, like res ipsa, "is not a substantive rule of law, but, rather, is a *procedural* convenience or device where the situation presented makes it applicable. In other words, it is merely a form of circumstantial evidence that allows a trier to infer negligence from a set of proven facts." *Higgins v. Consol. Rail Corp.*, 638 F. Supp. 254, 257 (D. Conn. 1986); *White v. Mazda Motor of Am., Inc.*, 313 Conn. 610, 625–26 (2014) ("The malfunction theory is not an independent tort but an evidentiary principle that alters the plaintiff's ordinary burden of proof in a product liability action."); *Fassbinder v. Pennsylvania R. Co.*, 322 F.2d 859, 863 (3d Cir. 1963) (res ipsa loquitur "is simply a rule of evidence and like any other rule of evidence it is brought into play where the situation presented makes it applicable. It does not have to be pleaded in the complaint or 'noticed' by specific designation to the adverse party at pre-trial or at trial, since it is neither a cause of action nor a ground for recovery, nor an 'issue.'"); *Hawkins v. Laboratories*, 2015 WL 12683962, at *3 n.2 (D. Ariz. Aug. 20, 2015) (rejecting an argument that res ipsa was not available because it was not specifically pleaded, reasoning that Rule 8 does not require such a specific statement, and that under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), federal courts follows federal procedural law, including federal pleading requirements); *but see Philadelphia Indem. Ins. Co. v. Lennox Indus., Inc.,* 2019 WL 1258918, at *5 (D. Conn.

Mar. 19, 2010) (Haight, J.) (following Connecticut pleading standard with regard to malfunction theory, not citing *Erie*).

 Conagra also asserts the malfunction theory is not available where the defective product is available. DN 168-2, Def. Mem. at 26.[17] That the can still exists in some form does not assist the plaintiffs in proving the exact point of weakness in it, such that the malfunction theory becomes unavailable. The metal bottom of the PAM can altered when the can buckled, such that the metal thickness and tensile strength that existed pre-fire cannot be known. SOF ¶ 43. The cans that vented are effectively unavailable for meaningful inspection. *See id.* Lastly, this requirement is not adopted in Connecticut. *See Metro. Prop. & Cas. Ins. Co. v. Deere & Co.*, 302 Conn. 123, 132 n.4 (2011) ("Whether a plaintiff in this state may use the malfunction theory when the product is still available for inspection but the plaintiff nevertheless is unable to produce direct evidence of a specific defect is a question that we need not resolve in this appeal.")

 Conagra then reprises its argument concerning the insufficiency of the evidence of how the fire started. DN 168-2, Def. Mem. at 26 ("there exists a myriad of potential causes for kitchen fires in general"). As noted in Part III.D. above, the plaintiffs' testimony, the Fire Marshal's Report, Mr. Cahanin's testimony, and Conagra's own customer complaints dispose of this argument.[18]

---

[17] Conagra apparently forgets that it made a conflicting argument four pages earlier, when it asserted that "Plaintiffs do not know which can … started the fire." *Id.* at 22.

[18] Conagra claims that "Plaintiffs agree that the 'other' vented PAM container found at the scene, i.e. the container *not* arbitrarily designated by Plaintiffs' counsel to be the can that caused the fire, vented for reasons other than manufacturing defect." DN 168-2, Def. Mem. at 27. This wildly inaccurate statement is not supported by any citation to the record. Plaintiffs do *not* agree that the other vented PAM can did not vent due to defect.

### G.     THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE PRODUCT WAS DEFECTIVE IN DESIGN

Conagra contends that plaintiffs cannot establish that "the existing design, when used as intended … is unreasonably dangerous." DN 168-2, Def. Mem. at 27. Plaintiffs refer the Court to Part III.B. above, in which plaintiffs describe the evidence of design defect.

Conagra, again framing the evidence through the smallest possible lens, argues that because Dr. Hendrickson established through simulations that the can to the right of the stove likely did not reach 180 psig, "[p]laintiffs admit that, had the subject PAM product been made according to its specifications, it would have 'safely retained' its contents." DN 168-2, Def. Mem. at 28. This is not an admission; it is one incompletely rendered aspect of Dr. Hendrickson's testimony. His full opinion is that the new, vented design is defective in multiple respects. SOF ¶¶ 87-90. The vents "are defects in the can." SOF ¶ 87 (quoting Ex. F, Hendrickson Dep. at 42-43). In addition, Conagra's failure to incorporate a "factor of safety" into the vented design means that new design fails to account for well-known variances in metal thickness and yield strength that commonly occur during the manufacturing process. SOF ¶ 88. The result is that some cans will fail below even the low tolerances set by Conagra for the vented cans. *Id.* The can that caused the Meyer fire likely was compromised in thickness or strength, resulting in below-180 psig venting. SOF ¶¶ 36, 88.  In contrast to the new-design can, the old-design can, which was designed to withstand at least 270 psig, would not have vented under these circumstances. SOF ¶ 89. An additional defect is the use of the A-70 propellant, which causes flash-fire fireballs when it vents. SOF ¶ 90. A reasonable alternate propellant would be *non-flammable* nitrous oxide, which, if vented would result in a "harmless liquid and vapor com[ing] out…." *Id.* (quoting Ex. F, Hendrickson Dep. at 210).

Conagra goes on to argue that "Plaintiffs have no ordinary or foreseeable risk to evaluate." DN 168-2, at Def. Mem. 28. The risk is flash-fire fireball. And Conagra's own files document that such fireballs occur during ordinary and foreseeable use of new-design cans. *See* SOF ¶ 64 (discussing customer complaints). It also argues that "a prediction that one in a million cans" may suffer from "a manufacturing defect" does not make a viable design defect claim. DN 168-2, at Def. Mem. 29. It is for the jury, not Conagra, to weigh whether the can design is unreasonably dangerous. *See generally Wegryn v. Smith & Nephew, Inc.*, 2011 WL 590759 (Conn. Super. Jan. 24, 2011) (manufacturer not entitled to summary judgment even though it showed that over 100,000 similar medical devices were safely implanted in other individuals with very few unsuccessful devices, as the question of whether a product is unreasonably dangerous is a question of fact).

In short, summary judgment cannot be granted because the record raises genuine issues as to design defect and manufacturing defect.

## H.    CONAGRA FAILED TO GIVE CRITICAL WARNINGS

The U.S. PAM Original labeling fails to warn that it is extremely flammable, fails to warn that it can explode when stored, and gives fewer hazard warnings than its Canadian label. William Kitzes will testify that Conagra failed to act as a reasonably prudent manufacturer to protect consumers by its failure to warn them of the inherent risks Conagra created by placing extremely flammable propellants and cooking oil into a vented canister designed and manufactured to release those ingredients at low temperatures. SOF ¶¶ 93, 94, 96. Its failure to warn put the plaintiffs in danger. If Emma Schmidt had seen "DANGER" and "Extremely flammable" warnings, she would not have bought the product. SOF ¶¶ 44-45.  As plaintiff Hallie Meyer stated in her deposition, only now does she understand that PAM Original contains flammable liquid and should not be used near

26

a stove top or even in a kitchen. *Id.* In addition, had Conagra complied with product safety regulations requiring them to report multiple consumer complaints of fires and burns prior to the subject incident, the plaintiffs' injuries most likely would never have occurred because the CPSC investigation would have required that some corrective action be taken with regard to this defective product.  SOF ¶ 95.

Conagra correctly cites *LaMontagne v. E.I. Du Pont de Nemours & Co, Inc.,* 41 F.3d 846, 859 (2nd Cir. 1994), for the general proposition that the seller's duty to warn encompasses only those dangers of which it knows or should know. Conagra knew or should have known of the risk that vented design cans would release the extremely flammable A70 propellant when the can was *stored* – not even used, just stored – near a heat source. *See* SOF ¶¶ 61-64. Conagra executive Baker said he would not keep a PAM can "near that stove be [sic] around any area of the stove or a heat source," SOF ¶ 65 (quoting Ex. B, Baker Dep. at 103),  testimony that cannot be reconciled with the argument the vented cans exploding while stored could only result from an unforeseeable manufacturing defect. Finally, the consumer complaints in Conagra's files show Conagra *actually knew* of the risk that a vented can would fail simply when stored over a grill or on a counter, and of the catastrophic consequences that would follow. SOF ¶ 64.

Conagra attacks only two aspects of plaintiffs' failure to warn proof. It asserts first that there is no duty to warn of a manufacturing defect "[u]nique to the [s]ubject [c]an" and then relies on its claim that plaintiffs assert only a manufacturing defect. DN 168-2, Def. Mem. at 30-31. As already explained quite extensively, the record establishes design and manufacturing defect. And *Conagra has known this since 2012*. In response to consumer complaints documenting fireballs resulting from storage of vented cans in the kitchen, Conagra concludes: "appears to have performed *as*

*designed.*" *Id.* (emphasis supplied). In short, the Subject Can's defect was far from "unique," and Conagra knew it.

Furthermore, plaintiffs do not claim Conagra should have stated in its PAM Original warning: "Dangerous if defectively manufactured." Plaintiffs claim that Conagra should have labelled U.S. PAM Original in vented cans "EXTREMELY FLAMMABLE," and "DANGER," which is true for *every* vented PAM Original can and is how the label already reads in Canada. *See* SOF ¶¶ 94, 98.

Conagra then challenges causation, asserting that plaintiffs would have acted no differently if the warnings had been appropriate. DN 168-2, Def. Mem. at 31-32. Again, Hallie thinks she read the PAM Original label, but only now – after the fire – does she understand that PAM Original contains flammable liquid and should not be used near a stove top or even in a kitchen. SOF ¶ 45. In addition, had Conagra complied with product safety regulations requiring them to report multiple consumer complaints of fires and burns prior to the subject incident, the plaintiffs' injuries most likely would never have occurred because the CPSC investigation would have required that some corrective action be taken with regard to this defective product. SOF ¶ 95.

Conagra sneaks in one final shot at plaintiffs' warnings claims, asserting that the existing label warns the PAM can should be "kept … away from a heat source such that it would not overheat, or vent." DN 168-2, Def. Mem. at 32.  The warning to which Conagra refers is presumably "CAN MAY BURST IF LEFT ON STOVE NEAR HEAT SOURCE." SOF ¶ 4. Conagra should have known this warning was insufficient, given the customer complaints it received. And this warning does not convey the real danger – not just a "burst" of the can, but a 1000 degree fireball.  The plaintiffs specifically testified that the can was on a countertop in their kitchen, not on a stove, so this warning did not apply to them in any case.  Moreover, this

argument, insinuating that the plaintiffs violated the warning by placing the can on the stove and are not being truthful, underlines the ultimate issue in dispute in this case regarding the plaintiffs' credibility; quintessentially a jury question.

In short, there is a genuine issue of material fact as to whether Conagra's failure to warn appropriately of the dangers posed by PAM Original in a vented can caused plaintiffs' injuries, and summary judgment must therefore be denied.

## I.   CONAGRA FAILED TO COMPLY WITH DOT REGULATIONS, AND ITS NONCOMPLIANCE IS RELEVANT

Conagra asserts that plaintiffs do not prove "the Subject Can failed to comply with the DOT regulations," and that the "DOT regulations are irrelevant and not tied to the CPLA claims." DN 168-2, Def. Mem. at 33.

Congress passed the Hazardous Materials Transportation Uniform Safety Act of 1990 in recognition that "accidents involving the release of hazardous materials are a serious threat to public health and safety." P.L. 101-615, Sec. 2(2). This Act significantly amended the myriad existing laws under different agencies pertaining to hazardous materials. In 1994, Congress further amended the existing regulatory scheme to clarify and streamline existing laws dealing with transportation of hazardous material. Section 5103 of the 1994 Act gave the Secretary of Transportation authority to designate "flammable or combustible liquid" as hazardous "when the Secretary decides that transporting the material in commerce in a particular amount or form may pose an unreasonable risk to health and safety or property." This section further provides:

> (b) Regulations for Safe Transportation. (1) The Secretary shall prescribe regulations for the safe transportation of hazardous material in intrastate, interstate, and foreign commerce.  The regulations –
>
>> (A) *apply to a person* –
>>
>>> (i)      transporting hazardous material in commerce;

        (ii)     *causing hazardous material to be transported in commerce*; or

        (iii)    manufacturing, fabricating, marking, maintaining, reconditioning, repairing, or testing a package or container that is represented, marked, certified, or sold by that person as qualified for use in transporting hazardous material in commerce; and

    (B) shall govern safety aspects of the transportation of hazardous material the Secretary considers appropriate.

The Department of Transportation is the government agency charged with regulating flammable and combustible liquids placed in the stream of commerce. One of the regulations the Secretary has chosen to promulgate under this authority is 173.306, entitled "Limited quantities of compressed gases." Subsection (a)(3)(ii) applies to the PAM canister at issue in this case. This subsection states:

> Pressure inside the container may not exceed 180 psig at 54.4°C (130°F) except as may be authorized by variations of a DOT specification container type. In any event, the metal container must be capable of withstanding without bursting a pressure of at least one and one-half times the equilibrium pressure of the contents at 54.4°C (130°F).

As an entity that "causes" hazardous material to be transported in commerce, Conagra must adhere to this regulation. Conagra recognizes this, because this is the vented can's design specification. Steven Baker, Conagra's Director of Packaging, testified that the vented can was designed to meet the Department of Transportation 2Q canister requirement that the can must withstand 180 psig before it buckles. SOF ¶ 99. It is undisputed that the can at issue in this case is a "2Q" can, and this designation is printed on the can label, as required by this regulation.[19]

---

[19] This regulation generally defines four types of metal aerosol containers required to be used for various products in the United States. The "2Q" designation is that required for some of the most dangerous products, such as those containing extremely flammable propellants like butane and propane. *See generally* 49 C.F.R. § 171, 172, 173, 178, *et seq*.

Rather than specifying exactly how metal aerosol containers must be designed, the regulation sets forth minimum standards for the internal pressures that each type of can must be able to withstand without deforming or releasing its contents. The regulation applicable to the 2Q can at issue here is in 49 C.F.R. § 173.306 (a)(3)(ii), *supra*.

Conagra takes the dubious position that a venting event in a vented can is not a "burst." As Drs. Hendrickson and Eagar explain, SOF ¶ 2; and Conagra's own customers have told it, SOF ¶ __; a venting event is a burst for all practical purposes. In accordance with the language in this regulation, the common interpretation of the minimum standards for a 2Q can within the canning industry is that a can may not "buckle" or deform until it reaches a minimum internal pressure of 180 psig and may not "burst" or release its contents until it reaches a minimum internal pressure of 270 psig (1.5 times 180). Def. Ex. 1, Hendrickson Am. Report at 5; Ex. C, Kuehn Dep. at 91-92; Ex. M, Shipley Dep. at 51-52; Ex. B, Baker Dep. at 78-79. Both Conagra and its can manufacturer (which owns the design patent on the vented cans), DS Containers, Inc., recognize that the minimum internal pressure at which a 2Q may burst, under this regulation, is 270 psig – they quibble over the definition of the word "burst," which is not defined in the regulation. SOF ¶ 99. Thus, by admittedly designing the can to burst at 180 psig rather than 270 psig, Conagra patently violates the regulation and their own standard, purposefully misinterpreting the regulation as it pertains to cans with vents. Far from being irrelevant, Conagra's violation of this consumer safety standard,[20] which it admits is applicable to the can at issue here, is evidence of a defect and its ludicrous interpretation is evidence of Conagra's utter disregard for consumer safety.

---

[20] A violation of the federal regulation is also accompanied by a violation of the state statute adopting the regulation, Conn. Gen. Stat. § 14-163g, which plaintiffs will also prove at trial.

Lastly, Conagra has already admitted the relevance of this regulation, by claiming compliance as an affirmative defense. *See* DN10, Answer at 5. In addition, compliance with safety regulations is relevant to establish consumer expectations, *Bifolck v. Philip Morris, Inc*., 324 Conn. 402, 433 (2016), and applicable industry standards.  *See, e.g.*, *Cappellini v. McCabe Powers Body Co.*, 713 F.2d 1, 4-5 (2d. Cir. 1983). Conagra cites *Byrne v. Liquid Asphalt Sys. Inc*., 238 F. Supp. 2d 491, 492-493 (E.D. N.Y. 2002), for the proposition that DOT regulations are irrelevant. *Byrne* holds that OSHA regulations that applied to employers and did not relate to the safety of products did not assist the trier of fact because the OSHA standards were not intended to impose duties upon manufacturers and have no application against manufacturers of products.  *Id.* at 492.  But here the can is designed specifically to comply with this regulation and fails to do so.

## IV.    CONCLUSION

For all the foregoing reasons, defendant's Motion for Summary Judgment should be denied.

THE PLAINTIFFS,

By_____/s/ ct26662_____
        J. Craig Smith
        Koskoff Koskoff & Bieder, P.C.
        350 Fairfield Avenue
        Bridgeport, CT 06604
        Tel.:  (203) 336-4421
        Fax:  (203) 368-3244
        csmith@koskoff.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the above date a copy of the foregoing was sent electronically and served by mail to all pro se parties and counsel of record as stated below:

Mary Young, Esq.
Blackwell Burke P.A.
431 South Seventh Street, #2500
Minneapolis, MN 55415
P: 612-343-3263
F: 612-343-3205
myoung@blackwellburke.com

Todd Raymond Michaelis, Esq.
Carmody Torrance Sandak & Hennessey, LLP
195 Church Street, 18th Floor
PO Box 1950
New Haven, CT 06510-1950
P: 203-578-4287
F: 203-575-2600
tmichaelis@carmodylaw.com

Mark E. Opalisky, Esq.
Cozen & O'Connor
1900 Market Street, 3rd Floor
Philadelphia, PA 19103-3527
P: 215-665-2729
F: 215-701-2429
mopalisky@cozen.com

Emily A. Ambrose
Blackwell Burke P.A.
431 South Seventh Street, #2500
Minneapolis, MN 55415
P: 612-343-3263
F: 612-343-3205
eambrose@blackwellburke.com

Peter J. Flowers
Frank V. Cesarone
Meyers & Flowers
3 North Second Street, #400
St Charles, IL  60174
P: 630-797-3340
F: 630-845-8982
pjf@meyers-flowers.com
fvc@meyers-flowers.com

  /s/ ct2666
J. Craig Smith